# EXHIBIT "9"

AUTO-OWNERS INSURANCE COMPANY
AUTO-OWNERS LIFE INSURANCE COMPANY
HOME-OWNERS INSURANCE COMPANY
OWNERS INSURANCE COMPANY
PROPERTY-OWNERS INSURANCE COMPANY
SOUTHERN-OWNERS INSURANCE COMPANY

Auto-Owners Insurance
Life Home Car Business
The "No Problem" People®

P O Box 244017 (CLAIMS)
Montgomery, Alabama 36124
PHONE (334) 279-0323
FAX (334) 271-0481

November 1, 2004

Sunshine Camping Center Inc
P O. Box 294
Daleville, AL 36322

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

RE: Insured: Sunshine Camping Center
Claim No: 37-10025-04
Plaintiff: Union Planters Bank, N A
Policy No: 034617-38009361-04 & 43-377-578-00

Dear Mr Borland:

Auto-Owners Insurance has received your request for defense and indemnification of the complaint Union Planters Bank, N A. V Sunshine Camping Center, Inc., et al in the Circuit Court of Dale County

The facts as we understand them are that one of your employees fraudulently obtained several loans from Union Planters Bank, N A

Auto-Owners is, at this time providing a defense to this complaint under a complete reservation of rights since some or all of the allegations in the complaint do not appear to be covered under your policy of insurance This means Auto-Owners Insurance Company has determined it will reserve all rights under the above referenced policy regarding its duty to defend and/or indemnify you This further means that the defense that is being provided to you at this time is not an admission of either a continuing duty to defend or a duty to indemnify you for the claims made against you in the above referenced lawsuit and that Auto-Owners Insurance fully reserves its right to later withdraw the defense that is being provided and to decline to pay any judgment or settlement

*Auto-Owners Insurance*

**YOU ARE THEREFORE ADVISED TO CONSULT WITH YOUR PERSONAL ATTORNEY TO PROTECT YOUR INTEREST IN THIS MATTER.**

Count I of this complaint alleges Breach of Contract.

Count II of this complaint alleges Negligence

Count III of this complaint alleges Wantonness

Count IV of this complaint alleges Fraud

Count V of this complaint alleges Conversion.

Count VI of this complaint alleges Civil Felony

Count VII of this complaint alleges Conspiracy

Count VIII of this complaint alleges Wrongful Hiring, Training, And/Or Supervision.

Count IX of this complaint alleges Wrongful Entrustment

Under your policy the following is contained:

SECTION I - INSURING AGREEMENTS

A. BODILY INJURY LIABILITY To pay on behalf

B. PROPERTY DAMAGE LIABILITY of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed under any contract as defined herein, for damages because of

A. bodily injury, sickness or disease including death at any time resulting therefrom, or

B. injury to or destruction of tangible property, including the loss of use thereof,

neither expected nor intended from the standpoint of the insured and arising out

of the hazards defined in Section II of this coverage form

*Auto-Owners Insurance*

Page 3

Under your policy endorsement # 55069 reads:

CONTRACTUAL COVERAGE AMENDATORY ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE COMMERCIAL GENERAL LIABILITY COVERAGE FORM.

It is agreed:

Under Section I - COVERAGE A, Item 2 Exclusions:

Exclusion b. is deleted and replaced by the following:

b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract" However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract"

(2) That the insured would have in the absence of the contract or agreement

As count I for Breach of Contract there may be no coverage

As to Count II Negligence and Count III Wantonness there is no coverage

As to count IV Fraud, the following is found in your policy under endorsement #59218:

ABSOLUTE EXCLUSION FOR FRAUD, MISREPRESENTATION, DECEIT OR SUPPRESSION OR CONCEALMENT OF FACT

This policy does not apply to any claim arising out of fraud, misrepresentation, deceit, suppression or concealment of fact, whether intentional, innocent, negligent, willful, malicious, reckless or wanton, including, but not limited to an action or lawsuit demanding or seeking damages or recovery based on direct liability, vicarious liability or agency principles

Due to the above, there may be no coverage for Count IV

*Auto-Owners Insurance*

As to Count V Conversion there is no occurrence Due to the lack of an occurrence there is no coverage

As to Count VI Civil Felony there is no occurrence Due to the lack of an occurrence there is no coverage

As to Count VII Conspiracy there is no occurrence Due to the lack of an occurrence there is no coverage

As to Count VIII Wrongful Hiring, Training, And/Or Supervision there may be coverage

As to Count IX Wrongful Entrustment there may be coverage

Auto-Owners has assigned the defense of this lawsuit to Attorney L Merrill Shirley His telephone number is 334-897-5775

As stated previously, we are reserving our rights to disclaim at a later date, any obligation of Auto-Owners Insurance under the policy identified above, and to assert the defense of non coverage under the policy, file a declaratory action, intervene in the lawsuit and withdraw our defense because of the foregoing

If there is any additional information you believe to be relevant to the question of coverage, or if you believe that any of the facts or information stated, upon which Auto-Owners has relied is not accurate, please advise Any lawsuit or amended lawsuit should be made available to Auto-Owners for immediate review

## RESERVATION

Please be advised that this letter does not waive any rights or defenses which Auto-Owners Insurance Company may have regarding this mater under any policy of insurance issued by Auto-Owners Insurance, whether or not such claims or defenses are set forth herein Auto-Owners Insurance reserves the right to supplement this letter upon receipt of further information which may subsequently become available

*Auto-Owners Insurance*

**Page 5**

Thank you for your time and consideration in this matter If you need any further assistance, please give me a call at 1-800-548-9881 ext. 204

Sincerely,

Bill Reaves
Field Claim Representative

BR/bw

cc: Insured by regular mail

AUTO-OWNERS INSURANCE COMPANY
AUTO-OWNERS LIFE INSURANCE COMPANY
HOME-OWNERS INSURANCE COMPANY
OWNERS INSURANCE COMPANY
PROPERTY-OWNERS INSURANCE COMPANY
SOUTHERN-OWNERS INSURANCE COMPANY

Auto-Owners Insurance
Life Home Car Business
The "No Problem People"®

August 29, 2005

P.O. BOX 244017, MONTGOMERY, AL 36124
PHONE: (334) 279-0232 FAX: (334) 271-0481

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Sunshine Camping Center, Inc
c/o Comer Borland
P O Box 294
Daleville, AL 36322

RE: Insured: Sunshine Camping Center, Inc
Claim No.: 37-10025-04
Plaintiff: Union Planters Bank, N A
Policy No : 034617-38009361 & 43-377-578
Subject: **Supplemental Reservation of Rights**

Dear Mr Borland:

As you know, Auto-Owners Insurance Company (Auto-Owners) has received the above-mentioned summons and complaint filed against Sunshine Camping Center, Inc and others in the Circuit Court of Dale County, Alabama, Case No.: CV-04-251 The complaint relates to a Recreational Vehicle Dealer Agreement and assignment of Retail Installment Contract and alleges damages/injury because of breach of contract, negligence, wantonness, fraud, conversion, civil felony, conspiracy, wrongful hiring, training and/or supervision, and wrongful entrustment.

This letter is to be considered as an amendment and supplement to the reservation of rights that was mailed to you on November 1, 2004 The reservations contained in the November 1, 2004 are hereby adopted by reference; however, the contents of this letter should be taken as an addition, amendment and supplement to that reservation of rights letter. A copy of our November 1, 2004, reservation of rights letter is enclosed. This letter explains

in further detail the reasons for the reservation of rights set forth in the November 1, 2004, letter to you.

You are again formally placed on notice that any activity on our part by way of investigation and/or settlement which we may undertake or any defense, which we may undertake on your behalf arising out of any legal action or actions instituted against you, does not constitute a waiver of any of our rights. We are reserving our rights to disclaim at a later date any obligation of Auto-Owners Insurance Company under the policy identified above and to assert the defense of non-coverage under the policy, to file a declaratory judgment action, intervene in the lawsuit and/or to deny coverage and withdraw the defense by reason of the following:

I The Tailored Protection Policy (TPP) issued by Auto-Owners contains a Commercial General Liability (CGL) coverage (form CG 00011188). The CGL coverage of Auto-Owners policy also contains a coverage for bodily injury and property damage liability. Section 1, Coverage A of the CGL coverage only provides coverage for bodily injury and property damage as follows:

**SECTION I - COVERAGES**
**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement.**

a We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies We will have the right and duty to defend any 'suit' seeking those damages We may at our discretion investigate any 'occurrence' and settle any claim or 'suit' that may result But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payments of judgments or settlements under

Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

b This insurance applies to 'bodily injury' and 'property damage' only if:

(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and

(2) The 'bodily injury' or 'property damage' occurs during the policy period

c Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury'

Section I, Coverage A of the CGL coverage (Bodily Injury and Property Damage Liability) provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which the insurance applies which are caused by an occurrence and which occur within the policy period. The complaint appears to contain claims for damages that are not because of "bodily injury" or "property damage" as those terms are defined in the policy. The complaint does not allege "bodily injury", and damages to intangible property or damages for pure economic loss or of a contractual nature which are not damages because of "bodily injury" or "property damage" as defined by the policy are not covered under Section I, Coverage A of the CGL coverage. Claims alleged for damages because of "bodily injury" or "property damage" which do not result from an "occurrence" ("an accident, including continuous or repeated exposure to substantially the same general harmful conditions") are not covered under Section I, Coverage A of the CGL coverage. "Bodily injury" and "property damage" are defined in the Commercial General Liability Coverage Form of the policy as follows:

**SECTION V - DEFINITIONS**

* * *

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any one time.

* * *

12 "Property damage" means:

a Physical injury to tangible property, including all resulting loss of use of that property All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b Loss of use of tangible property that is not physically injured All such loss shall be deemed to occur at the time of the "occurrence" that caused it

II The complaint alleges claims and damages that were not caused by an occurrence. Damages because of bodily injury or property damage that are not caused by an occurrence are not covered by CGL coverage contained in the policy. An occurrence is defined in the policy as follows:

9 "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions

III The CGL coverage contained in the Auto-Owners Tailored Protection Policy contains an Absolute Exclusion for Fraud, Misrepresentation, Deceit, Suppression or Concealment of Fact [Form 59218 (1-91)] The policy specifically excludes coverage for any type of fraud or suppression or misrepresentation, whether such fraud was intentional, reckless, wanton or unintentional. That exclusion applies to the CGL coverage as well as to the Garage Liability (GL) coverage. The exclusionary endorsement contained in the policy would exclude coverage for all claims asserted in the complaint in CV-04-251 based upon any type fraud, misrepresentation, deceit, concealment

or suppression of fact, whether such fraud was intentional, reckless, wanton, or unintentional.

IV Section I, Coverage A of the CGL coverage contains an exclusion to coverage for bodily injury or property damage expected or intended from the standpoint of the insured. Exclusion 2 a. under Section I, Coverage A of the CGL coverage reads as follows:

2 Exclusions

This insurance does not apply to:

a "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Some or all of the allegations of the complaint allege claims for damages that were expected or intended from the standpoint of the insured and those claims would not be covered.

V Section I, Coverage A of the Commercial General Liability Coverage Form, amended by the contractual Coverage Amendatory Endorsement [Endorsement 55069(1-88)], also contains Exclusion 2 b. which may apply to claims being made in the complaint. This exclusion as amended by Endorsement 55069 reads as follows:

* * *

2.b. This insurance does not apply to "bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract." However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract."

(2) That the insured would have in the absence of the contract or agreement.

All other terms and conditions of the policy apply.

The Commercial General Liability Coverage of the Auto-Owners policy does not provide liability coverage for bodily injury or property damage because of liability assumed in a contract unless the contract meets the definition of an "insured contract." A mere breach of contract is not an "occurrence" as defined in the Auto-Owners policy, and any claims for "bodily injury" or "property damage" that are not caused by an "occurrence" would not be covered The Auto-Owners insurance policy does not provide coverage for pure economic loss, including but not limited to any loss resulting from a breach of contract

VI. Section I, Coverage B of the CGL coverage also provides coverage for "personal injury" or "advertising injury"; however, none of the claims contained in the complaint appear to allege damages for "personal injury" or "advertising injury" as those terms are defined in the policy. "Advertising injury" and "personal injury" are defined in the Commercial General Liability Coverage Form of the policy as follows:

**SECTION V - DEFINITIONS**

1 "Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

* * *

10. "Personal injury" means, other than "bodily injury," arising out of one or more of the following offenses:

a False arrest, detention or imprisonment;

b Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e Oral or written publication of material that violates a person's right of privacy

VII. The Tailored Protection Policy (TPP) issued by Auto-Owners Insurance Company also contains a Garage Liability (GL) coverage. You should be aware that Section I of the GL coverage only provides coverage for bodily injury and property damage as follows:

**SECTION I - INSURING AGREEMENTS**

**A. BODILY INJURY LIABILITY.** To pay on behalf
**B. PROPERTY DAMAGE LIABILITY** of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed under any contract as defined herein, for damages because of

A. bodily injury, sickness or disease including death at any time resulting therefrom, or

B injury to or destruction of tangible property, including the loss of use thereof,

> neither expected nor intended from the standpoint of the insured and arising out of the hazards defined in Section II of this coverage form. [19652 (1-88)].

* * *

This endorsement agrees to pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed under any contract as defined herein, for damages because of bodily injury or property damage, neither expected nor intended from the standpoint of the insured and arising out of the hazards defined in Section II of this coverage form As stated above with regard to the CGL coverage, the complaint appears to allege claims for damages that would not be damages because of bodily injury or property damage The complaint does not allege "bodily injury" and the property damage liability coverage in the GL coverage is limited to damages because of injury to or destruction of tangible property, including the loss of use thereof neither expected nor intended from the standpoint of the insured The complaint contains claims for intentional fraudulent conduct or intentional wrongful conduct which would be excluded under the insuring agreement which limits coverage to those damages neither expected nor intended from the standpoint of the insured Furthermore, the allegations do not appear to arise from a garage hazard as defined in the policy

VIII. As stated above, both the CGL coverage and GL coverage contained in the Auto-Owners Tailored Protection Policy contain an Absolute Exclusion for Fraud, Misrepresentation, Deceit, Suppression or Concealment of Fact [Form 59218 (1-91)] The policy specifically excludes coverage for any type of fraud or suppression or misrepresentation, whether such fraud was intentional, reckless, wanton or unintentional That exclusion applies to the CGL coverage as well as to the GL coverage The exclusionary endorsement contained in the policy would exclude coverage for all claims asserted in the complaint in CV-04-251 based upon any type fraud, misrepresentation, deceit, concealment or suppression of fact, whether such fraud was intentional, reckless, wanton, or unintentional.

IX As stated above, the Commercial General Liability Coverage and the Garage Liability Coverage of the Auto-Owners policy do not provide liability coverage for damages because of liability assumed in a contract unless the contract is defined as an "insured contract". Further, Auto-Owners' policy does not

provide coverage for pure economic loss occurring from a breach of contract and a breach of contract does not constitute an occurrence as defined in the CGL coverage The Commercial General liability Coverage contains a contractual liability exclusion [exclusion 2.b., Contractual Coverage Amendatory Endorsement 55069 (1-88)]. The Garage Liability Coverage Amendatory Endorsement also contains a contractual liability exclusion [form 19634, 2.c 1.] which reads as follows:

> 2 Under SECTION I - INSURING AGREEMENTS: A BODILY INJURY LIABILITY and B PROPERTY DAMAGE LIABILITY:
>
> * * *
>
> c The following exclusions are added:
>
> (1) Liability coverage does not apply to any liability assumed under any contract or agreement. However, this exclusion does not apply to liability for damages:
>
> (a) assumed under a contract or agreement that is defined as an insured contract; or
>
> (b) that the insured would have even in the absence of a contract or agreement.
>
> (2) Liability coverage does not apply to bodily injury or property damage caused by war, whether declared or undeclared, or insurrection or any of their consequences. This exclusion applies only when such liability is assumed under a contract or agreement.
>
> (3) Liability coverage does not apply to any obligation on the part of the insured to indemnify another for those damages resulting from bodily injury to an insured's employee. However, this exclusion does not apply when such liability is assumed by an insured under an insured contract.

All other terms and conditions of the policy apply.

**You should also be aware that the complaint does not seek a specific sum of damages and that the possibility exists for a judgment in excess of your policy limits.**

For the foregoing reasons, Auto-Owners reserves the right to deny payment of any and all judgments, settlements, damages or claims resulting from the lawsuit. Auto-Owners further reserves the right, as facts and claims develop in the lawsuit, to subsequently withdraw the defense it is now providing to the lawsuit. Auto-Owners reserves the right not to pay any judgment or settlement that is rendered or reached in the lawsuit should it determine that no coverage exists for any reason. Auto-Owners reserves the right to decline to settle the lawsuit on your behalf if Auto-Owners determines that coverage does not exist for the claims and damages as set forth in the complaint. By setting forth specific reasons and policy provisions for its defenses to coverage, Auto-Owners does not waive any other policy provisions, exclusions, conditions, limitations or different reasons for denial of coverage which may exist. Auto-Owners expressly reaffirms and ratifies all terms, conditions, limitations and exclusions contained in any applicable insurance policy. Auto-Owners does not waive any rights it may have under any applicable insurance policy by undertaking the investigation, adjustment and defense of this case

You are aware that the defense of this lawsuit has been assigned by Auto-Owners to attorney Merrill Shirley, P O Box 408, Elba, AL 36323 His telephone number is (334) 897-5775 Mr Shirley will continue to be in touch with you to discuss this matter with you Because there are claims and damages contained in the complaint for which there may not be coverage, you may want to retain your personal attorney, at your own expense to protect your interests. If you retain your personal attorney, Mr Shirley will cooperate with your personal attorney to the fullest extent. Since Auto-Owners has issued a reservation of rights in this case, you are the sole client of Mr Shirley and you should consult with him at all times concerning decisions to be made in the defense of this case Mr Shirley is aware that you are his sole client regarding this lawsuit and of his enhanced duties to you regarding the defense of this lawsuit Counsel retained to defend this case will continue to communicate with you and provide you with evaluations regarding liability Counsel retained to defend you should keep you fully informed of all material developments and progress in the lawsuit Auto-Owners also recommends that you maintain periodic contact with defense counsel so that you stay informed regarding evaluations of liability and developments in the lawsuit. If at any time you have questions regarding the status of the lawsuit or developments relevant to coverage, or if you believe you are not being kept fully informed with regard to these matters, you should contact us immediately. Also, if you believe you are in possession of further information or material relevant to the question of coverage or the subject claims or damages please advise us immediately so that we may conduct a thorough investigation of such

matters.

Because some or all of the claims and/or damages claimed in the complaint in this action may not be covered, special interrogatories or special verdict forms may need to be submitted to the jury in the above-referenced action so that a coverage determination can be made in the event a verdict is returned in favor of the Plaintiffs and against Sunshine Camping Center, Inc. If special interrogatories or verdict forms are not submitted to the jury it may be impossible for Auto-Owners or you to make a determination of insurance coverage from a general verdict. AUTO-OWNERS, THEREFORE, FORMALLY ADVISES YOU THAT IF YOU DO NOT REQUEST AND PURSUE SPECIAL VERDICT FORMS AND INTERROGATORIES BEING SUBMITTED TO THE JURY, AUTO-OWNERS RESERVES ITS RIGHT TO ASSERT AS A DEFENSE TO COVERAGE AND AS A REASON FOR DENIAL OF COVERAGE THAT A GENERAL VERDICT RELEASES AND/OR DISCHARGES AUTO-OWNERS FROM ANY CLAIMS OR DAMAGES THAT MAY HAVE BEEN COVERED UNDER THE POLICY DUE TO THE FACT IT MAY BE IMPOSSIBLE TO DETERMINE FROM A GENERAL VERDICT WHETHER THE VERDICT WAS RETURNED ON A COVERED CLAIM OR ON A CLAIM THAT WAS NOT COVERED BY YOUR INSURANCE POLICY

The decision to pursue and request special interrogatories and verdict forms is your decision. Counsel assigned to defend this lawsuit under reservation of rights, Mr. Merrill Shirley, will not be requested by Auto-Owners to pursue or request special interrogatories and verdict forms because that decision is yours to make YOU SHOULD CONSULT WITH YOUR OWN PERSONAL ATTORNEY REGARDING YOUR DECISION TO PURSUE OR REQUEST SPECIAL INTERROGATORIES AND VERDICT FORMS TO ASSIST YOU IN MAKING AN INFORMED DECISION AND TO PROTECT YOUR INTERESTS IN THIS MATTER.

As stated above, Mr. Shirley is fully aware that you are his sole client and he will follow your and your personal attorney's instructions and directions concerning the type verdict forms to be utilized at trial You and your personal attorney should make Mr Shirley aware of your decision and directives concerning the verdict forms. We request that you and your personal attorney review the enclosed Alabama appellate court opinions in AHAT v. MASA, 538 So 2d 1209 (Ala. 1989) and Knutilla v. Auto-Owners Ins. Co., 578 So. 2d 1359 (Ala. Civ. App 1991) concerning the need for special interrogatories. See also, State Farm Fire and Casualty Co. v. Shady Grove Baptist Church, 838 So. 2d 1039 (Ala. 2002). Should you or your personal attorney decide that special interrogatories and special verdict forms should be utilized at the trial of this action so that a determination of coverage may be made, Auto-Owners through its own separate counsel, is willing to assist in drafting special interrogatories and/or special verdict forms If you desire assistance in drafting special

interrogatories and special verdict forms, please contact me or have your personal attorney contact me. You or your personal attorney are requested to advise me at your earliest opportunity if you decide to seek special interrogatories and special verdict forms from which a coverage determination may be made You should also advise me if you desire assistance in drafting the special interrogatories and special verdict forms

You are again advised that Auto-Owners reserves the right to file a declaratory judgment action or to file a motion to intervene in the above referenced lawsuit in order to have a judicial determination of coverage made. Auto-Owners has retained separate counsel to represent its interests and who may file either a declaratory judgment action or a motion to intervene on Auto Owners' behalf

**YOU SHOULD CONSULT WITH YOUR OWN PERSONAL ATTORNEY TO PROTECT YOUR INTERESTS IN THIS MATTER AND FOR THE PURPOSE OF SECURING REPRESENTATION OF YOUR INTERESTS WITH REGARD TO THE COVERAGE ISSUES.**

If you have any new, additional or different information that is contrary to the position of Auto-Owners set forth in this letter, Auto-Owners will be glad to receive and review the information and discuss it with you In addition, please notify me of any additional claims or amended complaints that may be presented so that such amendments may be reviewed for a determination of coverage If you feel that any facts or policy provisions referred to in this letter are incorrect or there are others you would like Auto-Owners to consider, please contact me and I will consider that information

**RESERVATION**

Please be advised that this letter does not waive any rights or defenses which Auto-Owners Insurance Company may have regarding this matter under any policy of insurance issued by Auto-Owners Insurance Company, whether or not such claims or defenses are set forth herein. The portions of the insurance policies that have been referenced are for your convenience only, and Auto-Owners Insurance Company does **not** waive any additional terms, conditions, provisions or exclusions that might be relevant to this claim. Auto-Owners Insurance Company reserves the right to supplement this letter upon the receipt of further information which may subsequently become available. This letter supersedes, supplements and amends any and all previous communications to you from Auto-Owners Insurance Company concerning its defense and/or indemnification duties under any applicable insurance policy.

Yours very truly,

William E. Barrett, Jr., AIC
Branch Claims Manager

enclosures
cc: Insured by regular mail
Merrill Shirley



AUTO-OWNERS INSURANCE COMPANY
AUTO-OWNERS LIFE INSURANCE COMPANY
HOME-OWNERS INSURANCE COMPANY
OWNERS INSURANCE COMPANY
PROPERTY-OWNERS INSURANCE COMPANY
SOUTHERN-OWNERS INSURANCE COMPANY

P.O. Box 244017 (CLAIMS)
Montgomery, Alabama 36124
PHONE (334) 279-0323
FAX (334) 271-0481

November 1, 2004

Sunshine Camping Center Inc
P O Box 294
Daleville, AL 36322

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

RE: Insured: Sunshine Camping Center
Claim No: 37-10025-04
Plaintiff: Union Planters Bank, N.A
Policy No: 034617-38009361-04 & 43-377-578 00

Dear Mr. Borland:

Auto-Owners Insurance has received your request for defense and indemnification of the complaint Union Planters Bank, N A V Sunshine Camping Center, Inc , et al in the Circuit Court of Dale County

The facts as we understand them are that one of your employees fraudulently obtained several loans from Union Planters Bank, N A

Auto-Owners is, at this time providing a defense to this complaint under a complete reservation of rights since some or all of the allegations in the complaint do not appear to be covered under your policy of insurance. This means Auto-Owners Insurance Company has determined it will reserve all rights under the above referenced policy regarding its duty to defend and/or indemnify you. This further means that the defense that is being provided to you at this time is not an admission of either a continuing duty to defend or a duty to indemnify you for the claims made against you in the above referenced lawsuit and that Auto-Owners Insurance fully reserves its right to later withdraw the defense that is being provided and to decline to pay any judgment or settlement

Auto-Owners Insurance

**YOU ARE THEREFORE ADVISED TO CONSULT WITH YOUR PERSONAL ATTORNEY TO PROTECT YOUR INTEREST IN THIS MATTER.**

Count I of this complaint alleges Breach of Contract.

Count II of this complaint alleges Negligence

Count III of this complaint alleges Wantonness.

Count IV of this complaint alleges Fraud

Count V of this complaint alleges Conversion.

Count VI of this complaint alleges Civil Felony

Count VII of this complaint alleges Conspiracy.

Count VIII of this complaint alleges Wrongful Hiring, Training, And/Or Supervision

Count IX of this complaint alleges Wrongful Entrustment

Under your policy the following is contained:

SECTION I - INSURING AGREEMENTS

A BODILY INJURY LIABILITY To pay on behalf

B. PROPERTY DAMAGE LIABILITY. of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed under any contract as defined herein, for damages because of

A. bodily injury, sickness or disease including death at any time resulting therefrom, or

B. injury to or destruction of tangible property, including the loss of use thereof,

neither expected nor intended from the standpoint of the insured and arising out

of the hazards defined in Section II of this coverage form

Auto-Owners Insurance

Page 3

Under your policy endorsement # 55069 reads:

CONTRACTUAL COVERAGE AMENDATORY ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE COMMERCIAL GENERAL LIABILITY COVERAGE FORM.

It is agreed:

Under Section I - COVERAGE A, Item 2 Exclusions:

Exclusion b. is deleted and replaced by the following:

b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract" However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract".

(2) That the insured would have in the absence of the contract or agreement

As count I for Breach of Contract there may be no coverage

As to Count II Negligence and Count III Wantonness there is no coverage.

As to count IV Fraud, the following is found in your policy under endorsement #59218:

ABSOLUTE EXCLUSION FOR FRAUD, MISREPRESENTATION, DECEIT OR SUPPRESSION OR CONCEALMENT OF FACT

This policy does not apply to any claim arising out of fraud, misrepresentation, deceit, suppression or concealment of fact, whether intentional, innocent, negligent, willful, malicious, reckless or wanton, including, but not limited to an action or lawsuit demanding or seeking damages or recovery based on direct liability, vicarious liability or agency principles.

Due to the above, there may be no coverage for Count IV.

*Auto-Owners Insurance*

As to Count V Conversion there is no occurrence Due to the lack of an occurrence there is no coverage

As to Count VI Civil Felony there is no occurrence. Due to the lack of an occurrence there is no coverage.

As to Count VII Conspiracy there is no occurrence Due to the lack of an occurrence there is no coverage

As to Count VIII Wrongful Hiring, Training, And/Or Supervision there may be coverage

As to Count IX Wrongful Entrustment there may be coverage

Auto-Owners has assigned the defense of this lawsuit to Attorney L. Merrill Shirley His telephone number is 334-897-5775.

As stated previously, we are reserving our rights to disclaim at a later date, any obligation of Auto-Owners Insurance under the policy identified above, and to assert the defense of non coverage under the policy, file a declaratory action, intervene in the lawsuit and withdraw our defense because of the foregoing

If there is any additional information you believe to be relevant to the question of coverage, or if you believe that any of the facts or information stated, upon which Auto-Owners has relied is not accurate, please advise Any lawsuit or amended lawsuit should be made available to Auto Owners for immediate review.

<u>RESERVATION</u>

Please be advised that this letter does not waive any rights or defenses which Auto-Owners Insurance Company may have regarding this mater under any policy of insurance issued by Auto-Owners Insurance, whether or not such claims or defenses are set forth herein Auto-Owners Insurance reserves the right to supplement this letter upon receipt of further information which may subsequently become available.

Auto-Owners Insurance

Thank you for your time and consideration in this matter. If you need any further assistance, please give me a call at 1-800-548-9881 ext 204

Sincerely,

Bill Reaves
Field Claim Representative

BR/bw

cc: Insured by regular mail

C
538 So.2d 1209

Supreme Court of Alabama.
ALABAMA HOSPITAL ASSOCIATION TRUST
v.
MUTUAL ASSURANCE SOCIETY OF ALABAMA.
87-835.

Jan. 13, 1989.

In suit arising out of claim against member hospital and anesthesiologists following patient's death, hospital's self-insurance plan moved for partial summary judgment on its claim by way of subrogation or indemnity against mutual insurance company, which moved for summary judgment on all claims. The Circuit Court, Jefferson County, Marvin Cherner, J., granted summary judgment for mutual insurance company. Adopting trial court's opinion as part of its opinion on appeal, the Supreme Court, Shores, J., held: (1) self-insurance plan, as party seeking coverage, was required to establish that hospital was entitled to coverage under "additional interests endorsement" contained in policies issued by mutual insurance company to anesthesiologists, and (2) mutual insurance company was not estopped to deny coverage because it did not undertake to defend hospital in suit, presumably under reservation of rights.

Affirmed.

West Headnotes

[1] **Insurance 217 ⚷2290**
217k2290 Most Cited Cases
(Formerly 217k646)
Self-insurance plan, as the party seeking coverage, was required to establish that hospital was entitled to coverage under "additional interests endorsement" in policies issued by mutual insurance company to anesthesiologists also named as defendants in suit following patient's death.

[2] **Insurance 217 ⚷3111(3)**
217k3111(3) Most Cited Cases
(Formerly 217k397.1)
Failure of insurer to defend claim against insured does not work estoppel on issue of coverage.

[3] **Insurance 217 ⚷3111(3)**
217k3111(3) Most Cited Cases
(Formerly 217k397.1)
Mutual insurance company that issued policies to anesthesiologists was not estopped to deny coverage of hospital under "additional interests endorsement" in those policies because it did not undertake to defend hospital, presumably under reservation of rights, in suit following patient's death.

*1209 Michael K. Wright of Norman, Fitzpatrick, Wood, Wright & Williams, Birmingham, for appellant.
Thomas W. Christian, Thomas A. Carraway, and Karon O. Bowdre of Rives & Peterson, Birmingham, for appellee.

SHORES, Justice.
This is an appeal by Alabama Hospital Association Trust ("AHAT") from a summary judgment in favor of Mutual Assurance Society of Alabama ("MASA"). The facts out of which the controversy between these two litigants arose are set out in the judgment of the trial court, and they are not disputed. The trial court determined that MASA was entitled to judgment as a matter of law. We agree, and we adopt the opinion of the learned trial judge as part of this Court's opinion:

"FINAL JUDGMENT

"This case has been submitted for decision by this Court on the motion for a partial summary judgment filed by Alabama Hospital Association Trust, a self insurance plan (hereinafter "AHAT"), with respect to its claim by way of subrogation or indemnity. This case

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has also been submitted for decision on the motion for summary judgment filed by the defendant, Mutual Assurance Society of Alabama, a mutual insurance company (hereinafter "MASA") with respect to all of the claims asserted by AHAT in this case.

"This case involves a dispute between AHAT and MASA with respect to MASA's obligation to reimburse AHAT in the amount which AHAT paid in satisfaction of a judgment rendered against Lloyd Noland Foundation, Inc. ("Lloyd Noland"), in the *1210 case styled *Albert May v. Lloyd Noland Foundation, Inc.*, et al., Civil Action No. CV 79-0583. In that case, the complaint filed by Albert May made claim for damages against Lloyd Noland and Dr. Janette Habachy and Dr. Han Young Park, alleging that Lloyd Noland undertook to treat and care for Albert May's minor child, Lepo Hatarar May, during the course of an operation; that Dr. Habachy and Dr. Park were practicing anesthesiologists who also undertook to treat and care for Lepo May during the course of an operation; and that the negligence of all three defendants concurred and combined to cause Lepo May's death on August 12, 1978.

"Lloyd Noland had insurance coverage with respect to May's claim as a member of the AHAT self insurance plan with coverage limited as follows:

" 'Regardless of the number of: (a) insureds under this exhibit; (b) persons or organizations who sustain loss; (c) claims made or suits brought on account of loss; the trust's liability for any one member hospital is limited to:

" '$1,000,000 per occurrence

" '$3,000,000 report year aggregate

" 'for loss resulting from any one claim or suit or all claims or suits first made during the fiscal period because of damages insured under any of the above Agreements.'

"The insuring agreement with respect to Lloyd Noland provided in pertinent part as follows:

" 'The trust will pay on behalf of each member all sums which the member shall become legally obligated to pay as damages because of any claim or claims made against the member during the fiscal period because of:

" 'AGREEMENT A-HOSPITAL PROFESSIONAL LIABILITY ARISING OUT OF THE PERFORMANCE OF PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED DURING THE FISCAL PERIOD, BY THE MEMBER OR BY ANY PERSON FOR WHOSE ACTS OR OMISSIONS THE MEMBER IS LEGALLY LIABLE, AND

" 'AGREEMENT B-PERSONAL INJURY LIABILITY ARISING OUT OF AN OCCURRENCE DURING THE FISCAL PERIOD. . .'

"The self insurance trust also defines persons covered in part as follows:

" 'II. PERSONS COVERED

" 'Each of the following is a member under this Trust to the extent set forth below:

" 'A. The member, as named in the Trust Participation Agreement;

" 'B. Any chief executive officer, hospital administrator, hospital supervisor or member of the governing body or stockholder of the member, while acting within the scope of his duties as such;

" ' . . .

" 'E. Under Agreement A, any person included as an employee, student or authorized volunteer worker (except interns, externs, residents, dental, osteopathic or medical doctors) for which coverage is afforded under this Trust, while such person is acting within the scope of his duties as an employee, student, or authorized volunteer worker; provided that the coverage afforded to any such person under this paragraph shall not apply to injury to any employee, student, or authorized volunteer worker of the member arising out of or in the course of his employment by the member, except injury arising out of the rendering of or failure to render professional services to such employee, student or authorized volunteer worker.

" 'F. Under Agreements B and C, any employee, student or authorized volunteer worker (except interns, externs, residents, dental, osteopathic or medical doctors) of the member, while acting within the scope of his duties as such, but the coverage afforded to such employee, student or authorized volunteer worker does not apply:

" '1. To personal injury to (a) another employee, student or authorized volunteer worker of the member arising out of or in the course of his employment, or (b) the member or, if the member is a *1211 partnership or joint-venture, any partner or member thereof. '

"The above quoted provisions indicate that liability coverage was provided to Lloyd Noland itself for all possible liability, whether the same resulted from the conduct of physicians or from the conduct of persons other than physicians. The AHAT insuring agreement also provided coverage for individuals rendering professional services for Lloyd Noland, excluding, however, individuals who were interns, externs, residents, dental, osteopathic or medical doctors.

"The two doctors, Habachy and Park, had liability insurance coverage with respect to May's claim under an insurance policy issued by MASA. This insurance policy had a limit of liability of $1,000,000 for each person and $1,000,000 annual aggregate amount.

"By special endorsement, MASA also provided liability insurance coverage to Lloyd Noland and the Medical Clinic Board of the City of Fairfield for liability resulting to either of those two entities arising out of acts or omissions of Habachy or Park.

"Pursuant to its obligation to Lloyd Noland under the self insurance trust agreement, AHAT employed Robert Parsons as attorney to represent Lloyd Noland and defend it against May's claim.

"MASA employed W. Stancil Starnes as the attorney to represent and defend Habachy against May's claim and also employed Charles A. Stakely, Jr., as the attorney to represent and defend Park against May's claim.

"Following the commencement of the trial, the case was then submitted to the jury on May's claim against Lloyd Noland based at least in part, if not wholly, on the negligence of Habachy and Park. No request was made by either party for any special findings of fact by the jury. The jury returned a general verdict in favor of May against Lloyd Noland in the amount of $4,000,000, which was then reduced as the result of a remittitur ordered by the trial court to $2,000,000.

"Thereafter, AHAT paid the sum of $1,000,000 in partial payment of the judgment rendered against Lloyd Noland, and MASA thereafter paid the sum of $725,000 plus a certain amount of interest in full satisfaction of the entire judgment.

"In the present case now before this Court, AHAT makes claim as a subrogee of Lloyd Noland for the recovery from MASA of the $1,000,000 paid by AHAT in partial satisfaction of the judgment. As the basis for its claim, AHAT says that May's claim against Lloyd Noland and the subsequent verdict and judgment rendered against Lloyd Noland were based only and could have been based only on the negligence of the two physicians, Habachy and Park, employed by Lloyd Noland.

"AHAT says that because Lloyd Noland's liability resulted from the acts or omissions of its physician employees, the MASA insurance coverage is primary and the AHAT insurance contract is secondary. In addition to the claim asserted by AHAT by subrogation, AHAT also says that MASA was negligent in failing to settle May's claim within the limits of its primary coverage and, finally, that MASA acted in bad faith in refusing to settle the claim of May within the policy limits and in refusing to pay the remitted judgment with respect to which it was the primary obligor.

"In support of its contention that the jury verdict was based solely and entirely on the negligence of Habachy and Park, AHAT has submitted the affidavit of Jerry Argo, the person who was elected as foreperson of the jury which rendered the verdict. This affidavit executed by Argo on December 8, 1986, long after the jury verdict in 1983, states as follows:

" '1. I was the duly elected foreman and spokesman for the jury which decided the case of May v. Lloyd Noland Hospital, et al.

" '2. This Affidavit is given with my personal knowledge.

" '3. During the course of our deliberations, the jury considered and discussed issues relating to the actions of several physician employees of Lloyd Noland Hospital regarding various decisions *1212

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

about the medical treatment of Lepo May.

" '4. We understood that the hospital would be responsible for the negligent acts of its physician employees.

" '5 In agreeing to award the plaintiff a verdict of $4,000,000, our unanimous decision was based solely on the conduct of the physicians. The jury did not base its verdict on the determination that any non-physician employees of Lloyd Noland Hospital were in any way negligent'

"AHAI has also submitted the affidavit of Robert Parsons, the attorney representing and defending Lloyd Noland in CV 79-0583. Noting that Lloyd Noland was named as an additional insured on the insurance policies issued by MASA insuring physician employees of Lloyd Noland, Parsons states under oath that it was AHAI's position in the *May* case that the alleged malpractice was solely the act or omission of the physician employees of Lloyd Noland Parsons also mentions other cases involving lawsuits against Lloyd Noland and its physician employees in which MASA assumed the defense of Lloyd Noland and settled the claims without any contribution from AHAI"

"MASA has acknowledged that its insurance policy provided coverage to Lloyd Noland for liability resulting from the acts or omissions of Habachy and Park However, MASA says that it was never determined by the jury or the trial court that Lloyd Noland's liability to May resulted in whole or in part from the negligent acts of Habachy or Park MASA says that May also made claim against Lloyd Noland based on the acts or omissions of its non-physician employees MASA says that since the jury returned a general verdict against Lloyd Noland and made no special findings of fact, it cannot be ascertained from the verdict whether the liability of Lloyd Noland was based on the acts or omissions of either or both of the physician and non-physician employees.

"In support of this position, MASA has submitted the affidavit of Thomas E. Dutton, one of the attorneys representing May in CV 79-0583. Dutton states in part in his affidavit:

" 'I was one of the attorneys that represented the plaintiff in the case of *Albert May, etc. v. Lloyd Noland Hospital, et al.*, Circuit Court of Jefferson County, Alabama, Civil Action No. CV 79-00583 The claims of the plaintiff in this case included claims that the Bird respirator which was provided by Lloyd Noland Hospital was inappropriate for use on small children and that the MA-1 respirator was inappropriately used by Lloyd Noland Hospital. The plaintiff claimed that Lloyd Noland Hospital was negligent in providing the Bird respirator and negligent in inappropriately using the MA-1 respirator'

"MASA has also submitted a question and answer form completed by Jerry Argo following the jury verdict in the *May* case in which Jerry Argo answered as follows to Question No 6:

" '6 Do you feel the hospital was guilty of negligence in providing the Mark XIV respirator which was provided for the child in the recovery room?

" 'A Yes Improper ventilator used or not used properly'

"MASA has also submitted a question and answer form completed by other member [s] of the same jury who answered yes to the above question number 6 Those members included Johnny M. Cook, Ann Terry, Harvey M. Gilliam, Yolinda Brunson, and Paula Bentley

"By submitting the affidavit of the foreman of the jury, AHAI sought in effect to establish special findings of fact by the jury verdict more than three years after the verdict was rendered. The affidavit of a juror cannot be admitted in evidence after the trial for the purpose of establishing the negligent conduct which was the basis of the jury verdict *Andrews v. O'Hearn*, 387 N.W.2d 716 (N.D.1986); *Chalmers v. City of Chicago*, 92 Ill.App.3d 54, 47 Ill.Dec. 503, 415 N.E.2d 508 (1980), *aff'd*, 88 Ill.2d 532, 59 Ill.Dec. 76, 431 N.E.2d 361 (1982); *Iowa-Des Moines Nat'l Bank v. Schwerman*, 288 N.W.2d 198, 204 (Iowa 1980); *1213*Menza v. Diamond Jim's, Inc.*, 145 N.J.Super. 40, 366 A.2d 1006 (1976); *Tenedios v. William Filene's Sons Co., Inc.*, 20 Mass.App. 252, 479 N.E.2d 723 (1985); *Cove, Inc. v. Mora*, 172 Cal.App.3d 97, 218 Cal.Rptr. 7 (1985); *Russo v. Rifkin*, 113 A.D.2d 570, 497 N.Y.S.2d 41 (1985); *Miami Herald Publishing Co. v.*

©2005 Thomson/West No Claim to Orig. U.S Govt. Works

Frank, 442 So.2d 982 (Fla.Dist.Ct.App.1983)

"In *Iowa-Des Moines Nat'l Bank v. Schwerman, supra*, the Supreme Court of Iowa stated:

> " 'We summarily treat the last prong of defendants' complaint first. The verdicts were lump-sum amounts presumably incorporating the several damage elements. Defendants made no request for separate special verdicts under Iowa R.Civ.P. 205. *See* Team Central, Inc. v. Teamco, Inc., 271 N.W.2d 914, 925 (Iowa 1978). Defendants instead attempted to prove by the jury foreman's affidavit the separate sum the jury computed for loss of services and support and incorporated in the lump-sum verdict. We are not persuaded the verdict may be so explained. *See* Cavanaugh v. Jepson, 167 N.W.2d 616, 624-25 (Iowa 1969); State v. Dudley, 147 Iowa 645, 653, 126 N.W. 812, 815 (1910). In any event, this problem may not recur on retrial.'

"In *Tenedios v. William Filing's Sons Co., Inc., supra*, the plaintiff made claim against Joseph Bisson, the security manager for William Filing's and also William Filing's for false imprisonment, malicious prosecution and abuse of process. Following a trial, the jury returned verdicts in her favor against each defendant for $1,000.00 on counts of false imprisonment; $35,000.00 on counts of malicious prosecution; and $4,000.00 on abuse of process. The judge on the motion of the defendants entered a statement that the total recovery was $40,000.00 cast jointly and severally against the two defendants. Tenedios then moved for a judgment of $80,000.00. In support of her motion, she filed an affidavit of the jury foreman purporting to show how the jury reached their verdict and that they intended the larger amount. Affirming the judgment of the trial court, the Appeals Court of Massachusetts stated:

> " 'As to the foreman's affidavit, it could not be considered, as it went to the mental processes of the jurors in arriving [at] their verdicts, whether in carrying out the judge's instructions or in conceiving of the consequences of their own findings. . .'

"In the present case now before this Court, the affidavits and answers of the jurors to questionnaires make evident the reason for the rule disallowing the use of jurors' affidavits to explain their verdict or to in effect make special findings of fact with respect to their verdict.

"Counsel representing Lloyd Noland and supplied by AHAT could have asked the Court to require the jury to make special findings of fact at the time the case was submitted to the jury. AHAT and Lloyd Noland elected not to do so. They cannot now ask this Court to determine from the affidavits of the jurors or the other evidence submitted at the trial whether the verdict against Lloyd Noland was based on the negligence of Habachy and Park or whether the verdict against Lloyd Noland was based on evidence concerning the negligence of other physicians or employees of Lloyd Noland.

"AHAT argues that MASA had primary coverage and that it had only excess coverage. According to AHAT, MASA thus had the primary duty to pay up to the full limits of its coverage before AHAT was required to pay. However, it has not been established and cannot be established at this point whether the jury's verdict was based on the conduct of Lloyd Noland's chief executive officer or members of its governing body, all of whom are provided coverage under the AHAT policy. It has not been established whether the jury's verdict was based on the conduct of Lloyd Noland's non-physician employees, all of whom are also provided coverage under the AHAT policy.

"AHAT says in the last brief submitted by its counsel that it is undisputed that Lepo May died from causes associated with his pulmonary edema. Counsel relies on the testimony of Dr. Gunter Corssen, an expert witness for the plaintiff, to argue *1214 that doctors Park and Friend were responsible for placing Lepo May on the Byrd respirator contrary to the warning of its unsuitability. Lepo remained on the Byrd ventilator for a period of approximately two hours and was then transferred to the Intensive Care Unit, where he was placed on the volume ventilator known as the MA-1 ventilator. Lloyd Noland did not then have the pediatric ventilator designed for use with small infants such as Lepo May.

"Dr. Gunter Corssen testified that Lepo's condition appeared to improve after he was placed on the MA-1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ventilator and that his condition then began to deteriorate markedly as the result of an accidental extubation. However, Dr. Corssen also said that Lepo's condition was critical at the time he was taken off the Byrd respirator and that the MA-1 respirator was not the optimal equipment. Corssen stated at one point in his testimony that it was quite possible that Lepo's death was caused by inadequate ventilation in the recovery room.

"Dr. James Arens, another expert testifying for the plaintiffs, stated that the MA-1 ventilator was a very difficult ventilator to use on babies. He recounted an experience where a small baby under his care in a Texas hospital encountered severe problems because of the use of an MA-1 ventilator at a time when all of that hospital's pediatric respirators were in use.

"Dr. Arens testified that in August 1978 there were two ventilators manufactured especially for small babies, a Bourne ventilator, which was a pure volume ventilator; and a Sieckcrist ventilator, which Dr. Arens referred to as an assist ventilator. At page 250 of his testimony, Dr. Arens testified as follows:

" 'Q. Explain to us the difference, how a suitable ventilator suitably used on this baby over at Lloyd Noland from, let's say, 9:55 on, assuming when he went from the operating room to the recovery room, he was placed on a suitably used suitable ventilator. Explain to us the difference in the effect of that ventilator on his pulmonary edema than what we know happened to his pulmonary edema while he was on the unsuitable ventilator over here and the one which was unsuitably used?

" 'A. The pulmonary edema would have gradually decreased. The pulmonary edema would have been so-called sucked up back into the lungs. The fluid would have cleared out of the lungs. The oxygenation in the baby would improve, and also the pulse rate would have gone down and his respiratory rate would have gone down.

" 'Q. Pulmonary edema would have cleared up?

" 'A. The pulmonary edema would have cleared up.'

" "There is evidence to support the claim that Lloyd Noland was liable for the death of Lepo May because of its failure to have available for use a pediatric ventilator.

"AHAT also argues that Lloyd Noland's failure to have a pediatric ventilator available for use would only have been the product of an omission on the part of members of the Lloyd Noland medical staff who failed to adequately assess their clinical needs for this piece of specialized equipment.

"Lloyd Noland here relies again on the affidavit of Dr. Friend, who has stated in his affidavit that the acquisition of any piece of specialized equipment for clinical use by Lloyd Noland would have been accomplished through a process of review and recommendation by the appropriate departments of the hospital medical staff. However, no reference is made to any specific discussion regarding the acquisition of the pediatric ventilator. Consequently, it is not possible to know whether members of the medical staff recommended its purchase and the same was then overturned by Lloyd Noland's hospital administrator or its chief executive officer.

"In the AHAT insuring agreement, Lloyd Noland itself is named as a person covered. In addition, other persons covered include Lloyd Noland's chief executive officer and its hospital administrator and hospital supervisor. If the failure to provide the pediatric ventilator was the fault of any of those persons, AHAT's obligation *1215 to Lloyd Noland would be primary rather than excess.

"The difficulty with AHAT's position in this case is that AHAT now seeks a determination by this Court that the death of Lepo May in August 1978 was caused only by the negligence of Park and Habachy, physician employees of Lloyd Noland. However, the claims asserted against Lloyd Noland as a result of the death of Lepo May have already been resolved by a jury verdict and judgment. The question presented is whether the jury verdict against Lloyd Noland was based in whole or in part on Lloyd Noland's failure to have a pediatric ventilator available for use in its Intensive Care Unit at the time of Lepo May's death. This Court has determined that evidence was presented which would support a jury verdict on this theory. Since no special interrogatories were submitted to the jury, it is not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possible for this Court to now determine what was the basis for the jury verdict finding Lloyd Noland liable

"If the verdict against Lloyd Noland was based in whole or in part on its failure to provide a pediatric ventilator, then AHAT's insurance coverage could also be primary rather than excess and it would have no right of subrogation, either equitable or otherwise

"AHAT also makes a novel argument that it is entitled to proration with MASA on the theory that MASA had provided insurance coverage for eight individual physician employees of Lloyd Noland whose errors or omissions were criticized by the plaintiff's expert witnesses or said by such expert witnesses to be applicable to the pediatric ventilator issue. It then argues that under the MASA 'other insurance' proration clause, each policy would owe 1/9 of the total amount of the settlement of $1,725,000.

"The first difficulty with this argument is that it cannot now be established whether the jury verdict against Lloyd Noland was based on the negligence of any one or more of the physician employees or was based on the negligence of non-physician employees of Lloyd Noland

"Furthermore, under its 'other insurance' clause, MASA's insurance contract merely provides that when its insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, MASA will not be liable for a *GREATER* proportion of the loss than would be payable if each insurer contributed an equal share. As this Court reads the 'other insurance' provision in the MASA policy, it does not obligate MASA to a pro rata contribution but merely puts an outer limit on MASA's obligation

"After a full and careful consideration of the evidence, it is this Court's conclusion that the motion for partial summary judgment filed by AHAT is due to be overruled and that the motion for summary judgment filed by MASA is due to be granted

"Accordingly, the motion for partial summary judgment filed by AHAT is hereby overruled. The motion for summary judgment filed by MASA is hereby granted Judgment is hereby rendered in favor of the defendant, Mutual Assurance Society of Alabama. All costs of court incurred in this proceeding are hereby taxed against the plaintiff, Alabama Hospital Association Trust

"Done this 2nd day of March 1988
"s/Marvin Cherner
"CIRCUIT JUDGE"

FN"* Parsons's affidavit refers to a number of other cases in which he says MASA assumed the defense on behalf of Lloyd Noland and ultimately paid the amount required for the compromise of those claims Parsons's affidavit is disputed by the affidavit of Wesley M Foster, Jr, the Administrative Vice President of MASA with responsibility of handling of claims, and also the affidavit of W Stancil Starnes, a member of the law firm defending certain of the doctors involved in those other cases In short, MASA denies that it ever assumed the defense of Lloyd Noland except in a case where the plaintiff admitted that his only theory of liability against Lloyd Noland was based on the negligence of the doctor employee who had insurance coverage under the MASA policy

FN"Because the decision in this case will be based on the provisions of the respective insurance contracts issued by AHAT and MASA, this Court considers it unnecessary to further detail the respective positions of AHAT and MASA with respect to other cases in which both entities provided insurance coverage"

*1216 [1] On appeal, AHAT argues that the trial court erred in requiring it to establish that Lloyd Noland was entitled to coverage under the "additional interests endorsement" FN1 contained in each of the policies issued by MASA to Drs. Habachy and Park.

© 2005 Thomson/West No Claim to Orig. U.S Govt Works

FN1. "*Additional interests endorsement.* It is agreed that the 'PERSONS INSURED UNDER PART I' section of the above-numbered policy is amended to include See * NAME SCHEDULE but only with respect to liability arising out of acts or omissions of the named insured Han Y Park, M D or of any person for whose acts or omissions the named insured is legally responsible It is further agreed that inclusion of SEE * NAME SCHEDULE as an insured shall not serve to increase the limits of liability applicable to PART I-COVERAGE A as shown in the policy declarations.

" * NAME SCHEDULE: The Lloyd Noland Foundation, Inc. The Medical Clinic Board of the City of Fairfield

"Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned policy, other than as above stated"

We cannot agree The trial court correctly placed the burden on AHAT as the one seeking coverage to prove that coverage existed within the terms of the policy *Bankers Fire & Marine Insurance Co. v. Contractors Equipment Rental Co.*, 276 Ala. 80, 159 So.2d 198 (1963) The issue in this case is whether the verdict in the May case against Lloyd Noland was based upon the jury's finding that Lloyd Noland was liable because of the negligence of the two medical doctors, Habachy and Park This is impossible to resolve, because the verdict of the jury was a general one and because there was evidence from which the jury could have found liability as to Lloyd Noland based upon the negligence of other employees of Lloyd Noland Absent a special verdict, the fact of coverage is impossible to prove Therefore, the trial court correctly resolved this issue against AHAT.

[2] [3] AHAT also argues that MASA is estopped to deny coverage because it did not undertake to defend Lloyd Noland in the May case (presumably under a reservation of rights). A failure of an insurer to defend a claim against an insured does not work an estoppel on the issue of coverage. *Alabama Farm Bureau Mutual Casualty Insurance Co. v. Moore*, 349 So.2d 1113 (Ala.1977), rejected an argument similar to AHAT's, in the following language:

> "We reject the proposition that an insurer's liability to pay for damages may stem from a breach of its duty to defend. The two duties are to that extent independent In other words, an insurance company may be liable for attorney's fees for breaching its duty to defend any groundless, false and fraudulent suits that potentially come within the policy where the suit is won by the insured, but such a breach in a suit lost by the insured does not automatically mean that the insured will be liable for total damages; *the latter will turn on whether the insured had coverage*"

The trial court's order is adopted as part of the opinion of this Court, and the judgment is affirmed.

AFFIRMED.

TORBERT, C J, and MADDOX, JONES, ADAMS, HOUSTON and STEAGALL, JJ., concur

Ala.,1989

Alabama Hosp Ass'n Trust v Mutual Assur Soc of Alabama

538 So 2d 1209

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U.S Govt Works.

C
578 So.2d 1359

Court of Civil Appeals of Alabama
Jeffrey D. KNUTILLA and Janie S. Knutilla
v.
AUTO-OWNERS INSURANCE COMPANY
2900018

Feb. 20, 1991.

Time-share unit purchasers sued time-share plan owners and their insurer claiming $25,000 plus interest, attorney fees, and costs under statutory surety bond, and damages due to insurer's bad-faith refusal to pay and breach of fiduciary duty. The Circuit Court, Talladega County, Jerry L. Fielding, J., entered summary judgment in favor of purchasers in amount of $2,395.86 and dismissed bad faith and breach of fiduciary duty claims. Purchasers appealed. The Court of Civil Appeals, Russell, J., held that: (1) language of bond limited payment of judgments recovered against vacation time-sharing plan owner or seller to any actual loss or damage, and thus, judgment granting sum representing actual loss or damage, rather than full amount of judgment obtained by purchasers in breach of contract action against owner, was proper; (2) trial court properly calculated amount of actual damages or loss to exclude punitive damage award; and (3) purchasers were not entitled to damages on bad-faith refusal to pay claim in light of insurer's lawful basis for denial of claim.

Affirmed.

West Headnotes

[1] **Principal and Surety 309 ⚷66(1)**
309k66(1) Most Cited Cases
Surety bond issued to time-share plan owner for benefit of time-share unit purchasers limited payment of judgments recovered against time-share plan owner or seller to any actual loss or damage, rather than any and all final judgments, and thus, judgment granting time-share unit purchasers sum representing actual loss or damages sustained by them, rather than full judgment of $25,000, which they obtained in breach of contract action against time-share plan owner, was proper. Code 1975, § 34-27-51(2), par. i.

[2] **Principal and Surety 309 ⚷66(1)**
309k66(1) Most Cited Cases
In action by time-share unit purchasers to recover under surety bond for owners' breach of contract, trial court correctly determined amount of actual damages or loss to time-share unit purchasers as $1,716.46, rather than $25,000 judgment which time-share unit purchasers obtained in breach of contract action against time-share plan owner, where it was not possible to determine which portion of $25,000 judgment was for punitive damages rather than actual damages or loss. Code 1975, § 34-27-51(2), par. i.

[3] **Principal and Surety 309 ⚷73**
309k73 Most Cited Cases
Insurer was not liable for bad-faith refusal to pay claim of time-share unit purchasers under statutory surety bond issued to time-share plan owner for benefit of purchasers, where amount for which insurer was held to be liable was great deal less than $25,000 plus interest demanded by time-share unit purchasers and trial court properly concluded that punitive damages were not included in actual damages which bond covered. Code 1975, § 34-27-51(2), par. i.

[4] **Insurance 217 ⚷3336**
217k3336 Most Cited Cases
(Formerly 217k602.5)
When claim is fairly debatable, insurer is entitled to debate claim, and if lawful basis for denial exists, insurer will not be held liable in action based on bad faith.

*1360 Don F. Wiginton, Birmingham, for appellant.
Thomas A. Woodall of Rives & Peterson, Birmingham, for appellee.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

RUSSELL, Judge.

Jeffrey D. Knutilla and Janie S. Knutilla filed a complaint against Alpine Bay Resorts, Inc., and Auto-Owners Insurance Company, claiming $25,000 plus interest, attorney's fees, and costs under a statutory bond and claiming damages due to a bad faith refusal to pay and due to a breach of fiduciary duty. Summary judgment was granted in favor of the Knutillas in the amount of $2,395.86, which the trial court found represented actual loss or damage plus $587.73 in post-judgment interest and $91.67 for court costs. The bad faith and breach of fiduciary duty claims were dismissed with prejudice. The Knutillas appeal, contending that the trial court erred in granting summary judgment in an amount lower than that requested and in ruling against them on the issue of bad faith refusal to pay. We affirm.

At the outset, we note that summary judgment is proper when the trial court determines that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *McMullin v. AmSouth Bank*, 512 So.2d 1382 (Ala.Civ.App.1987); Rule 56, Alabama Rules of Civil Procedure. The burden of proof is on the moving party. *Jones v. Newton*, 454 So.2d 1345 (Ala.1984). When reviewing a grant of summary judgment, the same standard as utilized by the court below must be applied by this court. *Southern Guaranty Insurance Co. v. First Alabama Bank*, 540 So.2d 732 (Ala.1989).

The record reveals that in 1983 the Knutillas purchased a time-share unit from Alpine Bay Resorts, Inc., at its resort in Talladega County, Alabama. They made a down payment of $450 and thirteen payments of $97.42 to Alpine Bay for a total of $1,716.46. In 1985 the Knutillas instituted a civil suit against Alpine Bay, alleging, among other things, that Alpine Bay had promised to repurchase the Knutillas' interest in the time-share unit and containing a cause of action for fraud and breach of contract relating to the purchase of the time-share unit. In 1987 the Knutillas, after a jury trial, were granted a judgment of $25,000 plus costs, which judgment was appealed to the Alabama Supreme Court and affirmed. The Knutillas then executed on the judgment, but found no unencumbered assets from which to satisfy their judgment.

Alpine Bay was required by § 34-27-51(2)i., Ala.Code 1975, to post a bond with the State of Alabama for the benefit of time-share owners in the amount of $100,000, and such bond was posted by Alpine Bay, as principal, and Auto-Owners, as surety. In 1988 the Knutillas filed a claim under the bond with Auto-Owners, which denied any liability to the Knutillas. The Knutillas then filed the present action.

[1] The Knutillas first contend that the trial court erred in refusing to grant summary judgment in their favor against Auto-Owners in the full amount of their judgment against Alpine Bay.

Section 34-27-51(2)i., which was codified from 1983 Ala.Acts, Act 83-670, requires *1361 that any seller of vacation time sharing plans provide to the Alabama Real Estate Commission:

> "i. Evidence that the time-sharing plan owner or his agent shall furnish a surety bond payable to the state of Alabama in the amount of $100,000.00 with a surety company authorized to do business in Alabama, which bond shall provide that the obligor therein shall pay up to $100,000.00 the aggregate sum of all judgments which may be recovered against the vacation time-sharing plan owner or seller *for any actual loss or damage* arising against such vacation time-sharing plan owner or seller from the activities of the time-sharing plan owner or seller, or their agents or representatives, related to the time-sharing plan."

(Emphasis supplied.)

The surety bond purchased by Alpine Bay from Auto-Owners provides in pertinent part:

> "The condition of this bond is that the principal is the Developer of a time sharing project known as Capricorn Complex, a condominium, in Alpine Bay, Alabama, and *has certain obligations to the purchasers* pursuant to the provisions of purchaser contracts between the principal and unit purchasers, ... and *under Act 83-670 of the 1983 Alabama Legislature*.
>
> "If principal shall pay *any and all final judgments* that may be rendered against it because of its failure to well and faithfully discharge its obligations under said purchase contract and Legislative Act during the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

term this bond is in force, then this obligation as to any such judgment shall be void; otherwise, it shall remain in full force and effect."
(Emphasis supplied.)

Although Auto Owners argues that it is responsible only for provable compensatory damages and the trial court granted damages representing actual loss or damage, the Knutillas argue that the language "any and all final judgments" in the bond obligates Auto-Owners to pay any and all final judgments rendered against Alpine Bay We disagree

We find the language in the bond, which refers to the obligations of the principal (Alpine Bay) to the purchasers (the Knutillas) under Act 83-670, to be dispositive of the issue. Section 34-27-51(2)i, part of the codification of Act 83-670, requires the payment of judgments recovered against the vacation time-sharing plan owner or seller for "any actual loss or damage." Therefore, we find that the judgment granting the Knutillas a sum representing the actual loss or damage sustained by them was proper

[2] The question remains whether the trial court correctly determined that the actual loss or damage was $1,716 46 The evidence indicates that, although the jury in the original trial was charged by the trial judge as to both actual or compensatory damages and punitive damages, the jury issued a general verdict of $25,000 in the original trial and did not clarify the types of damages awarded In addition, clarification was not requested by either party; thus the only evidence as to actual damages or loss indicates the amount of $1,716.46 As to the determination of actual damages under the bond, the burden was correctly placed on the one seeking coverage, here the Knutillas, to prove that coverage existed within the terms of the bond *See Alabama Hospital Association Trust v. Mutual Assurance Society of Alabama,* 538 So.2d 1209 (Ala.1989) Since we cannot determine which portion of the judgment was for punitive damages, rather than actual damages or loss, we find that the trial court was correct in its determination of the amount of actual damages or loss

[3] The Knutillas next contend that the trial court erred in ruling against them on the issue of Auto-Owners' bad faith refusal to pay their claim

[4] However, when a claim is fairly debatable, the insurer is entitled to debate the claim, and if a lawful basis for denial exists, the insurer will not be held liable in an action based on bad faith ***1362***Gulf Atlantic Life Insurance Co. v. Barnes,* 405 So.2d 916 (Ala.1981). In the instant case, the amount for which Auto-Owners has been held to be liable is a great deal less than the $25,000 plus interest demanded by the Knutillas. In addition, Auto-Owners' argument as to punitive damages has been accepted. Therefore, since there was a lawful basis for denial of the claim, we find that the trial court's dismissal of the bad faith count was proper

Because there was a lawful basis for the denial of the claim and, therefore, no basis for a bad faith action, we pretermit a discussion of the applicability of the tort of bad faith in this type of action as unnecessary

We, therefore, find that there was no genuine issue of material fact, that the moving party was entitled to the judgment as a matter of law, and that the grant of summary judgment was proper

Based on the above, this case is due to be affirmed

AFFIRMED.

ROBERTSON, P J, and THIGPEN, J, concur
Ala Civ App ,1991
Knutilla v Auto-Owners Ins Co
578 So 2d 1359

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

838 So.2d 1039

Supreme Court of Alabama.
STATE FARM FIRE AND CASUALTY COMPANY
v.
SHADY GROVE BAPTIST CHURCH.
**1010018.**

June 14, 2002

Insured brought action against property insurer to recover for collapse of church roof. The Circuit Court, Walker County, No. CV-98-71.80, John L. Madison, Jr., J., entered judgment on jury verdict in favor of insured. Insurer appealed. The Supreme Court, Harwood, J., held that insured failed to present substantial evidence showing that the collapse of the roof resulted from an enumerated cause and was covered.

Reversed and remanded.

Moore, C.J., dissented and filed opinion.

West Headnotes

**Insurance 217 ⟹2201**
217k2201 Most Cited Cases
Insured failed to present substantial evidence that the collapse of church roof resulted from an enumerated cause and was covered; testimony of pastor and former trustee and deacon concerning their beliefs as to the specific cause of the collapse was speculative and did not rise to the level of substantial evidence, and engineering report concluded that improper construction, not blasting in area, caused the collapse.

*1039 Roderick K. Nelson and Adam M. Milam of Spain & Gillon, L.L.C., Birmingham, for appellant. Gerald D. Colvin, Jr., of Bishop, Colvin, Johnson & Kent, Birmingham; and Frank S. Buck, Birmingham, for appellee.

HARWOOD, Justice.

State Farm Fire and Casualty Company (hereinafter referred to as "State Farm") appeals from the trial court's denial of its motions for a judgment as a matter of law in regard to a breach-of-contract claim asserted against it by the Shady Grove Baptist Church (hereinafter referred to as "the Church"). We reverse and remand.

On February 2, 1998, the Church sued State Farm, seeking to recover damages on claims of breach of contract, bad faith, and fraud in regard to State Farm's denial of a claim made by the Church following the collapse of a portion of the roof on its building. The Church's complaint alleged that an insurance policy issued by State Farm provided coverage for the roof collapse*1040 but that State Farm refused to pay the claim it made based on the collapse. On February 1, 1999, State Farm filed a motion for a summary judgment with attached exhibits and a supporting brief; on February 23, 1999, it filed a supplemental brief in support of its motion. On March 4, 1999, the Church filed an opposition to State Farm's motion for a summary judgment.

On May 3, 1999, the trial court entered a summary judgment for State Farm on the Church's claims of bad faith and fraud, and certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.; on May 12, 1999, the Church filed a notice of appeal. On November 19, 1999, the Court of Civil Appeals affirmed the trial court's judgment without an opinion. *Shady Grove Baptist Church v. State Farm Ins. Co.*, 789 So.2d 253 (Ala.Civ.App.1999)(table). On July 21, 2000, State Farm resubmitted its motion for a summary judgment as to the Church's breach-of-contract claim; the trial court denied that motion on November 6, 2000. The breach-of-contract claim was tried before a jury on April 9-11, 2001.

State Farm made an oral motion for a judgment as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

matter of law at the close of the Church's case-in-chief; the trial court denied the motion. On April 11, 2001, at the close of all the evidence, State Farm filed a written motion for a judgment as a matter of law; the trial court denied the motion that same day. On April 13, 2001, the jury returned a verdict in favor of the Church in the amount of $128,800, and the trial court entered a judgment on the verdict, adding $31,586.03 to the judgment as interest, for a total judgment of $160,386.03.

On May 10, 2001, State Farm filed a renewed motion for a judgment as a matter of law, or, in the alternative, a motion for a new trial or for a remittitur. On August 9, 2001, the trial court denied State Farm's renewed motion for a judgment as a matter of law and motion for a new trial. However, the trial court granted the motion insofar as it requested a remittitur and reduced the amount of the judgment to $98,700 to comport with the coverage limits of the insurance policy. The court added $24,205.98 in interest, for a total judgment of $122,905.98. On September 20, 2001, State Farm filed a notice of appeal to this Court.

State Farm states the issue presented in this appeal as whether "[t]he trial court erred by denying [its] Motion for Judgment As a Matter of Law because [the Church] failed to present any evidence which was sufficient to create a question of fact whether the cause of the roof collapse at the church was covered by the policy." Our review of the denial of a motion for a judgment as a matter of law is settled:

> "When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). In an action filed after June 11, 1987, the nonmovant must present *substantial evidence* to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced *substantial* evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a ***1041** [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."

*Ex parte* Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala.1999)(emphasis added). Further, this Court has stated that " '[e]vidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence.' " McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145 (Ala.2001) (quoting Brushwitz v. Ezell, 757 So.2d 423, 432 (Ala.2000)).

The insurance policy at issue provides, in pertinent part:

> "SECTION I
> "LOSSES INSURED AND
> "LOSSES NOT INSURED
> "...
> "LOSSES
> "NOT INSURED
> "...
> "2. We do not insure for loss either consisting of, or directly and immediately caused by, one of more of the following:
> "...
> "p. collapse, except as provided in the Extensions of Coverage.
> "But if accidental direct physical loss results at the described premises, we will pay for that resulting loss.
> "3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:
> "a. conduct, acts or decisions, including the failure to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

act or decide, of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault;

"b. faulty, inadequate, unsound or defective:

"(1) planning, zoning, development, surveying, siting;

"(2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

"(3) materials used in repair, construction, renovation or remodeling; or

"(4) maintenance;

"of part or all of any property (including land, structures, or improvements of any kind) on or off the described premises.

"But if accidental direct physical loss results from items 3.a. and 3.b., we will pay for that resulting loss unless the resulting loss is itself one of the losses not insured in this section.

"SECTION I

"EXTENSIONS OF

"COVERAGE

"EXTENSIONS OF COVERAGE

"Subject to the terms and conditions applicable to Section I of this policy, the following Extensions of Coverage apply separately to each location scheduled in the Declarations. But the amount of insurance afforded on any one scheduled *1042 location will not be more than the limit of insurance specified in each Extension of Coverage if a limit is included in the extension.

"....

"4. Collapse.

"a. We will pay for any accidental direct physical loss to covered property involving collapse of a building or any part of a building caused by only one or more of the following:

"(1) any of the 'Specified Causes of Loss' or breakage of building glass, only as insured against in this policy;

"(2) hidden decay;

"(3) hidden insect or vermin damage;

"(4) weight of people or personal property;

"(5) weight of rain that collects on a roof;

"(6) use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

"....

"c. Collapse does not include settling, cracking, shrinking, bulging or expansion."

In a section entitled "Definitions," the policy also states:

"Each time the phrase 'Specified Causes of Loss' is used in this policy, it refers to all of the following causes:

"1. fire;

"2. lightning;

"3. explosion;

"4. windstorm or hail;

"5. smoke;

"6. aircraft or vehicles;

"7. riot or civil commotion;

"8. vandalism;

"9. leakage from fire extinguishing equipment;

"10. sinkhole collapse, meaning the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or similar rock formations but does not include the cost of filling sinkholes.

"11. volcanic action, meaning the airborne volcanic blast or airborne shock waves, lava flow, ash, dust or particulate matter resulting from the eruption of a volcano but does not include the cost of removing ash, dust or particulate matter that does not cause accidental direct physical loss to covered property.

"12. falling objects, not including loss to:

"a. personal property in the open; or

"b. the interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object;

"13. weight of snow, ice or sleet;

"14. water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam."

In *Twin City Fire Ins. Co. v. Alfa Mutual Ins. Co.,* 817 So.2d 687 (Ala.2001), this Court observed:

"A contract of insurance, like other contracts, is governed by the general rules of contracts. *Pate v. Rollison Logging Equip., Inc.,* 628 So.2d 337

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Ala.1993). Insurance companies are entitled to have their policy contract enforced*1043 as written. Gregory v. Western World Ins. Co., 481 So.2d 878 (Ala.1985). 'Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions.' Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C., 703 So.2d 866, 870 (Ala.1996)."

817 So.2d at 691-92. FN1

FN1. We note that the Church makes no argument that the policy is ambiguous.

In regard to its burden of proof under the policy, the Church states in its brief to this Court:

"Certainly Shady Grove proved that there was a collapse of the roof which is clearly a covered loss under the policy. Further it is clear that Shady Grove established as probable causes of this collapse a number of causes listed as insured under the policy, such as explosion (blasting), weight of people, load of wind, rain, ice and snow, decayed wood and insect or vermin damage. The position of State Farm appears to be that the loss should be excluded because of State Farm's contention that defective construction played a part in the collapse. Clearly any such contention should have been considered as State Farm's burden to prove."

However, the policy states that it does not provide coverage for collapse unless the collapse resulted from one or more of the six specific enumerated causes stated within the section entitled "Extensions of Coverage." FN2 Further, it is not State Farm's position on appeal that the collapse was excluded from coverage; rather, State Farm asserts that the collapse was not covered under the policy. Therefore, this is not a case in which the Church has to prove that a collapse, as defined within the policy, has occurred and State Farm then has to prove that a certain exclusion within the policy removed the collapse from the scope of its coverage. See Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d at 697 ("[The insurer] has the burden of proof in asserting that a claim is excluded under its policy of insurance."). Rather, in resisting State Farm's motions for a judgment as a matter of law, and for the trial court's denial of those motions to have been proper, the Church must have submitted substantial evidence showing that the collapse fitted within the definition of that term in the policy and that it was covered under the policy by virtue of its being caused by at least one of the six enumerated causes provided in the policy. See, e.g., State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 325-26 (Ala.1999) (considering, on rehearing, whether the insureds had presented substantial evidence showing that their loss was a collapse as that term was defined in a policy); Colonial Life & Accident Ins. Co. v. Collins, 280 Ala. 373, 376, 194 So.2d 532, 535 (1967)("The burden was on the plaintiff to prove that the insured's death *1044 resulted from injuries sustained in such a manner as to bring him within the coverage of the policy.") Accordingly, we must consider whether the Church submitted substantial evidence as to this issue. Ex parte Alfa Mut. Fire Ins. Co., McGinnis v. Jim Walter Homes, Inc., supra.

FN2. See, e.g., Paula B. Tarr et al., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 35 Tort & Ins. L.J. 57, 59 (1999):

"In response to [some courts'] application of the concurrent causation theory, property insurance form writers made a number of changes in standard forms. One of those changes was to exclude collapse as a covered cause of loss except as provided in an 'additional' or 'extended' coverage. Coverage was provided only if the collapse was caused by certain enumerated perils. In this sense, collapse was not a peril but rather a result of other perils. The clear intent seemed to be to provide collapse coverage only if the cause or causes of the collapse were among those listed. ..."

During the Church's case-in-chief, testimony was elicited from Preston Walker, a former trustee, deacon, and pastor of the Church; Joann Lewis, Walker's sister

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

and chairman of the Church's building committee; and Timothy Ryan, a State Farm claim-team manager Portions of the deposition testimony of Hugh Walker, Jr., deceased, the brother of Preston Walker and Lewis and a former trustee and deacon of the Church, was also read into evidence. Preston Walker, Lewis, and Hugh Walker all testified that a coal company had conducted blasting activity in close proximity to the community in which the Church's building was located; the Church alleges in its brief that the blasting constituted an "explosion," listed as a specified cause of loss in the policy

Preston Walker testified as follows:

"Q Well, prior to 91 when you moved away, do you ever recall there having been blasting in and around the Sipsey area?

"A I'm trying to think of that company that came in there. There's a company came in there from Cullman. I can't recall their name, and there was a lot of strip pits back in there

"Q At the home that you lived in when you were in Sipsey, did you ever have occasion to experience blasting to where you could feel it in your home?

"A You could kind of feel a rumble sometimes from it, uh-huh."

Lewis testified as follows:

"Q Living in that Sipsey area in the year prior to the collapse of the roof of the church, did you experience any effects of blasting in the area?

"A Well, you know, a couple of times in my lifetime, but when I moved in my house, a couple of times I remember-I think it was like on August 8 that there was some blasting done, and you know, it just like rattled the dishes, you know, no kind of effects in my house It was just like a rattle.

"Q But it was something you could feel and see[,] the rattle?

"A Yeah.

"Q. And that occurred more than once in your residence?

"A. Not a lot since I've been in my house, not a lot"

The deposition testimony of Hugh Walker, which was read into evidence, stated:

"Q Have you ever had any blasting damage at your house here in Sipsey?

"A Not at my house

"Q How far do you live from the church, Shady Grove?

"A About three or four blocks, kind of blocks

"...

"Q Did you have any damage to your house from what you thought might be blasting in the summer of 1997 [when the roof on the Church's building collapsed]?

"A No. No, I didn't I didn't have no damage I don't think

"Q Anybody around you?

"A Well, nobody-the boy that stayed next to me, stayed down up under the hill from me, he was saying that his cabinets and things was-you know, was shaking and going on at times.

"Q Dishes rattling, plates rattling, things like that?

"A Yes."

*1045 In regard to the activities conducted in the Church's building, i e , weight of people, Lewis testified as follows:

"Q What kind of activities did y'all have in this church building?

"A As far as our services, you know, we had a lot of praise in our church We have a lot of praise in our church.

"Q. Is it a spirit-filled worship?

"A Yes

"Q. And do people sing and sway and raise their hands and be animated in their worship of the Lord?

"A Yes, yes

"Q Have you filled that church up-

"A Yes.

"Q -with people?

"A Uh-huh

"...

"Q Do you have children in the congregation?

"A Yes

"Q. And before and after church, do they sometimes run around and jump and have active times within the church?

"A. Yes, but, you know, we try to refrain from a lot of kids running around in the church but there are times that that happens."

Further, in regard to weather conditions the Church's building had been exposed to-the load of wind, rain,

© 2005 Thomson/West No Claim to Orig U.S Govt Works

ice, and snow-Lewis testified:

"Q. Have there been occasions at your house and at the church building when there have been heavy wind and rain storms?
"A Yes
"Q Have there been occasions where there have been snows and sleet?
"A Yes
"Q Have there been occasions where those have piled up on the roofs of your house and of the church's house?
"A Yes. It happens to everybody"

Lewis also made mention of possible termite damage to the roof, stating:

"Q After this roof came in, have you had an opportunity to look at some of the wood that was in there to determine if it was all good wood or if some of it had decayed?
"A. After it happened, you know, we were like just looking around in it, none of us being skilled in the area but, you know, you could pick up pieces of wood or you could walk to areas where someone would say, well, those are termites, termites have eaten it, but as far as experts or skilled people knowing, we were just looking."

In regard to Preston Walker's belief as to a specific cause of the roof's collapse, he stated:

"Q From what you did observe, could you come to any conclusion as to why that roof would have fallen in?
"[State Farm's counsel]: Object, Your Honor. I don't think there has been any predicate laid for him to render an opinion
"THE COURT: Overruled You can answer it.
"[State Farm's counsel]: Your Honor, can I take him on voir dire for qualify?
"THE COURT: Let's see what his answer is first
"[THE COURT:] Do you have an opinion? Do you know why it fell?
"THE WITNESS: No, I don't I was surprised.
"THE COURT: You don't have an opinion, do you?
"THE WITNESS: Not really"

*1046 As to the question of a specific cause, Hugh Walker testified in his deposition as follows:

"Q Yes, sir. Let me ask you this: Do you have an opinion as to what happened to the church roof?
"A No. The only thing that-the only thing I knew is it just-I don't know what happened to it. It just fell in.
"Q Do you have an opinion as to what caused it to fall in?
"A. Old and it could have been blasting and termites. It could have been anything I don't know I just don't know"

The Church's final witness was Timothy Ryan, a State Farm claim-team manager, who testified as to why the Church's claim was denied Ryan stated that the claim was denied based on an engineer's report. That report, which was admitted into evidence during Ryan's testimony, appears in the record as a 17-page document prepared by Joel D. Wehrman, identified as a registered engineer in the state of Alabama, on behalf of JADE Engineering The report's conclusion was that the collapse of the roof was not caused by blasting, a concern Wehrman stated was reported to him by the Church's members, but was caused by improper construction.

After considering the evidence presented by the Church, we conclude that the Church failed to present substantial evidence showing that the collapse of the roof on its building was a result of any one of the enumerated causes contained in the policy Rather, the testimony elicited provided several possible causes for the collapse, but substantial evidence as to any one cause was not presented. Further, the testimony of Preston Walker and Hugh Walker bolster this conclusion because their statements concerning their beliefs as to the specific cause of the collapse were speculative Therefore, their testimony does not rise to the level of substantial evidence, *McGinnis v Jim Walter Homes, Inc., supra,* and the trial court erred when it denied State Farm's motions for a judgment as a matter of law. The trial court's judgment is therefore reversed and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., dissents

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MOORE, Chief Justice (dissenting)

I respectfully dissent. I would affirm the trial court's denial of State Farm's renewed motion for a judgment as a matter of law because I believe Shady Grove Baptist Church presented substantial evidence to submit to a jury the issue whether the collapse of the church building's roof was a result of any of the causes covered by the Church's insurance policy with State Farm.

At trial, the Church presented the following evidence, from which a jury could have resolved the dispute in the Church's favor. Preston Walker, a former trustee, deacon, and pastor of the Church, testified that at his home in Sipsey, one block from the church, he "could kind of feel a rumble sometimes" from blasting activity at strip mines in the area. In his deposition, admitted into evidence at trial, Hugh Walker stated that one of his neighbors had experienced "cabinets and things" rattling from the blasting. Hugh Walker also stated in his deposition that he didn't know what happened to the roof: "It just fell in." But when pressed as to his opinion as to the cause of the collapse, he said, "Old and it could have been blasting and termites. *1047 It could have been anything. I don't know. I just don't know." Walker stated in his deposition what he may have told the State Farm inspector about the cause of the collapse: "I could have said blasting or something." Walker stated in his deposition that, in the past, he had seen broken rafters on other people's houses and that those people had said that the cause of the broken rafters was "coming from blasting."

Joann Lewis, the Walkers' sister and the chairman of the Church's building committee, testified at trial that blasting in Sipsey sometimes "rattled the dishes, you know, no kind of effects in my house. It was just like a rattle." Ms. Lewis responded affirmatively when she was asked whether there had been occasions at her house and at the church building where the wind and rain were heavy and where sleet and snow "piled up on the roofs" of her house and the church. Ms. Lewis also described what she and other church members observed after the collapse:

> "[W]e were just looking around in it, none of us being skilled in the area but, you know, you could pick up pieces of wood or you could walk to areas where someone would say, well, those are termites, termites have eaten it, but as far as experts or skilled people knowing, we were just looking."

Harold McCain, a former member and trustee of the Church *testifying for State Farm,* testified on cross-examination that when he arrived at the church building after the roof had collapsed, he "was told it was done through blasting, that through a mining company doing blasting was the first thing I heard." After the collapse, McCain was told what others thought had caused the collapse: "I was told it was due to blasting, and I pursued it in the sense of blasting, so I didn't feel that the insurance company [had any] liability to take care of it if it was a blasting company that caused the problem."

Joel Wehrman, an engineer employed by JADE Engineering sent by State Farm to inspect the collapsed church building, testified that when he went to see the church building after the collapse, "that's when I learned that many of the people there believed that the blasting from a coal mine had caused or contributed to the damage." More specifically, Wehrman stated that "the only thing anyone ever told me was there was a coal mine, I believe, it was south of the building and that there was some vibrations in the area, that several people felt had caused the collapse."

Such evidence would be and was weighed by the jury, but I believe the majority errs in holding that the evidence is not substantial and therefore not sufficient to present to a jury the issue whether the collapse of the roof was covered by the Church's insurance policy.

Ala.,2002.
State Farm Fire and Cas. Co. v. Shady Grove Baptist Church
838 So.2d 1039

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works