1

IN THE CIRCUIT COURT OF

DALE COUNTY, ALABAMA


REGIONS BANK,                    )
                                 )
        PLAINTIFF,               )
                                 )
VS.                              )    NO. CV-04-251M
                                 )
SUNSHINE CAMPING CENTER,         )
INC., JON K. WILLIAMS,           )
ET AL.,                          )
                                 )
        DEFENDANT.               )


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


    The following is a transcript of the trial in
the above case which was held May 1 - 4, 2006, at
the Dale County Courthouse, Ozark, Alabama, before
The Honorable Kenneth W. Quattlebaum.

2

```
 1                      A P P E A R A N C E S

 2

 3      FOR THE PLAINTIFF:

 4                      HON. JOHN SMITH
                        BALCH & BINGHAM, LLP
 5                      P. O. Box 78
                        Montgomery, Alabama 36101-0078
 6

 7                      HON. LANE KNIGHT
                        BALCH & BINGHAM, LLP
 8                      P.O. Box 78
                        Montgomery, Alabama  36101-0078
 9

10      FOR THE DEFENDANT SUNSHINE CAMPING CENTER, INC.

11                      HON. L. MERRILL SHIRLEY
                        P.O. Box 408
12                      Elba, Alabama 36323

13

14      FOR THE DEFENDANT JON K. WILLIAMS:

15                      HON. WILLIAM B. MATTHEWS, JR.
                        P.O. Box 1145
16                      Ozark, Alabama 36361

17

18

19

20

21

22

23

24

25
```

1                <u>I N D E X</u>

CASE CAPTION.................................... 1

APPEARANCES.................................... 2

INDEX.......................................... 3

SPECIAL QUALIFICATIONS........................ 11

VOIR DIRE..................................... 18

OBJECTION DURING VOIR DIRE.................... 18

BENCH CONFERENCE.............................. 19

CHALLENGE TO VENIRE........................... 41

JURY SEATED IN BOX............................ 42

INSTRUCTIONS TO JURY.......................... 43

PROCEEDINGS ON MAY 2, 2006................... 45

MOTION IN LIMINE.............................. 46

INSTRUCTIONS TO JURY.......................... 54

OPENING STATEMENTS............................ 59

<u>PLAINTIFF'S WITNESSES</u>

  <u>JON K. WILLIAMS</u>

    DIRECT BY MR. SMITH....................... 61

    CROSS BY MR. SHIRLEY..................... 160

MOTION IN LIMINE............................. 176

    CROSS BY MR. MATTHEWS................... 211

4

```
 1                      I N D E X

 2

 3      JON K. WILLIAMS (Continued)

 4          REDIRECT BY MR. SMITH.................... 215

 5          RE-CROSS BY MR. SHIRLEY.................. 228

 6      JIMMY DALE YORK, JR.

 7          DIRECT BY MR. SMITH..................... 230

 8      MOTION IN LIMINE........................... 263

 9          CROSS BY MR. SHIRLEY................... 266

10      MOTION TO EXCLUDE.......................... 269

11          CROSS BY MR. MATTHEWS.................. 313

12          REDIRECT BY MR. SMITH................. 313

13      JIMMY R. WARD

14          DIRECT BY MR. KNIGHT................... 320

15          CROSS BY MR. SHIRLEY................... 331

16      PROCEEDINGS ON MAY 3, 2006................. 334

17      PLAINTIFF'S WITNESSES (Continued)

18      COMBER BORLAND

19          DIRECT BY MR. SMITH................... 336

20          CROSS BY MR. MATTHEWS................. 400

21          CROSS BY MR. SHIRLEY.................. 404

22          RE-CROSS BY MR. MATTHEWS.............. 420

23      RHODA TOMLINSON

24          DIRECT BY MR. SMITH................... 421

25
```

1

I N D E X

2

3    BENCH CONFERENCE.............................. 430

4      JOHN SMITH

5        DIRECT BY MR. KNIGHT...................... 436

6        CROSS BY MR. SHIRLEY...................... 441

7    MOTION....................................... 449

8    PLAINTIFF RESTS.............................. 466

9    DEFENDANT SUNSHINE'S WITNESSES

10      JAMES CHANNELL (By deposition)

11        DIRECT BY MR. SHIRLEY.................... 467

12    DEFENDANT SUNSHINE RESTS..................... 480

13    DEFENDANT WILLIAMS RESTS..................... 480

14    MOTION....................................... 481

15    CHARGE CONFERENCE............................ 482

16    CLOSING ARGUMENTS............................ 508

17    JURY CHARGE.................................. 509

18    JUROR GRIFFIN DISMISSED...................... 538

19    PROCEEDINGS ON MAY 4, 2006.................. 539

20    JURY RECHARGED............................... 546

21    VERDICT...................................... 550

22    JURY DISMISSED............................... 552

23

24

25

I N D E X

EXHIBITS                                           MARKED   RECEIVED

Plaintiff's Exhibit

1 - Union Planter's Documents

  1-Dealer Agreement..............        75          76

  2-Dealer Agreement..............        75          76

  3-Dealer Signature..............        85          86

  4-Authorized Signatures.........        86          87

  7-Fraudulent Loans Letter.......       255         256

  10-Sunshine Camping Letter.......       72          73

  19-Limited Power of Attorney.....       87          88

  20-Union Planter Letter, 4-15-04.      380         380

  36-McAllister Contract...........      144         160

  37-McAllister Contract...........      144         160

  39-McAllister Credit Application.      139         140

  40-McAllister Buyer's Order......      141         141

  45-Criminal Loss Document........      248         248

  61-McAllister Approval Form......      142         143

  83-McAllister Buyer's Order......      120         137

  92-Indirect Loan Data Entry Form.      316         317

113-Copy of Check-Lawson Proc.....      109         109

114-Copy of Check-Commission Check      112         113

7

```
 1                    I N D E X

 2

 3   EXHIBITS                          MARKED   RECEIVED

 4   Plaintiff's Exhibit (Continued)

 5    2 - Lawson Documents

 6     1-Credit Application...........   123      124

 7     2-Retail Installment Contract...  127      128

 8     3-Retail Installment Contract...  127      128

 9     4-Buyer's Order.................  120      121

10     9-Criminal Loss Document........  245      246

11    2-1 - First Lawson Loan Documents

12     1-Indirect Loan Data Entry Form   241      241

13     2-Approval Form.................  103      103

14     3-Credit Application...........   101      101

15     4-Buyer's Order.................  100      100

16    19-Retail Installment Contract..  105      105

17    20-Retail Installment Contract..  105      105

18    3 - Peters Documents

19     1-Retail Installment Contract..  152      152

20     2-Retail Installment Contract..  152      152

21     3-Credit Application...........  150      150

22     4-Buyer's Order.................  148      149

23    11-Criminal Loss Document.......  253      254

24

25
```

8

I N D E X

EXHIBITS                                    MARKED   RECEIVED

Plaintiff's Exhibit (Continued)

7 - Mel Channell's Documents

127-Copy of Check, Finder's Fee..   146       147

128-Copy of Check, McAllister....   145       146

130-Indirect Loan Data Entry Form   251       252

139-Mel Channell's Document......   151  Not Offered

142-Mel Channell's Document......   155  Not Offered

145-Indirect Loan Data Entry Form   242       243

161-Lawson Approval Form.........   124       125

163-Copy of Check, 11-14-02......   129       129

164-Copy of Check, Finder's Fee..   131       131

10-ACH Document Reflecting Direct
    Deposit Payment to Sunshine....  154      253

11-Signature Cards from Community Bank
   & Trust for Sunshine Camping Center
   Account......................    89        90

13-Documents produced by Don Pittman. 93      94

28-Corporate Minutes............    132       133

30 & 31-Promissory Note.........    134       134

15-Attorney Fee Records.........    261       262

EXHIBIT 15 WITHDRAWN FROM EVIDENCE            335

EXHIBIT 15 ADMITTED TO EVIDENCE...            437

9

```
 1                    I N D E X

 2

 3   EXHIBITS                              MARKED   RECEIVED

 4   Defendant Sunshine's Exhibit

 5   A - Authorization Agreement.......  289        334

 6   B - Credit Application, Lawson....  161        166

 7   C - Title Application, Lawson.....  161        166

 8   D - Credit Application, Peters....  162        166

 9   E - Title Application.............  163        166

10   F - Credit Application, McAllister 165         166

11   G - Credit Application, McAllister 165         166

12   H - Title Application, McAllister.  166        166

13   I - Copy of Email, 2-11-2002......  278        280

14   J - Union Planters Document.......  167        176

15   K - Copy of Email, 6-11-2004......  274        277

16   L - Lawson Documents..............  281        284

17   M - Peters Documents..............  282        284

18   N - Union Planters Loan Policy Manual 285      289

19   O & P Marked As Court Documents Only

20   O - Case Action Summaries.........  435

21   O-1 Case Action Summary...........  435

22   O-3 Case Action Summary...........  435

23   O-4 Case Action Summary...........  435

24   O-5 Case Action Summary...........  435

25   O-6 Case Action Summary...........  435
```

```
1                           I N D E X

2

3     EXHIBITS                              MARKED   RECEIVED

4     Defendant Sunshine's Exhibit

5      P-Interrogatory #16 and
           Request #24 & 25...............   435
6

7     REPORTER'S CERTIFICATE OF COMPLETION..........  553

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P-R-O-C-E-E-D-I-N-G-S

2              THE COURT:  At this time the Court is

3         going to call our final case for trial

4         this week, which is Regions Bank versus

5         Sunshine Camping Center, Incorporated, and

6         Jon K. Williams.  Is the plaintiff,

7         Regions Bank, ready to proceed?

8              MR. SMITH:  Plaintiff's ready, Your

9         Honor.

10             THE COURT:  Is the defendant Sunshine

11        Camping Center ready to proceed?

12             MR. SHIRLEY:  Ready, Your Honor.

13             THE COURT:  And is defendant Jon

14        Williams ready to proceed?

15             MR. MATTHEWS:  Yes, sir.

16             THE COURT:  All right.  At this time

17        I'll ask our circuit clerk,

18        Ms. Bludsworth, to call the roll of the

19        jurors.

20                  (The roll was called.)

21             THE COURT:  Okay.  The case that the

22        Court has called is a contracts case

23        between the plaintiff, Regions Bank, and

24        the two defendants.  And out of this

25        contract the plaintiff is making a claim

against the defendants based on several
legal causes of action including fraud;
negligence; wantonness; breach of
contract; conversion; civil felony;
conspiracy; wrongful hiring, training,
and/or supervision; and wrongful
entrustment.

I'm going to introduce the parties
and the attorneys to you in a moment, but
first there's questions that I will need
to ask you touching on your qualifications
to serve as jurors in this particular
case.  Of course, I'll ask that you be
truthful and candid in your responses.
None of us can be completely free of bias
or prejudice in all phases of our lives
and all issues that we have to decide, but
we don't want those biases and prejudices
to affect the outcome of this case and to
interfere with your independent judgment
in this case; therefore, it's imperative
that you respond to all questions that are
posed which apply to you.  And your
failure to correctly respond, even if it
should be inadvertent, could result in the

1  case being mistried and our having to try

2  the case again.

3       Now, as I mentioned, the plaintiff in

4  the case is Regions Bank, and I'll ask the

5  representative for Regions Bank or

6  representative and the attorneys, John

7  Smith and Lane Knight, if they would

8  please stand.

9       MR. SMITH:  And may it please the

10  Court, this is Dale York.  He's a

11  representative of Regions Bank from

12  Paducah, Kentucky.

13       THE COURT:  All right.  Thank you.

14  And then for Sunshine Camping Center,

15  attorney Merrill Shirley.  And I'll let

16  you introduce your client, Mr. Shirley.

17       MR. SHIRLEY:  This is Comber Borland.

18       THE COURT:  And then Mr. William B.

19  Matthews, Jr., representing Jon Williams.

20       MR. MATTHEWS:  This is Jon Williams.

21       THE COURT:  Are any of you related by

22  blood or marriage to any person that I

23  just introduced to you?

24       JURORS:  (No response.)

25       THE COURT:  Do any of you know or

think you might know anything about this case?

JURORS:  (No response.)

THE COURT:  Do any of you have a particular interest in this case for any reason?

JURORS:  (No response.)

THE COURT:  Do any of you have a fixed opinion about this case or in general cases of this type?

JURORS:  (No response.)

THE COURT:  Do any of you have other business in court this week as a party or as a witness?

A JUROR:  Restate that question, please.

THE COURT:  Do any of you have any other business in court this week either as a party in a lawsuit or as a witness in a lawsuit?

JURORS:  (No response.)

THE COURT:  Do any of you have a business relationship with any party to this case?  Okay.

A JUROR:  (Inaudible)

1           (Reporter asked for

2           clarification.)

3      THE COURT:  All right.  If you would,

4    I guess we need to get each of you who

5    believe that you have a business

6    relationship with Regions Bank to stand at

7    this time and give your name and just

8    state your relationship with Regions Bank

9    and I guess -- okay.  If everybody will

10   stand who has any kind of business

11   relationship with Regions Bank.  We're

12   gonna start on my far left over here, and

13   I'll ask you to give your name and your

14   relationship with the bank.

15      MS. CARROLL:  Judy Carroll.  I'm an

16   account holder there.

17      THE COURT:  Okay.  And that would be

18   your only relationship, you're an account

19   holder?

20      MS. CARROLL:  Yes, sir.

21      MS. DOVER:  Sandra Dover.  And I bank

22   with them one account and also my house is

23   mortgaged with Regions Bank.

24      THE COURT:  Okay.

25      MS. ENFINGER:  My name is Robyn

1  Enfinger, and I have an account with
2  Regions Bank.
3         THE COURT:  You just have an account?
4     MS. ENFINGER:  Checking.
5         THE COURT:  Robyn Enfinger?
6     MS. ENFINGER:  Yes, sir.
7         THE COURT:  Okay.  Thank you, ma'am.
8  Okay.  In the pink?
9     MS. STRAIN:  Ann Strain.  I have an
10  account there.
11        THE COURT:  All right.  And in the
12  back, sir?
13     MR. DENT:  Jonathan Dent.  I'm a
14  personal friend of Comber Borland and done
15  business with Sunshine Campers.  I've
16  bought two campers from them in the past.
17        THE COURT:  All right.  Thank you,
18  sir.  And your name, ma'am?
19     MS. COLE:  Mary Cole.  I have an
20  account with Regions.
21        THE COURT:  Okay.  Excuse me, I'm
22  sorry.
23     MS. KIRKLAND:  Mr. Quattlebaum, I
24  rented a camper from Sunshine RV in 2001
25  and again in 2002.

1          THE COURT:  Okay.  If you'll state

2     your name for the record.

3          MS. KIRKLAND:  Debbie Kirkland.

4     Debra Kirkland.

5          THE COURT:  Okay, Ms. Kirkland.

6     Okay.  Hold on just a minute, now.  Okay.

7     We've got Mr. Dent and Ms. Kirkland who

8     have stated business relationships with

9     Sunshine Camping Center.  Are there any

10    others who feel like they might have a

11    relationship, business relationship with

12    Sunshine Camping Center?  Okay.

13    Ms. Enfinger, did you have something you

14    wanted to say?

15         MS. ENFINGER:  My husband went to

16    school with Comber.

17         THE COURT:  With Mr. --

18         MS. ENFINGER:  My husband went to

19    school with Comber Borland.

20         THE COURT:  Okay.  Mr. Borland?  What

21    is his name?

22         MS. ENFINGER:  Jeff Enfinger.

23         THE COURT:  Jeff Enfinger?  All

24    right.  Is there anyone else who

25    believes -- this is just about business

1    relationships, now.  Is there anyone else

2    who believes they might have a business

3    relationship with any of the three parties

4    in this case?

5        A JUROR:  Talking about people

6    involved or including attorneys, too?

7        THE COURT:  No, I'm just talking

8    about the parties:  Regions Bank, Sunshine

9    Camping Center, or Jon K. Williams.  All

10   right.  At this time we will conduct our

11   voir dire, and that will begin with the

12   plaintiff, Mr. Smith.

13           (Voir Dire Examination by Mr.

14           Smith.)

15           OBJECTION

16     MR. SHIRLEY:  Your Honor, I'd like to

17   object to that.  Defendant is Sunshine

18   Camping.  Mr. Borland is a witness.

19           (Voir Dire Examination by Mr.

20           Smith Continues.)

21       THE COURT:  For Sunshine Camping?

22       MR. SHIRLEY:  Yes, sir.

23           (Voir Dire Examination by Mr.

24           Shirley.)

25       THE COURT:  Mr. William Matthews.

```
 1              (Voir Dire Examination by Mr.
 2        Matthews.)
 3        THE COURT:  Did you want to inquire
 4   of the jurors that want to speak in
 5   private?
 6        MR. SMITH:  If we could, Your Honor,
 7   please.
 8        THE COURT:  There were several of you
 9   who indicated that you wanted to give your
10   responses in private.  And I'll ask you if
11   you will just to come on up at this time,
12   and I'll allow Mr. Smith to ask you
13   whatever questions he wants to ask you up
14   here at the Bench.  I believe it was in
15   response to if you had ever been charged
16   or a member of your family or a relative
17   or close friend of a criminal offense.
18   Yeah.  If y'all will just stop right there
19   at that table and sort of get in a line,
20   and we'll just take you one at a time.
21   The first lady there can come on up.
22              (Whereupon, the following was
23         heard at the Bench out of the
24         hearing of the venire.)
25        MR. SMITH:  Ma'am, I'm sorry tell me
```

1        your name again.

2           MS. BUCKHALTER:  Etta Buckhalter.

3           MR. SMITH:  Ms. Buckhalter.  What

4        was -- who and what was the nature of the

5        crime?

6           MS. BUCKHALTER:  I have a theft of

7        property from '94.

8           MR. SMITH:  Were you charged -- did

9        you actually go to trial on that?

10          MS. BUCKHALTER:  No.  Set a $500

11       fine.

12          MR. SMITH:  3500?

13          MS. BUCKHALTER:  $500.

14          MR. SMITH:  500.  Was that a

15       misdemeanor?

16          MS. BUCKHALTER:  I'm not sure.

17          MR. SMITH:  Do you remember the

18       amount of money that was supposedly taken?

19          MS. BUCKHALTER:  No, I can't

20       remember.

21          MR. SMITH:  Where was that?

22          MS. BUCKHALTER:  Enterprise.

23          MR. SMITH:  And did you plead guilty

24       to that or were you tried?

25          MS. BUCKHALTER:  Yes, I pleaded

1    guilty.

2        MR. SMITH:  Did you pay the money

3    back to the person that you supposedly

4    took it from?

5        MS. BUCKHALTER:  All I had to pay was

6    500.

7        MR. SMITH:  Just 500, and that got it

8    over?

9        MS. BUCKHALTER:  Yes.

10        MR. SMITH:  Would the fact you had

11    that theft of property charge against you

12    tend for you to believe one way or the

13    other in this case?

14        MS. BUCKHALTER:  No.

15        MR. SMITH:  If I told you that the

16    facts in this case would show that there

17    had been a theft of property or something

18    close to that in this case, would that

19    tend to affect the way you decided this

20    case?

21        MS. BUCKHALTER:  No.

22        MR. SMITH:  Okay.  Thank you,

23    Ms. Buckhalter.

24        THE COURT:  If you other lawyers have

25    a question --

MR. MATTHEWS:  I do.

MS. BUCKHALTER:  I'm sorry.

MR. SHIRLEY:  No, I didn't have any.

THE COURT:  All right.  Thank you, ma'am, you may -- oh, excuse me.

MR. MATTHEWS:  Was that case in city court?

MS. BUCKHALTER:  Yes.

MR. MATTHEWS:  Okay.  That's all, Judge.

MS. BUCKHALTER:  I think I've also had -- I think my mother may have had a case you may have done.  Minnie Buckhalter?  I'm not sure.

THE COURT:  Next.

MS. HUNTER:  I believe the question was ever been arrested or --

MR. SMITH:  Yes, you or a family member ever been charged.

MS. HUNTER:  Myself.

MR. SMITH:  All right.  And tell me your name again, please.

MS. HUNTER:  Heavenly Hunter.

MR. SMITH:  Ms. Hunter, I knew that, I'm sorry.  What was the nature of the

23

1      charge against you?

2         MS. HUNTER:  Animal cruelty.

3         MR. SMITH:  Where was that?

4         MS. HUNTER:  Daleville.

5         MR. SMITH:  And what was the result

6      of that?

7         MS. HUNTER:  Pled youthful offender.

8         MR. SMITH:  How long ago was that?

9         MS. HUNTER:  Five years ago.

10         MR. SMITH:  I was about to say, can't

11      be that long, because you're not that old.

12      Okay.

13         MS. HUNTER:  Same day I started at

14      the police department.  It was a mess.

15         MR. SMITH:  Thank you, Ms. Hunter.

16      That's all.  These lawyers may have a

17      question.

18         MR. MATTHEWS:  I don't.

19         MR. SHIRLEY:  No questions.

20         MR. SMITH:  Yes, ma'am, if you could

21      tell us your name, please.

22         MS. BORAH:  Linda Borah.

23         MR. SMITH:  All right.  Ms. Borah, I

24      got you confused with somebody else?

25         MS. BORAH:  That's okay.

24

1    MR. SMITH:  I'm sorry.  And what is

2    it that you can tell us in response to

3    that question?

4    MS. BORAH:  My son.

5    MR. SMITH:  Your son?  What type of

6    charge was made?

7    MS. BORAH:  He served seven years for

8    kidnapping.

9    MR. SMITH:  Where was that?

10    MS. BORAH:  Where was the court or

11    where --

12    MR. SMITH:  Yes, ma'am.

13    MS. BORAH:  Houston County.

14    MR. SMITH:  In Houston County?  And

15    were there any charges other than

16    kidnapping?

17    MS. BORAH:  There was some made but

18    they were dropped.  That's the only one

19    that he served time for.

20    MR. SMITH:  Did he actually go to

21    trial or plead guilty?

22    MS. BORAH:  He went to trial.  He had

23    two hung juries and then the third jury --

24    MR. SMITH:  Would that experience

25    with your son, would that affect you in

1    deciding this case at all?

2         MS. BORAH:  No.

3         MR. SMITH:  All right.  That's all

4    the questions I have.

5         MR. MATTHEWS:  I don't have any.

6         MS. BORAH:  Okay.

7         THE COURT:  Next.

8         MS. STRAIN:  Strain.

9         MR. SMITH:  Ms. Strain?  And what

10   information can you tell us that was

11   responsive to that question?

12        MS. STRAIN:  My husband, DUI.  My

13   husband, DUI.

14        MR. SMITH:  Was that just a one DUI?

15        MS. STRAIN:  (Indicated in the

16   negative by a shake of the head.)

17        MR. SMITH:  He had some others as

18   well?

19        MS. STRAIN:  Yes.

20        MR. SMITH:  Did he ever have to do

21   any -- was he ever convicted of a felony

22   DUI statute?

23        MS. STRAIN:  He served time in jail.

24        MR. SMITH:  Do you have a judgment as

25   to how many DUI's he's had?

1    MS. STRAIN:  Three.

2    MR. SMITH:  Okay.  Would the fact

3    that your husband has had DUI's affect

4    your ability to be fair in this case?

5    MS. STRAIN:  No.

6    MR. SMITH:  Okay.  Thank you.

7    MR. SHIRLEY:  How many did she say?

8    MR. SMITH:  Said he had three.

9    MR. SHIRLEY:  Three?  I couldn't hear

10   her.

11   MS. DOVER:  Hi, I'm Sandra Dover, and

12   my brother was arrested and went to prison

13   for domestic violence and drugs.

14   MR. SMITH:  Where was that?

15   MS. DOVER:  That was in Phenix City,

16   Alabama.  And I also went bankrupt myself

17   because I signed for the church, which was

18   $200,000.

19   MR. SMITH:  Okay.  Would the fact

20   that you've had that experience --

21   MS. DOVER:  No.

22   MR. SMITH:  -- cause you to be --

23   MS. DOVER:  No.

24   MR. SMITH:  -- think one way or the

25   other in this case?

MS. DOVER:  No, no, no.

MR. SMITH:  Ms. Dover, thank you.
These lawyers may have a question.

MR. MATTHEWS:  I don't have any.

MR. SHIRLEY:  No thank you, I don't.

MS. STARLING:  Good afternoon.

MR. SMITH:  Good afternoon.  Could
you tell us your name, please?

MS. STARLING:  I'm Loretta Starling.

MR. SMITH:  And, Ms. Starling, what
information do you have for us?

MS. STARLING:  Well, my son, he got
in trouble when he was 17.  And he was
guilty and he knowed it.  And then April
the 3rd of 2000, he got arrested on a drug
charge.  He's currently on probation for
that.

MR. SMITH:  And where were the
charges when he was 17?

MS. STARLING:  Here in Ozark.

MR. SMITH:  And what were they?

MS. STARLING:  Rape or --

MR. SMITH:  Statutory rape?

MS. STARLING:  Yeah.

MR. SMITH:  Supposedly had sex with

28

```
1       someone who was underage?

2           MS. STARLING:  Yeah.

3           MR. SMITH:  And he's currently got

4       drug charges on probation?

5           MS. STARLING:  Right, right.

6           MR. SMITH:  The fact that he has

7       those charges or had that experience,

8       would that affect your ability to decide

9       this case?

10          MS. STARLING:  No, sir.

11          MR. SMITH:  Okay.  Thank you.

12          MR. MATTHEWS:  Is your son Greg

13      Starling?

14          MS. STARLING:  No, that's my

15      brother-in-law.

16          MR. MATTHEWS:  Brother-in-law, okay.

17          MS. STARLING:  Yeah.

18          MR. MATTHEWS:  Okay.

19          MS. STARLING:  That it?

20          MR. MATTHEWS:  Yeah.

21          MR. SMITH:  Yes, ma'am.  And, yes,

22      ma'am, could you tell us your name?

23          A JUROR:  (Inaudible)

24          THE REPORTER:  Would you say that

25      again?
```

1    MS. KILO: Eatrice Kilo. One L.

2    MR. SMITH: One L, thank you. Fix

3    that. And what information do you have

4    for us, Ms. Kilo?

5    MS. KILO: My uncle's incarcerated.

6    MR. SMITH: What is he in jail for?

7    MS. KILO: For rape.

8    MR. SMITH: And is that here in

9    Alabama?

10    MS. KILO: Huh-uh, Florida.

11    MR. SMITH: Florida? How long a

12    sentence does he have, if you know?

13    MS. KILO: Twenty-five to life.

14    MR. SMITH: And the fact that he

15    has -- he's currently in jail in Florida,

16    would that affect your ability to sit and

17    be fair in this case?

18    MS. KILO: No.

19    MR. SMITH: Did your uncle plead

20    guilty to the charge against him or was he

21    tried, do you know?

22    MS. KILO: He was tried.

23    MR. SMITH: Tried and found guilty?

24    MS. KILO: Uh-huh.

25    MR. SMITH: Okay. Thank you, ma'am.

1           MR. MATTHEWS:  No questions.

2           MR. SHIRLEY:  No questions.

3           MR. SMITH:  Yes, sir.  How do you do?

4           MR. TYLER:  I'm doing good.

5           MR. SMITH:  If you could tell us your

6  name, please.

7           MR. TYLER:  My name is Terry Tyler.

8           MR. SMITH:  All right, Mr. Tyler.

9           MR. MATTHEWS:  Tyler?

10          MR. TYLER:  Tyler, T-Y-L-E-R.

11          MR. SMITH:  And what information do

12  you have for us today?

13          MR. TYLER:  Well, my son, you asked

14  about that.

15          MR. SMITH:  Yes, sir.

16          MR. TYLER:  My son's got an ongoing

17  case right now.

18          MR. SMITH:  Here in Ozark?

19          MR. TYLER:  Yes.

20          MR. SMITH:  And what kind of case is

21  it?

22          MR. TYLER:  It's criminal.  He broke

23  into a store.

24          MR. SMITH:  Charged with theft or --

25          MR. TYLER:  Breaking and entering and

theft.

MR. SMITH:  And is that in city court or is it in district court or circuit court or do you know?

MR. TYLER:  I don't know.

MR. SMITH:  But it's going on now?

MR. TYLER:  Yes.

MR. SMITH:  Was he indicted by the grand jury?

MR. TYLER:  No.

MR. SMITH:  Would the fact that your son is under indictment for breaking and entering or theft or whatever that is, would that affect your ability to be fair in this case?

MR. TYLER:  No.

MR. SMITH:  Thank you, Mr. Tyler. How you doing, sir?  What is your name, please?

MR. RIVERS:  Charles Rivers.

MR. SMITH:  Mr. Rivers.  And what information do you have for us today?

MR. RIVERS:  Well, I have several relatives that's been incarcerated, three siblings.

1        MR. SMITH:  Let me ask you this.

2   Were any of the charges against them theft

3   where they'd supposedly taken something

4   from somebody?

5        MR. RIVERS:  (Inaudible)

6        THE REPORTER:  I didn't hear what you

7   said.

8        MR. RIVERS:  One sibling.

9        MR. SMITH:  And what was the nature

10  of the charge?  What was he supposed to

11  have taken?

12       MR. RIVERS:  I really don't have any

13  information.  I just know he was

14  incarcerated.

15       MR. SMITH:  Is he in jail at this

16  time?

17       MR. RIVERS:  Yes, he is.

18       MR. SMITH:  Where is he in jail, here

19  in Alabama?

20       MR. RIVERS:  In Florida.

21       MR. SMITH:  In Florida?

22       MR. RIVERS:  Yes, Florida.

23       MR. SMITH:  And just real quickly,

24  your other two siblings, what kind of

25  charges against them?

1        MR. RIVERS:  One was a drug charge
2    and one was attempted murder.
3        MR. SMITH:  And are both of them
4    still in jail or they both --
5        MR. RIVERS:  Yes.
6        MR. SMITH:  They're still in jail?
7        MR. RIVERS:  Still incarcerated.
8        MR. SMITH:  Florida or another state?
9        MR. RIVERS:  I really don't know.
10       MR. SMITH:  The fact that your three
11   brothers have had these experiences, would
12   that affect your ability to be fair in
13   this case?
14       MR. RIVERS:  No, sir.  My youngest
15   siblings from two marriages, and I'm fifty
16   years old.  We're separated.
17       MR. SMITH:  I understand.  They're
18   your brothers but you're not real close to
19   them?
20       MR. RIVERS:  No.
21       MR. SMITH:  Okay.  Mr. Rivers, thank
22   you.  Yes, ma'am, could you tell us your
23   name?
24       MS. DICK-GRACE:  Janet Dick-Grace.
25       MR. SMITH:  Yes, I should have known

1    that.  And what information do you have

2    for us?

3         MS. DICK-GRACE:  My cousin was

4    arrested for writing bad checks twice.

5    She was in the Dale County jail one time,

6    and my mother went and paid and got her

7    out.  And then she was in a jail in New

8    Brockton for writing bad checks, and my

9    mother went and paid and got her out of

10   that, too.

11        MR. SMITH:  And your mother would be

12   her aunt?

13        MS. DICK-GRACE:  Uh-huh, uh-huh.

14        MR. SMITH:  And the fact that your

15   cousin had had -- well, let me ask you

16   this.  Were the checks bad checks?

17        MS. DICK-GRACE:  What do you mean?

18        MR. SMITH:  As far as you know, I

19   mean, it wasn't a situation where there

20   was some confusion?  Were they really bad

21   checks?

22        MS. DICK-GRACE:  I think they were

23   bad checks.

24        MR. SMITH:  Bad checks.  And the fact

25   that your cousin has had that experience,

```
 1              would that affect your ability to be fair
 2              in this case?
 3                   MS. DICK-GRACE:  No.  I don't believe
 4              in writing bad checks.
 5                   MR. SMITH:  Sure.  Did your cousin
 6              pay those bad checks?  Or your mother --
 7                   MS. DICK-GRACE:  No, my mother did.
 8                   MR. SMITH:  Your mother?
 9                   MS. DICK-GRACE:  My mother did.  And
10              then my mother had her paint her beach
11              house.
12                   MR. SMITH:  She got a little labor
13              out of it?
14                   MS. DICK-GRACE:  Yeah.
15                   MR. SMITH:  Okay.  Thank you,
16              Ms. Dick-Grace.
17                   MR. SHIRLEY:  No questions, thank
18              you.
19                   MR. SMITH:  Good afternoon.  And your
20              name, please, ma'am?
21                   MS. COLE:  Mary Cole.
22                   MR. SMITH:  Ms. Cole.  And what
23              information do you have for us today?
24                   MS. COLE:  My niece.  Want her name?
25                   MR. SMITH:  Well, no, ma'am.  What
```

1    problem has she had?

2         MS. COLE:  Theft, theft.

3         MR. SMITH:  Where was that?

4         MS. COLE:  In Enterprise.

5         MR. SMITH:  And you say she's your

6    niece?  Is she someone that you're close

7    to?

8         MS. COLE:  My brother's -- yes --

9    daughter, yes.

10        MR. SMITH:  Did she serve any time in

11   jail for that?

12        MS. COLE:  She's still serving time.

13        MR. SMITH:  Did she plead guilty to

14   the charge against her or was she tried

15   and convicted?

16        MS. COLE:  Uh-huh.

17        MR. SMITH:  She was tried?  Would the

18   fact that your niece was convicted of this

19   theft charge, would that affect your

20   ability to be fair in this case?

21        MS. COLE:  No, it wouldn't.

22        MR. SMITH:  Thank you so much,

23   Ms. Cole.  Yes, sir.  Could you tell us

24   your name again, please?

25        MR. PATTERSON:  James W. Patterson.

1          MR. SMITH:  All right, Mr. Patterson,
2     and what information do you have for us
3     today?
4          MR. PATTERSON:  About where you asked
5     the questions if you've ever been arrested
6     or anything.
7          MR. SMITH:  Yes, sir.
8          MR. PATTERSON:  I have.  And I was
9     charged with two felony charges, and they
10    broke it down to misdemeanor third degree.
11         MR. SMITH:  Got a guilty plea -- I
12    mean, excuse me, a plea deal or something
13    like that?
14         MR. PATTERSON:  Yes, sir.
15         MR. SMITH:  What were those felony
16    charges?
17         MR. PATTERSON:  Breaking and
18    entering.
19         MR. SMITH:  How old were you when
20    that happened?
21         MR. PATTERSON:  I was in my twenties,
22    probably about 26.
23         MR. SMITH:  Where was that?
24         MR. PATTERSON:  In Daleville.
25         MR. SMITH:  Did you serve any jail

```
 1              time for that?
 2                   MR. PATTERSON:  Stayed three days,
 3              two-and-a-half days.
 4                   MR. SMITH:  When they arrested you?
 5                   MR. PATTERSON:  Right.
 6                   MR. SMITH:  Okay.  The fact that you
 7              had that experience when you were in your
 8              mid twenties, would that affect your
 9              ability to be fair in this case?
10                   MR. PATTERSON:  No, sir.
11                   MR. SMITH:  Thank you, Mr. Patterson.
12                   MS. PAYNE:  I'm Virginia Payne.
13                   MR. SMITH:  Ms. Payne?
14                   MS. PAYNE:  Uh-huh.  And this
15              happened forty years ago.
16                   MR. SMITH:  Okay.
17                   MS. PAYNE:  But my brother is a
18              junior, and he mortgaged property that my
19              daddy owned.
20                   MR. SMITH:  Uh-huh.
21                   MS. PAYNE:  And went to court.
22                   MR. SMITH:  What came of that?
23                   MS. PAYNE:  He had to pay the money
24              back.  He paid the money back.  He never
25              served time or anything, but it was -- the
```

1          loan was fraudulently, and my daddy had an
2          excellent name and it was --
3                MR. SMITH:  Was that here in Ozark?
4                MS. PAYNE:  Uh-huh, in Ozark.
5                MR. SMITH:  And would the fact that
6          your brother and your family, I guess,
7          went through that experience, would that
8          affect your ability in this case?
9                MS. PAYNE:  No.
10                MR. SMITH:  But your brother --
11                MS. PAYNE:  I just wanted -- I wanted
12          to -- I didn't feel right by not saying,
13          not telling.
14                MR. SMITH:  We appreciate that.
15                MS. PAYNE:  And my brother did pay it
16          back, all of it back.
17                MR. SMITH:  All right.  Thank you,
18          Ms. Payne.  Ms. Kirkland?
19                MS. KIRKLAND:  Okay.  My sister -- my
20          sister's daughter has been in criminal --
21          in court, but what I don't know for.  I
22          just know she's a drug addict.  Her
23          children have been taken away from her and
24          my sister's raising them and I don't know
25          a whole lot of details.  And that was

```
 1              in -- I think she was in Birmingham but --
 2                   MR. SMITH:  The fact that your niece
 3              has had this experience --
 4                   MS. KIRKLAND:  No.
 5                   MR. SMITH:  -- would that be -- that
 6              affect your --
 7                   MS. KIRKLAND:  No, I just didn't want
 8              to leave it out.
 9                   MR. SMITH:  Well, thank you.  Thank
10              you so much for telling us.  Thank you,
11              Your Honor.
12                   THE COURT:  Ladies and gentlemen, I
13              anticipate it'll take approximately 45
14              minutes for us to strike a jury, and so
15              I'm going to -- the court will stand in
16              recess until 15 minutes till four.  You'll
17              be free to get up and go to the restroom
18              if you want to or perhaps even step
19              outside.  But if you'll be back in the
20              courtroom here in the courtroom at 15
21              minutes till four, we will resume with the
22              trial.
23                        (Pause in the Proceedings.)
24                        (Whereupon, counsel conferred at
25                         the Bench out of the hearing of
```

1          the venire.)
2              MR. SMITH:  Your Honor, we have a
3      challenge for cause as to juror Dent who
4      was close friends with Mr. Borland.  I
5      understand that Mr. Borland is not the
6      corporation but he is the president of the
7      corporation.  He is the sole officer of
8      the corporation.  Mr. Dent testified that
9      he just couldn't sit in this case.  He did
10     not want to be tested in this case.  And I
11     think by all appearances, everything that
12     he said in total would indicate that he
13     could not be fair.  He could not consider
14     Mr. Borland's testimony -- he would give
15     Mr. Borland's testimony more weight than
16     he would give the testimony of any other
17     witness.  And for that reason we would
18     challenge him for cause.
19             THE COURT:  All right, sir.
20             MR. SHIRLEY:  We respectfully object.
21     We will accept him.
22             THE COURT:  I want to give y'all all
23     an opportunity to get on the record.
24             MR. MATTHEWS:  We'd ask he be
25     stricken, Judge.  I don't think he could

```
 1        be fair.
 2             THE COURT:  I'm gonna grant the
 3        challenge.
 4             MR. SMITH:  Judge, we would also have
 5        a challenge for juror Deal.  He's the
 6        insurance adjustor who's worked closely
 7        with Mr. Shirley.
 8             THE COURT:  That will be denied.
 9             MR. SMITH:  Thank you, Your Honor.
10                  (Break in the proceedings.)
11                  (The following was heard in open
12                   court.)
13             THE COURT:  Okay.  If you'll please
14        have a seat here in the jury box as your
15        name is called.
16                  (Jury seated in the box.)
17             THE COURT:  Okay.  This will be,
18        then, the jury that tries the case of
19        Regions Bank versus Sunshine Camping
20        Center, Incorporated, and Jon Williams.
21        The rest of you get to go home.
22                  (Venire dismissed.)
23             THE COURT:  Are there any matters
24        that we need to address before we get
25        started?
```

1     MR. SHIRLEY:  May I?

2              (Discussion off the record.)

3     THE COURT:  Ladies and gentlemen of

4     the jury, we have a few matters that need

5     to be taken care of in preparation for the

6     trial of the case, hopefully make it go a

7     little more smoothly, and we'll be able to

8     conclude it a little bit faster by doing

9     so.  I'm going to, before we adjourn for

10    the evening, though, give you a brief

11    charge on your conduct during the trial.

12    Of course, you don't really know a lot

13    about or any about the facts of this case

14    as of yet, but you do know who the parties

15    are and you know the nature of the case.

16    So I feel like it would be a good idea to

17    go ahead and give these instructions to

18    you before we take the evening recess.

19    And these instructions will apply for the

20    entire trial of the case.

21        Until the case is submitted to you

22    for your deliberations, you must not

23    discuss the case with anyone, nor permit

24    anyone to discuss the case with you in

25    your hearing or in your hearing.  You are

1  to keep an open mind and you shall neither

2  discuss nor decide any issue in this case

3  among yourselves until the case is

4  submitted to you for your deliberations

5  under the instructions of the Court.  If

6  members of your family or friends or

7  anyone else should ask you about the case,

8  you should tell them that you are under

9  the Court's instruction not to discuss it.

10 When the trial is over and your verdict is

11 rendered, you will then be released from

12 this instruction and you will then be free

13 to discuss the case and your experiences

14 as a juror to whatever extent you desire.

15      The attorneys, parties, and witnesses

16 are not permitted to talk to you during

17 the course of the trial.  Even a

18 discussion which has no relation to the

19 case might give a bad appearance, so we

20 need to avoid that.  If the participants

21 in the trial fail to greet you or converse

22 with you during this trial, it will be due

23 to this rule.

24      So with that I will excuse you for

25 the evening and ask you to be back here in

1    the jury room.  And the jury room is at

2    the far end of this hall.  I'll ask the

3    bailiff -- when I excuse you, if you'll

4    just come out this door, he'll show you

5    the jury room.  It'll be the last jury

6    room on the left at the end of the hall

7    there.  Be back there in the morning at

8    8:30.  Is 8:30 an inconvenience, a serious

9    inconvenience for any of you in the

10   morning?  Okay.  If not, then, I'll ask

11   you to be in that jury room at 8:30 in the

12   morning, and we'll try to get started very

13   soon thereafter.  So if you will, you may

14   step out with the bailiff at this time and

15   he'll show you out this door right here.

16                (The jury left the courtroom.)

17        THE COURT:  Okay.  We'll see everyone

18   back in the morning at 8:30.

19                (The following was heard May 2,

20        2006.)

21        THE COURT:  Okay.  I understand there

22   may be something y'all want to put on the

23   record before we begin.

24        MR. SMITH:  Yes, sir, I did.  We

25   had -- you had heard argument yesterday on

the consolidation for the trial with this
case CV04-251-M, a claim for
indemnification in case number 04-296-M.
And defendant Sunshine objected to that
consolidation for trial, Your Honor, and
Your Honor sustained that objection.  And
we simply wanted to make sure that those
facts were recited into the record.

          THE COURT:  All right.

          MR. SMITH:  And further, Your Honor,
because of that we would ask -- because of
that ruling from the Court we would ask
for the Court to enter an order in limine
to keep the defendants in this case from
discussing the facts of Regions being sued
in the McAllister lawsuit or Regions
paying any money toward settlement in the
McAllister lawsuit.  The McAllister
lawsuit being CV04-296-M.

          THE COURT:  Okay.  Response?

          MR. SHIRLEY:  Well, the response is
that insofar as the McAllister case, the
296 case being joined in this case,
Sunshine Camping had no notice.  There's
been no order entered that they were to be

consolidated for trial purposes. I
believe that was the foundation for the
Court making such a ruling. Any kind of
order about motion in limine relative to
that point would not be well taken at this
time if, in fact, they intend to make
Mr. McAllister personally as a witness
would be one ground, one basis. On behalf
of Sunshine we would submit to the Court
that we have the right and the privilege
that to show bias, prejudice, interest,
motivation for not telling it exactly like
the witness may portray it on direct
examination and to exclude the mention or
the reference to that unduly limits the
opportunity for evidence. The
plaintiff -- if the plaintiff calls him as
a witness, he can limit his testimony by
his examination, which would obviate the
need of any kind of order in motion in
limine.

    MR. SMITH: Your Honor, we --

    THE COURT: Before you respond I
think I need a little background on the
McAllister case.

1    MR. SMITH:  Yes, sir, Your Honor.

2    THE COURT:  If you can tell me a

3    little bit about that and how it relates

4    to this case.

5    MR. SMITH:  McAllister -- after

6    Regions, or Union Planters at the time,

7    sued Sunshine and Mr. Williams, about

8    three months or so -- my memory is a

9    little vague on that, after that lawsuit

10    was filed Mr. McAllister -- who was one of

11    the individuals whose identity was used to

12    obtain monies from Regions by the

13    defendants in this case -- filed a lawsuit

14    against Regions, Sunshine, and Mr.

15    Williams, and I think Mr. Borland as well.

16    That lawsuit settled in mediation back in

17    September.

18    Now, as part of that lawsuit, before

19    the mediation Regions asserted a claim for

20    indemnification and other claims against

21    Sunshine, not Mr. Borland but just

22    Sunshine and Mr. Williams.  We asserted

23    that claim for indemnification.  It was

24    our belief because of the status

25    conference that was held several months

ago, both of the cases were on the status
docket, we, Regions, announced ready for
trial.  No one was present for Sunshine
there.  It was our belief that both cases
were on this docket, both cases, both this
case and the McAllister case had been
consolidated for discovery.  We see no
reason why they should not be consolidated
for trial; however, you heard yesterday
Sunshine's objection, and the Court
sustained that objection and did not
consolidate the cases for trial.  But
because of that, Your Honor, we have a
separate claim for indemnification in the
McAllister lawsuit relating to Sunshine's
attorneys fees that it had to pay in
defending the McAllister lawsuit and for
the monies that it paid Mr. McAllister
toward settlement in that lawsuit.  And
those monies are $10,000.

THE COURT:  Wait a minute.  Regions
has a claim for indemnification?

MR. SMITH:  Yes, sir.

THE COURT:  Okay.  For what it paid
to McAllister?

1    MR. SMITH: Yes, sir, against

2    Sunshine and Mr. Williams. Because under

3    the terms of both the dealer agreement and

4    the retail installment contract and

5    security agreement that was assigned

6    Sunshine, the corporation, says in effect

7    that we, Sunshine, take responsibility for

8    any losses that Regions may incur because

9    of our wrongdoing in assigning

10   unenforceable contracts. And other

11   than -- I mean, the scope is broader than

12   that, at least that's our position in this

13   case.

14       THE COURT: Now, tell me why that

15   should be kept out of this case.

16       MR. SMITH: Because the two cases

17   aren't consolidated for trial, Your Honor,

18   its indemnification claim and this claim,

19   what Regions may have paid in attorneys

20   fees in Mr. McAllister's case and what

21   Regions paid as indemnification or paid to

22   Mr. McAllister to settle is simply

23   irrelevant and immaterial to the issues to

24   be tried in this lawsuit. And those

25   issues are whether Regions was defrauded

1   by -- and there are other cause of action

2   but I just cached (sic) it as fraud -- was

3   defrauded by Sunshine in assigning these

4   three contracts, in particular the

5   McAllister contract. Doesn't have

6   anything to do -- the damages are to be

7   tried in that other lawsuit. The claim

8   for indemnification is a separate issue

9   from what may have happened with this

10  contract in this lawsuit and the monies

11  that were paid for that contract. The

12  fact that we, Regions, had to defend a

13  lawsuit that was filed against us and pay

14  monies to settle that lawsuit is another

15  issue to be tried in another case, and

16  it's not relevant to this case.

17      THE COURT: Now, tell me again why it

18  ought to be allowed.

19      MR. SHIRLEY: One of the primary

20  issues of any witness that takes the stand

21  is whether or not their testimony is

22  biased, prejudiced, has a financial

23  interest in the outcome, did they assert a

24  financial interest. And if the way I

25  understand what he's asking for is that

that case is not ever supposed to be
mentioned.  And I submit that that's two
broad a request for motion in limine at
this juncture in this trial.  There's not
any testimony that he's proffering that's
supposed to be offered.  There's not any
testimony that is designated as being this
is all that McAllister is gonna say and do
and therefore you shouldn't get into all
of this.  And that's the problem, the
first problem with it.

The second problem with it is I think
he told you, he's telling you it's a
separate issue and it's a separate thing
for trial purposes, but it ain't gonna be
evidence if he doesn't make the wrong
suggestion of testimony on direct
examination.

MR. SMITH:  Your Honor, if that's the
point, we don't intend to get into Mr.
McAllister with his lawsuit against
Regions.  That's not our intent at all.
We're gonna put him on the stand if
necessary to, I guess, not identify the
documents that supposedly had his

signature on them.  But what I wanted to
avoid, Your Honor, is the defense in this
case coming up and going into Mr. -- with
Mr. McAllister the fact of his lawsuit and
any monies that Regions may have paid,
because that is a separate issue, based on
their objection, to be tried in another
lawsuit.

THE COURT:  And you're saying that
ought to be allowed to show possible
prejudice or bias on his part as a
witness --

MR. SHIRLEY:  Yes, sir.  Yes, sir.

THE COURT:  -- for Regions?

MR. SHIRLEY:  Yes, sir.

THE COURT:  I'm gonna deny your
motion at this time.  Of course, you're
free to raise it later on during the trial
of the case.  I'll just have to consider
it during the context of the trial.

MR. SMITH:  Okay.

THE COURT:  Okay.  Anything further,
then, before we bring the jury in?

MR. SMITH:  Not from Regions, Your
Honor.

1    MR. MATTHEWS:  No, sir.

2    MR. SHIRLEY:  No, Your Honor.

3         (The jury entered the

4         courtroom.)

5    THE COURT:  Good morning, ladies and

6    gentlemen.

7    JURORS:  Good morning.

8    THE COURT:  Before we begin with the

9    trial of this case I think it may be

10   helpful for you to have an understanding

11   of the procedure that we'll be following

12   throughout the course of the trial.  And

13   as you are aware, this is a civil case,

14   and the procedure that we will follow will

15   begin with opening statements.  First,

16   counsel for the plaintiff Regions Bank

17   will make an opening statement of their

18   case, and then counsel for the defendants

19   will be given an opportunity to respond

20   with a statement of their defenses.  Each

21   side will be confined to an outline of the

22   case and a statement of what they expect

23   the evidence to show.  These statements

24   are not evidence but are given simply to

25   familiarize you with the case so it will

1    be easier for you to follow it when the

2    evidence is presented.

3        Following the opening statements,

4    evidence will be presented by witnesses

5    and perhaps by various exhibits.  In

6    receiving evidence you should bear in mind

7    that as officers of the court attorneys

8    have a duty to present evidence in behalf

9    of the parties that they represent, to

10   make such objections as they deem proper,

11   and to fully argue their party's cause.

12   An attorneys statements, again, are not

13   evidence but are to help you understand

14   the evidence and to apply the law;

15   therefore, you should consider in your

16   verdict only statements that are supported

17   by the evidence and by the law as given

18   you by the Court.  Likewise, statements

19   made by the Court are not evidence and

20   should not be considered by you as such.

21       During this trial I will rule on

22   objections by counsel as to the

23   admissibility of testimony and other

24   evidence.  You should not concern yourself

25   with the reasons for my rulings since they

are controlled and required by rules of law. You shouldn't speculate as to possible answers to questions which I do not require to be answered. Additionally the overruling of objections to evidence is not intended to indicate the weight to be given such evidence by you.

Occasionally during the course of the proceedings it may become necessary for me to confer with the attorneys outside your presence or outside your hearing. Should I call counsel to the Bench or excuse you from the courtroom it will be to resolve a legal point or other matter which at that point might not be proper for you to hear and consider. You should not speculate on the content of any such conference, nor allow the conference or any inference you might draw to affect your verdict.

Following the close of the evidence in the case counsel will again be allowed to address you in closing arguments. In the arguments they will discuss the evidence and all reasonable inferences to be drawn therefrom to help guide you to a

true and just verdict. Again, counsel for
the plaintiff will open the arguments, the
defendants will be allowed to respond, and
then the plaintiff will be given an
opportunity to close.

At the close of the arguments the
Court will state to you the applicable
rules to guide you in arriving at your
verdict. Upon retiring to the jury room
to consider your verdict you will elect
one of your number as foreperson to
moderate your discussion and to sign and
return to the Court the verdict arrived at
by you.

When a judge and jury sit together as
a court of law it is the duty of the judge
to see that the trial progresses in an
orderly fashion, to rule upon legal
matters that are presented, to define the
issues involved, and to instruct the jury
as to the law applicable to the case. It
is your duty as jurors to follow the law
as so stated to you by the Court. You
will therefore render a verdict in
accordance with the facts as you determine

them from the evidence and the law as
given you by the Court. You will be the
sole and exclusive judges of the facts.
It will be your duty to attempt to
reconcile the testimony of all witnesses
so as to make them all speak the truth if
this can be done reasonably. If you
cannot reasonably reconcile all of the
testimony, it is then your duty to
consider the testimony with the view of
determining what the true facts are. In
so doing you may accept or reject any part
of the testimony of any witness and accept
only the testimony that you consider
worthy of belief. In determining what the
true facts are from the evidence you may
take into consideration any natural
interest or bias that a witness may have
as a result of any connection with the
case. You may take into account any
interest or bias a witness may show while
testifying. You may take into
consideration the demeanor of any witness
as to whether the witness was apparently
testifying frankly or evasively. You may

1  take into consideration any matter in

2  which you would in your everyday affairs

3  in passing upon the truthfulness and

4  accuracy of the testimony.  Weigh the

5  testimony in the light of your common

6  observation and experience and reach a

7  verdict that will be based upon the truth

8  as you determine it from all of the

9  evidence.

10      With that we will begin with opening

11  statements from the plaintiff.

12      MR. SMITH:  May it please the Court,

13  defense counsel.

14          (Opening Statements by Mr.

15          Smith.)

16      THE COURT:  Mr. Shirley.

17      MR. SHIRLEY:  Thank you, Your Honor.

18          (Opening Statements by Mr.

19          Shirley.)

20      THE COURT:  Mr. Matthews.

21      MR. MATTHEWS:  We waive opening,

22  Judge.

23      THE COURT:  All right.  You may call

24  your first witness.

25      MR. SMITH:  Your Honor, may we have a

1    moment to arrange some things?

2        THE COURT:  Yes, sir.  Ladies and

3    gentlemen of the jury, I will tell you

4    while they're doing this that I normally

5    go about an hour and a half and then we'll

6    take a break.  But if anybody has an

7    emergency, if you'll waive your hand at me

8    then I'll call for a recess and we'll take

9    a little break sooner than that.  I'm

10   usually looking around the courtroom for

11   those kind of things so -- and

12   sometimes -- I try to find a good breaking

13   point, so it may be a little bit longer

14   than an hour and a half at times, but

15   that's the schedule we'll try to follow.

16   And I will need you gentlemen to move this

17   easel over here --

18       MR. SMITH:  I'm sorry, Judge.

19       THE COURT:  -- so those jurors can

20   see the witness stand and see the Court.

21          (Pause in the Proceedings.)

22       MR. SMITH:  Thank you, Your Honor,

23   ladies and gentlemen.  We call Jon

24   Williams.

25       MR. SHIRLEY:  Am I gonna interfere

1           with anybody if I move over to the

2           chalkboard?

3                MR. SMITH:  I don't have any

4           objection, Your Honor.

5                THE COURT:  Okay.

6                JON K. WILLIAMS

7    having been first duly sworn or affirmed, was

8    examined and testified as follows, to-wit:

9              DIRECT EXAMINATION

10   BY MR. SMITH:

11   Q    You are Jon Williams?

12   A    Yes, sir.

13   Q    And where do you live, Mr. Williams?

14   A    Slocomb, 658 South County Road 9.

15   Q    And you're a native of Slocomb, would that be

16       true?

17   A    Yes, sir.

18   Q    Went to high school there?

19   A    Yes, sir.

20   Q    Finished in 1983?

21   A    Yes, sir.

22   Q    And then after that you went to junior college,

23       I think at Wallace State for a while?

24   A    Yes, sir.

25   Q    And after you finished at Wallace State did you

1          go into the military?

2     A    Yes, sir.

3     Q    And you served in what branch?

4     A    The Army.

5     Q    And how long were you in the Army?

6     A    Till 1991.

7     Q    And what did you do in the Army?

8     A    I was a tanker.

9     Q    And did you receive an honorable discharge?

10    A    Yes, sir.

11    Q    After you got out of the Army what job did you

12         have?

13    A    RC Cola there in Dothan.

14    Q    And what did you do for RC in Dothan?

15    A    Route salesman.

16    Q    How long did you do that job?

17    A    Roughly a year.

18    Q    After that job what did you do?

19    A    Cattle business.

20    Q    And what -- was there a particular cattle

21         business or company that you worked for?

22    A    Perry Livestock.

23    Q    And what did you do for Perry Livestock?

24    A    Dispatch, invoicing, stuff like that.

25    Q    And how long did you do that job?

1   A   From about '92 to '95.

2   Q   And then in 1995 what job did you take?

3   A   Waylon Jones RV Center.

4   Q   And what did you do at Waylon Jones RV Center?

5   A   I started off counter parts and worked my way

6       into the office finance.

7   Q   When you say office finance, what do you mean

8       by that?

9   A   Just basically getting people financed that

10      want to buy something through different

11      lenders.

12  Q   And did you become familiar with dealing with

13      lenders to obtain financing for prospective

14      purchasers of Waylon Jones RV during that time

15      period?

16  A   Yes, sir.

17  Q   And I may be mistaken, you may have to correct

18      me, but were there two periods of time that you

19      worked for Waylon Jones?

20  A   Yes.

21  Q   And the first period of time, when would that

22      have been?

23  A   I believe I left there in '98 or -- I think it

24      was '99.

25  Q   And you worked there from '95 to '99

| | | |
|---|---|---|
| 1 | | approximately? |
| 2 | A | Yes, sir. |
| 3 | Q | When you were doing financing for customers at |
| 4 | | Waylon Jones the first time you were there, did |
| 5 | | you become familiar with Union Planters Bank |
| 6 | | and Dale York? |
| 7 | A | Yes. |
| 8 | Q | So would it be fair to say that Union Planters |
| 9 | | knew you, knew of Jon Williams back in the late |
| 10 | | 1990s? |
| 11 | A | I think that's when we got signed up, yes, sir. |
| 12 | Q | You mean Waylon Jones got signed up? |
| 13 | A | Yes, sir. |
| 14 | Q | So you had obtained financing for your |
| 15 | | customers through Union Planters back, what, |
| 16 | | seven or eight years ago now? |
| 17 | A | Yes, sir. |
| 18 | Q | And so you were someone that was known to Union |
| 19 | | Planters, would that be true? |
| 20 | A | Yes, sir. |
| 21 | Q | Always had good relations with them during that |
| 22 | | time period, would that be fair to say? |
| 23 | A | Yes, sir. |
| 24 | Q | And when you left Waylon Jones in 1999 or so |
| 25 | | where did you go? |

1    A    Emerald Coast RV.

2    Q    And what did you do at Emerald Coast RV?

3    A    Finance.

4    Q    Same thing that you had been doing at Waylon

5         Jones?

6    A    Yes, sir.

7    Q    Did you continue to do work with Union Planters

8         during that time?

9    A    Yes, sir.

10   Q    So you're again someone that was known to Union

11        Planters back in the '99, 2000 time period?

12   A    Yes, sir.

13   Q    Had good relations with them I trust?

14   A    Yes, sir.

15   Q    Sold them good contracts?

16   A    Yes, sir.

17   Q    Didn't have -- and how long were you with

18        Waylon Jones during that period of time?

19   A    Emerald Coast or --

20   Q    I'm sorry, Emerald Coast.  I beg your pardon.

21   A    Little over a year, I think, right at.

22   Q    And then you left and went back to Waylon

23        Jones?

24   A    Yes, sir.

25   Q    When was that that you left to go back to

1        Waylon Jones?

2    A   I believe it was around 2000.

3    Q   And what did you do when you went back to

4        Waylon Jones?

5    A   Basically the same thing.

6    Q   Financing?

7    A   (Indicated in the affirmative by a nod of the

8        head.)

9    Q   I need you to say yes or no.

10   A   Yes, sir, I'm sorry.

11   Q   And, again, did you continue to work with Union

12       Planters and Dale York?

13   A   Yes, sir.

14   Q   So you were known to them during that time

15       period?

16   A   Yes, sir.

17   Q   Sold good contracts to them --

18   A   Yes, sir.

19   Q   -- would that be fair to say?  Now, there came

20       a point in time that you left Waylon Jones,

21       would that be true?

22   A   Yes, sir.

23   Q   And when was that?

24   A   October, November of '01, I believe.

25   Q   Okay.

1   THE COURT:  Are you jurors hearing
2   the witness's testimony okay?
3   JURORS:  (Indicating.)
4   MR. SMITH:  Your Honor, may I have
5   permission to move about?
6   THE COURT:  Yes, sir.
7   MR. SMITH:  Thank you, sir.
8   THE COURT:  The only concern I have
9   is these jurors on the far end of the jury
10  box there may not be able to see the
11  witness.
12  MR. SMITH:  Okay.  You're right,
13  Judge.  I may not be able to do this.
14  THE COURT:  There you go.
15  MR. SMITH:  Is this better?
16  THE COURT:  Yeah.
17  MR. SMITH:  Okay.
18  BY MR. SMITH:
19  Q   And why did you leave Waylon Jones in November
20      of 2001?
21  A   He was going out of business or --
22  Q   Now, before November of 2001 did you know
23      Comber Borland, the individual right here?
24  A   Yes, sir.
25  Q   How long had you known Mr. Borland in 2001?

| | | |
|---|---|---|
| 1 | A | Since I had went to Emerald Coast.  I guess a |
| 2 | | little over a year. |
| 3 | Q | Was he a coworker of yours there at Emerald |
| 4 | | Coast? |
| 5 | A | Yes, sir. |
| 6 | Q | Do you know what he did at Emerald Coast? |
| 7 | A | He was in sales. |
| 8 | Q | And did you and he sometime in late 2001 |
| 9 | | determine that you and he wanted to start your |
| 10 | | own business? |
| 11 | A | Yes, sir. |
| 12 | Q | And what business did you and he start? |
| 13 | A | Sunshine Camping Center. |
| 14 | Q | And was that an incorporated business? |
| 15 | A | Yes, sir. |
| 16 | Q | Were you determined to be the president of that |
| 17 | | corporation? |
| 18 | A | Yes, sir. |
| 19 | Q | And was Mr. Borland going to be the vice |
| 20 | | president of that corporation? |
| 21 | A | Yes, sir. |
| 22 | Q | And were you going to have 50 percent of the |
| 23 | | stock? |
| 24 | A | Yes, sir. |
| 25 | Q | And was Mr. Borland going to have the other |

1     50 percent?

2   A   Yes, sir.

3   Q   Do you remember how many shares of stock in the

4     company there were?

5   A   I think there was 500.

6   Q   I think that's right. So you had 250 shares

7     and Mr. Borland had 250 shares?

8   A   Yes, sir.

9   Q   Now, did you and he -- at least when you formed

10    the corporation in November of 2001 -- come up

11    with sort of division of -- any sort of

12    division of labor as to how Mr. Borland would

13    do something and you would do something? How

14    was that worked out?

15  A   Kind of what we knew. I knew the financing

16    side. He was more into sales, and he knew a

17    little bit more about mechanical than I did.

18    So we just kind of -- was a given that we

19    separated like that most of the time.

20  Q   Okay. Did you anticipate that -- and where was

21    Sunshine Camping Center located in

22    November 2001?

23  A   In Level Plains.

24  Q   And was it always in Level Plains?

25  A   Yeah.

1    Q    Up until the time you left?

2    A    Yes, sir.

3    Q    And you would have left when?

4    A    January of '04.

5    Q    You had a lot there?

6    A    We were renting a lot and -- yes, sir.

7    Q    What type of RV's -- I take it it was RV's that

8         were sold?

9    A    Yes, sir.

10   Q    What type of RV's were sold?

11   A    We had motor homes, travel trailers, fifth

12        wheels, pop-up campers.

13   Q    Do you know or know of an individual at Union

14        Planters Bank named John Gill?

15   A    Yes, sir.

16   Q    And who do you understand Mr. Gill to be?

17   A    Vice president, I believe, at that time.

18   Q    Had you had any dealings with him before

19        November or December of 2001?

20   A    Yes.

21   Q    And what kind of dealings had you had with him?

22   A    Him and Don -- I forget his last name -- him

23        and the president was one that actually signed

24        me up or signed Waylon Jones up at the

25        dealership.

1    Q    So when would that have been?

2    A    I'm not real sure the date on that.  Probably a

3         year and a half, about '96, maybe '97.  I'm not

4         real sure.

5    Q    So going again back to the '96, '97 timeframe,

6         you or somebody -- you, Jon Williams, was

7         somebody that was known to Union Planters?

8    A    Yes.

9    Q    And known at least at that time to be someone

10        who was trustworthy?

11   A    Yes.

12             MR. SHIRLEY:  Object.  Object.

13             THE COURT:  I sustain that objection

14        and ask the jury to disregard that

15        response.

16   BY MR. SMITH:

17   Q    When you and Mr. Borland formed Sunshine, did

18        you believe that you would need to obtain

19        financing for your customers who wished to buy

20        RV's?

21   A    Yes, sir.

22   Q    Did you do anything to try to locate financing

23        for your customers?

24   A    Yes, sir.

25   Q    And to that end in November or December of 2001

1          did you provide Union Planters with certain

2          documents?

3    A     I believe I called John Gill and talked to him.

4    Q     What did you tell Mr. Gill?

5    A     That we were new, trying to get set up to do

6          some financing because we knew we would need

7          it.  And he sent me a packet.

8    Q     Okay.  I want to show you documents that we've

9          used in this case.  It's really a group of

10         documents, but it's Union Planters documents

11         Exhibit Number 1.

12                        (Whereupon, Plaintiff's Exhibit

13                         Number 1, page 10, was marked

14                         for identification.)

15   BY MR. SMITH:

16   Q     And I want to call your attention to page 10.

17         They're numbered in the lower right-hand

18         corner.  Do you have it there?

19   A     Yes, sir.

20   Q     Do you recognize that?

21   A     Yes, sir.

22   Q     And tell us what that is, please.

23   A     If my memory -- it's been a long time ago, I

24         don't know if John requested me to put

25         something on my letterhead requesting some

```
 1           retail financing.  This looks like it probably
 2           is.
 3    Q      Was that something you provided to him?
 4    A      Yes, sir.
 5                   MR. SMITH:  Your Honor, we would
 6              offer page 10 of Union Exhibit 1.
 7                   MR. SHIRLEY:  No objection.
 8                   THE COURT:  It's admitted.
 9                       (Whereupon, Plaintiff's Exhibit
10                        Number 1, page 10, was admitted
11                        into evidence.)
12    BY MR. SMITH:
13    Q      You see page 10 on the screen?
14                   MR. SHIRLEY:  John, excuse me just
15              one minute.  Is that gonna be Plaintiff's
16              Exhibit Number 10 or --
17                   MR. SMITH:  One.  Page 10 of
18              Plaintiff's Exhibit Number 1.
19                   MR. SHIRLEY:  You're introducing the
20              whole exhibit?
21                   MR. SMITH:  No, I'm introducing right
22              now page 10.
23                   MR. SHIRLEY:  And it's gonna be
24              Plaintiff's Exhibit 10 or Plaintiff's
25              Exhibit 1?
```

1          MR. SMITH:  Plaintiff's Exhibit 1,

2     page 10.

3          MR. SHIRLEY:  Okay.  Thank you.  I'm

4     sorry.

5  BY MR. SMITH:

6  Q    Now, do you see the letter that you sent on the

7     screen here.

8  A    Excuse me?

9  Q    Can you see it on the screen here?

10 A    Yes, sir.

11 Q    Is this Sunshine Camping Center letterhead at

12     the top?

13 A    Yes, sir.

14 Q    All right.  And you signed as Jon K. Williams

15     president, correct?

16 A    Doesn't look like I signed it but, yeah, I sent

17     it.  I recognize it.

18 Q    You prepared this, didn't you?

19 A    Yes, sir.

20 Q    And Mr. Gill was someone that you knew at Union

21     Planters; is that correct?

22 A    Yes, sir.

23 Q    You told him that you and Mr. Borland were the

24     owners of the company?

25 A    Yes, sir.

```
 1    Q    And you were president and Mr. Borland was the
 2         vice president?
 3    A    Yes, sir.
 4    Q    And you told Mr. Gill that you were the finance
 5         manager, correct?
 6    A    Yes, sir.
 7    Q    Okay.  Turn with me to page 1, if you will,
 8         please.  And do you have pages 1 and 2 of
 9         Exhibit 1?
10                    (Whereupon, Plaintiff's Exhibit
11                     1, pages 1 and 2, were marked
12                      for identification.)
13    A    Yes, sir.
14    Q    And do you recognize that document?
15    A    Yes, sir.
16    Q    And is that something that Sunshine and Union
17         Planters entered into?
18    A    Yes, sir.
19    Q    All right.
20              MR. SMITH:  Your Honor, we would
21         offer those two pages.
22              MR. SHIRLEY:  Is that gonna be
23         Plaintiff's Exhibit 2?
24              MR. SMITH:  No, sir, Plaintiff's
25         Exhibit 1, pages 1 and 2.
```

```
 1                    THE COURT:  They're admitted.
 2                        (Whereupon, Plaintiff's Exhibit
 3                         Number 1, pages 1 and 2, were
 4                         admitted into evidence.)
 5   BY MR. SMITH:
 6   Q    All right.  Now, what are we looking at there,
 7        please, sir?
 8   A    It's a retail agreement with the dealer and the
 9        lender.
10   Q    And were you familiar with that kind of
11        agreement before November and December of 2001?
12   A    I've seen them, yes, sir.
13   Q    Was that the kind of agreement that you had
14        entered into when you were at the earlier
15        dealer --
16                    MR. SHIRLEY:  I would object.  That's
17            hearsay.  That's not the best evidence
18            either.  He's asking him to recount
19            something that went on ten years ago.
20            It's not the best evidence to prove
21            whether it's the same or similar
22            documents; hearsay information of a
23            document that has nothing whatsoever to do
24            with this case.
25                    THE COURT:  I sustain.
```

```
 1                    MR. SMITH:  Okay.
 2    BY MR. SMITH:
 3    Q    Now, did you enter into this recreational
 4         vehicle dealer agreement on behalf of Sunshine
 5         with Union Planters?
 6    A    Yes, sir.
 7    Q    You agreed to that, didn't you?
 8    A    Yes, sir.
 9    Q    And were you acting on behalf of the company in
10         your capacity as president of the company when
11         you agreed to that?
12    A    Yes, sir.
13    Q    Particularly I'll call your attention to
14         paragraph two the first sentence, the dealer
15         will identify each applicant.  You see that?
16    A    Yes, sir.
17    Q    Do you understand -- when you entered into
18         this, did you understand what the term
19         "identify" meant?
20    A    Yes, sir.
21    Q    And what did you understand it to mean?
22                    MR. SHIRLEY:  Judge, at this time we
23              would object for him to give an
24              explanation of the document.  Page 2 is
25              entered in as a Plaintiff's Exhibit.
```

```
 1              Plaintiff's Exhibit 1, pages 1 and 2 is
 2              the agreement that he's asking about.
 3              It's a document that's executed to -- for
 4              him to --
 5                  MR. SMITH:  Your Honor, Your Honor,
 6              if Mr. Shirley has an objection, can we
 7              have it outside the hearing of the jury?
 8              I don't think it's proper for him to have
 9              a speaking objection in front of the jury.
10                  THE COURT:  Can you simplify your
11              objection or do you need --
12                  MR. SHIRLEY:  Yes, sir, if I can step
13              up so the Court can hear.
14                  THE COURT:  All right.
15                      (Whereupon, counsel conferred at
16                      the Bench out of the hearing of
17                      the jury.)
18                  MR. SHIRLEY:  I object to him asking
19              his understanding of the documentation
20              because the documentation is in contracts
21              or agreement that the claims of this
22              lawsuits concern are to be determined
23              based upon the language.  And for him to
24              give his meaning and understanding is
25              violation of the parol evidence rule.
```

```
 1                    THE COURT:  Okay.
 2                    MR. SMITH:  He's the president of the
 3              company.  He is, in fact, the company when
 4              he entered into that document.  I think he
 5              can explain what he means.  I don't think
 6              it's a violation of the parol evidence
 7              rule.  I frankly don't understand the
 8              objection.  I just don't think it's a
 9              proper objection.  It's due to be
10              overruled.
11                    THE COURT:  Mr. Matthews, do you have
12              anything?
13                    MR. MATTHEWS:  (Indicated in the
14              negative by a shake of the head.)
15                    THE COURT:  I overrule the objection.
16                        (The following was heard in open
17                        court.)
18    BY MR. SMITH:
19    Q    As president of the company what did you
20         understand the term "identify" to mean?
21    A    Recognize who's giving you the application.
22    Q    And what did you understand as president of the
23         company the term "dealer" to mean?
24    A    Me or the representative of --
25    Q    Sunshine Camping Center?
```

1    A    -- Sunshine Camping Center.

2    Q    And "applicant," what did you understand that

3          term to mean?

4    A    Person applying for the loan.

5    Q    Third sentence talks about the dealer shall

6          assume all loss and damage.  Now, again, dealer

7          would be Sunshine, would it not?

8    A    Yes, sir.

9    Q    And what did you understand as president of the

10         company the phrase "all loss and damage" to

11         mean?

12         MR. SHIRLEY:  Object.  That asks for

13            a legal opinion, asks for a legal

14            conclusion.  It violates the merger rule.

15            The document speaks for itself.

16         THE COURT:  Overrule your objection.

17            You may answer the question.

18    BY MR. SMITH:

19    Q    As president of the company what did you

20         understand all loss and damage to mean?

21    A    Anything lost by whatever it states.  I mean,

22         (inaudible)

23               (Reporter asked for

24                clarification.)

25    A    Anything wrong with the contract.

1    Q    In other words, if an unenforceable contract
2         was bought by Union Planters, if that contract
3         was unenforceable because of something Sunshine
4         did, did you understand when you signed that
5         document that Sunshine would be responsible for
6         that loss and damage?
7    A    Yes, sir.
8    Q    And that's fairly clear, isn't it, to you?
9    A    Yes, sir.
10   Q    And that was clear to you when you signed this
11        document?
12   A    Yes, sir.
13   Q    Wasn't confusing at all, was it?
14   A    No, sir.
15   Q    Sustained by the bank.  You understood that to
16        be, at least at that time, Union Planters,
17        correct?
18   A    Yes, sir.
19   Q    And it goes on, which results from any false
20        representation contained in the application
21        which the dealer knows to be false when the
22        application is submitted to the bank, correct?
23   A    Yes, sir.
24   Q    And you agreed to that on behalf of Sunshine?
25   A    Yes, sir.

```
1    Q    And that would have been, what, January 26,
2         2002?
3    A    Yes, sir.
4    Q    Page six -- excuse me, paragraph six of that
5         page.  The dealer warrants that all contracts
6         will be valid and enforceable against the
7         purchaser.  You see that?
8    A    Yes, sir.
9    Q    Did you agree to that as president of Sunshine
10        Camping Center?
11   A    Yes, sir.
12   Q    Sunshine Camping Center agree to that?
13   A    Yes, sir.
14   Q    And is that pretty clear to you?
15   A    Yes, sir.
16   Q    You understood that, didn't you?
17   A    Yes, sir.
18   Q    It's not confusing, is it?
19   A    No, sir.
20   Q    The dealer will at all times hereafter
21        indemnify and hold harmless the bank against
22        any and all liabilities, loans, damage, costs,
23        and expenses of whatever kind or nature,
24        including reasonable attorneys fees arising
25        from or connected with claims of
```

1           misrepresentations or fraud, failure, or
2           refusal in handling warranty obligations in
3           connection with the sale or financing of any
4           recreational vehicle under this, or any other
5           agreement, between the parties hereto.  Do you
6           see that?
7    A      Yes, sir.
8    Q      Who did you understand the parties hereto to be
9           as president of the company?
10   A      Sunshine.
11   Q      And Union Planters?
12   A      Yes, sir.
13   Q      And you agreed to that provision as president
14          of this company?
15   A      Yes, sir.
16   Q      Did you agree to it?
17   A      Yes, sir.
18   Q      You understood it?
19   A      Yes, sir.
20   Q      It's not confusing, is it?
21   A      No, sir.
22   Q      Quite clear, isn't it?
23   A      Yes, sir.
24   Q      And did you have an understanding of what the
25          words "indemnify and hold harmless" meant?

```
 1    A    Indemnify, I'm not real sure.  But hold
 2         harmless, yes, sir.
 3    Q    Do you know what that means?
 4    A    Yes, sir.
 5    Q    What was your understanding?
 6    A    The dealer's responsible for making sure you
 7         had a valid contract.
 8    Q    And if there was a contract that was invalid
 9         that the bank paid for, that the dealer would
10         have to pay it back?
11              MR. SHIRLEY:  Object.  That invades
12         the ultimate issue.  It calls for a legal
13         opinion and conclusion.  The ultimate
14         issue is what to do about this agreement.
15         Whether it applies in his opinion would be
16         irrelevant, and it would invade the
17         province of the jury to decide the outcome
18         of the case.
19              THE COURT:  Overruled.  You may
20         answer.
21    BY MR. SMITH:
22    Q    You may answer.  Do you recall the question?
23    A    Repeat it, please.
24    Q    I'll try to restate it.  Did you understand and
25         hold harmless to mean that if it was a bad
```

```
 1          contract, one the bank couldn't collect on, and
 2          it was bad because of something Sunshine did,
 3          Sunshine would have to pay the bank the money
 4          back?
 5     A    Yes, sir.
 6                    MR. SHIRLEY:  We would restate for
 7              the record our objection, Your Honor.
 8                    THE COURT:  It's overruled.
 9                        (Whereupon, Plaintiff's Exhibit
10                         Number 1, page 3, was marked
11                         for identification.)
12     BY MR. SMITH:
13     Q    Now, before we move on, let me see if we can --
14          well, I'll tell you what, now is not the time
15          for that.  And on page three of the exhibit, is
16          that your signature?
17     A    Yes, sir.
18     Q    And is that where you manifested as president
19          of the company your agreement to this contract?
20     A    Yes, sir.
21                    MR. SHIRLEY:  Object to the form of
22              the question.
23                    THE COURT:  Overruled.
24                    MR. SHIRLEY:  Didn't define what
25              manifestation means.
```

```
 1                    THE COURT:  I overrule.
 2                    MR. SMITH:  We offer page 3, Your
 3              Honor, of Exhibit 1.
 4                    THE COURT:  Yes, sir, it's admitted.
 5                        (Whereupon, Plaintiff's Exhibit
 6                        Number 1, page 3, was admitted
 7                        into evidence.)
 8                        (Whereupon, Plaintiff's Exhibit
 9                        Number 1, page 4, was marked
10                        for identification.)
11   BY MR. SMITH:
12   Q    Now, did you and Mr. Borland also sign a
13        document sometime in January '02 or thereabouts
14        that said who on behalf of Sunshine could
15        assign contracts, financing contracts to the
16        bank?
17   A    I remember the document but I don't remember
18        the timeframe.
19   Q    Turn to page 4 of the exhibit, please.  And do
20        you recognize that?
21   A    Yes, sir.
22   Q    And what is that, please?
23   A    It's who can sign a contract with Union
24        Planters representing Sunshine Camping Center.
25                    MR. SMITH:  Your Honor, we would
```

```
 1                    offer page 4 of Exhibit 1.
 2                         THE COURT:  It's admitted.
 3                              (Whereupon, Plaintiff's Exhibit
 4                              Number 1, page 4, was admitted
 5                              into evidence.)
 6    BY MR. SMITH:
 7    Q    Now, this is your signature here at the bottom;
 8         is that correct?
 9    A    Yes, sir.
10    Q    And this is your signature up here?
11    A    Yes, sir.
12    Q    And we see that Mr. Borland's name appears
13         there as well?
14    A    Yes, sir.
15    Q    Is that his signature next to that?
16    A    Yes, sir.
17    Q    Did you see him sign that?
18    A    I believe so, yes.
19    Q    And so you and he were the two people on behalf
20         of Union Planters -- excuse me, on behalf of
21         Sunshine authorized to assign financing
22         contracts to the bank?
23    A    Yes, sir.
24                              (Whereupon, Plaintiff's Exhibit
25                              Number 1, page 19, was marked
```

```
1                        for identification.)
2    BY MR. SMITH:
3    Q    Turn to page 19 of the exhibit.  Well, turn to
4         page 19.  Do you recognize that document?
5    A    Yes, sir.
6    Q    And would you tell us what that is, please?
7    A    It's power of attorney for Union Planters to be
8         able to do something with the title in case
9         they needed to.
10   Q    Okay.
11                   MR. SMITH:  Your Honor, we'd offer
12            page 19.
13                   THE COURT:  It's admitted.
14                        (Whereupon, Plaintiff's Exhibit
15                        Number 1, page 19, was admitted
16                        into evidence.)
17   BY MR. SMITH:
18   Q    Did you sign that?
19   A    As a notary, yes, sir.
20   Q    Who was the person, though, that signed it --
21        signed a limited power of attorney for
22        Sunshine?
23   A    Comber.
24   Q    Mr. Borland?
25   A    Yes, sir.
```

89

```
1    Q    He signed on January 26, 2002?

2    A    Yes, sir.

3    Q    Now, did Sunshine have a bank account that it

4         used for -- to operate with?

5    A    Yes, sir.

6    Q    Where was that bank account?

7    A    I believe our first one was at SouthTrust Bank.

8    Q    Did you later have an account at CB&T?

9    A    Yes, sir.

10   Q    That was in Enterprise?

11   A    Yes, sir.

12   Q    Do you remember when that account was first

13        opened?

14   A    I don't recall the date.

15   Q    Okay.  I want to show you Exhibit 11.

16                      (Whereupon, Plaintiff's Exhibit

17                       Number 11 was marked for

18                       identification.)

19   BY MR. SMITH:

20   Q    And turn your attention to the last page of the

21        exhibit.  Do you recognize that?

22   A    Yes, sir.

23   Q    And tell us what that is, please.

24   A    It's when we opened the account.

25   Q    With CB&T?
```

```
1    A    Yes, sir.

2    Q    Do you recognize your signature on that

3         document?

4    A    Yes, sir.

5              MR. SMITH:  Your Honor, we would

6         offer Exhibit 11.

7              THE COURT:  Admitted.

8                   (Whereupon, Plaintiff's Exhibit

9                   Number 11 was admitted into

10                  evidence.)

11             MR. SHIRLEY:  What number is that

12        gonna be?

13             MR. SMITH:  It's Exhibit Number 11.

14   BY MR. SMITH:

15   Q    Let me put that last page on the screen.  Now,

16        CB&T in Enterprise is also known as Community

17        Bank & Trust; is that correct?

18   A    Yes, sir.

19   Q    Do you remember the person that you dealt with

20        there?

21   A    I really don't know who opened the account.

22   Q    Was it Linda Blair?

23   A    I suppose, yes, sir.

24   Q    Shows on the document that your account opened

25        with CB&T was opened on March 11 of 2002; is
```

```
 1            that correct?
 2    A       Yes, sir.
 3    Q       And you agreed that that's the date the CB&T
 4            account was opened?
 5    A       Yes, sir.
 6    Q       And that was a checking account?
 7    A       Yes, sir.
 8    Q       And that was one of the business accounts that
 9            Sunshine had; is that correct?
10    A       Yes, sir.
11    Q       And account number 2524635, was that the
12            account number?
13    A       Yes, sir, I guess it was.
14    Q       You don't dispute that, do you?
15    A       No, sir.
16    Q       Did you and Mr. Borland both have signatory
17            authority on that account when it was opened?
18    A       Yes, sir.
19    Q       Meaning both of you could write checks?
20    A       Yes, sir.
21    Q       Where would the statements for that CB&T
22            account go?
23    A       I guess to our post office box.
24    Q       Would there be anybody at Sunshine who would
25            review those checking account statements when
```

92

```
 1            they'd come in?
 2    A       Comber normally did.
 3    Q       Comber would?  Mr. Borland would review the
 4            checking account statements?
 5    A       Yes, sir.
 6    Q       And was that true as long as you were at the
 7            business?
 8    A       Yes, sir.
 9    Q       Now, there came a point in time, didn't there,
10            that you were no longer on that CB&T account;
11            would that be correct?
12    A       Yes, sir.
13    Q       And I call your attention to the page just
14            before the last page of Exhibit 11, and that's
15            marked as signature update; is that correct?
16    A       Yes, sir.
17    Q       August 5th, 2002?
18    A       Yes, sir.
19    Q       And the document shows that only Mr. Borland --
20            as of August 5, 2002, only Mr. Borland had
21            signature authority on this account; is that
22            correct?
23    A       Yes, sir.
24    Q       You were removed from the account?
25    A       Yes, sir.
```

```
 1    Q    Did Sunshine tell Union Planters Bank to make
 2         deposits into that CB&T account?
 3    A    Not real sure when that started.  I know that
 4         we came with the -- they were all doing that
 5         electronic deposit.
 6    Q    Okay.  Now, there was a change in your
 7         relationship with Mr. Borland at Sunshine in
 8         August of 2002, wasn't there?
 9    A    Yes, sir.
10    Q    I want to show you what has been marked as
11         Exhibit 13 in this case.
12                        (Whereupon, Plaintiff's Exhibit
13                         Number 13 was marked for
14                         identification.)
15    BY MR. SMITH:
16    Q    Those are some records from Don Pittman.
17         That's what the first page shows, correct?
18    A    Yes, sir.
19    Q    Who is Mr. Pittman?
20    A    He was our -- the lawyer that set up our
21         corporation.
22    Q    Set up Sunshine Camping Center?
23    A    Yes, sir.
24    Q    And if you can look at the documents that are
25         part of Exhibit 13, are those the corporate
```

```
1          records of Sunshine Camping Center?
2     A    Yes, sir.
3               MR. SMITH:  Your Honor, we would
4          offer Exhibit 13.
5               THE COURT:  Admitted.
6                    (Whereupon, Plaintiff's Exhibit
7                    Number 13 was admitted into
8                    evidence.)
9               MR. SHIRLEY:  You gonna ask him about
10         it, I'd like to look at it.
11              MR. SMITH:  You've seen it.
12              MR. SHIRLEY:  Well, I'd like to look
13         and see --
14              MR. SMITH:  Okay.
15              MR. SHIRLEY:  -- for sure that --
16         what it is.
17    BY MR. SMITH:
18    Q    I want to call your attention, please, to page
19         21.  Now, there is a document called bill of
20         sale, correct?
21    A    Yes, sir.
22    Q    And that reflects your sale of 5 of your 250
23         shares of stock in the corporation to
24         Mr. Borland, correct?
25    A    Yes, sir.
```

```
 1    Q    And turn with me to page 22.  Now, that is a
 2         document called security agreement, correct?
 3    A    Yes, sir.
 4    Q    And what is the date of that security
 5         agreement?  I believe it's on the next page,
 6         23?
 7    A    Twenty-ninth day of August, 2002.
 8    Q    And that was a note that you signed where you
 9         agreed to pay Mr. Borland $15,000; is that
10         correct?
11    A    Yes, sir.
12    Q    Hold onto that page.  Well, I'll tell you what,
13         let's talk about that.  Why on August 29 of
14         2002, did you transfer five shares to
15         Mr. Borland and agree to this $15,000 security
16         agreement?
17    A    I was having some problems financially, and I
18         owed the company -- we determined that amount
19         of money, and was gonna -- you know, agreed to
20         pay him back and turn over my control.
21    Q    You had taken $15,000 from the company, hadn't
22         you?
23    A    Yes, sir.
24    Q    Without Mr. Borland's knowledge, correct?
25    A    Some of it, yes, sir.
```

```
 1    Q    Some of it?  But some of it had been with his
 2         knowledge?
 3    A    Yes, sir.
 4    Q    But it was $15,000 that you had taken out of
 5         the company that you shouldn't have taken out
 6         of the company; would that be fair to say?
 7    A    Some of it, yes, sir.
 8    Q    But as of August 29, Mr. Borland knew that you
 9         had taken this $15,000 out of the company,
10         correct?
11    A    Yes, sir.
12    Q    And you said you had financial problems, and
13         I'm sorry to ask this but I need to.  You had a
14         gambling problem, didn't you?
15    A    Yes, sir.
16    Q    And Mr. Borland knew that, didn't she -- didn't
17         he?
18    A    He knew I gambled, yes, sir.
19    Q    Did he know that you owed money for gambling?
20    A    Directly I don't think he did, no, sir.
21    Q    But he knew you had taken some of this $15,000
22         without his knowledge, correct?
23    A    Yes, sir.
24    Q    And he wanted you to, as part of this
25         agreement, give up control of the company,
```

```
 1          correct?
 2    A     Well, I didn't have control, but give him
 3          control.
 4    Q     Give him control?
 5    A     Yes, sir.
 6    Q     Did it have anything to do with inventory?  In
 7          other words, buying inventory?
 8    A     No, sir.
 9    Q     Did it have anything to do with Mr. Borland
10          securing financing from some family member to
11          buy more inventory for the business?
12    A     Well, now, we needed the money back in the
13          company.  We were a young company that our
14          inventory we would buy as we go.
15    Q     Right.
16    A     And the company needed the money.
17    Q     Right.
18    A     And I think -- then again I'm not real, you
19          know, 100 percent sure, but I think at that
20          time Comber might have been trying to get some
21          outside financing.  And me being -- you know,
22          him being in control of the company would help
23          do that.
24    Q     And some part of that, though, of that $15,000
25          was money you took from the company without
```

1          Mr. Borland's knowledge?

2     A    Yes.

3               MR. SHIRLEY:  Object, that's

4          argumentative.  That's not direct

5          testimony, that's arguing with the witness

6          and argumentative, improper question.

7               THE COURT:  I overrule.

8     BY MR. SMITH:

9     Q    Was your answer yes?

10    A    Yes, sir.

11    Q    Mr. Borland allowed you to stay on with the

12         company, did he not?

13    A    Yes, sir.

14    Q    And he allowed you to continue to do financing;

15         would that be true?

16    A    Yes, sir.

17    Q    Even though that you had taken some portion of

18         this $15,000 without his knowledge?

19    A    Yes, sir.

20    Q    And you resigned as an officer of the company,

21         didn't you?

22    A    Yes, sir.

23    Q    Turn to page 26.  That was your statement of

24         resignation on August 29, 2002, correct?

25    A    Yes, sir.

```
1    Q    Did you ever inform the bank that you had

2         resigned as an officer?

3    A    I don't recall, no, sir.

4    Q    Did Sunshine ever inform the bank that you had

5         resigned as an officer?

6    A    I don't believe -- I don't recall, no, sir.

7    Q    Did Mr. Borland ever inform the bank that you

8         had resigned as an officer?

9    A    I can't answer that, I don't know.

10   Q    But after you resigned on August 29, 2002, you

11        continued to do financing contracts, didn't

12        you?

13   A    Yes, sir.

14   Q    I mean, that was part of the agreement you had

15        with Mr. Borland when you resigned and gave him

16        51 percent of the stock and entered into this

17        $15,000 promissory note, that you would

18        continue to do financing with the company?

19   A    That wasn't a specific thing.  He said I could

20        keep working.

21   Q    And part of your work was to do financing?

22   A    Yes, sir.

23   Q    Now, tell us who Hubert A. Lawson, III, is?

24   A    Brother-in-law.

25   Q    Did Mr. Lawson ever buy anything from Sunshine
```

1        Camping Center?

2   A    No, sir.

3   Q    I need to show you what has been marked as

4        Exhibit 2-1, and I want to call your attention

5        to page 4, please.

6                        (Whereupon, Plaintiff's Exhibit

7                         Number 2-1, page 4, was marked

8                         for identification.)

9   BY MR. SMITH:

10  Q    Do you have it there?

11  A    Yes, sir.

12  Q    What is that?

13  A    You call it a buyer's order.

14                 MR. SMITH:  Your Honor, we would

15            offer page 4 of Exhibit 2-1.

16                 THE COURT:  It's admitted.

17                        (Whereupon, Plaintiff's Exhibit

18                         Number 2-1, page 4, was

19                         admitted into evidence.)

20  BY MR. SMITH:

21  Q    Whose handwriting appears on that document?

22  A    Mine.

23  Q    And the signature at the bottom, Hubert A.

24       Lawson, who signed that?

25  A    I did.

```
 1    Q    The address of 658 South County Road 9,
 2         Slocomb, Alabama 36375, is that Mr. Lawson's
 3         true address?
 4    A    No, sir.
 5    Q    Home phone number (334)588-6146, was that his
 6         true phone number?
 7    A    No, sir.
 8    Q    Was there a sale of a vehicle described in here
 9         to Mr. Lawson?
10    A    No, sir.
11    Q    What was done with -- turn to page 3 of the
12         document, please.  What is that?
13    A    It's a credit application.
14    Q    For Mr. Lawson?
15    A    Yes, sir.
16    Q    For a sale in September of 2002?
17    A    Yes, sir.
18    Q    Who completed that?
19    A    I did.
20              MR. SMITH:  Your Honor, we would
21           offer page 3.
22              THE COURT:  It's admitted.
23                 (Whereupon, Plaintiff's Exhibit
24                  Number 2-1, page 3, was marked
25                  for identification and admitted
```

1                          into evidence.)

2    BY MR. SMITH:

3    Q    Mr. Lawson signed here, applicant signature?

4    A    No, sir.

5    Q    Did you do that?

6    A    Yes, sir.

7    Q    What did you do with this document?

8    A    It all gets faxed to Union Planters.

9    Q    And you say it all, would that include the one

10        we looked at just before the buyer's order?

11   A    Yes, sir, the buyer's order, the credit

12        application, and -- that's the two documents

13        that normally get faxed.

14   Q    And who at Union Planters would you have sent

15        that to?

16   A    Most of the time I worked with Dale or I

17        believe it was Lisa Driver.

18   Q    You mean Dale York?

19   A    Yes, sir.

20   Q    Turn with me to page 2 of the exhibit.  Do you

21        recognize that?

22   A    Yes, sir.

23   Q    What is that?

24   A    It's an approval letter that they sent back.

25                  MR. SMITH:  Your Honor, we would

```
 1              offer page 2.
 2                   THE COURT:  It's admitted.
 3                        (Whereupon, Plaintiff's Exhibit
 4                         Number 2-1, page 2, was marked
 5                         for identification and admitted
 6                         into evidence.)
 7   BY MR. SMITH:
 8   Q    Now, see thanks Dale.  Is that from Dale York?
 9   A    Yes, sir.
10   Q    It shows here that there was an amount financed
11        of 1,000 -- excuse me, $15,466.50, correct?
12   A    Yes, sir.
13   Q    It also shows that there was a down payment of
14        $6500, correct?
15   A    Yes, sir.
16   Q    And where did that $6500 number on the down
17        payment line come from?
18   A    It wasn't put on the down payment line on the
19        buyer's.  It was put as a just down -- but
20        there was no money put down.
21   Q    Okay.  But I mean, that was what was written in
22        the buyer's order, wasn't it?
23   A    Yes, sir.
24   Q    Okay.  But there wasn't a sale is what you're
25        telling us, right?
```

```
 1   A    Yes, sir.
 2   Q    But the condition under which -- one of the
 3        conditions under which the bank approved this
 4        was that there was a $6500 cash down payment.
 5                MR. SHIRLEY:  Object, asking somebody
 6            in Union Planters in Paducah what the
 7            reason was, he's not an officer --
 8                THE COURT:  I sustain the objection.
 9                MR. SHIRLEY:  -- unless he's an agent
10            at Union Planters.
11                THE COURT:  I sustain the objection.
12   BY MR. SMITH:
13   Q    The finance amount that Union Planters
14        approved, according to this document, was
15        $15,466.50; is that correct?
16   A    Yes, sir.
17   Q    I'd like you to turn to page 19 of your exhibit
18        now.
19                MR. SHIRLEY:  I'm sorry I didn't hear
20            that.
21                MR. SMITH:  Page 19.
22                MR. SHIRLEY:  Of which exhibit?
23                MR. SMITH:  2-1, the one we've been
24            looking at.
25                (Whereupon, Plaintiff's Exhibit
```

```
 1                          Number 2-1, pages 19 and 20,

 2                          were marked for

 3                          identification.)

 4    BY MR. SMITH:

 5    Q    Now, what is that?

 6    A    It's a retail contract.

 7    Q    Is it continued on page 20?

 8    A    I believe that's the back side.

 9    Q    Okay.  Is that a form that you're familiar

10         with?

11    A    Yes, sir.

12    Q    Did you complete that form?

13    A    Yes, sir.

14              MR. SMITH:  Your Honor, we'd offer

15         pages 19 and 20 of Exhibit 2-1.

16              THE COURT:  It's admitted.

17                  (Whereupon, Plaintiff's Exhibit

18                   Number 2-1, pages 19 and 20,

19                   were admitted into evidence.)

20    BY MR. SMITH:

21    Q    You've already told us that there was not a

22         sale of a 1992 Allegro to Mr. Lawson on

23         September 17, 2004, correct?

24    A    Yes, sir.

25    Q    This document that we're looking at, retail
```

```
 1              installment contract security agreement, had
 2              you been familiar with this document or type of
 3              document before September of 2002?
 4        A     Yes, sir.
 5        Q     And how had you been familiar with this
 6              document?
 7        A     Been doing the same document since probably
 8              '96, '97.
 9        Q     And dealing with Union Planters using this
10              document?
11        A     (Inaudible)
12                        (Reporter asked for
13                         clarification.)
14        A     Yes, sir, yes, sir.
15        Q     It's a standard form?
16        A     It's a standard form.  A lot of banks use same
17              retail contract.
18        Q     There are certain provisions and conditions
19              contained in this contract; is that right?
20        A     Yes, sir.
21        Q     Now, under the terms of this contract who was
22              financing this transaction on April 17, 2002?
23        A     April, September?
24        Q     I'm sorry, thank you.  September 17, 2002.
25        A     Union Planters.
```

```
 1    Q    Well, isn't it true that the seller under this
 2         contract was Sunshine Camping Center?
 3    A    Yes, sir.
 4    Q    And the buyer supposedly was Mr. Lawson; is
 5         that correct?
 6    A    Yes, sir.
 7    Q    And then this -- once this sale, once this sale
 8         went through, the contract here that we're
 9         looking at was assigned to the bank?
10    A    Yes, sir.
11    Q    And then would the bank pay Sunshine certain
12         monies for this financing contract?
13    A    Yes, sir.
14    Q    And with regard to this transaction on
15         September 17, 2002, was that done?
16    A    Yes, sir.
17    Q    Now, what monies would have been paid by the
18         bank as a result of this contract?
19    A    The amount financed.  And then they give you a
20         percentage of the amount financed as a ...
21    Q    Okay.  Now, what is the amount financed
22         according to the document?
23    A    18,216.50.
24    Q    Okay.  Just so that we're clear.  You signed
25         Mr. Lawson's name?
```

```
 1    A    Yes, sir.
 2    Q    And then you signed the assignment of the
 3         contract to the bank?
 4    A    Yes, sir.
 5    Q    Where were you when you signed that?
 6    A    I really don't remember.
 7    Q    You were employed by Sunshine at the time,
 8         correct?
 9    A    Yes, sir.
10    Q    Part of your job duties at Sunshine was to
11         assign financing contracts, wasn't it?
12    A    Yes, sir.
13    Q    Contracts like -- well, contracts of the form
14         which we're looking at here on pages 19 and 20?
15    A    Yes, sir.
16    Q    Now, did Sunshine Camping Center receive any
17         money as a result of that contract?
18    A    The check was made out to it, I think.
19    Q    Okay.  I want you to look -- do you still have
20         Exhibit 1 there with you?
21    A    Yes, sir.
22    Q    Turn with me to page 113.  What is that?
23    A    That's the (inaudible)
24                        (Reporter asked for
25                           clarification.)
```

1    A    The check from Union Planters.

2    Q    For that $18,000 number that we referred to

3    earlier?

4    A    Yes, sir.

5            MR. SMITH:  Your Honor, we'd offer

6    page 113 of Exhibit 1.

7            THE COURT:  It's admitted.

8              (Whereupon, Plaintiff's Exhibit

9              Number 1, page 113, was marked

10             for identification and admitted

11             into evidence.)

12  BY MR. SMITH:

13    Q    Now, that check's made payable to Sunshine

14    Camping Center, isn't it?

15    A    Yes, sir.

16    Q    It's not made payable to Jon Williams?

17    A    No, sir.

18    Q    I want to show you the back of the check.  Was

19    this check deposited into the Sunshine account?

20            MR. SHIRLEY:  We object unless he

21    knows.

22    A    I don't --

23             THE COURT:  If he knows.

24  BY MR. SMITH:

25    Q    Do you know?

1    A    No, sir, I don't know.

2    Q    Whose handwriting is this right here?

3    A    I couldn't say for sure.  I mean, that's not

4         mine.

5    Q    It's not yours?

6    A    That there's not, no, sir.

7    Q    Are you familiar with this number 2524635?

8    A    Looks like the account number at CB&T.

9              THE COURT:  Mr. Smith, let me

10             interrupt you right here.  I believe we

11             might need to take a recess at this time

12             if it will be okay.  I'm going to excuse

13             the jurors.  We'll take about a 15 -- 10-

14             to-15-minute recess, and the bailiff will

15             let you know when it's time to come back

16             in.

17                  (The jury left the courtroom.)

18                  (Break in the proceedings.)

19                  (The jury entered the

20                  courtroom.)

21   BY MR. SMITH:

22   Q    May it please the Court, ladies and gentlemen.

23        Mr. Williams, before we took our break we were

24        talking about the $18,216.50 that was paid on

25        the check made out to Sunshine on the first

1              Lawson contract, do you recall that?
2        A     Yes, sir.
3        Q     And you also had mentioned something about a --
4              I think finders fee may have been the term that
5              was used?
6        A     I call it commission --
7        Q     Commission.
8        A     -- for the contract.
9        Q     Would you tell the members of the jury what
10             that was?
11       A     Most all of your lenders pay you a percent of
12             the amount financed as a commission finders fee
13             for getting the contract.  That's your
14             commission for sending them the deal.
15       Q     So in this case the bank paid this $18,000
16             first to buy the contract, the amount financed;
17             is that correct?
18       A     Yes, sir.
19       Q     And then was there a separate check cut for the
20             finders fee?
21       A     That's the way it normally is done.
22       Q     Now, but for this contract for this deal that
23             really wasn't a deal being assigned, would
24             there have been any monies paid by the bank to
25             Sunshine?  In other words, if this first Lawson

```
 1            deal hadn't been sent to Sunshine, would there
 2            have been this commission paid?
 3    A       No.
 4    Q       I mean, Sunshine only received monies when
 5            there was a deal that went to the bank, would
 6            that be true?
 7    A       Yes, sir.
 8    Q       There weren't just monies that were received
 9            each month like a retainer or something like
10            that, was there?
11    A       No, sir.
12    Q       All right.  Turn to page, if you would, 114 of
13            Exhibit 1.  Do you recognize that?
14                         (Whereupon, Plaintiff's Exhibit
15                          1, page 114, was marked for
16                          identification.)
17    A       Yes, sir.
18    Q       And what is that?
19    A       Looks like the commission check.
20    Q       For the first Lawson deal?
21    A       Yes, sir.
22                    MR. SMITH:  Your Honor, we would
23               offer page 114 of Exhibit 1.
24                    THE COURT:  It's admitted.
25                         (Whereupon, Plaintiff's Exhibit
```

1              Number 1, page 114, was

2              admitted into evidence.)

3    BY MR. SMITH:

4    Q    You see the $1,092.99 was paid as the

5         commission on this first Lawson contract; is

6         that correct?

7    A    Yes, sir.

8    Q    And do you recognize your handwriting on the

9         back of the check that we see here?

10   A    Yes, sir.

11   Q    And you were working for Sunshine Camping

12        Center when this money was received, weren't

13        you?

14   A    Yes, sir.

15   Q    And that's your signature endorsing that check?

16   A    Yes, sir.

17   Q    In what account was that money put, if any?

18   A    I'm not sure it was put in any account.

19   Q    Just cashed it?

20   A    Yes, sir.  I'm not 100 percent sure but it

21        looks like that.

22   Q    Fair enough.  Okay.  Now, before we move on, I

23        think this is an appropriate place to cover

24        this.  Turn back with me to page 20 of

25        Exhibit 2-1.  2-1 is right here.  I think it's

```
 1              the last page.  Do you have it there?
 2      A    Yes, sir.
 3      Q    And that's the back of the financing contract
 4              for this first Lawson deal, correct?
 5      A    Yes, sir.
 6      Q    Now, I'm getting ahead of myself but I think
 7              here's the appropriate place to do it.  On the
 8              second Lawson deal, was the back of the
 9              contract like we see there the same?
10      A    I would assume so.  I mean, I don't have it in
11              front of me so I don't know.
12      Q    Okay.  Well, let's talk just a minute about
13              this, about the first Lawson deal.  There's a
14              box there called assignment by seller, do you
15              see that?  Down toward the bottom of the page.
16              I'll see if I can help you.
17      A    Yeah, okay.
18      Q    Assignment by seller?
19      A    Yes, sir.
20      Q    You got me?
21      A    Yes, sir.
22      Q    Okay.  I've got it blown up some so it will be
23              a little more legible.  See it on the screen
24              there?
25      A    Yes, sir.
```

```
1    Q    It says, seller sells and assigns.  Seller
2         meant Sunshine Camping Center, didn't it?
3    A    Yes, sir.
4    Q    That's pretty clear, isn't it?
5    A    Yes, sir.
6    Q    This retail installment contract and security
7         agreement, that was the deal, right?
8    A    Yes, sir.
9    Q    To assignee.  Now, who do you understand -- or
10        who did you understand assignee to be?
11   A    Union Planters Bank.
12   Q    Its successors.  Do you understand that Regions
13        Bank is the successor to Union Planters?
14              MR. SHIRLEY:  Object to the form.
15        Calls for a legal --
16              THE COURT:  Hold on just a minute.
17              MR. SMITH:  I'm asking does he
18        understand that is what --
19              THE COURT:  I overrule.
20   BY MR. SMITH:
21   Q    Do you understand that?
22              THE COURT:  It's to his
23        understanding.
24   A    No, sir.
25   Q    You didn't have any understanding one way or
```

```
 1          the other?
 2   A   I'm confused on that a little bit, yes, sir.
 3   Q   Fair enough.  Assigns.  Do you know whether
 4          Regions is the assigned of Union Planters?  Do
 5          you know one way or the other?
 6   A   No, sir.
 7   Q   Including all its rights, title, and interest
 8          in this contract.  You see that?
 9   A   Yes, sir.
10   Q   Says further:  Seller warrants.  Did you have
11          an understanding of what that means?
12   A   The seller guarantees.
13   Q   And the seller in this case was who?
14   A   Sunshine Camping Center.
15   Q   Not Jon Williams?
16   A   No, sir.
17   Q   This is similar to the dealer agreement
18          language.  A:  This contract represents a sale
19          by seller to buyer on a time price basis and
20          not a cash basis.  That's what it says, right?
21   A   Yes, sir.
22   Q   And this -- at least this one is for the first
23          Lawson deal, correct?
24   A   Yes, sir.
25   Q   B:  Statements contained in the contract are
```

```
 1              true and correct.  That's what Sunshine was
 2              saying on this first Lawson deal, correct?
 3       A      Yes, sir.
 4       Q      E -- I'm gonna skip these other ones.  E:  This
 5              contract is valid and enforceable in accordance
 6              with its terms.  That was a warranty that
 7              Sunshine was making to Union Planters, wasn't
 8              it?
 9       A      Yes, sir.
10       Q      F:  The names and signatures on this contract
11              are not forged, fictitious, or assumed, and are
12              true and correct.  That was something that
13              Sunshine was warranting, correct?
14       A      Yes, sir.
15       Q      None of those things were done, were they?
16       A      (No response.)
17       Q      In other words, the contract didn't represent a
18              sale, did it?
19       A      No, sir.
20       Q      The statements in the contract weren't true and
21              correct, were they?
22       A      No, sir.
23       Q      The contract was not valid and enforceable, was
24              it?
25       A      No, sir.
```

```
 1    Q    The names and signatures on the contract were
 2         either forged, fictitious, or assumed, correct?
 3    A    Yes, sir.
 4    Q    This paragraph here -- it's under J, it's not
 5         numbered:  If any of these warranties is
 6         breached or untrue, seller will upon assignee's
 7         demand purchase this contract from assignee.
 8         You see that?
 9    A    I hear it, I don't see it.
10    Q    Look under J.
11    A    I mean, I just can't read it on this.  I'm
12         understanding what you're saying, yes, sir.
13    Q    It's on the agreement, isn't it?
14    A    Yes, sir.
15    Q    And again seller was?
16    A    Sunshine Camping Center.
17    Q    And assignee was Union Planters?
18    A    Yes, sir.
19    Q    Now, it says further the purchase shall be in
20         cash in the amount of the unpaid balance
21         including finance charges plus the cost and
22         expenses of assignee, including attorneys fees;
23         that's what it says?
24    A    Yes, sir.
25    Q    Did you agree to that on behalf of Sunshine
```

1        when this contract was assigned to Union

2        Planters?

3   A   I did, yes, sir.

4   Q   Now, in November was there a second contract --

5        November of 2002, was there a second contract

6        bought by the bank reflecting another sale to

7        Mr. Lawson?

8   A   Yes, sir.

9   Q   Let me show you Exhibit 2 and Exhibit 7.

10              MR. SMITH:  Oh, and, Your Honor, we

11          would offer page 114 if I have not already

12          done so.

13              THE COURT:  I believe it's been

14          offered.

15              MR. SMITH:  Thank you.

16              THE COURT:  And admitted.

17              MR. SMITH:  I beg your pardon.

18              MR. SHIRLEY:  I'm sorry, but what

19          number is that, page 14 of Number 2?

20              MR. SMITH:  Page 114 of Exhibit 1.

21  BY MR. SMITH:

22   Q   You still have page -- excuse me, Exhibit 1

23        there with you, do you not?

24   A   Yes, sir.

25   Q   Okay.  Turn with me to page 83 of Number 1.

1          (Whereupon, Plaintiff's Exhibit
2          Number 1, page 83, was marked
3          for identification.)
4    BY MR. SMITH:
5    Q    Now, what are we looking at?  I'm sorry, I'm
6         sorry.  Stop just a minute.
7              MR. SMITH:  I've gotten confused
8         myself here, Mr. Shirley.
9              MR. SHIRLEY:  Well, I'm not
10        surprised.
11   BY MR. SMITH:
12   Q    Exhibit 2 is the one I'd like you to look at.
13   A    Page two?
14   Q    Exhibit 2, page 4.
15             (Whereupon, Plaintiff's Exhibit
16             Number 2, page 4, was marked
17             for identification.)
18   A    I've lost track.
19   Q    Let me see if I can help you.  Number 2, you
20        got -- no, that's not it.  Okay.  Page 4 of
21        Exhibit 2.  And my question to you is going to
22        be what is that, please?
23   A    It's a buyer's order.
24   Q    For Hubert Lawson?
25   A    Yes, sir.

1    Q    Dated November 13, 2002?

2    A    Yes, sir.

3    Q    Whose handwriting appears on that document?

4    A    It's mine.

5             MR. SMITH:  Your Honor, we would

6         offer page 4 of Exhibit 2.

7             THE COURT:  It's admitted.

8                 (Whereupon, Plaintiff's Exhibit

9                 Number 2, page 4, was admitted

10                into evidence.)

11   BY MR. SMITH:

12   Q    Now, this shows, does it not, that Mr. Lawson

13        was buying a 2003 All American; is that

14        correct?

15   A    Yes, sir.

16   Q    And an all American is a type of recreational

17        vehicle, isn't it?

18   A    Yes, sir.

19   Q    But he wasn't really, was he?

20   A    No, sir.

21   Q    And it shows that this sale was going to be for

22        $29,252, correct?

23   A    Yes, sir.

24   Q    And there was a trade allowance of $21,000?

25   A    Yes, sir.

1    Q    What was that supposed to represent?

2    A    The other vehicle.

3    Q    The trade-in of the one that was supposedly

4         bought back in September of '02?

5    A    Yes, sir.

6    Q    And it shows here on this line, balance owing

7         on trade.  You see that?

8    A    Yes, sir.

9    Q    What was that representing?

10   A    The payoff on the first one.

11   Q    On this one from September 17?

12   A    Yes, sir.

13   Q    Now, have you made some payments in

14        Mr. Lawson's name on this loan in September?

15   A    Yes, sir.

16   Q    Whatever payments you had made it reduced the

17        balance of that $18,500 or so down to

18        18,284.56, correct?

19   A    Yes, sir.

20   Q    But that was money that had already been

21        advanced to Sunshine, correct?

22   A    Yes, sir.

23   Q    So the total price was going to be $26,800.62,

24        correct?

25   A    Yes, sir.

```
1    Q    Now, and at the bottom of the page, the
2         signature.  That's your signature here under
3         dealer's authorized representative, isn't it?
4    A    Yes, sir.
5    Q    And you were an authorized representative of
6         Sunshine when you signed your name here,
7         weren't you?
8    A    I worked for them, yes, sir.
9    Q    And you signed Hubert Lawson's name on the
10        purchaser's signature, didn't you?
11   A    Yes, sir.
12   Q    Did you send that to Sunshine?  I mean, I'm
13        sorry, to Union Planters?
14   A    Yes, sir.
15                      (Whereupon, Plaintiff's Exhibit
16                       Number 2, page 1, was marked
17                       for identification.)
18   Q    Turn to page 1 of the exhibit.  Do you
19        recognize that?
20   A    Yes, sir.
21   Q    Tell us what that is.
22   A    Credit application.
23   Q    Whose handwriting appears on that?
24   A    Mine.
25                  MR. SMITH:  Your Honor, we would
```

1          offer page 1 of Exhibit 2.

2               THE COURT:  It's admitted.

3                    (Whereupon, Plaintiff's Exhibit

4                    Number 2, page 1, was admitted

5                    into evidence.)

6   BY MR. SMITH:

7   Q    Signature here, Hubert Lawson, you signed that,

8        didn't you?

9   A    Yes, sir.

10  Q    And was this along with the page that we just

11       looked at, page 4, was that sent to Sunshine --

12       I mean, sent to Union Planters?

13  A    Yes, sir.

14  Q    Did you send it?

15  A    Yes, sir.

16  Q    Did you get a response back from Union

17       Planters?

18  A    I'm sure I did.

19  Q    Look at page 161 of Exhibit 7, this one right

20       here.

21                   (Whereupon, Plaintiff's Exhibit

22                   Number 7, page 161, was marked

23                   for identification.)

24  A    161?

25  Q    Yes, sir, 161.

```
 1    A    I don't have it in this.  Hang on a second.

 2    Q    If there's some paper clips there, just feel

 3         free to pull them off.  That's for my benefit.

 4    A    I'm there.

 5    Q    You there?  Do you recognize that?

 6    A    Yes, sir.

 7    Q    Tell us what that is.

 8    A    It's approval letter.

 9    Q    And was that on this second Lawson deal of

10         November 13, 2002?

11    A    Yes, sir.

12    Q    It come from Dale York?

13    A    Yes, sir.

14              MR. SMITH:  Your Honor, we would

15         offer that.

16              THE COURT:  It's admitted.

17                   (Whereupon, Plaintiff's Exhibit

18                    Number 7, page 161, was

19                    admitted into evidence.)

20    BY MR. SMITH:

21    Q    According to this document, Mr. York was

22         telling you that Mr. Lawson was approved for a

23         $26,800.62 loan; is that correct?

24    A    Yes, sir.

25    Q    Now, would it be true that part of that amount
```

```
 1            that was being borrowed in this loan would go
 2            to pay off the amount loaned on this first one?
 3    A       Yes, sir.
 4    Q       But that was still money that the bank had
 5            advanced, would that be true?
 6    A       Yes, sir.
 7    Q       And you believed that Mr. York made his
 8            decision to approve this based on the
 9            information contained in the financing
10            documents you sent?
11                    MR. SHIRLEY:  I object to that unless
12                he knows what Mr. York did.  That's a
13                conclusion; that's a question of fact.
14                Unless he has personal knowledge, it would
15                be inappropriate.  It would be an
16                assumption without predication.
17                    THE COURT:  I overrule as to what he
18                believed was being done.
19    BY MR. SMITH:
20    Q       You may answer.
21    A       That was standard procedure, yes, sir.
22    Q       And it was standard procedure for this first
23            Lawson deal, too, wasn't it?
24    A       Yes, sir.
25    Q       Because it was Sunshine that was getting the
```

```
 1              information together for the bank so that the
 2              bank could make a decision:  Do we loan this
 3              money or not loan the money.  Would that be
 4              fair to say?
 5      A       Yes, sir.
 6      Q       Exhibit 2 again, please, sir.  Need you to look
 7              at Exhibit 2 again.  I'd like you to look at
 8              page 2.
 9                          (Whereupon, Plaintiff's Exhibit
10                           Number 2, pages 2 and 3, were
11                           marked for identification.)
12      BY MR. SMITH:
13      Q       You there?
14      A       Yes, sir.
15      Q       And is that the retail installment contract and
16              security agreement for this second Lawson deal?
17      A       Yes, sir.
18      Q       Who's handwriting appears on that?
19      A       It's my signatures.
20      Q       You signed Hubert Lawson?
21      A       Yes, sir.
22      Q       Is page 3 the back side?
23      A       Yes, sir.
24                  MR. SMITH:  Your Honor, we'd offer
25                  pages 2 and 3 of Exhibit 2.
```

```
1                    THE COURT:  They're admitted.
2                        (Whereupon, Plaintiff's Exhibit
3                        Number 2, pages 2 and 3, were
4                        admitted into evidence.)
5    BY MR. SMITH:
6    Q    This shows $26,800.62 being paid, correct?
7    A    Yes, sir.
8    Q    And it shows 18,284.56 being paid to Union
9         Planters Bank, correct?
10   A    Yes, sir.
11   Q    And then the signature here at the bottom?
12   A    Yes, sir.
13   Q    Hubert Lawson, you signed that, didn't you?
14   A    Yes, sir.
15   Q    And then this assignment of contract, you
16        signed that, didn't you?
17   A    Yes, sir.
18   Q    And the next page, page 3 of that contract
19        includes this language here, assignment by
20        seller, that we spent sometime reviewing just a
21        little while ago, correct?
22   A    Yes, sir.
23   Q    Makes those same warranties, A through J?
24   A    Yes, sir.
25   Q    Same thing, if any of these warranties is
```

```
 1            breached or untrue, seller will upon assignee's

 2            demand purchase this contract?

 3     A      Yes, sir.

 4     Q      Monies received by Sunshine from this

 5            assignment?

 6     A      Yes, sir.

 7     Q      You still have Exhibit 7 with you?

 8     A      Yes, sir.

 9     Q      Was that yes?

10     A      Yes, sir.

11     Q      Okay.  Turn with me to page 163.

12                      (Whereupon, Plaintiff's Exhibit

13                       Number 7, page 163, was marked

14                       for identification.)

15     BY MR. SMITH:

16     Q      Do you recognize that check?

17     A      Yes, sir.

18     Q      What is it for?

19     A      The second deal.

20                  MR. SMITH:  Your Honor, we would

21              offer that page.

22                  THE COURT:  It's admitted.

23                      (Whereupon, Plaintiff's Exhibit

24                       Number 7, page 163, was

25                       admitted into evidence.)
```

1    BY MR. SMITH:

2    Q    Now, this check is for $8,516.06, correct?

3    A    Yes, sir.

4    Q    Now, that's not for that entire $26,000

5         purchase price, was it?

6    A    No, sir.

7    Q    Can you tell us again why this check is not for

8         that entire $26,000 purchase price?

9    A    Union Planters always backed the payoff out.

10   Q    So the money that was used to pay off this loan

11        came from this deal here, correct?

12   A    Yes, sir.

13   Q    But there was really $26,000 owed according to

14        the paperwork; is that right?

15   A    Yes, sir.

16   Q    On this one, the second one?

17   A    Yes, sir.

18   Q    But the first one, because of the second one,

19        was paid off?

20   A    Yes, sir.

21   Q    Okay.  So even though the check's for only

22        $8500 there's really about $26,000 that the

23        bank has paid?

24   A    Yes, sir.

25   Q    And was this check deposited in Sunshine's

```
 1        account with CB&T?

 2   A    I don't believe so, no, sir.

 3   Q    Isn't that the CB&T account number?

 4   A    I'm not 100 percent sure.

 5   Q    Okay.  That's fine.  And there was a finders

 6        fee paid on this contract, too, wasn't there?

 7   A    Yes, sir.

 8   Q    And is that on page 164 of Exhibit 7?

 9   A    Yes, sir.

10             MR. SMITH:  Your Honor, we'd offer

11        that.

12             THE COURT:  It's admitted.

13             MR. SHIRLEY:  What page of that, I'm

14        sorry?

15             MR. SMITH:  164 of Exhibit 7.

16             MR. SHIRLEY:  Thank you.

17             MR. SMITH:  Very simple.

18                 (Whereupon, Plaintiff's Exhibit

19                  Number 7, page 164, was marked

20                  for identification and admitted

21                  into evidence.)

22   BY MR. SMITH:

23   Q    $1,340.03 paid as a finders fee?

24   A    Yes, sir.

25   Q    That was money that Union Planters would not
```

```
 1              have paid to Sunshine but for this deal?
 2      A      Yes, sir.
 3      Q      And was that check deposited in Sunshine's
 4              account with CB&T?
 5      A      I don't know.
 6      Q      Did you make payments on this deal as well?
 7      A      Yes, sir.
 8      Q      Do you know how much you paid?
 9      A      No, sir.
10      Q      I want to talk to you about the date of
11              April 2, 2003.  Do you still have Exhibit 11
12              there with you?  I'm sorry, Exhibit 13 there
13              with you?
14      A      Yes, sir.
15      Q      Turn with me to page 28.
16                          (Whereupon, Plaintiff's Exhibit
17                           Number 13, page 28 was marked
18                           for identification.)
19      BY MR. SMITH:
20      Q      Do you have it?
21      A      Yes, sir.
22      Q      All right.  What are we looking at there?
23      A      Looks like some minutes or something that I
24              sold the rest of the shares to Comber or gave
25              them to him.
```

1          MR. SMITH:  Your Honor, we'd offer
2      page 28 of Exhibit 13.
3          THE COURT:  Admitted.
4              (Whereupon, Plaintiff's Exhibit
5              Number 13, page 28, was
6              admitted into evidence.)
7  BY MR. SMITH:
8  Q    Why did you transfer to Comber Borland -- let
9      me start over.  On April 2, 2003, would it be
10     true that the only -- that you only owned 245
11     shares in Sunshine Camping Center?
12 A    Yes, sir.
13 Q    That was your whole interest in the
14     corporation; is that right?
15 A    Yes, sir.
16 Q    And you transferred that to Mr. Borland on
17     April 2, 2003, correct?
18 A    Yes, sir.
19 Q    Tell the members of the jury why you did that,
20     please.
21 A    I don't remember the exact reason.  I know
22     Comber's -- I think his father-in-law was gonna
23     help him a little bit more if I was out of the
24     picture as far as any kind of ownership.
25     Agreed to sign that over.  And still, best I

1          can remember, is paying the money that I still

2          owed him.

3     Q    $15,000?

4     A    Yes, sir.

5     Q    In fact, you executed another note on that

6          date, didn't you, for $15,000?

7     A    I believe so, yes, sir.

8     Q    All right.  Look at page 30 and 31 of the

9          exhibit.

10                        (Whereupon, Plaintiff's Exhibit

11                         Number 13, pages 30 and 31,

12                         were marked for

13                         identification.)

14    BY MR. SMITH:

15    Q    Is that the note you signed?

16    A    Yes, sir.

17              MR. SMITH:  Your Honor, we'd offer

18          those two pages, 30 and 31, of

19          Exhibit 7 -- or Exhibit 13.

20              THE COURT:  They're admitted.

21                        (Whereupon, Plaintiff's Exhibit

22                         Number 13, pages 30 and 31,

23                         were admitted into evidence.)

24    BY MR. SMITH:

25    Q    Now, you had signed a note back in August of

135

```
 1        2002 for $15,000, correct?
 2    A   Yes, sir.
 3    Q   Was the one that you signed here on April 2,
 4        was that in addition to the first one?
 5    A   No, sir.
 6    Q   Was it in lieu of the first one?
 7    A   Yes, sir.
 8    Q   Was the first one paid off?
 9    A   No, sir.
10    Q   So --
11    A   Other than the collateral of my shares I gave
12        to him.
13    Q   Okay.  So --
14    A   But I still agreed to pay $15,000.
15    Q   So wasn't any new monies advanced; is that
16        right?
17    A   Best of my knowledge, no, sir.
18    Q   Okay.  Was that note ever paid off?
19    A   Yes, sir.
20    Q   How was it paid off?
21    A   Cashier's check.
22    Q   Where did the money from the cashier's check
23        come from?
24    A   From the deposit at CB&T.
25    Q   Was that after April 2, 2003?
```

```
1    A    Yes, sir.
2    Q    Where did the money come from that went into
3         the deposit of CB&T that was used to pay off
4         that second loan?
5    A    A contract.
6    Q    Do you remember who the contract was with?
7    A    Union Planters.
8    Q    Do you remember who the person was that was
9         shown to be the buyer on that contract?
10   A    Dorothy Peters.
11   Q    Make sure I understand.  This note we're
12        looking at dated April 2, 2003, was paid off;
13        is that right?
14   A    Yes, sir.
15   Q    Paid off by money that came from Union
16        Planters?
17   A    Yes, sir.
18   Q    Into Sunshine's account?
19   A    Yes, sir.
20   Q    On a contract by a lady named Dorothy Peters?
21   A    Yes, sir.
22   Q    And that was several months after this date;
23        would that be true?
24   A    I don't know the exact date but it was.
25   Q    We'll talk about that in a minute.  So when you
```

```
 1              transferred your shares on April 2, Mr. Borland
 2              had a hundred percent of the value of the
 3              corporation, a hundred percent of the shares?
 4      A       Yes, sir.
 5      Q       All right.  I want to ask you about a gentleman
 6              named Robert McAllister, Bobby McAllister.
 7              Turn with me to page 83 of Exhibit 1.
 8      A       I'm there.
 9      Q       Okay.  What is that?
10      A       Buyer's order.
11      Q       And it's dated what?
12      A       Question again, I'm sorry?
13      Q       And it's dated what?
14      A       Oh, I'm sorry, 2/19/2003.
15                      MR. SMITH:  Your Honor, we'd offer
16                  page 83.
17                      THE COURT:  It's admitted.
18                          (Whereupon, Plaintiff's Exhibit
19                          Number 1, page 83, was admitted
20                          into evidence.)
21      BY MR. SMITH:
22      Q       Now, is your handwriting on this document?
23      A       Yes, sir.
24      Q       Did Mr. McAllister come into Sunshine on or
25              about February 19, 2003?
```

1  A   I believe so, yes, sir.

2  Q   Was he interested in buying a camper at that

3      time?

4  A   Yes, sir.

5  Q   Did he give you certain information

6      regarding -- strike that.  And was the camper

7      he was interested in buying this 2003 Salem?

8  A   Yes, sir.

9  Q   Did he give you certain information so -- to

10     use to see whether he'd be approved for

11     financing to buy that camper?

12 A   Yes, sir.

13 Q   Including his Social Security number?

14 A   Yes, sir.

15 Q   Just a minute, let me step back, I'm sorry.  On

16     these Lawson contracts did you put Mr. Lawson's

17     Social Security number on those contracts?

18 A   Not on the contracts.

19 Q   Okay.  But on those financing documents?

20 A   Only document it goes on is the credit ap.

21 Q   Credit ap?  And was the Social Security number

22     you put down on Mr. Lawson's credit application

23     his Social Security number?

24 A   On the first one it was.  On the second one

25     they're telling me there was one that was off.

1           Not intentionally, but.

2      Q    Where did you get the Social Security number?

3      A    It was kind of easy accessible with him.

4      Q    And then Mr. McAllister in February of 2003

5           gave you his Social Security number; would that

6           be true?

7      A    Yes, sir.

8      Q    And did you attempt to get financing for him in

9           February of 2003 for this 2003 Salem?

10     A    I believe so, yes, sir.

11     Q    And then ultimately Mr. McAllister -- well, he

12          was approved for financing, wasn't he?

13     A    Yes, sir.

14     Q    But he decided not to buy in February, didn't

15          he?

16     A    Yes, sir.

17     Q    Would it be true that you took the information

18          he gave you in February and then submitted

19          another false application to Union Planters in

20          June of 2003?

21     A    Yes, sir.

22     Q    Turn with me to page 39 of Exhibit 1.

23     A    I'm there.

24                      (Whereupon, Plaintiff's Exhibit

25                       Number 1, page 39, was marked

1                      for identification.)

2     BY MR. SMITH:

3     Q    You recognize that?

4     A    Yes, sir.

5     Q    Is your handwriting on that document?

6     A    Yes, sir.

7               MR. SMITH:  Your Honor, we'd offer

8          page 39 of Exhibit 1.

9               THE COURT:  Admitted.

10                  (Whereupon, Plaintiff's Exhibit

11                  Number 1, page 39, was admitted

12                  into evidence.)

13    BY MR. SMITH:

14    Q    This is another purchase order, isn't it, or is

15         this a credit ap?

16    A    Credit application.

17    Q    There's a signature, Robert M. McAllister, at

18         the bottom here, correct?

19    A    Yes, sir.

20    Q    You signed that, didn't you?

21    A    Yes, sir.

22    Q    Was that sent to Union Planters?

23    A    Yes, sir.

24    Q    Turn with me to page 40.

25                  (Whereupon, Plaintiff's Exhibit

```
 1                       Number 1, page 40, was marked

 2                       for identification.)

 3    BY MR. SMITH:

 4    Q    And is that the buyer's order that you created?

 5    A    Yes, sir.

 6                  MR. SMITH:  Your Honor, we'd offer

 7           page 40 of Exhibit 1.

 8                  THE COURT:  Admitted.

 9                       (Whereupon, Plaintiff's Exhibit

10                       Number 1, page 40, was admitted

11                       into evidence.)

12    BY MR. SMITH:

13    Q    Now, this shows that Mr. McAllister was buying

14         that Salem, correct?

15    A    Yes, sir.

16    Q    Sales price was gonna be, what, $21,700?

17    A    Yes, sir.

18    Q    And the amount financed was going to be what?

19    A    Looks like 19,000.

20    Q    Okay.  And signatures, the signature there for

21         Mr. McAllister, you signed that, didn't you?

22    A    Yes, sir.

23    Q    But the dealers authorized representative you

24         signed, didn't you?

25    A    Yes, sir.
```

```
1    Q    And you were an authorized representative for
2         Sunshine when you signed that document?
3    A    Yes, sir.
4    Q    And that was sent to the bank as well, wasn't
5         it?
6    A    Yes, sir.
7    Q    And based on that information that you sent,
8         the bank approved financing for that sale that
9         was represented by those documents, didn't it?
10                  MR. SHIRLEY:  Object to the form.  No
11             predicate.
12                  THE COURT:  I overrule.
13   BY MR. SMITH:
14   Q    You may answer.
15   A    Yes, sir.
16   Q    Turn with me to page 61 of Exhibit 1.
17                       (Whereupon, Plaintiff's Exhibit
18                        Number 1, page 61, was marked
19                        for identification.)
20                  MR. SHIRLEY:  I'm sorry I didn't hear
21             what you said.
22                  MR. SMITH:  Page 61 of Exhibit 1.
23                  MR. SHIRLEY:  Thank you.
24   BY MR. SMITH:
25   Q    Is that the approval form?
```

```
 1    A    Yes, sir.
 2                   MR. SMITH:  Your Honor, we'd offer
 3              page 61.
 4                   THE COURT:  It's admitted.
 5                       (Whereupon, Plaintiff's Exhibit
 6                        Number 1, page 61, was admitted
 7                        into evidence.)
 8    BY MR. SMITH:
 9    Q    By this, Mr. York was telling you at Sunshine
10         Camping Center that Mr. McAllister, for this
11         June 2003 contract, had been approved?
12    A    Yes, sir.
13    Q    The amount financed was going to be $18,800,
14         correct?
15    A    Yes, sir.
16    Q    Now, did Sunshine then submit a credit
17         application -- or strike that.  Did Sunshine
18         then -- strike that.  Was a contract then
19         prepared reflecting the financing of that sale
20         of $18,800?
21    A    Yes, sir.
22    Q    Turn to page 36 of the exhibit if you will.
23         Number 1.
24                   MR. SMITH:  Exhibit 1, Mr. Shirley,
25              page 36.
```

1              MR. SHIRLEY:  I've got a vent that's
2          blowing over my head.  I don't mean to be
3          disruptive.
4              MR. SMITH:  Just want to make sure
5          we're not confused.
6    BY MR. SMITH:
7    Q    Does page 36 and 37 of the exhibit represent
8         the front and back of the retail installment
9         contract and security agreement for this
10        McAllister deal of June 2003?
11   A    Yes, sir.
12                    (Whereupon, Plaintiff's Exhibit
13                     Number 1, pages 36 and 37, were
14                     marked for identification.)
15   BY MR. SMITH:
16   Q    It shows that the amount financed was going to
17        be $19,000 even, correct?
18   A    Yes, sir.
19   Q    And then you signed Mr. McAllister's name to
20        that document, didn't you?
21   A    Yes, sir.
22   Q    And there was not a sale, though, was there?
23   A    No, sir.
24   Q    Then you signed the assignment to Union
25        Planters bank there, correct?

1    A    Yes, sir.

2    Q    And you were at that time authorized by

3         Sunshine to sign contracts like this?

4    A    Yes, sir.

5    Q    Again let's look at the second page, the back

6         of it where we see assignment by seller again.

7         We see the seller warrants A through J there,

8         don't we?

9    A    Yes, sir.

10   Q    Seller again was Sunshine, wasn't it?

11   A    Yes, sir.

12   Q    The assignee was Union Planters Bank, correct?

13   A    Yes, sir.

14   Q    There's this same language about if any of

15        these warranties are breached or untrue, seller

16        will upon assignee's demand purchase this

17        contract from assignee, correct?

18   A    Yes, sir.

19   Q    Now, did the bank pay monies for this contract?

20   A    Yes, sir.

21   Q    Turn to page 127 of Exhibit 7.  I'm sorry, turn

22        to page 128 of Exhibit 7.

23                    (Whereupon, Plaintiff's Exhibit

24                     Number 7, page 128, was marked

25                        for identification.)

```
 1    A    I'm there.
 2    Q    Okay.  Do you recognize that as the $19,000
 3         check for this McAllister deal?
 4    A    Yes, sir.
 5              MR. SMITH:  Your Honor, we'd offer
 6         that.
 7              THE COURT:  Admitted.
 8                 (Whereupon, Plaintiff's Exhibit
 9                 Number 7, page 128, was
10                 admitted into evidence.)
11    BY MR. SMITH:
12    Q    Was that check delivered to Sunshine Camping
13         Center?
14    A    Yes, sir.
15    Q    And what was done with it?
16    A    Put into, looks like, my bank.
17    Q    Into your bank?
18    A    Yes, sir.
19    Q    How would Union Planters get this information
20         to or get these checks to Sunshine?  Would they
21         mail them?
22    A    Fed-Ex.
23    Q    Fed-Ex.  And turn with me now to page 127.
24                 (Whereupon, Plaintiff's Exhibit
25                 Number 7, page 127, was marked
```

1                         for identification.)

2     BY MR. SMITH:

3     Q      Of Exhibit 7.  And what are we looking at

4            there?

5     A      Looks like the finders fee.

6     Q      For the?

7     A      McAllister.

8     Q      McAllister?

9                   MR. SMITH:  Your Honor, we would

10              offer page 127.

11                  THE COURT:  It's admitted.

12                      (Whereupon, Plaintiff's Exhibit

13                      Number 7, page 127, was

14                      admitted into evidence.)

15    BY MR. SMITH:

16    Q      And that was for $1,140?

17    A      Yes, sir.

18    Q      And what was done with that check?

19    A      Looks like it's my account, too.

20    Q      Now, that finders fee would not have been paid

21           again but for this false McAllister deal; would

22           that be correct?

23    A      Yes, sir.

24    Q      Did you make payments on Mr. McAllister's or

25           the loan that was in Mr. McAllister's name?

1    A    Yes, sir.

2    Q    Do you know how much?

3    A    No, sir.

4    Q    Let me show you Exhibit Number 3.  Turn with me

5         to page 4 of that document.

6                        (Whereupon, Plaintiff's Exhibit

7                         Number 3, page 4, was marked

8                         for identification.)

9    A    I'm there.

10   Q    Do you recognize that?

11   A    Yes, sir.

12   Q    What is that?

13   A    Buyer's order.

14   Q    Who is the person that is shown as the buyer on

15        that buyer's order?

16   A    Dorothy Peters.

17   Q    Now, I failed to ask you this.  Mr. McAllister

18        is no relation to you, he's just a attempted

19        customer; is that right?

20   A    Yes, sir.

21   Q    Does Ms. Peters have any sort of relation to

22        you?

23   A    Mother-in-law.

24                  MR. SMITH:  Your Honor, we'd offer

25            page 4 of Exhibit 3.

```
1              THE COURT:  Admitted.
2                    (Whereupon, Plaintiff's Exhibit
3                     Number 3, page 4, was admitted
4                     into evidence.)
5    BY MR. SMITH:
6    Q    Now, this shows that Ms. Peters was buying what
7         type of vehicle?
8    A    A motor home.
9    Q    Sunseeker?
10   A    Yes, sir.
11   Q    What was the purchase price going to be, total
12        selling price?
13   A    Looks like 48.  I can't read the rest of it.
14   Q    Okay.  Maybe forty-eight five hundred?
15   A    That looks like it.
16   Q    What does it show the amount that's being
17        financed was?
18   A    45,171.53.
19   Q    And did you fill in all this information on
20        this document?
21   A    Yes, sir.
22   Q    And at the bottom where there is this signature
23        over purchaser's signature, did you sign the
24        name Dorothy Peters to that?
25   A    Yes, sir.
```

```
 1   Q    That document does not represent a sale, does
 2        it?
 3   A    No, sir.
 4   Q    Did Ms. Peters know that you were signing that
 5        document?
 6   A    No, sir.
 7   Q    Was that document provided to Union Planters?
 8   A    Yes, sir.
 9   Q    Turn with me to page 3 of Exhibit 3.
10                        (Whereupon, Plaintiff's Exhibit
11                         Number 3, page 3, was marked
12                         for identification.)
13   BY MR. SMITH:
14   Q    My question is what is that?
15   A    Credit application.
16   Q    For Ms. Peters for this July 15, 2003, deal?
17   A    Yes, sir.
18              MR. SMITH:  Your Honor, we'd offer
19         that.
20              THE COURT:  It's admitted.
21                        (Whereupon, Plaintiff's Exhibit
22                         Number 3, page 3, was admitted
23                         into evidence.)
24   BY MR. SMITH:
25   Q    Is all the handwriting on that document yours?
```

```
 1    A    Yes, sir.
 2    Q    Is this Ms. Peters's Social Security number?
 3    A    Yes, sir.
 4    Q    How did you obtain that Social Security number?
 5    A    I forget how exactly I got it.
 6    Q    But it is her accurate Social Security number?
 7    A    Yes, sir.
 8    Q    Where it says applicant's signature here, did
 9         you sign that?
10    A    Yes, sir.
11    Q    You signed Dorothy Peters?
12    A    Yes, sir.
13    Q    Was that provided to Union Planters?
14    A    Yes, sir.
15    Q    Did Union Planters approve a sale to Ms. Peters
16         under the terms that were reflected in those
17         documents?
18    A    Yes, sir.
19    Q    Do you have Exhibit 7 there with you still?
20    A    Yes, sir.
21    Q    I call your attention to page 139.
22                        (Whereupon, Plaintiff's Exhibit
23                         Number 7, page 139, was marked
24                            for identification.)
25    A    I'm there.
```

1  Q    Do you recognize that?

2  A    No, sir.

3  Q    Okay.  Well, did you receive information from

4        Union Planters that Ms. Peters was approved?

5  A    Yes, sir.

6  Q    And was that from Dale York?

7  A    Yes, sir.

8  Q    And after receiving that information did you

9        create a retail installment contract and

10       security agreement in Ms. Peters's name?

11 A    Yes, sir.

12 Q    Turn with me to page 1 of Exhibit 3, 1 and 2

13       actually.

14                        (Whereupon, Plaintiff's Exhibit

15                         Number 3, pages 1 and 2, were

16                         marked for identification.)

17 A    I'm there.

18 Q    And is that the retail installment contract and

19       security agreement for the Peters deal?

20 A    Yes, sir.

21              MR. SMITH:  Your Honor, we'd offer

22          pages 1 and 2 of Exhibit 3.

23              THE COURT:  It's admitted.

24                        (Whereupon, Plaintiff's Exhibit

25                         Number 3, pages 1 and 2, were

1                          admitted into evidence.)

2     BY MR. SMITH:

3     Q    And the information contained in this document

4          you put in, would that be correct?

5     A    Yes, sir.

6     Q    It shows that there was going to be $45,171.50

7          financed; is that correct?

8     A    Yes, sir.

9     Q    And you signed the name Dorothy Peters here?

10    A    Yes, sir.

11    Q    Now, you didn't -- let's see.  Got cut off on

12         my overhead, but did you sign this assignment

13         to Union Planters Bank here?

14    A    Yes, sir.

15    Q    And were you authorized by Sunshine to assign

16         financing contracts when you did that?

17    A    Yes, sir.

18    Q    And did the bank provide both a check for the

19         amount financed and a finders fee for this

20         retail installment contract and security

21         agreement?

22    A    Wasn't a check, no, sir.

23    Q    Wasn't a check?  You're right.  Did this

24         contract that we just looked at for the Peters

25         deal, did it contain this assignment by seller?

1    A    Yes, sir.

2    Q    Had these warranties A through J?

3    A    Yes, sir.

4    Q    Had these if any of these warranties is

5         breached or untrue seller will upon assignee's

6         demand purchase this contract from assignee?

7    A    Yes, sir.

8    Q    And those things A through J that are required

9         there, those weren't done with regard to Peters

10        at least from Sunshine's end?

11   A    No, sir.

12   Q    Now, you mentioned that there wasn't a check

13        for the Peters deal; is that correct?

14   A    Yes, sir.

15   Q    Did Sunshine Camping Center receive any money

16        for the Peters deal?

17   A    Yes, sir.

18   Q    Do you know how much was received?

19   A    Not exactly, no, sir.

20   Q    Let me show you a document marked as

21        Exhibit 10.

22                        (Whereupon, Plaintiff's Exhibit

23                         Number 10 was marked for

24                         identification.)

25   BY MR. SMITH:

1    Q   Have you ever seen that before?

2    A   No, sir.

3    Q   All right.  Do you still have Exhibit 7 with

4        you?

5    A   Yes, sir.

6    Q   Turn with me to page 142.

7                    (Whereupon, Plaintiff's Exhibit

8                    Number 7, page 142, was marked

9                    for identification.)

10   A   Okay.

11   Q   Have you ever seen that document before?

12   A   No, sir.

13   Q   I will ask you did Union Planters direct

14       deposit some money into Sunshine's account at

15       CB&T as a result of this Peters deal?

16   A   Yes, sir.

17   Q   And was the amount that was direct deposited

18       $45,171.50?

19   A   Yes, sir.

20   Q   That was for the amount financed; is that

21       correct?

22   A   Yes, sir.

23   Q   And was $2,710.29 paid in as a commission?

24   A   Yes, sir.

25   Q   And that went into Sunshine's account at CB&T;

1       is that correct?

2   A   Yes, sir.

3   Q   And you've told us previously that some portion

4       of that almost -- almost $48,000 that Union

5       Planters paid in was used to pay off this

6       note --

7   A   Yes, sir.

8   Q   -- for Mr. Borland; is that correct?

9   A   Yes, sir.

10   Q   Mr. Borland know that that money came out of a

11       Sunshine account to pay off this note?

12   A   He knew it came out of the account, yes.

13               MR. SMITH:  Just a minute, Your

14         Honor, I may be through.

15  BY MR. SMITH:

16   Q   You stopped working for Sunshine when?

17   A   January of '04.

18   Q   And why did you leave Sunshine's employment in

19       January of '04?

20   A   Pretty much got fired.

21   Q   Who fired you?

22   A   Comber.

23   Q   Do you know why he fired you?

24   A   I wrote a check.

25   Q   On a Sunshine account?

```
1    A    On a CB&T account.

2    Q    That you weren't authorized to do?

3    A    Right.

4    Q    So Mr. Borland at that time fired you; is that

5         right?

6    A    Yes, sir.

7    Q    After that date would you have had anything to

8         do with the operation of the company?

9    A    No, sir.

10   Q    Are you aware of any demand that Union Planters

11        Bank placed on Sunshine to repay the monies

12        from the Peters, McAllister, and Lawson deals?

13   A    No, sir.

14   Q    Do you know whether Sunshine has paid those

15        monies back?

16   A    No, sir.

17   Q    Have you paid those monies back?

18   A    No, sir.

19   Q    Do you believe that Union Planters could have

20        gotten those monies from Ms. Peters, Mr.

21        McAllister, and Mr. Lawson?

22   A    Payoffs?

23             MR. SHIRLEY:  Excuse me, I didn't

24          hear the question.  I'm sorry.

25   BY MR. SMITH:
```

1    Q    Do you believe that Union Planters could have

2         gotten the monies from Ms. Peters, Mr.

3         McAllister, and Mr. Lawson, the payoffs?

4    A    No, sir.

5    Q    Why not?

6    A    It wasn't their debt.

7    Q    Do you recall -- my final point.  Do you recall

8         when it was this promissory note, the one from

9         April of '03, was paid off?  When was it paid

10        off?

11   A    Right after the Peters deal came into the bank.

12   Q    Before you were fired.

13   A    Yeah.

14   Q    So sometime around August of 2003?

15   A    It was July or August -- July sometime.

16   Q    I'm just gonna put plus or minus.  And that was

17        a note -- that note that was paid off with the

18        money from Sunshine's account, that was a note

19        that you owed in -- you individually owed to

20        Mr. Borland individually, correct?

21   A    Well, Sunshine Camping Center.

22   Q    Well, it says in favor of Comber Borland.

23        That's what the note says, isn't it?

24   A    Yes, sir.

25   Q    I believe those are all my questions for you,

1          Mr. Williams, thank you.

2                    THE COURT:  Okay.  Ladies and

3          gentlemen, I believe this is gonna be a

4          place where we need to take our recess for

5          lunch.  So for that reason I'm going to

6          excuse you at this time and ask that you

7          be back in the jury room at 1:15, and

8          we'll try to get started promptly at that

9          time.  So I'll allow you at this time to

10         go with the bailiff.  And I don't know if

11         you may have left anything in the jury

12         room.  Just go out that way and you may

13         leave the premises and be back in the jury

14         room at 1:15.

15                    (The jury left the courtroom.)

16              THE COURT:  Okay.  We will probably

17         lock the courtroom during lunch recess so

18         if there's anything you need to have

19         during that time, you probably ought to

20         get it now.

21              MR. SMITH:  Your Honor, we offer

22         pages 36 and 37 of Exhibit --

23              THE COURT:  Hold on just a minute

24         until Mr. Shirley gets back.  He had to

25         step out.

1              (Pause in the Proceedings.)

2         MR. SHIRLEY:  Thank you.

3         MR. SMITH:  Your Honor, during my

4    questioning of Mr. Williams I referred to,

5    and I put on the overhead I remember,

6    pages 36 and 37 of Exhibit 1; that was the

7    McAllister contract.  And our reporter has

8    informed me that I failed to offer those

9    documents at that time.  So I do offer

10   pages 36 and 37 of Exhibit 1 at this time.

11        THE COURT:  They'll be admitted.

12             (Whereupon, Plaintiff's Exhibit

13              Number 1, pages 36 and 37, were

14              admitted into evidence.)

15             (Break in the proceedings.)

16        THE COURT:  Can we bring the jury?

17   Anything we need to address before we do?

18        MR. SMITH:  I don't think so, Your

19   Honor.

20             (The jury entered the

21              courtroom.)

22             CROSS-EXAMINATION

23   BY MR. SHIRLEY:

24   Q    Mr. Williams, you know that I'm Merrill

25        Shirley.  Possibly you know I'm an attorney?

1   A    Yes, sir.

2   Q    You know that I represent Sunshine?

3   A    Yes, sir.

4                      (Whereupon, Defendant Sunshine's

5                      Exhibit B was marked for

6                      identification.)

7   BY MR. SHIRLEY:

8   Q    What I've done, sir, is I have made some

9        copies, and at the bottom here you'll see it's

10       Defendant's Exhibit B.  And you'll see to the

11       right that it says Exhibit 2, which is what I

12       believe to be the document that you've

13       previously testified to.  And by way of

14       reference, Exhibit 2 would be the Hubert

15       Lawson, III, and this is dated on the 11th

16       and 13th, '02.  You remember that day from

17       the chronology and your documentation, right?

18   A   Yes, sir.

19                     (Whereupon, Defendant Sunshine's

20                     Exhibit C was marked for

21                     identification.)

22  BY MR. SHIRLEY:

23  Q    This is Defendant's Exhibit C that came from

24       that exhibit or another exhibit, and this

25       appears to be an Alabama Department of Revenue

```
 1              application -- title for application that shows
 2              it's on Mr. Lawson.  It shows that the lien
 3              holder is Union Planters, and it shows Sunshine
 4              typed on there.  This is a document that you
 5              prepared as well, is it not?
 6       A     Yes, sir.
 7       Q     And it -- there is also another document in
 8              existence that says when the lien title
 9              documentation is to be sent to Union Planters
10              at the time frame that we're talking about, you
11              told them you'd be responsible for getting them
12              a title, didn't you?
13       A     Yes, sir.
14                          (Whereupon, Defendant Sunshine's
15                           Exhibit D was marked for
16                           identification.)
17     BY MR. SHIRLEY:
18       Q     Defendant's Exhibit D -- and you may have to
19              help me.  Read the name on the top there.
20       A     Dorothy Peters.
21       Q     And that's -- document has been previously
22              identified as another exhibit.  This is just a
23              true copy of it, isn't it?
24       A     Yes, sir.
25                          (Whereupon, Defendant Sunshine's
```

```
 1                          Exhibit E was marked for
 2                          identification.)
 3        BY MR. SHIRLEY:
 4        Q    And also Defendant's Exhibit E is the same type
 5             of documentation for application for a title to
 6             the property that's supposed to be security,
 7             correct?
 8        A    Yes, sir.
 9        Q    You completed that, didn't you?
10        A    Yes, sir.
11        Q    And can you look on there and tell me between
12             Defendant's Exhibit E and Defendant's Exhibit C
13             where the title is supposed to be mailed?
14        A    To Union Planters Bank.
15        Q    What's the address?
16        A    One's 44 Business Park 3, and one --
17        Q    Wait a minute, Nashville?
18        A    One's Nashville and this other one I can't
19             really read.
20        Q    So there's one that you sent in that didn't
21             have the correct information about where the
22             title was even supposed to be sent, was it?
23                  MR. SMITH:  Objection, Your Honor,
24               lack of foundation.
25        BY MR. SHIRLEY:
```

```
 1    Q    You see it --
 2               THE COURT:  I sustain.  I sustain.
 3    BY MR. SHIRLEY:
 4    Q    Well, sir, you completed this, did you not?
 5    A    Yes, sir.
 6    Q    And you're telling us you can't read it to show
 7         where it was supposed to be delivered, are you
 8         not?
 9    A    I can't read this one --
10    Q    Right.
11    A    -- because it's too light.
12    Q    And then are you saying that Nashville and the
13         correct address is used or is there two
14         different addresses on here?
15    A    They have changed before in the past where you
16         mail the title to.
17    Q    Do you know if that was the correct address
18         where to mail the title to when you completed
19         those documents?
20    A    Union Planters never really funded a deal
21         unless the paperwork was correct.
22    Q    Well, we've heard testimony that they funded
23         three deals and a fourth deal that the
24         paperwork was wrong because you put a forgery
25         on there, correct?
```

```
 1    A    Yes, sir.
 2    Q    Okay.  Now, I want to show you what's been
 3         marked as Defendant's Exhibit F.  See the name
 4         Robert McAllister up there?
 5                        (Whereupon, Defendant Sunshine's
 6                         Exhibit F was marked for
 7                         identification.)
 8    A    Yes, sir.
 9    Q    See the name 2/19 -- date 2/19/03, don't you?
10    A    Yes, sir.
11    Q    And this was sent in to Union by you.  This is
12         the document you were talking about, correct?
13    A    Credit application, yes, sir.
14    Q    And this application that got sent in was a
15         document that Union Planters said that they
16         approved his credit back in February of '03?
17    A    Yes, sir.
18    Q    Okay.  And you knew that when you sent the
19         fraudulent, false forgery in Defendant's
20         Exhibit G, didn't you?
21                        (Whereupon, Defendant Sunshine's
22                         Exhibit G was marked for
23                         identification.)
24    A    Yes, sir.
25    Q    And again, here's Defendant's Exhibit H which
```

```
 1          is supposed to be the title application, isn't
 2          it?
 3    A     Yes, sir.
 4                        (Whereupon, Defendant Sunshine's
 5                         Exhibit H was marked for
 6                         identification.)
 7                  MR. SHIRLEY:  We offer these as
 8          Defendant's Exhibits, Your Honor.
 9                  MR. SMITH:  We have no objection,
10          Your Honor.
11                  THE COURT:  They'll be admitted.
12                        (Whereupon, Defendant Sunshine's
13                         Exhibits B through H were
14                         admitted into evidence.)
15    BY MR. SHIRLEY:
16    Q     You see that before you here are the exhibits
17          that you were asked about in your direct
18          testimony?
19    A     Yes, sir.
20    Q     And you see this document, Exhibit 7.  You've
21          been asked to look at things and you've been
22          asked to identify things, have you not?
23    A     Yes, sir.
24    Q     And inside this exhibit -- let me ask you this.
25          I have not looked all the way through the
```

```
 1          exhibit, and I'm not sure that Exhibit 7 is the
 2          same -- includes the exact same exhibits that
 3          were produced in discovery in this case by the
 4          lawyers to the other lawyers.  I don't know if
 5          that makes any sense to you.  I'm trying to
 6          explain to you what I'm talking about, okay?
 7      A   Yes, sir.
 8      Q   And Union Exhibit 7 that was produced to me
 9          shows page 2 and 3 that's on this exhibit.
10          It's a Union Planters document, is it not?
11      A   Yes, sir.
12      Q   And you see I marked it Defendant's Exhibit J?
13      A   Yes, sir.
14                        (Whereupon, Defendant Sunshine's
15                         Exhibit J was marked for
16                         identification.)
17  BY MR. SHIRLEY:
18      Q   And of course you know Dale York, yes?
19      A   Yes, sir.
20      Q   And you know Jon Williams, yes?
21      A   Yes, sir.
22      Q   And December 9, 2003, you were still working
23          with Sunshine, were you not?
24      A   Yes, sir.
25      Q   Did you, in fact, receive this document, the
```

```
 1              original of this document or a facsimile or a
 2              true copy of this document?
 3       A      Yes, sir.
 4       Q      Okay.  And that document, sir, means in
 5              December of 2003, they were notifying you that
 6              they did not have the titles to the loans for
 7              the documentation that this paper reflects,
 8              isn't it?
 9       A      Yes, sir.
10       Q      And of course -- I'm sorry, I hadn't noticed
11              how clear your voice is over here by this
12              speaker.  Maybe I should stand over here.  And
13              the reason they didn't have that is because
14              you -- there was none in existence, was there?
15       A      No, sir.
16       Q      And so let me make certain that I understand.
17              You agree with me that what you did, Jon
18              Williams did to Union Planters to get almost
19              $90,000, that's a criminal act, isn't it?
20                   MR. SMITH:  Judge, we object.  That
21                 calls for a legal conclusion.
22                   THE COURT:  I sustain.
23       BY MR. SHIRLEY:
24       Q      Do you believe you were breaking the law, sir,
25              when you falsely signed somebody's name to a
```

```
 1            document and represented to Union Planters that
 2            you were asking them to send you money?
 3                    MR. SMITH:  And, Your Honor, we again
 4                object as that's a legal conclusion.
 5                    THE COURT:  I overrule as to what he
 6                believed he was doing.  You may answer the
 7                question.
 8     A      Yes, sir.
 9     Q      Yes, sir, I did, too.  And so you and I agree
10            with that.  That, you can call it a bunch of
11            fancy things but it was theft, wasn't it, sir?
12     A      Yes, sir.
13     Q      Okay.  And the theft occurred with the signing
14            of those documents that have been put into
15            evidence, the documents that have the names of
16            Hubert Lawson and Dorothy Peters that are your
17            relatives?
18     A      Yes, sir.
19     Q      And then Robert McAllister, who's been referred
20            to as Bob McAllister, is he kin to you?
21     A      No, sir.
22     Q      Now, we learned about and we saw where you had
23            done an earlier one with Hubert Lawson, right?
24     A      Yes, sir.
25     Q      Okay.  But today you are a defendant in this
```

```
 1              case, are you not?
 2       A      Yes, sir.
 3       Q      And you are being sued by Regions in regards to
 4              this money for your misconduct; is that right?
 5       A      Yes, sir.
 6       Q      And you agree it's misconduct, don't you?
 7       A      Yes, sir.
 8       Q      And you agree you owe the money, don't you?
 9       A      Yes, sir.
10       Q      Now, it is correct, isn't it, sir, that there's
11              never been an occasion -- I'm gonna start over
12              if I may, forgive me.  Do you recall the last
13              day you worked or were an employee with
14              Sunshine Camping?
15       A      Some of it, yes, sir.
16       Q      Do you know the calendar day?
17       A      Not off the top of my head, no, sir.
18       Q      Well, Defendant's Exhibit J --
19                      MR. SHIRLEY:  Which we offer into
20                  record, if we have not, Your Honor.
21                          (Whereupon, Defendant Sunshine's
22                          Exhibit J was admitted into
23                          evidence.)
24                      MR. SMITH:  Is that pages 2 and 3,
25                  Mr. Shirley?
```

```
 1              MR. SHIRLEY:  It is.  It's not on the
 2         copy but I'll be glad --
 3              MR. SMITH:  No, I've got a copy.
 4         That's fine.
 5              MR. SHIRLEY:  But I believe that it
 6         is.
 7              MR. SMITH:  We have no objection to
 8         that coming into evidence, Your Honor.
 9         It's exactly what we produced.
10              THE COURT:  It will be admitted.
11              MR. SHIRLEY:  By way of
12         qualification, I don't think they were
13         saying ... I just didn't realize the copy
14         page, the number of the page is down at
15         the very bottom on some of the legal
16         pages, but it didn't come through.
17    BY MR. SHIRLEY:
18    Q    That document says December 9, 2003.  So you
19         were working there then, were you not?
20    A    Yes, sir.
21    Q    And for the months and days and weeks leading
22         up to the end of the calendar year of 2003, not
23         only had you received notification to get us a
24         title, get the paperwork in, send the paperwork
25         up there, this thing had been going on, these
```

1       indebtednesses that occurred, these frauds that

2       you perpetuated had been in existence for a

3       good period of time?

4   A   Yes, sir.

5   Q   And I'm asking you to think about February

6       2004.  Is that when you were fired?

7   A   I think it was at the end of January.

8   Q   Could have been like the last week in January?

9   A   Yes, sir.

10   Q   Okay.  And at the time that you were fired

11       Comber Borland told you to leave the premises

12       because he discovered that you had yet again --

13            MR. SMITH:  Your Honor, we object as

14          to what he may have been told by Comber

15          Borland.  That's very clearly hearsay.

16             MR. SHIRLEY:  Well --

17             MR. SMITH:  Mr. Borland is not a

18          party, as Mr. Shirley's pointed out.  The

19          corporation's a party.  So we object,

20          that's hearsay.

21             MR. SHIRLEY:  Well, I thought that he

22          had established in direct testimony that

23          Mr. Borland, who has been advised to the

24          Court as the representative of Sunshine,

25          who has been questioned and asked about

```
 1                 his duties and his responsibilities and
 2                 what his capacity was and even asked about
 3                 this if he was fired and discharged by
 4                 Comber Borland, I don't see what the
 5                 mystery is.
 6                      MR. SMITH:  Your Honor, it's not the
 7                 act.  It's what may have been told at the
 8                 time.  I think that's something Mr.
 9                 Borland will have to testify to.
10                      THE COURT:  I'm gonna sustain the
11                 objection.
12    BY MR. SHIRLEY:
13    Q    All right, sir.  Well, let me ask it this way.
14         Did the police come up there and escort you
15         out?
16    A    Yes, sir.
17    Q    Why?
18    A    I don't know.
19    Q    Because Comber Borland called them, didn't he?
20    A    Yes, sir.
21    Q    Called them in your presence, yes?
22    A    He didn't call them in my presence, no.
23    Q    All right.  Well, you knew on that day that
24         Comber Borland would not tolerate stealing
25         money from Sunshine.  You knew that, didn't
```

```
 1          you?
 2    A     Yes, sir.
 3    Q     And you knew all those days leading up to the
 4          last days of January 2004 that Comber Borland
 5          would not tolerate stealing money from Union
 6          Planters.  You knew that, didn't you?
 7                    MR. SMITH:  Objection as to what
 8                Comber Borland knew.  I may have
 9                misunderstood the question, Your Honor.
10                    THE COURT:  He's saying he knew that
11                Comber Borland wouldn't tolerate that.
12                    MR. SMITH:  I'm sorry, no objection.
13    A     Yes.
14    Q     Yes?  Speak up, sir, yes?
15    A     Yes.
16    Q     Now, you're not gonna try to tell me, sir, that
17          when you signed those documents that have been
18          introduced into evidence that you were working
19          for Sunshine Camping company and that was part
20          of your job, are you?
21    A     No, sir.
22    Q     Say again?
23    A     No, sir.
24    Q     And is that because you were in the scheme of
25          stealing money from somebody?
```

```
 1    A    Wasn't in a scheme, no, sir.

 2    Q    You don't call this a scheme, getting this

 3         money?

 4    A    I was having problems.

 5    Q    Yes, sir.  We're gonna get to that in just a

 6         minute.  But you agree with me --

 7    A    Yes, sir.

 8    Q    And of course you played up to Dale York

 9         because y'all had known each other, didn't you?

10    A    Play up to him?  No, sir.

11    Q    Well, you knew you were supposed to give

12         complete information, fill out that form

13         completely, and you didn't do that, did you?

14    A    No, sir.

15    Q    In fact, you'd call him on the phone and say,

16         Hey, Dale, this is your ol' pal, send me some

17         money, take this loan; is that the way it went?

18    A    No, sir.

19    Q    It didn't?  Well, sir, you just told us that

20         this exhibit -- I think it's Defendant's

21         Exhibit F -- it wasn't even signed by Mr.

22         McAllister, and you said he approved it without

23         it even being signed.  Yes?

24    A    Yes, sir.

25    Q    Yes, sir.  That's not the procedures, is it?
```

```
 1    A    No, sir.

 2    Q    Now, sir.  You are a convicted felon, are you

 3         not, sir?

 4    A    No, sir.

 5              MR. MATTHEWS:  Your Honor, I'm gonna

 6         object to that.

 7              MR. SHIRLEY:  Well --

 8              THE COURT:  I overrule the objection.

 9         I think he can be asked and answer.

10   BY MR. SHIRLEY:

11    Q    Well, did you not plead guilty to four offenses

12         of theft that were somehow related to Sunshine

13         Camping company?  You didn't do that?

14              MR. MATTHEWS:  Your Honor, I object

15         and I'd like to make a motion outside the

16         presence of the jury.

17              THE COURT:  Okay.  I'm going to

18         excuse the jury at this time for us to

19         take up this motion.  So y'all may go back

20         to the jury room, please.

21              (The jury left the courtroom.)

22              MR. MATTHEWS:  Your Honor, I object

23         to this line of questioning.  I would ask

24         that a motion in limine be placed against

25         Mr. Shirley.  He knows, and I've been up
```

1      front with them, that my client got

2      pretrial diversion.  He entered a

3      conditional guilty plea that does not come

4      into effect unless he does something

5      against the pretrial agreement we made

6      with the district attorney's office.  He

7      has not been convicted of a felony and

8      Mr. Shirley knows that.  He's trying to

9      somehow get these matters before this

10     Court.  They're not germane to this issue.

11     They don't have anything to do with the

12     case that you're hearing.

13          MR. SHIRLEY:  Well --

14          MR. MATTHEWS:  And he knows that.

15          MR. SHIRLEY:  All I --

16          MR. MATTHEWS:  That's why I make the

17     motion.

18          MR. SHIRLEY:  All I can say to you, I

19     just pulled out one case action summary

20     from the circuit court of Geneva County.

21     And on the 20th day of May, 2005, the case

22     action summary -- and it's typed, which I

23     understand to be the customary form --

24     that says that he pleads guilty and

25     adjudicated guilty and sentence is

1        withheld and he's placed on pretrial
2        diversion administrative document.
3        Administrative docket is what I should
4        say.  But I submit, and that's why I asked
5        him that question, that these matters
6        arise from an indictment for which, as he
7        now testifies, he has pled guilty to the
8        charge in this indictment.  Count one
9        theft by deception; count two, theft by
10       deception; and possession of a forged,
11       second degree.  Plea bargain agreement
12       dated May 16, 2005.  I think the others
13       are in the same representative form.  And
14       whatever the Court rules would seem to me
15       would be the same.
16           MR. MATTHEWS:  Judge, one thing that
17       should be noted, he has not been
18       adjudicated guilty.
19           THE COURT:  Well, if he read the
20       order correctly that's what it said.
21           MR. SHIRLEY:  Yes, sir.  It says --
22           MR. MATTHEWS:  And he's not been
23       convicted of a felony.
24           THE COURT:  Well, what I'm going to
25       do, I'm gonna have to allow it.  I mean,

1    you can explain the circumstances if you

2    want to as far as the deferred prosecution

3    or however you want to deal with it, but

4    the Court's entry indicates an

5    adjudication of guilt.  And if that's the

6    case it's gonna have to be allowed.

7         MR. SHIRLEY:  Now, I would like to

8    say that -- and I'm trying to do this

9    outside the presence of the jury, so if I

10   say it wrong I'm not trying to say it

11   wrong.  But it's my belief there are two

12   cases in Dale County, two cases in Coffee

13   County, and a case in Geneva County where

14   he entered pleas of guilty.  And the case

15   action summaries indicated that he was

16   adjudicated guilty for which I understand

17   the adjudication can be withdrawn or

18   whatever the case may be if he

19   successfully accomplishes everything.

20        THE COURT:  That's right.

21        MR. SHIRLEY:  But insofar as the

22   record is concerned, that's the way that I

23   understand it.

24        THE COURT:  Are these other

25   situations just like the ones we're

1    trying?

2        MR. SHIRLEY: Well, he --

3        THE COURT: Or similar?

4        MR. SHIRLEY: Yeah -- well, and I

5    don't know that I have them reduced to

6    memory. I would make the proffering to

7    the Court this: That there was a title on

8    a piece of recreational vehicle from

9    Sunshine Camping that was carried to the

10   Hartford Bank in Geneva County, Alabama,

11   and $10,000 was received from it. And

12   that the forged instrument was the title

13   that said he owned it when it should have

14   been the title in the vehicle ownership of

15   Mr. and Ms. Owens. That concerns Sunshine

16   Camping because the MSO came to them from

17   their work, from their business. It came

18   in, he took the title and the application.

19       THE COURT: Let me ask this. What's

20   the purpose of the question?

21       MR. SHIRLEY: Well, the purpose of

22   the question is that if in fact he has a

23   felony conviction and if in fact he has a

24   felony conviction wherein he admits or is

25   found guilty of conduct procuring property

1       or property values which are through false
2       pretense or false pretenses or scheme, it
3       would be relevant to prove both you can
4       impeach by the commission of a felony and
5       you can impeach further by the conviction
6       of a felony involving theft or crimes of
7       false pretense.  And it would be offered
8       for that purposes.

9            It would also be offered to prove
10      that he's not trying to claim that he was
11      working for Sunshine when he took that
12      title down there that he stole out, which
13      would be an inference that the rest of the
14      time he hadn't been working for them
15      arising out of the scope of employment.

16           MR. SMITH:  Your Honor, we would say
17      on behalf of Regions Bank in this case
18      that Mr. Shirley may be correct to the
19      extent that he can impeach the witness
20      based on a felony conviction if indeed
21      that's what's occurred.  But the facts and
22      circumstances past that are simply
23      irrelevant and immaterial and highly
24      prejudicial, and we do object to anything
25      past the fact you've been convicted of a

1    felony or felonies, period.

2          THE COURT:  Anything further?

3          MR. MATTHEWS:  Judge, I think this is

4    totally wrong.  He has not been convicted

5    of a felony.  If he's convicted of a

6    felony the appeal time starts running.

7    He's sentenced and he's got an option to

8    appeal.  It's not a final judgment.  And

9    for the Court to allow him to call this a

10   final judgment, that's not -- that's not

11   right.  He's not a convicted felon.  As a

12   matter of fact, when he complete pretrial

13   the cases will be dismissed.  I mean, it's

14   not a final -- you know.  That's just my

15   argument.

16         THE COURT:  I believe you're correct.

17   I believe if there's -- sentencing hadn't

18   occurred, then I don't believe he's got a

19   conviction.

20         MR. MATTHEWS:  Basically --

21         THE COURT:  I'm gonna sustain the

22   objection and I'm going to disallow the

23   question.

24         MR. MATTHEWS:  Thank you, Judge.

25              (Pause in the Proceedings.)

1        MR. SHIRLEY:  I need to make a

2  statement in the record.

3        MR. SMITH:  Okay.

4        MR. SHIRLEY:  I am asking the Court

5  to allow me at some more convenient time

6  to make a proffer of all of those so the

7  record would reflect what the documents

8  indicate about the disposition of the

9  different cases that form the foundation

10  for asking the questions that I did.

11        MR. SMITH:  And we don't object to

12  that -- at least Regions doesn't object to

13  that being out of order, Your Honor.

14        THE COURT:  All right.  Okay.

15  Anything further that we can address with

16  regard to this issue before we bring the

17  jury back in?

18        MR. MATTHEWS:  Judge, I just want --

19  I don't know if I need a curative

20  instruction or not from the Court.  Mr.

21  Williams denied being convicted of a

22  felony, I think twice.

23        THE COURT:  Okay.

24        MR. MATTHEWS:  And I think that

25  might --

1    THE COURT:  Well, that being the

2    case --

3    MR. SHIRLEY:  He has not been

4    impeached.  What you gonna cure?

5    MR. MATTHEWS:  That's what I'm

6    saying.  I don't think there's a reason to

7    do that.

8    THE COURT:  Okay.

9    (The jury entered the

10   courtroom.)

11   THE COURT:  You may proceed,

12   Mr. Shirley.

13   BY MR. SHIRLEY:

14   Q    Let me direct your thinking to the timeframe of

15        late January, February 2004.  Was this in the

16        middle of the day that you were escorted out by

17        the police there at Sunshine Camping?

18   A    I believe so.

19   Q    Mr. Borland was the president of Sunshine

20        Camping on that occasion?

21   A    Yes, sir.

22   Q    Was he in charge of the premises and the

23        business on that day so far as you understand?

24   A    Yes, sir.

25   Q    And on that occasion did you see or did you