1        have shown to you any type of check that you

2        had signed?

3   A   I believe he showed it to me, yes, sir.

4   Q   And that was a check drawn on the Sunshine

5        Camping account for which you wrote to another

6        business in Enterprise, correct?

7   A   Yes, sir.

8   Q   And that was -- the name of that business was

9        what?

10   A   Southeastern Lawbreakers, I believe.

11   Q   And you did not have authority to do that, did

12        you?

13   A   No, sir.

14   Q   And did you consider that in your mind a

15        forgery?

16   A   Yes, sir.

17   Q   And is that the reason that you believed you

18        were being asked to leave and being discharged?

19   A   Yes, sir.

20   Q   At that very moment when you left do you agree

21        with me that there was no fact or circumstance

22        nor indication, to your knowledge, that Comber

23        Borland knew about these fraudulent loans that

24        you had sent to Union Planters?

25   A   No, sir.

```
 1    Q    In fact, until after you left, until you were
 2         discharged and the police started investigating
 3         this matter, Comber Borland and Sunshine
 4         Camping knew nothing about it?
 5    A    Yes, sir.
 6    Q    Now, you know and understand, do you not, sir,
 7         that when you are an employee that you are
 8         employed to do things that are recognized
 9         acceptable, appropriate for the person you're
10         hired for, correct?
11    A    Yes, sir.
12    Q    And at the time you signed these documents that
13         we've introduced into evidence and you put your
14         name on those documents, you knew you were
15         going against what you were hired to do,
16         correct?
17    A    Yes, sir.
18    Q    As a matter of fact, you were asked a bunch of
19         questions while you looked at a document that
20         was put up here on an overhead projector,
21         didn't you?
22    A    Yes, sir.
23    Q    However, they didn't bring the projector down
24         there to you for you to sign it, did they?
25    A    No, sir.
```

1    Q    And they didn't come down there and point it

2          out to you or say this is what you're doing and

3          this is what it's supposed to be and this is

4          the effect of it; none of that happened, did

5          it?

6    A    No, sir.

7    Q    In fact, it wasn't anything close to what you

8          went through in this courtroom, is it?

9    A    No, sir.

10    Q    But you knew at the time you signed that

11          document, that document that I'm making

12          reference to, I'm not trying to confuse you.  I

13          want to start over and make certain that I have

14          not confused you, okay?

15    A    Yes, sir.

16    Q    It's in and you've looked at it.  I think it's

17          document Plaintiff's Exhibit 1.  It's called a

18          dealer agreement?

19    A    Yes, sir.

20    Q    Yes?  And you said you signed that because you

21          were the president, were you not, at Sunshine

22          Camping at that time?

23    A    Yes, sir.

24    Q    Okay.  But even though you were the president

25          at that time you knew and understood that you

```
 1              wasn't signing a document that Sunshine was
 2              gonna be paying Union Planters back for you
 3              having a theft scheme; you knew that, didn't
 4              you?
 5        A     Yes, sir.
 6        Q     You didn't even have to be told that.  You had
 7              enough intelligence and knowledge to know that,
 8              didn't you?
 9        A     Yes, sir.
10        Q     And don't you know and understand that when the
11              documents are sent up to Paducah, Kentucky,
12              that they have the opportunity to check into
13              these applications and see if, in fact, the
14              recreational equipment existed, the people
15              existed, et cetera?
16        A     I don't understand that question.
17        Q     You don't know what they do up there in
18              Paducah, Kentucky?
19        A     Never been there.
20        Q     Never asked them?
21        A     No, sir.
22        Q     You didn't -- well, you put on several of
23              those:  See bureau.  You remember writing that
24              on there?
25        A     If the -- yeah, I've wrote it on there before.
```

1    Q    Yeah.

2    A    If a customer told me something that was on

3         their credit, I put:  See bureau.

4    Q    Right.  Well, why didn't you write it on there

5         like they told you to instead of saying:  See

6         bureau?  They told you to fill it out

7         completely, didn't they?

8    A    They wanted a complete credit application.

9    Q    But those aren't complete when you say:  See

10        bureau.  You're supposed to identify what the

11        problem is if there is a problem, aren't you?

12   A    Yes, sir.

13   Q    And you didn't identify what the problem was

14        because you would have been caught, right?

15   A    Yes, sir.

16   Q    But if you had been doing what you were hired

17        to do, what you were authorized to do, what was

18        in the scope of your employment and

19        relationship with Sunshine by telling the

20        truth, you'd have been caught out, wouldn't

21        you?

22              MR. SMITH:  Your Honor, we object to

23           that as it calls for a legal conclusion.

24              THE COURT:  I overrule.

25              MR. SHIRLEY:  That isn't --

1        THE COURT:  I overrule.

2    BY MR. SHIRLEY:

3    Q    Answer, sir.

4    A    Repeat the question, please.  I'm sorry.

5    Q    You gonna make me repeat that?  No, I think I

6         can repeat it.  You knew that if you had been

7         doing your job, if you had been telling the

8         truth, if you had been working like you were

9         hired to do within the scope of your employment

10        and within the authority that you had hired --

11        been hired to do, you would have been caught

12        out and these loans wouldn't have been

13        approved; you knew that, didn't you?

14   A    Yes, sir.

15   Q    And it is correct for me to believe, sir, that

16        up to this very moment, this very moment, you

17        have never told a soul that Comber Borland knew

18        anything about what you were doing?

19   A    No, sir.

20   Q    Had you ever -- forgive me, I'm trying not to

21        get into something that I'm not supposed to.

22        Earlier in your testimony you said Sunshine

23        Camping company was a young company.  You

24        remember saying that?

25   A    Yes, sir.

1    Q    And so when I suggest to someone and tell
2         someone that Union Planters was dealing with a
3         new dealer, that would be correct, wouldn't it?
4    A    Yes, sir.
5    Q    And your experience that you had with Union
6         Planters before you ever showed up with
7         Sunshine Camping Company, that was -- you were
8         backed up with a big organization, wasn't you?
9    A    Yes, sir.
10   Q    Sir?
11   A    Yes, sir.
12   Q    Emerald Coast?  Yes, sir?
13   A    Yes, sir.
14   Q    Waylon Jones?
15   A    Yes, sir.
16   Q    Just you and Comber in this case, right?
17   A    Yes, sir.
18   Q    And y'all had not been in business for five
19        years, had you?
20   A    No, sir.
21   Q    Now, if, in fact -- you remember that Exhibit
22        J, you remember it had those dates and those
23        times.  Jon Williams, where is our title; Jon
24        Williams, where is our document that says we
25        have a security interest in this piece of

```
 1            camping equipment -- you know what I'm talking
 2            about, don't you?
 3     A      Yes, sir.
 4     Q      Had you told them the truth you would have been
 5            discovered right then, wouldn't you?
 6     A      Yes, sir.
 7     Q      But you didn't, did you?
 8     A      No, sir.
 9     Q      And they never checked with anybody else, did
10            they?
11     A      Not that I'm aware of.
12     Q      And you made up numbers and names of that
13            equipment, right?
14     A      Yes, sir.
15     Q      You must have thought they were a real easy
16            target, did you?
17     A      No, sir.
18     Q      You didn't?  You mean they're supposed to know
19            that?  Huh?
20     A      Don't know, sir.
21     Q      Yeah, I think they ought to know that.
22                 MR. SMITH:  Judge, now, wait, we
23              object.  We object.
24                 THE COURT:  I sustain.
25                 MR. SMITH:  That's improper.  He
```

```
 1              knows that.
 2                   THE COURT:  I'll order the jury to
 3              disregard Mr. Shirley's comments.
 4  BY MR. SHIRLEY:
 5  Q   And all of this money that this lawsuit is over
 6      is money that you started the scheme on,
 7      correct?
 8  A   Yes, sir.
 9  Q   And you pursued the scheme all alone?  Yes,
10      sir?
11  A   Yes, sir.
12  Q   You did it outside your purpose for being
13      employed, outside of your scope of employment,
14      and knowing you were not employed to be doing
15      that, yes?
16              MR. SMITH:  Your Honor --
17              THE COURT:  Hold your answer.
18              MR. SMITH:  Objection, calls for
19          legal conclusion.
20              MR. SHIRLEY:  Doesn't.
21              THE COURT:  I overrule the objection.
22  A   Yes, sir.
23  Q   And you got the money solely for personal
24      reasons, didn't you?
25  A   Yes, sir.
```

194

```
1    Q    Does Hubert Lawson have a kinship to you?

2    A    Brother-in-law.

3    Q    Is he still your brother-in-law today?

4    A    Yes, sir.

5    Q    You've never told your brother-in-law that

6         Comber Borland knew anything about this, have

7         you?

8    A    No, sir.

9    Q    And have you told your brother-in-law that you

10        took all the money and used it for your own

11        purposes?

12   A    I think we have had that conversation, yes,

13        sir.

14   Q    Okay.  And so Ms. Peters, Dorothy Peters, how

15        is she related to you?

16   A    Mother-in-law.

17   Q    Before I leave Mr. Lawson, you didn't give

18        Mr. Lawson any of the money?

19   A    No, sir.

20   Q    And you didn't give any of the money to

21        Sunshine Camping; you took the money and did

22        what with it?

23   A    On what particular deal?

24   Q    On the Lawson deal.

25   A    I'm not sure the amount on the second one that
```

195

1       came back to me.

2   Q   You're not sure about what?

3   A   Whatever check went into Sunshine Camping

4       Center, I don't know how much of that I got

5       back.

6   Q   Okay. You got it back because you were holding

7       the checkbook and doing the checkbook and

8       managing it and got it.

9   A   No, sir.

10   Q   Weren't? Okay. But you got the money for your

11       purposes, did you not?

12   A   Yes, sir.

13   Q   Okay. And that purpose was what on Lawson?

14   A   I had a gambling problem among other things.

15   Q   And that's certainly not in the scope of your

16       employment to gamble, is it?

17   A   No, sir.

18   Q   There's never been a day that you showed up at

19       Sunshine Camping that gambling was permitted,

20       was it?

21   A   No, sir.

22   Q   And you're not trying to tell this Court and

23       jury that Comber Borland knew you had a

24       gambling problem, are you?

25   A   I'm not sure he knew I had a problem.

1    Q    That says to me you can't testify under oath

2         that he knows of something.

3    A    Yes, sir.

4    Q    And if he gets up here and says under oath that

5         he didn't know it, you can't refute it, can

6         you?

7    A    No, sir.

8    Q    Now, McAllister, you remember how much

9         McAllister's was?

10   A    I think it was 19,000.

11   Q    Almost 20,000 with a finders fee?  All of that

12        went to gambling again?

13   A    I'm not 100 percent sure but one of the two.

14   Q    Either gambling or personal debts or

15        obligations or something of that nature?

16   A    Yes, sir.

17   Q    Totally unrelated to Sunshine Camping?  Yes?

18   A    Yes, sir.

19   Q    Now, you knew Comber was easy pickin's, didn't

20        you?

21   A    No, sir.

22   Q    Well, you didn't put a single penny into

23        Sunshine Camping company as an investment, did

24        you?

25   A    No, sir.

1    Q    He put all the money in there, didn't he?

2    A    Yes, sir.

3    Q    So you would agree with me that what you've

4         done is stolen from him, haven't you?

5    A    No, sir.

6    Q    You wouldn't?  You hadn't stolen his

7         reputation, stolen his name, stolen from the

8         business?  You don't consider that stealing

9         from the business?

10   A    Yes, sir.

11   Q    Okay.  I do, too.

12             MR. SMITH:  We object and move to

13         strike that last comment, Your Honor.

14             THE COURT:  I sustain and order it be

15         stricken.

16             MR. SMITH:  Could you ask Mr. Shirley

17         to refrain from making improper comments,

18         Your Honor, he continues to do it.

19             THE COURT:  So instructed.

20   BY MR. SHIRLEY:

21   Q    If I understand, by your testimony you are

22        agreeing with me that when this business

23        started, that Comber furnished the financing

24        for the business.

25   A    Yes, sir.

Q   And the responsibility would be that Comber
    would do the parts, the setup, the sort of the
    manual stuff, try to sell, but you were the one
    that had the knowledge and information about
    financing?

A   Yes, sir.

Q   And when you signed these notes that this
    lawsuit's about, you knew that he was not
    informed as a coworker at Sunshine about the
    policies or the procedures with Union Planters
    like you; you knew that, didn't you?

A   Yes, sir.

Q   You got notice and advice and were told when
    these loans were sent in when to expect the
    money, weren't you?

A   Yes, sir.

Q   And you could then manipulate the money and use
    the money and keep the money from coming in and
    being known from him as coming in without him
    knowing it, wouldn't you?

A   All about except when it went to direct
    deposit.

Q   Now, direct deposit.  So that means that the
    only one that involved direct deposit was what?

A   Dorothy Peters.

```
 1   Q   Right.  And Dorothy Peters was in July, was it
 2       not?
 3   A   Yes, sir.
 4   Q   July 2003, right?  Yes?
 5   A   Yes, sir.
 6   Q   Now, prior to that time did you know that there
 7       was a document that said the wire transfers
 8       were supposed to go to Commercial Banking in
 9       Ozark?  Did you know that?
10   A   I don't recall.
11   Q   Okay.  Well, you're not saying that's not
12       correct, are you?
13   A   No, sir.
14   Q   Do you agree with me from what you know about
15       the operation of the business from your
16       dealings with the business that at the time you
17       entered into a relationship with Union Planters
18       that the money was supposed to be deposited by
19       check to CB&T?
20   A   I don't understand the question.
21   Q   Okay.
22   A   They funded by check sent to you by Fed-Ex and
23       then it went to direct deposit.
24   Q   Okay.  And let me make certain that I'm being
25       clear about what I'm understanding.  What I
```

```
 1            not CB&T under this agreement, doesn't it?
 2   A        Yes, sir.
 3   Q        Yes, sir.  Now, what did you do, call them up
 4            and tell them to send it to CB&T?
 5   A        No, sir.
 6   Q        You didn't?
 7   A        No, sir.
 8   Q        Well, how did it get to CB&T?
 9   A        I think they had on record to CB&T.  I don't
10            know why they had to change it.
11   Q        They had a CB&T checking account to send a
12            check to, to be payable to that, but they
13            didn't have any authorization for CB&T, did
14            they?
15   A        Right here they do.
16   Q        They don't for wire transfers, do they?
17   A        Yes, sir.
18   Q        So they can do this with a automatic agreement
19            transfer?
20   A        If my memory recalls we set it up with CB&T.
21   Q        Okay.
22   A        And they funded that deal.  For whatever reason
23            they still had this one.  They sent it here --
24   Q        Okay.
25   A        -- instead of here.
```

1   Q   That does explain it.  But what I'm asking you,
2       sir, is had they sent wire transfers to CB&T to
3       your knowledge before Dorothy Peters?
4   A   I think that was the first one.
5   Q   I think it was, too, because we've seen checks
6       on McAllister and Lawson, Hubert Lawson.
7   A   Yes, sir.
8   Q   Both of his, haven't we?
9   A   Yes, sir.
10  Q   So there really wasn't any reason for -- I
11      guess you didn't know it was wire transferred
12      the day you went to the bank in July.  You
13      didn't know it was wire transferred?
14  A   I think they sent us a notice once they do wire
15      it.
16  Q   Sent it to you, right?
17  A   I remember seeing it, yes, sir.
18  Q   Yeah.  But you can't tell this Court that
19      Comber Borland ever saw it, can you?
20  A   I'm not sure if he did or not.
21  Q   Right.  Then that means you can't testify under
22      oath that you do know it, right?
23  A   Yes, sir.
24  Q   And if Mr. Borland says that he never saw it,
25      you cannot refute that, can you?

1    A    No, sir.

2    Q    As a matter of fact, if you had shown it to

3         him, the cat would have been out of the bag,

4         wouldn't it, because he didn't know anything

5         about Dorothy Peters's, did he?

6    A    He knew it was in the bank.

7    Q    He knew there was money in the bank, did he

8         not?

9    A    Yes, sir.

10   Q    Isn't it correct, Mr. Williams, that you told

11        him that your mother had given you some money

12        to put in the bank?

13   A    I forget exactly what I told him.

14   Q    You forget something that important?

15   A    I forget my words exactly.

16   Q    Yes, sir.  You forget $45,000 being in the

17        bank?  Didn't you tell him that your mother

18        gave you that money and she wanted it back

19        because she wasn't gonna keep paying you to

20        stay at Sunshine?

21   A    No, sir.

22   Q    You didn't say that?

23   A    No, sir.

24   Q    Well, if Mr. Borland says that's what you told

25        him, I guess you're saying he's untruthful?

204

```
 1    A    I didn't say that.
 2    Q    Okay.  That's what I want to be sure of because
 3         he says you told him that, okay?
 4    A    I'm sorry, I didn't.
 5    Q    I ask you to assume that he said that.  What
 6         did you do with the money you got out of
 7         Dorothy Peters?
 8    A    Same thing as the other.
 9    Q    Gambling, right?  Gambling?
10    A    Yes, sir.
11    Q    Well, he didn't know anything about the
12         gambling, did he?
13    A    He knew I gambled.
14    Q    He didn't know you were in trouble with the
15         gamblers, did he?  No, sir.  And you knew --
16              MR. SMITH:  Wait, Your Honor.
17              THE COURT:  Yeah, he needs to be
18         allowed to answer his question.
19              MR. SHIRLEY:  I'm sorry, he shook his
20         head.
21              MR. SMITH:  I don't believe he did.
22    BY MR. SHIRLEY:
23    Q    Didn't you -- he didn't know you were in
24         trouble with the gamblers, did he?
25    A    Not that I'm aware of.
```

205

```
 1   Q   All right.  In fact, your story was I'm in
 2       trouble with debts; I can't pay my debts.
 3       That's your story, isn't it?  Yes, sir?
 4   A   Yes, sir.
 5   Q   Okay.  Now, you owed him $15,000, didn't you?
 6   A   Yes, sir.
 7   Q   Because he bought you a truck?
 8   A   No, sir.
 9   Q   You didn't have a truck that you used at
10       Sunshine Camping?
11   A   It wasn't mine, it was the company's.
12   Q   Oh, so it was a truck debt, that $15,000?
13   A   No, sir.
14   Q   Well, you're gonna say if he says it was to go
15       to that truck, he's just not being honest?
16   A   It wasn't a truck debt, no, sir.
17   Q   Okay.  Well, where did the truck come from?
18   A   We bought it when we first started.
19   Q   With what, you didn't have any money?
20   A   The company bought it.
21   Q   Okay.  But it was titled in your name?
22   A   No, sir.
23   Q   Whose?
24   A   Sunshine Camping Center, I think.
25   Q   Okay.  Then you don't know.
```

1                    MR. SMITH:  Wait, Judge.  I believe

2              he said it was titled in the name of

3              Sunshine Camping Center.

4                    MR. SHIRLEY:  He said I think.

5    BY MR. SHIRLEY:

6    Q    If you think, is that something you know, sir?

7                    THE COURT:  I overrule.

8    BY MR. SHIRLEY:

9    Q    Is that something, you know?

10   A    I'm not sure.

11   Q    Okay.  You're not sure.  Can we rest on that,

12        you're not sure?

13   A    Yes, sir.

14   Q    Okay.  Well, it is fair for me to believe, is

15        it not, sir, that when you were down there at

16        the bank, CB&T, Dorothy Peters's name didn't

17        come up?

18   A    No, sir.

19   Q    No, sir, it didn't; no, sir, it did.  You agree

20        it didn't come up?

21   A    No, sir.  No, it didn't.

22   Q    Okay.  So it wasn't mentioned that that money,

23        because you knew he knew Dorothy Peters hadn't

24        bought no camper.  You knew that, didn't you?

25   A    Yes, sir.

1    Q    And you would have been caught if you had told

2         the truth about what that money came from and

3         what it was trying to be used for, wouldn't it?

4    A    Yes, sir.

5    Q    And he wouldn't have let you do that, would he?

6    A    No, sir.

7    Q    I apologize if I've asked this but I want to be

8         for certain about something.  I know you've

9         told me you did not put any money in the

10        business, right?

11   A    Yes, sir.

12   Q    And I'm trying to ask this question because one

13        day in the history of our lives you withdrew as

14        the president?

15   A    Yes, sir.

16   Q    Okay.  And that was sometime in August of '02?

17   A    I believe, yes, sir.

18   Q    And the reason was that Sunshine didn't have

19        money to operate.  And Comber told you that if

20        he got financing from some of his family, you

21        were going to have to give up your control in

22        the business?

23   A    Yes, sir.

24   Q    And you did that?

25   A    Yes, sir.

1  Q   And you told him you didn't have any money to
2      put in the business, didn't you?
3  A   Yes, sir.
4  Q   Because you didn't, did you?
5  A   No, sir.
6  Q   And then it comes along over in the spring of
7      the next year and y'all need money, don't you?
8  A   Yes, sir.
9  Q   And then you give up your shares, don't you?
10 A   Yes, sir.
11 Q   Because again you didn't have any money?
12 A   No, sir.
13 Q   And the reason you didn't have any money is
14     because you were gambling and people were after
15     you?
16 A   Yes, sir.
17 Q   Do you have any reason to believe you're gonna
18     be criminally prosecuted by Regions in this
19     matter?
20         MR. MATTHEWS:  Your Honor, I'm gonna
21      object.  That's an improper question and
22      he knows it.
23         MR. SHIRLEY:  It's not an improper
24      question.  It shows interest, motive,
25      bias, whether or not he will be truthful.

```
 1                  THE COURT:  I overrule.
 2    A    Question again, please.
 3    Q    Do you have any reason to believe that you're
 4         gonna be criminally prosecuted for this $90,000
 5         that you fraudulently received by falsely
 6         completing those forms?
 7    A    I don't know, sir.  I don't know.
 8    Q    You don't know?
 9    A    I don't know their intentions, no.
10    Q    Do you think you should be?
11    A    I've done wrong, and I'm willing to pay back.
12         I made a mistake.
13    Q    You wouldn't be surprised that I would agree
14         with that, would you?
15    A    No, sir.
16    Q    It would be fair for me to believe that what
17         has happened is that Comber Borland stuck his
18         neck out to try to build a business for you and
19         him, and you stabbed him in the back, right?
20    A    Yes, sir.
21    Q    You don't consider that to be in the course of
22         your employment or what you were hired to do or
23         for the benefit of Sunshine, do you?
24    A    No, sir.
25    Q    McAllister, 19,000 -- almost $20,000; you
```

```
 1            remember that?
 2      A     Yes, sir.
 3      Q     We're talking about in June of 2003?
 4      A     Yes, sir.
 5      Q     That didn't even go anywhere close to Sunshine;
 6            you got that by Federal Express stuck it in
 7            your pocket, and went off and cashed it away
 8            from the business, didn't you?
 9      A     Yes, sir.
10      Q     And matter of fact, I challenge you, sir, to
11            tell me you filled these things out, even these
12            fraudulent loans, that you filled them out at
13            Sunshine Camping because you said you couldn't
14            remember where you were.  Tell me you did that.
15      A     I filled them out in the building I'm sure, but
16            I don't know where.
17      Q     But that doesn't mean you were working, does
18            it, for Sunshine, does it?
19      A     I was employed by them.
20      Q     You were working for yourself because you were
21            filling them out to get that money to do
22            personal reasons and purposes, debts, gambling
23            debts, right?
24      A     Yes, sir.
25      Q     That isn't what Sunshine Camping company has
```

```
 1            ever been thought to exist for, has it?
 2    A    No, sir.
 3                   MR. SHIRLEY:  Just one moment, Your
 4            Honor.  No more questions, Your Honor.
 5                       CROSS-EXAMINATION
 6    BY MR. MATTHEWS:
 7    Q    Mr. Williams, you've told these people the
 8            truth today, haven't you?
 9    A    Yes, sir.
10    Q    Now, on the Lawson deals, the bank's out
11            $26,000, would you agree with that?
12    A    Yes, sir.
13    Q    And on the McAllister deal, the bank's out
14            $20,140, you go --
15    A    Yes, sir.
16    Q    -- along with that?  And on the Peters deal,
17            the bank's out 47,881; is that right?
18    A    Yes, sir.
19    Q    And total of that is $94,021, right?
20    A    Yes, sir.
21    Q    Now, you've told this jury you're responsible
22            for that money; is that right?
23    A    Yes, sir.
24    Q    Now, how much of that money did you actually
25            receive?
```

212

```
 1    A    That less the 15 and on the --
 2    Q    All right.  15,000 went to Mr. Borland over
 3         there, right?
 4    A    Yes, sir.
 5    Q    What other amounts went to Mr. Borland or went
 6         into the company?
 7    A    The 26.  I'm not sure how much of that I got
 8         back out.
 9    Q    Part of the 26,000?
10    A    Yes, sir.
11    Q    You're not sure how much?
12    A    I might have got it all, I don't know.
13    Q    So between -- what would you say the low amount
14         might be?
15    A    Twenty that I got.
16    Q    All right.  So from 6,000 -- zero to 6,000,
17         would you say that?
18    A    Yes, sir.
19    Q    All right.  So you're not sure on that?
20    A    No, sir, I'm not.
21    Q    Zero to 6,000.  So basically you're responsible
22         for between 64 and $70,000 that you got in your
23         pocket; is that right?
24    A    I don't know 100 percent sure, but I guess that
25         would be a good estimate.
```

213

1   Q   You admit you owe the bank this money?

2   A   Yes, sir.

3   Q   And they're (inaudible)

4                   (Reporter asked for

5                    clarification.)

6   Q   I said, the bank is suing you.  Comber Borland

7       and Sunshine are not suing you, are they?

8   A   No, sir.

9   Q   The bank is suing you?

10  A   Yes, sir.

11  Q   And you admit that you put in your pocket

12      between 64 and $70,000?

13  A   Yes, sir.

14  Q   And that Mr. Borland and Sunshine received

15      between 15 and $21,000 of that money?

16  A   Yes, sir.

17  Q   Okay.  Now, during the McAllister deal and the

18      Peters deal, did you have check writing

19      authority on the accounts at the company?

20  A   I don't believe so, no, sir.

21  Q   You did on the Lawson deal?

22  A   Yes, sir.

23  Q   Okay.  Now, what did Mr. Borland receive for

24      that $15,000?

25  A   Cashier's check.

214

```
1   Q   All right.  What did you -- what were you
2       paying him the $15,000 for?
3   A   Off that note.
4   Q   Okay.  And where -- what did the money come
5       from of the note that you --
6   A   Money that I had taken or Comber actually
7       loaned me some out of the company, and we
8       agreed it was 15,000.
9   Q   All right.  Now, Mr. Shirley was making a big
10      deal and asking you about him knowing about
11      your gambling problem.
12  A   Yes, sir.
13  Q   And you say you didn't know if he knew about
14      your gambling problem?
15  A   Yes, sir.
16  Q   Did he know you gambled?
17  A   Yes, sir.
18  Q   What kind of gambling were you doing?
19  A   Pretty much all sports.
20  Q   Sports gambling?
21  A   Yes, sir.
22  Q   Is that like betting on football games and
23      stuff like that?
24  A   Yes, sir.
25  Q   Was Mr. Borland betting on football games and
```

1           stuff like that?

2    A      No, sir.

3    Q      But he knew you were?

4    A      Yes, sir.

5    Q      Y'all talked about it?

6    A      Yes, sir.

7    Q      Okay.  Did y'all have any other employees other

8           than you and him?

9    A      For the first year I don't think we -- his son

10          helped, my brother-in-law.  Not really, not

11          until a year or two, I think, is when he

12          finally got some other employees.

13   Q      That's when you were let go?

14   A      Well, no, it was the end of year two.

15              MR. MATTHEWS:  That's all.  You may

16          examine.

17                   REDIRECT EXAMINATION

18   BY MR. SMITH:

19   Q      I want to make sure that everyone is clear

20          about this, Mr. Williams.  On these documents,

21          these financing documents that you sent to my

22          client, I'm not gonna pull them out again

23          because we've seen them and spent time on them,

24          but was there anything on the face of them?  If

25          Dale York is reading them there at Union

```
1          Planters Bank, was there anything on the face
2          of them that would have shown that they weren't
3          true, that they were false?
4    A     No, sir.
5    Q     I mean, you wanted them to be drawn up so the
6          folks at the bank would understand -- or
7          believe, rather, that they were real sales; is
8          that correct?
9    A     Yes, sir.
10   Q     And so you -- there was nothing on the face of
11         them that would have indicated, wait, this
12         isn't a real sale; is that right?
13   A     Yes, sir.
14   Q     You were asked about the McAllister documents
15         and some that were unsigned.  Do you recall
16         being asked about that by defense counsel over
17         here?
18   A     Yes, sir.
19   Q     Now, actually there were two McAllister
20         contracts that were sent to the bank; isn't
21         that right?
22   A     One when he first came in and one at a later
23         date.
24   Q     And one was -- the first one was real, wasn't
25         it?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And it was the second one that wasn't real; is |
| 3 | | that right? |
| 4 | A | Yes, sir. |
| 5 | Q | I want to show you, and it's already in |
| 6 | | evidence, now, the first one.  I want this to |
| 7 | | be very clear, I want everybody to understand |
| 8 | | this, I'm sure they do.  I don't want anybody |
| 9 | | to be confused.  This is page 83 of Exhibit 1. |
| 10 | | Now, this is the first one from February of |
| 11 | | 2003; is that right? |
| 12 | A | Yes, sir. |
| 13 | Q | This is the real one, isn't it? |
| 14 | A | Yes, sir. |
| 15 | Q | And this one is not signed, is it? |
| 16 | A | No, sir. |
| 17 | Q | But there wasn't any money loaned on this first |
| 18 | | one, was there? |
| 19 | A | No, sir. |
| 20 | Q | So the fact that it's signed or not signed as |
| 21 | | this lawsuit's concerned really doesn't mean |
| 22 | | anything, does it? |
| 23 | A | No, sir. |
| 24 | Q | Because there wasn't any money loaned on it, |
| 25 | | right? |

1    A    Yes, sir.

2    Q    Let's look right here.  Purchaser's signature

3         is filled in, isn't it?

4    A    Yes, sir.

5    Q    Okay.  So the fact that what happened in

6         February was signed or not signed doesn't make

7         any difference because no money was advanced on

8         February, was it?

9    A    No, sir.

10   Q    It was advanced on June, wasn't it?

11   A    Yes, sir.

12   Q    And both of the McAllister documents from June

13        were signed, weren't they?

14   A    Yes, sir.

15   Q    Again, there wasn't anything on the face of

16        these documents that you submitted to the bank

17        that would have indicated that there is a

18        problem or there is anything to be concerned

19        about on these loans; is that right?

20   A    Yes, sir.

21   Q    Okay.  Now, I want to make sure that I

22        understand this.  Is there any way that you

23        could have submitted these contracts to the

24        bank for approval unless you were an employee

25        of Sunshine?

1    A    No, sir.

2    Q    I mean, if you had not been working for

3         Sunshine, could you have gotten these contracts

4         approved?

5    A    No, sir.

6    Q    If Sunshine had told the bank that Dale -- that

7         Jon Williams is no longer authorized to sign

8         contracts, could you have gotten this money?

9    A    No, sir.

10   Q    If Sunshine had told the bank that, look, Jon

11       Williams is removed; he's no longer president

12       of the company, is there any way that you could

13       have gotten this money?

14   A    No, sir.

15   Q    I need to set this up real quickly.  I'm sorry,

16       I don't want to beat this into the ground, but

17       I have to respond to some of the things that

18       were brought up.  In August of 2002 you

19       resigned as president of the company and you

20       were removed from the CB&T account; is that

21       right?

22   A    Yes, sir.

23   Q    And you gave Mr. Borland five shares of your

24       stock; is that right?

25   A    Yes, sir.

221

1   Q   And you signed a note for $15,000, right?

2   A   Yes, sir.

3   Q   And some part of that $15,000 was for money

4       that you had taken from Sunshine without Mr.

5       Borland's permission; isn't that right?

6   A   Yes, sir.

7   Q   Money that you had stolen from Sunshine?

8   A   Yes, sir.

9   Q   And he didn't fire you or run you off, did he,

10      in August of 2002?

11  A   No, sir.

12  Q   Even though he knew you had been stealing from

13      the company, right?

14  A   Yes, sir.

15  Q   He let you stay on, didn't he?

16  A   Yes, sir.

17  Q   He let you sign a note?

18  A   Yes, sir.

19  Q   And one of the reasons that you signed that

20      note was not -- well, was additional capital

21      going into the company but also money that was

22      to obligate you to pay back money that you had

23      taken from the company without Mr. Borland's

24      permission and knowledge, correct?

25  A   Yes, sir.

```
 1   Q   Even though you did that he let you stay on
 2       with the company; is that right?
 3   A   Yes, sir.
 4   Q   Now, your name was taken off the checking
 5       account, right?
 6   A   Yes, sir.
 7   Q   And why was that done, please?
 8   A   Didn't want me to have no control over it.
 9   Q   He didn't want you to be able to sign checks,
10       did he?
11   A   No, sir.
12   Q   He didn't really trust you at that point in
13       time, did he?
14   A   No, sir.
15   Q   But he let you stay on, didn't he?
16   A   Yes, sir.
17   Q   Let you keep writing contracts, didn't he?
18   A   Yes, sir.
19   Q   And it was after that date in August that all
20       four of these deals that we're here about today
21       occurred, right?
22   A   Yes, sir.
23   Q   That's what I thought you told us earlier, I
24       just wanted to make sure.  And again, had your
25       employment been ended back when he caught you
```

1  stealing, there's no way you could have done

2  any of this, was there?

3          MR. SHIRLEY:  Object, speculative.

4          THE COURT:  I sustain.

5  BY MR. SMITH:

6  Q   Well, isn't it true that it was your continued

7      employment at Sunshine that allowed you to do

8      these four deals?

9  A   Yes, sir.

10 Q   Now, when you were working at Sunshine, about

11     how many campers a month would be sold?

12 A   Probably an average of 8, 9.

13          MR. SHIRLEY:  We would object if

14      that's a guess.

15          THE COURT:  Overrule.

16 BY MR. SMITH:

17 Q   Would Mr. Borland know when campers were sold?

18 A   Yes, sir.

19 Q   Would he know when they were financed?

20 A   Yes, sir.

21 Q   Would he know to expect money to come in?

22 A   Yes, sir.

23 Q   And he's the guy at the company that was

24     responsible for the checking accounts, wasn't

25     he?

224

```
 1   A   Yes, sir.
 2   Q   Whether it's CB&T or SouthTrust or the other
 3       bank, Commercial Bank; wouldn't that be
 4       correct?
 5   A   Yes, sir.
 6   Q   He was the only person that had signatory
 7       authority on those checks?
 8   A   After that timeframe, yes, sir.
 9   Q   He got the account statements, didn't he?
10   A   Yes, sir.
11   Q   It would have been real simple for him to look
12       at those statements and see money coming in,
13       wouldn't it?
14   A   Yes, sir.
15   Q   And money going out?
16   A   Yes, sir.
17   Q   And he knew about sales that were being made,
18       didn't he?
19   A   Yes, sir.
20   Q   So he would have known when money would come
21       into these accounts, correct?
22   A   Yes, sir.
23   Q   And so this $26,000 that came in on Lawson, Mr.
24       Borland would have known that, wouldn't he?
25   A   Yes, sir.
```

1   Q   And the $47,000 that came in on Peters, he for

2       sure knew that, didn't he?

3   A   Yes, sir.

4   Q   He never one time questioned you about, hey,

5       why are we getting $26,000, why are we getting

6       $47,000 and we haven't made a sale?  He didn't

7       question you on that, did he?

8   A   Yeah, he asked me what it was.

9   Q   And what did you tell him?

10   A   I forget on Lawson.  Told him I had gotten some

11       kind of line of credit on Peters.

12   Q   And he would see then -- how would you get the

13       money out of the CB&T account for Lawson and

14       Peters?  How'd you get that out?

15   A   By check.

16   Q   Who would write the check?

17   A   I think Comber wrote the one on Lawson, and I'm

18       not sure on Peters, whether I got a cashier's

19       check that same day or what.

20   Q   But he's the one that was writing you the

21       checks, wasn't he?

22   A   He's the one had to get it out of the bank.

23   Q   Whether it was CB&T or Commercial Bank, there's

24       no question that this Peters money came into a

25       Sunshine account, is there?

```
1    A    No, sir.
2    Q    There's no question that Mr. Borland knew that
3         it came into that account; would that be true?
4    A    The money, yes, sir.
5    Q    The final thing on this second note, the second
6         $15,000 note, that was done because you weren't
7         able to pay the first $15,000 note back, the
8         one from August of 2002; isn't that right?
9    A    (No response.)
10   Q    Isn't that --
11   A    Yes, sir.
12   Q    -- right?  Now, I want to make sure I
13        understand this.  And let's talk about that
14        April 2003 note.  This is already into
15        evidence.  This is page 30 of Exhibit 13.  Now,
16        that's that note from April 2, 2002, isn't it?
17   A    Yes, sir.
18   Q    And that note wasn't in favor of Sunshine
19        Camping Center, was it?
20   A    No, sir.
21   Q    It was in favor of Wallace C. Borland, right?
22   A    Yes, sir.
23   Q    The gentleman sitting right here?
24   A    Yes, sir.
25   Q    But money was taken from the Sunshine account
```

| | | |
|---|---|---|
| 1 | | on this Peters deal to pay Mr. Borland that |
| 2 | | back, right? |
| 3 | A | Yes, sir. |
| 4 | Q | And that was done with Mr. Borland's knowledge, |
| 5 | | wasn't it? |
| 6 | A | (No response.) |
| 7 | Q | In other words, he knew the money was coming |
| 8 | | out of Sunshine's account to pay off that loan |
| 9 | | that was made to him individually? |
| 10 | A | Yes, sir. |
| 11 | Q | Two final points and I'm done.  This truck that |
| 12 | | was mentioned, I ain't heard this.  This truck |
| 13 | | that was mentioned, when you were fired that |
| 14 | | day, did you get that truck? |
| 15 | A | No, sir. |
| 16 | Q | Did you drive that truck anymore after that day |
| 17 | | in April? |
| 18 | A | No, sir. |
| 19 | Q | Where was that truck the last time you saw it? |
| 20 | A | Sunshine Camping Center. |
| 21 | Q | Do you know what Sunshine Camping Center did |
| 22 | | with it? |
| 23 | A | No, sir. |
| 24 | Q | Did you ever make a payment on that truck? |
| 25 | A | No, sir. |

228

| | | |
|---|---|---|
| 1 | Q | Do you know who -- was that truck bought with |
| 2 | | cash or was it financed? |
| 3 | A | It was just bought. |
| 4 | Q | Okay.  But you didn't buy it yourself?  You |
| 5 | | didn't write a check and make any sort of offer |
| 6 | | for it, did you? |
| 7 | A | No, sir. |
| 8 | Q | Final point and I'm done.  These numbers that |
| 9 | | Mr. Matthews wrote up here, those don't include |
| 10 | | the finders fees, do they? |
| 11 | A | Looks like they do.  Well, not on McAllister |
| 12 | | doesn't.  I'm not sure on Lawson. |
| 13 | Q | You're sure that Lawson, the $26,000 wasn't |
| 14 | | just for the loan and there was some more over |
| 15 | | that for Lawson? |
| 16 | A | That's what I say.  I'm not sure on Lawson if |
| 17 | | that figure includes the finders fee. |
| 18 | Q | Do you know whether it does on McAllister? |
| 19 | A | Yeah, it does. |
| 20 | Q | Do you know whether it does on Peters? |
| 21 | A | Looks like it does, yes, sir. |
| 22 | Q | That's all I've got.  Thank you, sir. |
| 23 | | RE-CROSS EXAMINATION |
| 24 | BY MR. SHIRLEY: | |
| 25 | Q | You don't argue with me that you're a liar, do |

229

1          you?

2                    MR. MATTHEWS:  Your Honor, I object.

3              That's an improper question.

4     BY MR. SHIRLEY:

5     Q    Do you disagree?

6                    THE COURT:  I overrule.  Go ahead.

7     BY MR. SHIRLEY:

8     Q    Do you disagree with me that you have told many

9          lies in this?

10    A    No, sir.

11    Q    You haven't ever told any lies?  You just said

12         you told --

13    A    Yes, sir.

14    Q    Yeah, I know.  See you can't keep it all

15         straight you've told so many lies, can you,

16         sir?  Sir, yes?  Is that right?

17    A    In this courtroom I've been honest, yes, sir.

18    Q    Oh.  You just decided that today you'd be

19         honest?

20    A    Quite awhile ago, sir.

21    Q    Oh, I see.  Never mind, thank you.

22                    THE COURT:  Anything further?

23                    MR. MATTHEWS:  No questions.

24                    THE COURT:  Mr. Smith?

25                    MR. SMITH:  We have no other

1          questions, Your Honor.

2                  THE COURT:  Thank you, sir, you may

3          step down.

4                  MR. SMITH:  Your Honor, we call Dale

5          York.

6                  JIMMY DALE YORK, JR.

7    having been first duly sworn or affirmed, was

8    examined and testified as follows, to-wit:

9                  DIRECT EXAMINATION

10   BY MR. SMITH:

11   Q    You are Dale York?

12   A    Yes.

13   Q    And Mr. York --

14                 THE COURT:  Pull the microphone up to

15         you there and speak into it so we can hear

16         you.

17   Q    Where are you employed, Mr. York?

18   A    Regions Bank.

19   Q    And where is your office located?

20   A    401 Kentucky Avenue, Paducah, Kentucky.

21   Q    Are you a native of Paducah?

22   A    That area.

23   Q    How long have you worked for Regions Bank?

24   A    As a total?

25   Q    Yes.

231

```
1    A    Twenty years.
2    Q    Now, you've not actually worked for Regions for
3         twenty years, have you?
4    A    No.
5    Q    Have you worked with some banks that eventually
6         became part of Regions?
7    A    Yes.
8    Q    Let's talk a little bit, if we could, about
9         your employment in the banking industry.
10        You've worked in the banking industry for how
11        long?
12   A    Twenty-five years.
13   Q    And how old are you now?
14   A    I'm 45 years old.
15   Q    What was your first employment in the banking
16        industry?  Who did you work for and what did
17        you do?
18   A    The very first in banking or finance was a
19        finance company.  I worked for five years at
20        Heights Finance.  After that went with People's
21        First National Bank.  That was then taken over
22        by Union Planters which is now Regions bank.
23   Q    What have you done during your 25 years in the
24        bank and finance industry?  What's been the
25        focus of your employment?
```

232

1    A    Indirect lending.

2    Q    And can you tell us what indirect lending is?

3    A    Indirect lending is the purchase of third-party

4         contracts from dealerships, automobile

5         dealerships, mobile home dealerships, RV

6         dealership and the like.

7    Q    And third-party contracts, what is that?

8    A    Third-party contracts are dealership receives

9         the application and the customer actually goes

10        there.  They apply for the loan.  The

11        information is sent to us.  We approve the

12        credit.  They sign the documentation there at

13        the dealership, forward it on to us, and then

14        we pay for the loan.

15   Q    You're familiar with Sunshine Camping Center,

16        Incorporated?

17   A    Yes.

18   Q    And how are you familiar with them?

19   A    They're a dealership that we did business with.

20   Q    Now, we've looked at it earlier today but do

21        you recall the dealer agreement?

22   A    Yes.

23   Q    Did you have anything to do with the creation

24        of the dealer agreement between Sunshine and at

25        that time Union Planters?

233

1    A    No, I did not.

2    Q    Was there somebody that you were familiar with

3         that did?

4    A    Yes.

5    Q    And who was that?

6    A    Don Hollifield and John Gill.

7    Q    And what did you or what do you understand

8         their positions to be with the bank at the time

9         of the recreational vehicle dealer agreement?

10   A    Donald, who was a senior vice president, John

11        Gill was the vice president.

12   Q    And would a dealer such as Sunshine Camping

13        Center have been able to assign contracts to

14        Union Planters without a dealer agreement such

15        as we've already seen?

16   A    No.

17   Q    Let me ask you a little bit about the financing

18        contracts at issue here.  Do you have a

19        specific memory as we sit here today of

20        receiving those contracts from Sunshine?

21   A    Yes.  We did receive contracts from Sunshine.

22   Q    And particularly the two Lawson contracts, the

23        McAllister and the Peters contracts, would

24        those have been received by someone at Union

25        Planters Bank?

234

1   A   Yes.

2   Q   And would you have been that person?

3   A   Not actually receiving it from the fax machine,
4   no.

5   Q   Well, but would the information from the fax
6   machine have been brought to your attention?

7   A   Yes.

8   Q   And in order to at the time of these incidents,
9   to obtain or get approval for financing from a
10   customer, would it be necessary for the dealer
11   to provide you with certain information?

12   A   Yes.

13   Q   And what would that information have been?

14   A   Name, address, Social Security number, date of
15   birth.

16   Q   Would there have been any sort of format or
17   form in which that was presented?

18   A   Usually on a consumer credit application.

19   Q   And once you received that consumer credit
20   application, what would you do?

21   A   Our department would process that application
22   for the credit bureau, and we would determine
23   the credit worthiness of the applicant.

24   Q   And how would that be done or how would that be
25   determined?

1  A    I would review the credit application, and the

2       credit bureau would determine the worthiness of

3       the customer.

4  Q    And how would you determine the credit

5       worthiness of the customer?  What would you do?

6  A    We'd look at the credit bureau to see if the

7       individual had any delinquent credit, making

8       sure there was no loss accounts on the credit

9       bureau, job times, just numerous things that we

10      look at to determine the credit worthiness of a

11      customer.

12 Q    And in particular I want to show you page 39

13      Exhibit 1, it's already in evidence.  I'll just

14      put it on the screen.  Is this the kind of

15      document you'd look at?

16 A    Yes.

17 Q    This is for supposedly Robert M. McAllister,

18      and here's the Social Security number; is that

19      correct?

20 A    Yes.

21 Q    And date of birth?

22 A    Yes.

23 Q    And it's supposedly signed by him?

24 A    Yes.

25 Q    And there's this information here, credit

236

```
1          references or installment -- can't quite read
2          that.
3    A     I believe it's obligations.
4    Q     Installment obligations.  Thank you.  Someone
5          has written in here.  Can you determine what
6          that is?
7    A     Looks like an abbreviation for see bureau.
8    Q     See bureau.  What does that mean to you?
9    A     To review the credit bureau for the
10         information.
11   Q     Now, on this kind of contract is it out of the
12         ordinary to have that kind of information
13         written there in your 25 years in the business?
14   A     No.
15   Q     What does that indicate to you as someone with
16         25 years of experience in the business?
17   A     It would indicate to me that they have several
18         references in the bureau, just to review the
19         bureau.
20   Q     Is that something that your office had the
21         capability to do, to review the credit bureau
22         information?
23   A     Yes.
24   Q     And was that something that would have been
25         done before approving any contract?
```

1    A    Most definitely.

2    Q    So on this contract or this customer statement

3         here received supposedly from Mr. McAllister,

4         does the fact that it has see bureau written

5         in, does that in any way hinder your ability or

6         the bank's ability to determine whether to lend

7         or not to lend money?

8    A    No.

9    Q    It would have been checked anyway?

10   A    Most definitely.

11   Q    Now, I don't want to run through each one of

12        these documents that was sent, we have already

13        been through with them -- through them.  But

14        would it have been true that based on

15        information supplied to you by Sunshine Camping

16        Center, you approved the two Lawson,

17        McAllister, and Peters deal?

18   A    I am the approving officers on those deals.

19   Q    On all of them?

20   A    On all of them.

21   Q    Once you had approved all four of those deals,

22        what would you have done?

23   A    Notified the dealership that they had been

24        approved by fax.

25   Q    And would you have expected anything from the

238

```
 1        dealership after that?
 2   A    Well, we hope the loans that we approve we do
 3        receive there.  They have the opportunity to
 4        send them to other institutions if they so
 5        elect, if they approve those.  But, yes, we
 6        like to receive those.
 7   Q    And how would you know -- well, let me ask you
 8        this.  Would it be the dealer that would make
 9        the determination as to who would be the buyer
10        of the contract?
11   A    Yes.
12   Q    So in other words, since we're talking about
13        McAllister, page 36 of Exhibit 1, there's the
14        assignment here to Union Planters Bank.  It's
15        signed by Mr. Williams.  On this financing
16        agreement would it have been Sunshine Camping
17        Center that made the determination whether to
18        assign this to Union Planters as opposed to
19        some other institution?
20   A    Yes.
21   Q    But you would have approved this arrangement
22        based upon the information provided to you by
23        Sunshine Camping Center?
24   A    That's correct.
25   Q    And that would be true for both of the Lawson
```

1      loans and the Peters loan as well, correct?

2  A  Yes.

3  Q  Would this document here have been provided to

4      Union Planters Bank?

5  A  Yes.

6  Q  After the sale had been completed?

7  A  That's correct.

8  Q  And would that also hold true for the two

9      Lawson and the Peters loans?

10  A  Yes.

11  Q  Well, typically it would be provided if there

12      was a sale, correct?

13  A  That is correct.

14  Q  Was there anything that you saw on any of these

15      documents that we've reviewed today related to

16      Lawson, Peters, or McAllister that would have

17      indicated to you that something was improper or

18      amiss about any of these transactions?

19  A  No.

20  Q  Based on your 25 years of experience in the

21      industry would that be the case?

22  A  That's correct.

23  Q  And so upon receipt of this document here would

24      Union Planters have done anything?

25  A  They would process or we would process the loan

```
 1            to fund the deal.
 2    Q    What do you mean by fund the deal?
 3    A    Pay the money to Sunshine.
 4    Q    Now, was Union Planters relying on the
 5            information that was contained in this
 6            document?
 7    A    Yes.
 8    Q    And the similar document for the two Lawson and
 9            the McAllister and the Peters transaction?
10    A    Yes, sir.
11    Q    Did you believe that information?
12    A    Yes.
13    Q    And because of that did you go through with the
14            funding?
15    A    Yes.
16    Q    I want to ask you about the Lawson transaction.
17            I call your attention to Exhibit 2-1, Mr. York,
18            you're going to need to look at that.  One of
19            these right here.  There I go.
20    A    Okay.
21    Q    The first page of that document, do you
22            recognize that?
23    A    Yes, I do.
24    Q    Tell us what that is.
25    A    It's a data entry form that we use.
```

1         MR. SMITH:  Your Honor, we'd offer

2    page 1.

3         THE COURT:  All right, sir.

4    Admitted.

5         MR. SHIRLEY:  I'm not sure they know

6    what you're talking about.

7         THE COURT:  You need to see it?

8         MR. SMITH:  Page 1 of Exhibit 2-1.

9              (Whereupon, Plaintiff's Exhibit

10             Number 2-1, page 1, was marked

11             for identification and admitted

12             into evidence.)

13   BY MR. SMITH:

14   Q    Now, what does that reflect?

15   A    It's the information that we received off the

16        credit application and the contract.  Also

17        additional information as to how we funded the

18        deal and also paid the dealership.

19   Q    This document here, disbursements, you see the

20        portion of the document called disbursements?

21        You see that?

22   A    Yes.

23   Q    What does that, what does the information there

24        indicate, please?

25   A    The information there looks to be a check

```
1          number and a dollar amount 18,216.50 paid to
2          Sunshine Camping Center.  Below that is another
3          check number with amount of $1,092 and I
4          believe it's 99-cents to Sunshine Camping
5          Center for a finders fee.
6      Q   Were those monies paid?
7      A   Yes.
8      Q   Would they have been paid but for the
9          information contained in the financing
10         documents relating to Lawson?
11     A   No.
12     Q   Now, let me -- just a second.  Let me now ask
13         you about the second Lawson loan.  You'll need
14         to look at Exhibit 7, which you should have
15         there.
16     A   Yes.
17     Q   All right.
18                 MR. SMITH:  Your Honor, just a
19             second.  I've misplaced a document here.
20             Page 145.
21                     (Whereupon, Plaintiff's Exhibit
22                     Number 7, page 145 was marked
23                     for identification.)
24     A   Okay.
25     Q   You familiar with that?
```

```
 1   A   Yes.
 2   Q   And what is that?
 3   A   It was another indirect loan data entry form.
 4   Q   Was this for the second Lawson loan?
 5   A   Yes, it was.
 6               MR. SMITH:  Your Honor, we'd offer
 7           page 145 of Exhibit 7.
 8               THE COURT:  It's admitted.
 9                   (Whereupon, Plaintiff's Exhibit
10                    Number 7, page 145, was
11                    admitted into evidence.)
12   BY MR. SMITH:
13   Q   Does this reflect monies paid on account of the
14       second Lawson loan?
15   A   Yes, it does.
16   Q   And under the disbursements what does that
17       indicate?
18   A   Indicates that $8,516.06 was sent to Sunshine
19       Camping Center with another amount of $1,340,03
20       as a finders fee and a payoff of 18,284.56 for
21       the prior loan.
22   Q   For the prior loan?
23   A   Yes.
24   Q   Those three figures, though, represent money
25       advanced by the bank --
```

1    A    That's correct.

2    Q    -- would that be true?  Would the bank have

3         advanced that money but for the information

4         contained in the retail installment contract

5         and security agreement relating to the second

6         Lawson loan?

7    A    No.

8    Q    Now, with regard to the first Lawson loan, it

9         would have been paid off; would that be true?

10   A    Yes.

11   Q    Paid off with the proceeds from the second

12        loan; is that right?

13   A    That's correct.

14   Q    Was there a point in time that the bank decided

15        to assign the second Lawson loan to a loss

16        account?

17   A    Yes.

18   Q    And can you tell the members of the jury what a

19        loss account is?

20   A    A loss account for purposes of the bank is

21        deemed uncollectible at that point in time, but

22        it's moved from an active account to inactive

23        account.

24   Q    And is the fact that the -- is that done for

25        accounting purposes?

```
1    A    Yes.

2    Q    Does the fact that that's done for accounting

3         purposes, does that indicate that the money is

4         not owed anymore?

5    A    No.

6    Q    Or that the money has somehow been paid back?

7    A    No.

8    Q    I'd like you to look at page 9 of Exhibit 2,

9         please.

10             MR. SHIRLEY:  I'm sorry, you got your

11          back to me I couldn't hear it.

12             MR. SMITH:  Page 9 of Exhibit 2.

13                (Whereupon, Plaintiff's Exhibit

14                 Number 2, page 9, was marked

15                 for identification.)

16   A    Okay.

17   Q    Do you recognize that document?

18   A    Yes, I do.

19   Q    Would you tell us what that is?

20   A    This is a checklist form for Union Planters.

21   Q    Is that a document you're familiar with?

22   A    Yes, it is.

23   Q    Does it relate to the second Lawson loan?

24   A    I'm not able to tell by this form alone if it

25        is related to the second one.
```

1   Q   Well, is there another document within

2       Exhibit 2 that you might use?  Turn back a

3       page.  I think we're confused on -- this one,

4       this document.  I'm sorry.  Okay.  Page 9 of

5       Exhibit 2, I'm sorry.

6   A   This is the document I'm familiar with.

7   Q   Now, what is that?

8   A   This is a written account of the loss showing

9       that for accounting purposes moved this to a

10      loss account.

11  Q   For the second Lawson loan?

12  A   Yes.

13              MR. SMITH:  Your Honor, we'd offer

14          page 9 of Exhibit 2.

15              THE COURT:  It's admitted.

16                  (Whereupon, Plaintiff's Exhibit

17                  Number 2, page 9, was admitted

18                  into evidence.)

19  BY MR. SMITH:

20  Q   Now, we heard testimony earlier that there may

21      have been some money that was paid back on this

22      second Lawson loan, do you recall that?

23  A   Yes.

24  Q   There's a number here next to a date of

25      June 15, 2004, do you see that?

```
1    A    Yes, I do.
2    Q    The number's 25,838.75 --
3    A    Yes.
4    Q    -- is that correct?  Is that a dollar amount?
5    A    Yes, it is.
6    Q    What does that dollar amount represent?
7    A    The loss that we suffered on this particular
8         account.
9    Q    And does that include interest?
10   A    Yes.
11   Q    And does that include the loan less any
12        payments paid on --
13   A    Yes.
14   Q    Does it include the finders fee?
15   A    No, it does not.
16   Q    So just on the loan 25,838.75; is that correct?
17   A    That is correct.
18   Q    Plus the finders fee, correct?
19   A    That is correct.
20   Q    Does it also include the finders fee for the
21        first Lawson loan?
22   A    No, it does not.
23   Q    Is that also a loss?
24   A    Yes, it is.
25   Q    Because --
```

248

1    A    Should never have been paid.

2    Q    Should never have been paid; is that correct?

3    A    Yes.

4    Q    Gonna write plus finders fee twice.  I want to

5         call your attention again to the McAllister

6         loan.  Call your attention to page 45 of

7         Exhibit 1.

8                        (Whereupon, Plaintiff's Exhibit

9                         Number 1, page 45 was marked

10                        for identification.)

11   A    Okay.

12   Q    Do you recognize that?

13   A    Yes, I do.

14   Q    And tell us what that is.

15   A    Is the same transaction as before only on

16        another account.

17   Q    On the McAllister.  This one is on the

18        McAllister?

19   A    On McAllister.

20             MR. SMITH:  Your Honor, we'd offer

21          that document page 45 of Exhibit 1.

22             THE COURT:  It's admitted.

23                        (Whereupon, Plaintiff's Exhibit

24                         Number 1, page 45, was admitted

25                         into evidence.)

BY MR. SMITH:

1

2　Q　Does that represent a loss on the McAllister

3　　　transaction by the bank?

4　A　Yes, it does.

5　Q　And what does it indicate that the bank showed

6　　　the loss for that deal to be?

7　A　19,187.19.

8　Q　Is that less any payments that may have been

9　　　made on that --

10　A　Yes.

11　Q　-- loan plus interest?

12　A　Yes.

13　Q　But does not include the finders fee?

14　A　It does not include the finders fee.

15　Q　Now, it's carried as a criminal loss Sunshine

16　　　Camping; is that right?

17　A　Yes.

18　Q　Not carried as a criminal loss Jon Williams,

19　　　was it?

20　A　No.

21　Q　The money was paid to Sunshine Camping Center

22　　　on both this and the McAllister loan, wasn't

23　　　it?

24　A　That's correct.

25　Q　And the same would be true for Peters, wouldn't

```
 1        it?
 2    A   Yes.
 3    Q   Before we talk about Peters let me ask you
 4        this.  Was the bank -- was Jon Williams up
 5        until January of 2004 ever taken off of an
 6        authorized person to assign accounts for
 7        Sunshine Camping Center?
 8    A   Not to my knowledge.
 9    Q   Was there any documentation that reflected that
10        Sunshine did not want Mr. Williams assigning
11        loans?
12    A   No, there was not.
13    Q   Was there any documentation to reflect that
14        Sunshine did not want Mr. Williams to submit
15        financing agreements?
16    A   No, there was not.
17    Q   Or get customers approved for financing?
18    A   No.
19    Q   Did the bank know anything about Mr. Williams
20        being removed from the CB&T checking account?
21    A   No.
22    Q   Or resigning as president?
23    A   No.
24    Q   Or the entering into a note to pay back $15,000
25        that had been taken from the company?
```

1    A    No.

2    Q    Or transferring any interest in stocks that he

3         had?

4    A    No.

5    Q    Did the bank know anything about this second

6         note for $15,000?

7    A    No.

8    Q    Did the bank know anything about Mr. Borland

9         getting a hundred percent of the shares of the

10        stock of the company?

11   A    No.

12   Q    Up until January of 2004 did the bank know

13        anything that would have prevented Mr. Williams

14        from attaining financing for customers and

15        assigning financing contracts?

16   A    No.

17   Q    And, in fact, until this lawsuit got started

18        did you know anything about these loans that

19        were made?

20   A    No.

21   Q    Let me talk to you about the Peters loan now.

22        I want you to look at page 130 of Exhibit 7 if

23        you would, please.

24                       (Whereupon, Plaintiff's Exhibit

25                        Number 7, page 130, was marked

```
 1                        for identification.)

 2    A    130?

 3    Q    Yes.

 4    A    Okay.

 5    Q    What are we looking at there?

 6    A    Data entry form.

 7    Q    And is it for the Peters loan?

 8    A    Yes, it is.

 9              MR. SMITH:  Your Honor, we'd offer

10         page 130 of Exhibit 7.

11              THE COURT:  It's admitted.

12                   (Whereupon, Plaintiff's Exhibit

13                   Number 7, page 130, was

14                   admitted into evidence.)

15    BY MR. SMITH:

16    Q    What does that show?

17    A    It shows that we paid Sunshine Camping Center

18         45,171.50 and $2,710.29 first for proceeds and

19         second for finders fee through a wire transfer.

20    Q    And that was on the Peters loan?

21    A    That is correct.

22    Q    Do you have Exhibit 10 up there with you, you

23         may not?  No, you don't, I've got it.  I show

24         you Exhibit 10 and ask you if you recognize

25         that?
```

1   A    Yes, I do.

2   Q    And would you tell the members of the jury what

3        that is?

4   A    This is an internal form showing the wire

5        transfer to Sunshine Camping Center's -- or

6        Sunshine Camping Incorporated's checking

7        account.

8   Q    And what does it indicate was transferred?

9   A    45,171.50.

10                  MR. SMITH:  Your Honor, we'd offer

11            Exhibit 10.

12                  THE COURT:  Admitted.

13                      (Whereupon, Plaintiff's Exhibit

14                      Number 10 was admitted into

15                      evidence.)

16  BY MR. SMITH:

17  Q    Do you have Exhibit 3 with you?

18  A    Yes.

19  Q    All right.  Turn to page 11, if you would.

20                      (Whereupon, Plaintiff's Exhibit

21                      Number 3, page 11, was marked

22                      for identification.)

23  A    Okay.

24  Q    What is that?

25  A    That is the loan loss accounting.

254

1    Q    For the Peters loan?

2    A    That is correct.

3              MR. SMITH:  Your Honor, we'd offer

4         page 11.

5              THE COURT:  Admitted.

6                   (Whereupon, Plaintiff's Exhibit

7                   Number 3, page 11, was admitted

8                   into evidence.)

9    BY MR. SMITH:

10   Q    Now, what does the number 45,585.68 represent?

11   A    The loss that was incurred on this account.

12   Q    That would be the amount -- the sums advanced?

13   A    Yes.

14   Q    Less any payments?

15   A    Yes.

16   Q    Plus interest?

17   A    That is correct.

18   Q    Would it include a finders fee?

19   A    No, it would not.

20   Q    Now, how did it come to your attention that

21        these -- that the McAllister, Lawson, and

22        Peters loans were fraudulent loans?

23   A    Came to my attention through our security

24        officer, Mel Channell.

25   Q    And what do you understand Mr. Channell's

```
 1           duties to be?

 2    A      He -- to my knowledge he was the security

 3           officer for Union Planters Bank.

 4    Q      And once it came to your attention did you do

 5           anything to try to collect those monies?

 6    A      No, I did not.

 7    Q      Well, did you send a request to Sunshine

 8           Camping Center to pay off the Lawson,

 9           McAllister, and Peters loans?

10    A      Yes, I did, after they were deemed they were

11           fraudulent accounts.

12    Q      I'd ask to you look at Exhibit 1, page 7.

13                         (Whereupon, Plaintiff's Exhibit

14                          Number 1, page 7, was marked

15                          for identification.)

16    BY MR. SMITH:

17    Q      Okay.  Okay.  Do you recognize that document?

18    A      Yes, I do.

19    Q      And tell us what that is.

20    A      This is our request to Sunshine Camping Center

21           and Wallace Borland for the monies that were

22           due us on fraudulent accounts.

23                    MR. SMITH:  Your Honor, we'd offer

24              page 7 of Exhibit 1.

25                    THE COURT:  It's admitted.
```

```
1                        (Whereupon, Plaintiff's Exhibit
2                    Number 1, page 7, was admitted
3                    into evidence.)
4    BY MR. SMITH:
5    Q    Now, this is dated June 11, 2004, is it not?
6    A    Yes.
7    Q    And that is approximately the same time, dated
8         as the same time as these criminal loss account
9         forms we looked at; is that correct?
10   A    Yes.
11   Q    And you sent this to Sunshine Camping Center,
12        did you not?
13   A    Yes, I did.
14   Q    That is you, Dale York?
15   A    Yes, it is.
16   Q    How did you send it to them?
17   A    I believe, if I'm not mistaken, it was mailed
18        to them certified.
19   Q    All right.  You state here the second paragraph
20        as per our dealer agreement dated January 26,
21        2002, we're demanding the payoffs of 90,000 --
22        $90,763.54 total; is that correct?
23   A    Yes.
24   Q    And that's what you determine McAllister,
25        Lawson, and Peters contracts to total at that
```

```
 1            time; is that right?
 2    A       That's correct.
 3    Q       That did not include the finders fee, did it?
 4    A       No, it did not.
 5    Q       Should it have included the finders fee?
 6    A       Yes, it should have.
 7    Q       As of today has Sunshine Camping Center under
 8            the terms of the dealer agreement paid off
 9            those contracts?
10    A       No, they have not.
11    Q       Now, at the time this document was sent on
12            June 11, 2004, was the company that was the
13            owner of these loans Union Planters Bank?
14    A       2000 -- yes, it was Union Planters Bank.
15    Q       Now, subsequent to that did Union Planters Bank
16            and Regions Bank, to your knowledge, merge?
17    A       Yes, it did.
18    Q       As part of that merger, to your knowledge and
19            understanding did Regions acquire all of the
20            accounts of Union Planters Bank?
21    A       Yes, they did.
22    Q       Including the criminal loss accounts?
23    A       Yes.
24    Q       Would Regions have been an assignee of Union
25            Planters Bank to your knowledge and
```

```
 1        understanding?
 2   A    Yes.
 3             MR. SHIRLEY:  Object.  That calls for
 4        a legal opinion.
 5             THE COURT:  Overruled.
 6   BY MR. SMITH:
 7   Q    You may answer.
 8   A    Yes.
 9   Q    So when we're here today as Regions, it is
10        Regions that is the owners of these accounts
11        that were charged off, and I've written here in
12        red as criminal losses; is that correct?
13   A    Yes, that's correct.
14   Q    Now, under the terms of the dealer agreement,
15        show you paragraph 6 of the dealer agreement.
16        You see what I'm referring to?
17   A    Yes.
18   Q    Does that also include reasonable attorneys
19        fees?
20   A    Yes, it does.
21   Q    Has Regions incurred attorneys fees in
22        prosecuting this lawsuit to get the money back?
23   A    Most definitely.
24   Q    Do you know what those attorneys fees are?
25             MR. SHIRLEY:  We object.  That's
```

1      hearsay.  The fact that he knows what they
2      are does not establish they're reasonable
3      as required in any type of indemnification
4      even if they were to seek to have this
5      under this agreement.  What he paid is
6      irrelevant and immaterial.
7          MR. SMITH:  It's a question for the
8      jury to resolve, Your Honor.
9          THE COURT:  I'm gonna sustain the
10      objection to the extent that no predicate
11      for his knowledge of those fees have been
12      laid.
13  BY MR. SMITH:
14  Q   Okay.  Well, do you know what the fees are?
15  A   Not at the present time.
16  Q   Okay.  Do you understand that there are records
17      and documents that would reflect what those
18      fees are?
19  A   Yes.
20  Q   Do you believe that those fees are reasonable?
21          MR. SHIRLEY:  Object to that.
22      What -- that's just a representative who
23      is a nonexpert coming in here giving his
24      opinion.  That invades the province of the
25      jury if that's what it's for.  That's

1    inadmissible and irrelevant for him to
2    express reasonableness of something when
3    he's not competent to decide how it's all
4    done.  He has no qualification or
5    predicate to decide it.  Doesn't even know
6    what the law of Alabama is about what
7    reasonable attorneys fees are.
8         MR. SMITH:  I think he can give his
9    opinion as to whether they're relevant or
10   not, Your Honor --
11        MR. SHIRLEY:  His opinion is not
12   evidence.
13        MR. SMITH:  Well, wait --
14        MR. SHIRLEY:  That's the point.
15        MR. SMITH:  Your Honor, I think he
16   can express his opinion as to whether
17   they're reasonable or not.
18        THE COURT:  I overrule the objection.
19        MR. SHIRLEY:  Sir?
20        THE COURT:  I overrule the objection.
21        MR. SHIRLEY:  All right.  Then let me
22   make certain, he is asking --
23        MR. SMITH:  May we do this out of the
24   presence of the jury, Your Honor, if
25   Mr. Shirley's going to make a speech about

```
 1              this?
 2                   MR. SHIRLEY:  He is asking for an
 3              opinion of a lay witness.  What he's
 4              asking him to testify to is what has been
 5              charged or to the extent of what they are
 6              or to the extent his opinion.  That is not
 7              competent evidence for a lay witness.  It
 8              does not offer any clarity or evidence of
 9              reasonableness, clarity, properness,
10              anything.  All it'll do is confuse the
11              jury.
12                   THE COURT:  I overrule the objection.
13                   MR. SMITH:  Okay.
14                   MR. SHIRLEY:  We except.
15    BY MR. SMITH:
16    Q    Do you believe those to be reasonable,
17         Mr. York?
18    A    Yes.
19    Q    Let me show you what I have marked as
20         Exhibit 15 in this matter.
21                        (Whereupon, Plaintiff's Exhibit
22                        Number 15 was marked for
23                        identification.)
24    BY MR. SMITH:
25    Q    Do you understand that to reflect the attorneys
```

```
 1         fees and expenses Regions has incurred in
 2         pursuing this matter to try to collect these
 3         monies?
 4    A    Yes, I do.
 5    Q    And what is the amounts of those fees?
 6              MR. SHIRLEY:  Object.  Same
 7         objection, Your Honor.
 8              THE COURT:  I overrule.
 9              MR. SHIRLEY:  All right, sir.
10    A    $46,979.47, current.
11              MR. SMITH:  Your Honor, we would move
12         to admit Union Exhibit 15.
13              MR. SHIRLEY:  We except.
14              THE COURT:  I overrule your
15         objection.  It'll be admitted.
16         Exhibit 15?
17              MR. SMITH:  Yes, sir, Exhibit 15.
18                   (Whereupon, Plaintiff's Exhibit
19                   Number 15 was admitted into
20                   evidence.)
21    BY MR. SMITH:
22    Q    Mr. York, I believe those are all the questions
23         I have for you.  Mr. Shirley may have some
24         questions.
25              MR. SHIRLEY:  Are you ready for me to
```

go ahead, Your Honor?

THE COURT: Yeah. We need to take a recess at this time. If you'll go with the bailiff to the jury room we'll take a short recess.

(The jury left the courtroom.)

(Break in the proceedings.)

MR. MATTHEWS: Judge, I've got a little motion to make before the jury comes in, and it's not to this witness but the next witness. But I don't want to disrupt the flow of the trial or anything, but the witness after this witness is gonna be an ABI agent. And I'd like to make a motion in limine that he not discuss any case other than the present case. He's got other cases, my client does. And I'd ask that he not testify to any other investigation of him other than with the facts of these cases, these four events that are the source of this civil case.

MR. KNIGHT: We weren't gonna go into that, Your Honor.

THE COURT: What about you,

1         Mr. Shirley?
2              MR. SHIRLEY:  Well, I -- yes, sir,
3         I'd like the record to reflect that I
4         intended to ask him questions about it
5         because I think that his conduct relevant
6         to the time of this matter demonstrates
7         that Mr. Williams is not trustworthy.  And
8         I think I understand what he means.  It's
9         relevant to this case, but from the
10        standpoint of the foundation of this case
11        that's not all that this witness -- for
12        example, I don't know, I've never talked
13        to the witness to know what Mr. Williams
14        himself has ever told him about any of the
15        matters, i.e., the one if it's not a crime
16        surely it's a element of evidence to
17        demonstrate that he went and got $10,000
18        from the Hartford Bank on a fraudulent
19        conveyance of a title of a document from
20        Sunshine Camping.  And that was one of the
21        things that came up in his investigation
22        and why he ever got into the case.  Why,
23        it's my -- I could only --
24             THE COURT:  Well --
25             MR. SHIRLEY:  Yes, sir?

1   THE COURT: What would be the purpose
2   of questioning him concerning any other
3   criminal activity of Mr. Williams?
4   MR. SHIRLEY: Well, it is -- would --
5   THE COURT: In view of the fact that
6   Mr. Williams has admitted doing everything
7   he's been accused of in this case.
8   MR. SHIRLEY: I don't think that
9   we've been permitted to asking him about
10  the Hartford Bank issue.
11  THE COURT: Okay. I'm not familiar.
12  Is that something --
13  MR. SHIRLEY: That's one of the
14  things --
15  THE COURT: That's not been brought
16  up so far?
17  MR. SHIRLEY: Yes, sir. It's one of
18  the ones that he pled to that is in his
19  whatever criminal status he's in now. One
20  of the ones that they objected to us
21  getting into.
22  MR. MATTHEWS: That's the conviction
23  that Mr. Shirley attempted to get --
24  THE COURT: I'm gonna grant the
25  motion in limine.

1                    MR. SHIRLEY:  And we would like the
2          record to reflect that we object.
3                    THE COURT:  All right.  Anything else
4          before we bring the jury back again?
5                    (The jury entered the
6                    courtroom.)
7                    THE COURT:  Mr. Shirley, you may
8          cross-examine.
9                    MR. SHIRLEY:  Thank you, Your Honor.
10                   CROSS-EXAMINATION
11  BY MR. SHIRLEY:
12  Q    Mr. York, what's your position with Regions
13       Bank?
14  A    Present position is indirect lender three.
15  Q    I'm sorry?
16  A    Indirect lender three.
17  Q    Okay.  And Union Planters what was it?
18  A    Vice president.
19  Q    Vice president of what?
20  A    Indirect lending.
21  Q    You told me in your deposition -- you remember
22       we took your deposition?
23  A    Yes.
24  Q    You remember giving your deposition?  You told
25       me that Mr. Hollifield and Mr. Gill were the

1      ones that were in that department that had

2      something to do with procuring and obtaining

3      the dealer agreement; is that correct?

4    A  Yes.

5    Q  That wasn't your department?

6    A  That's correct.

7    Q  And you're not in collections?

8    A  No.

9    Q  And as of this very moment you're not in

10     collections with Regions?

11   A  No.

12   Q  You're not a lawyer, are you?

13   A  No.

14   Q  You've never practiced law, don't have a

15     license, right?

16   A  No.

17   Q  Any opinion you hold today about that exhibit

18     that was introduced about attorney fees, that's

19     just an opinion you hold as an individual

20     without any legal training, right?

21   A  Yes.

22   Q  It's also an opinion with someone who's in the

23     financing industry that doesn't have anything

24     to do with collections, right?

25   A  That's correct.

1    Q    It's also an opinion that's been offered by
2         someone that doesn't know what's reasonable or
3         unreasonable, correct?
4    A    I cannot answer.
5              MR. SMITH:  I object to the form of
6         the question, Your Honor.
7              THE COURT:  Hold on just a minute
8         before you answer.
9              MR. SMITH:  We object to the
10        question, Your Honor, it's argumentative.
11             THE COURT:  I overrule.
12             MR. SHIRLEY:  I'm sorry?
13             THE COURT:  I overrule the objection.
14        You may ask the question.
15             MR. SHIRLEY:  I'm sorry.
16   A    Would you like to repeat it, please?
17   Q    Well, why don't we let the court reporter read
18        it back.  She looks like she's about to go to
19        sleep.  Just kidding.
20                  (Reporter read back the two
21                   questions immediately before
22                   the objection.)
23   A    I can't answer that question.
24   Q    Well, then, if you can't answer that question,
25        you'd have to agree with me you have no

```
 1            foundation for knowing whether those attorney
 2            fees are reasonable or not, right?
 3    A       Doesn't have to agree with you, no.
 4    Q       Huh?
 5    A       I do not have to agree with you, no, I do not.
 6    Q       All right.  You don't have any reason that you
 7            could tell me that you know those fees are
 8            reasonable, do you?
 9    A       That's correct.
10    Q       Okay.  Well, that's what I wanted to be sure
11            of.
12                       MR. SHIRLEY:  This time we move to
13                  exclude him because he has established and
14                  indicated to the Court that he has no
15                  predicate for basing any kind of opinion
16                  or any qualification as to why and how
17                  those attorney fees are reasonable.  And
18                  part of proof for damages of attorney fees
19                  is reasonable and necessary.  This witness
20                  is not competent to do that.
21                       MR. SMITH:  Your Honor, you've
22                  already allowed him to testify as a lay
23                  witness in that regard, and I see no
24                  reason for Your Honor to overrule or
25                  sustain this objection given your prior
```

1          ruling.
2                THE COURT:  I'm going to reserve a
3          ruling on that motion.
4                MR. SHIRLEY:  Thank you, Your Honor.
5     BY MR. SHIRLEY:
6     Q    Do you consider that what your testimony has
7          been today to be opinion evidence?
8     A    As to what?
9     Q    As to what --
10    A    Give me specific.
11    Q    -- this means on this document up here and what
12         this and whether we would do that and whether
13         we would do this, do you consider that opinion
14         evidence?
15    A    As it relates to my job, no, it's not opinion.
16    Q    Okay.  You do, in fact, know that Union
17         Planters had guides and policies about
18         underwriting indirect loans, do you not?
19    A    Yes.
20    Q    And what I've done is I've got together what
21         Mr. Smith has produced, and let me show you to
22         indicate this.  You see that on there, page
23         139?
24    A    Yes.
25    Q    And you see the word "Union Planters"?

1   A    Yes.

2   Q    And this is a copy because obviously when I

3        took your deposition, if I understand it

4        correctly, the documentation that I have been

5        furnished was on a computer and had to be

6        printed up.

7   A    That's correct.

8   Q    And I want you to -- let me take this apart and

9        put the clip on there in hopes I won't drop it.

10       And I was gonna skip back to the last page that

11       says 0154 and it's got Union Planters.

12  A    Okay.

13  Q    And what I am saying to you is that these

14       documents are numbered by page for

15       identification purposes to me to show that I

16       received them, pages 0139 through 0154.

17  A    Okay.

18  Q    Okay.  And this is what you -- can you look at

19       that and look at those headings and confirm

20       that was, in fact, what the policies and

21       procedures were relative to indirect writing at

22       that time?

23  A    Yes.

24  Q    Okay.  You're familiar enough with them that

25       you don't have to thumb through them like I

272

1          would, right?
2     A    Well, I would want to look at them.
3     Q    Okay.  Well, just take a moment to -- I've made
4          myself a copy.  And what I'm trying to do is
5          look at a copy and go back over there and ask
6          you some questions.  And it says -- you see the
7          general policy, that's the first two pages?
8     A    Yes.
9     Q    It says lending policy relative to dealer
10         agreement.  You see that, don't you?
11    A    Yes.
12    Q    Then it says dealer approvals.  What had to go
13         through with the dealer approval, right?
14    A    Yes.
15    Q    And then it says applications, underwriting,
16         and credit approval.  And you see that's at
17         page -- and some reason mine doesn't have a
18         page number.  Yeah, thank you, 144.
19    A    Yes.
20    Q    That's part of the rules, isn't it?
21    A    Yes.
22    Q    Looks like you got a copy of everything I have,
23         doesn't it?
24    A    I believe so.
25    Q    Now, let me ask you to look back at page 144.

```
 1              And on 144 it has all that information on

 2              there, and this is what the guides were at the

 3              time the loans involved in this lawsuit

 4              occurred.  There was some 23 in number, was it

 5              not?

 6    A         There are 23 here, yes.

 7    Q         And would you agree with me that the

 8              applications that had been sent in and have

 9              been introduced into evidence, they were not

10              filled out to every nth degree?

11    A         Not every instance, no.

12    Q         But this is what your company told you should

13              be the policy and the guide to be followed if

14              in fact you were going to act on somebody's

15              loan?

16    A         This is a policy that the bank provides us,

17              which we have guidelines to go by, and we can

18              deviate from this policy.

19    Q         You can deviate from them if you feel

20              comfortable enough with Jon Williams, right?

21    A         Yes.

22    Q         So it's your discretion, isn't it?

23    A         It could be my discretion.

24    Q         And it was your discretion, wasn't it?

25    A         Yes.
```

```
 1    Q     Now, you remember that there's a -- and if you
 2          would, just sit that right here on the corner.
 3          Let me go ahead and finish this.  I think it'll
 4          probably be easier if I go ahead and finish.  I
 5          wanted to go back.  You recall giving testimony
 6          about a form that was issued, and I'll show you
 7          what I've identified as Defendant's Exhibit K.
 8          And I would represent to you that this document
 9          came from Mr. Mel Channell's computer or file.
10          Okay?
11                        (Whereupon, Defendant Sunshine's
12                         Exhibit K was marked for
13                         identification.)
14                    MR. SMITH:  Which page is that?
15                    MR. SHIRLEY:  I can't remember.
16          It'll take me a minute.
17                    MR. SMITH:  Can I see it a minute --
18                    MR. SHIRLEY:  Sure, sure.
19                    MR. SMITH:  -- so I can understand?
20                    MR. SHIRLEY:  Sure.  I might can find
21          it right here.
22                    MR. SMITH:  It's page six.  It's
23          right on there, Mr. Shirley.
24                    MR. SHIRLEY:  Okay.  Good.
25    BY MR. SHIRLEY:
```

```
1    Q    Now, this would be --
2              MR. SMITH:  Don't be confused.
3    BY MR. SHIRLEY:
4    Q    This would be from Mr. Channell's -- is it
5         Channell or Channell (pronouncing)?
6    A    I believe it's Channell.
7    Q    His exhibit that we've talked about is number
8         7.  You know, Exhibit Number 7 that has several
9         documents in it.
10   A    Okay.
11   Q    And I need to know do you know that.
12   A    That they're all related to Number 7?
13   Q    No, no, no.  You see, this is what we've been
14        talking about, Plaintiff's Exhibit Number 7,
15        Mel Channell's documents.
16   A    I see that.
17   Q    Okay.  And I believe that it's not in these
18        documents, but I believe that it was produced
19        to me by your attorney as he so astutely called
20        to my attention page 6.  And it says it's going
21        where?
22   A    It goes to Daniele Cain, Dale York, Bryan
23        Grissom and Ronnie Gross.
24   Q    Can you authenticate this as being a correct
25        document that told you and the other people to
```

```
 1              create a criminal loss?
 2      A       It was sent to a Daniele Cain.  It was carbon
 3              copied to me.  I did not create a criminal
 4              loss.
 5      Q       Well, what's the date on it?
 6      A       June 11th, 2004.
 7      Q       And isn't that what you testified earlier in
 8              deposition that you were doing?  Changing,
 9              creating a criminal loss at the notification
10              from Mr. Channell, Channell (pronouncing), your
11              security officer to do so?
12      A       I cannot create a criminal loss.
13      Q       Okay.  Well, this says he did, correct?  That's
14              my understanding.
15      A       It does ask to be asked of Daniele Cain to do
16              that.
17      Q       All right.  And they sent you a copy of that?
18      A       That is correct.
19      Q       And then sometime on June the 11$^{th}$ or
20              sometime -- is that not when you zeroed out all
21              the accounts with the criminal loss?
22      A       I did not do that, no.
23      Q       Who did?
24      A       I do not know.
25      Q       Well, you've testified it was done, don't you?
```

```
 1   A   It shows that on the documents that was --
 2   Q   Well, that's what I was trying to be sure of.
 3       And I say it correctly when I say that you have
 4       given testimony -- and there's a document
 5       introduced into evidence that so indicates
 6       that, that you've given testimony as being
 7       highlighted on the viewer, criminal loss for
 8       each one of these accounts.
 9   A   It shows on that paper that there was a
10       criminal loss created, yes.
11   Q   And when that --
12               MR. SHIRLEY:  We offer Exhibit K into
13           evidence.
14               MR. SMITH:  We don't have any
15           objection to it, Your Honor.  It's one of
16           our documents.
17               THE COURT:  It's admitted.
18                   (Whereupon, Defendant Sunshine's
19                   Exhibit K was admitted into
20                   evidence.)
21   BY MR. SHIRLEY:
22   Q   And so the transaction so far as you're
23       concerned in the undirect -- I'm sorry, let me
24       start over.  That transaction that you talked
25       about -- let me start over, I apologize.  Tell
```

```
 1           me who Mel Channell, Channell (pronouncing) is?
 2    A      To my knowledge he's a security officer with
 3           Union Planters Bank, now Regions.
 4    Q      Okay.  And he did, in fact, get involved in
 5           this matter, did he not?
 6    A      Yes, he did.
 7    Q      And he got involved in this matter -- and I
 8           think this is page 108 of Exhibit 1.
 9           Defendant's Exhibit I, you see it's marked
10           Exhibit I there below your thumb?
11                      (Whereupon, Defendant Sunshine's
12                       Exhibit I was marked for
13                       identification.)
14    A      Yes.
15    Q      And that is a memo to you, is it not?
16    A      That is correct.
17    Q      And what I understand is that that is the
18           reproduction of an e-mail; is that right?
19    A      That's what it looks like, yes.
20    Q      I mean, the -- Union Planters maintain things
21           on a computer as opposed to having a paper
22           file?
23    A      I'm not sure how they do that.
24    Q      Okay.  But you know you got this memo, don't
25           you?
```

```
 1    A    Yes, I do.
 2    Q    And it says in here the State of Alabama has an
 3         open criminal investigation and UP is opening
 4         one as well.  It says that in there, doesn't
 5         it?
 6    A    Yes.
 7    Q    We do not want to jeopardize the criminal case,
 8         correct?
 9    A    Does say that.
10    Q    And that concerns Robert McAllister, Dorothy
11         Peters, and what else, the names that appear
12         there on it?
13    A    Yes.  Hubert Lawson, Patricia Glazier, James R.
14         Pote, and Nancy L. Coleman.
15    Q    And at that point in time you did nothing, did
16         you?
17              MR. SHIRLEY:  We offer Defendant's
18           Exhibit I.
19    A    I think that document requested I send them
20         information on those customers.
21    Q    You did nothing to contact Comber Borland, did
22         you?
23    A    No.
24    Q    And you did nothing to contact these other
25         people, did you?
```

1    A     No.

2                              (Whereupon, Defendant Sunshine's

3                              Exhibit I was admitted into

4                              evidence.)

5    BY MR. SHIRLEY:

6    Q     Now, the dealer agreement does not have the

7          word "criminal" or "criminal loss" on it, does

8          it?

9    A     To my knowledge, no.

10   Q     Okay.  Now, the agreement -- let me start over

11         again.  That document, that agreement is called

12         what?

13   A     The dealer agreement?

14   Q     Yeah.  You referred to it as the dealer --

15   A     Dealer agreement, yes.

16   Q     So when I use the word "dealer agreement," you

17         and I know what we're talking about?

18   A     Yes.

19   Q     We've seen it several times?

20   A     Yes.

21   Q     It's introduced into evidence, right?  So it

22         would be correct for me to say that you got

23         Mr. Channell, who was authorized to decide if a

24         criminal loss account should be set up, sends a

25         memo out, and then the Lawson, the McAllister,

| | | |
|---|---|---|
| 1 | | and the Peters gets a zero balance as a |
| 2 | | criminal loss? |
| 3 | A | Not at that time I don't believe, no. |
| 4 | Q | It wasn't done on the 11th of June? |
| 5 | A | I believe that's around that date that -- |
| 6 | Q | Okay. |
| 7 | A | It shows criminal loss, but I'm not sure the |
| 8 | | document said that date on there, the e-mail. |
| 9 | Q | Okay. When you say around that date, you mean |
| 10 | | it could have been the 12th or the 13th? |
| 11 | A | Whatever the date said as the evidence was |
| 12 | | presented. |
| 13 | Q | Okay. Whatever the document says on it? And |
| 14 | | this may clear it up. You see this has been |
| 15 | | produced to me. I marked it as Defendant's |
| 16 | | Exhibit L. |
| 17 | | (Whereupon, Defendant Sunshine's |
| 18 | | Exhibit L was marked for |
| 19 | | identification.) |
| 20 | BY MR. SHIRLEY: | |
| 21 | Q | And it is shown to be several pages of Hubert |
| 22 | | Lawson. And the last page, page -- actually |
| 23 | | pages 7, 8, and 9 are again reproduced |
| 24 | | computer -- |
| 25 | A | Yes. |

```
 1    Q    -- screens, aren't they?

 2    A    Yes.

 3    Q    And it shows it's done the 15th?

 4    A    June 15th, 2004.

 5    Q    And it says criminal loss Sunshine Camping.

 6    A    Yes, it does.

 7    Q    And what I'm trying to ask you, to be sure that

 8         I understand, the person that decided on behalf

 9         of Union Planters for it to be a criminal loss,

10         zero balance in the account, sent the word

11         down.  And on or about the 15th of June it

12         was done?

13    A    I believe that to be correct, yes.

14    Q    And I think if we look at Defendant's Exhibit

15         Number 3, which I've marked as Defendant's

16         Exhibit M --

17                        (Whereupon, Defendant Sunshine's

18                         Exhibit M was marked for

19                         identification.)

20    BY MR. SHIRLEY:

21    Q    This one is on Dorothy Peters?

22    A    Yes.

23    Q    And if you'll look at the last pages of that

24         document and tell us at what the date was that

25         it was assigned a criminal loss.
```

283

1    A   Are you referring to page 11, not the last

2         page?

3    Q   I'm sorry?

4    A   Are you referring to page 11 and not the last

5         page?

6    Q   I don't know, you'll have to tell me.  If 11

7         says it, that's what we need to know.

8    A   Eleven says on effective date 6/11/04.

9    Q   Okay.  And then the other one has been produced

10       on McAllister, and it says whatever it says,

11       yes?

12    A  Yes.

13    Q  And it's gonna say something around June the

14       11th or 12th or 13th or 14th --

15    A  I believe that's --

16    Q  -- or the 15th, just like these do.

17          MR. SHIRLEY:  We offer Defendant's

18         Exhibit --

19          MR. SMITH:  May I see them?  I

20         haven't seen them in that form, I don't

21         think.

22          MR. SHIRLEY:  They're just like you

23         gave them to me.

24          MR. SMITH:  Okay.  No objection to

25         either of these, Your Honor.

284

1          THE COURT:  All right.  They'll be

2     admitted.

3          MR. SMITH:  That was all of 2-1.

4          MR. SHIRLEY:  Let me say for the

5     explanation, I'm not sure it's 2-1.  I

6     thought 2-1 was the first one I thought,

7     and I thought that was the second one.

8          MR. SMITH:  Off 2 and 3.

9          MR. SHIRLEY:  Yeah.

10          MR. SMITH:  All right.  Thank you.

11     Thank you.

12               (Whereupon, Defendant Sunshine's

13               Exhibits L and M were admitted

14               into evidence.)

15     BY MR. SHIRLEY:

16     Q    Now, somebody other than you was supposed to

17          put the language for the dealer agreement,

18          right?

19     A    That is correct.

20     Q    But these guidelines -- which we offer into

21          evidence Defendant's Exhibit N -- say what the

22          policy and the guide is relative to completing

23          that and putting the proper language in it,

24          doesn't it?

25     A    Yes.

```
 1                        (Whereupon, Defendant Sunshine's
 2                        Exhibit N was marked for
 3                        identification.)
 4     BY MR. SHIRLEY:
 5     Q    The guides say that the following policies and
 6          procedures in an indirect loan approval
 7          business need to be followed, and they need to
 8          be specific, and they do have a particular
 9          purpose for being put in writing, do they not?
10     A    I believe it says that, yes.
11     Q    And so that would say to me that when it says
12          that it should have -- the dealer should have a
13          thorough understanding of the bank's acceptable
14          credit criteria, that guide is saying Sunshine
15          is supposed to know what the acceptable credit
16          criteria is, right?
17     A    That's what it says.
18     Q    And somebody is supposed to tell Sunshine that
19          on behalf of Union Planters, right?
20     A    Yes.
21     Q    But that's not in the indirect writing
22          department, is it?
23     A    (No response.)
24     Q    Somebody else does that.  Somebody else goes to
25          the dealer, interacts with the dealer.
```

```
1    A    Somebody other than me, yes.
2    Q    That's what I was trying to establish.  Someone
3         else does that?  And these guides say that they
4         recommend that the bank take these titles and
5         apply for them so they can make certain they
6         get them, doesn't it?
7    A    I believe it does state that.
8    Q    But that wasn't done in a single one of these,
9         was it?
10   A    No.
11   Q    And that's your decision, isn't it?
12   A    That's not my decision.
13   Q    Well, you were the one that approved the loans,
14        all three of them, didn't you?
15   A    Yes.
16   Q    So it had to be you.  Ain't nobody else that
17        you can blame it on, is there?
18   A    My superiors has authorized us to purchase
19        contracts that way.
20   Q    Well, then your superiors are at fault, not
21        you?  Is that what you're telling me?
22   A    I'm ultimately responsible for each loan I
23        make.
24   Q    Okay.  So you now agree that it was your
25        responsibility?
```

```
 1    A    Yes.
 2    Q    And you wouldn't have ever done that if you
 3         hadn't have known Jon Williams so long, would
 4         you?
 5    A    Actually I didn't know Mr. Williams that long.
 6    Q    And you certainly didn't know anything about
 7         Sunshine, did you?
 8    A    No.
 9    Q    And recourse is no substitute for loan
10         underwriting, is it?  Isn't that what the guide
11         says?
12    A    That is correct.
13    Q    Pardon?
14    A    That's correct.
15    Q    So on the firing line it's left up to you to
16         decide whether or not to approve it, isn't it?
17    A    That is correct.
18    Q    And that dealer agreement says that we, Union
19         Planters, reserve the right to approve this
20         loan.  It says that, doesn't it?
21    A    Yes, it does.
22    Q    That means on these three loans you, acting
23         from Union Planters, right?
24    A    Yes.
25    Q    The bank should always do a complete credit
```

```
 1          underwriting on the borrower.  That's what your
 2          guides say, isn't it?
 3     A    Yes.
 4     Q    Page 153.
 5               MR. SHIRLEY:  And we offer
 6          Defendant's Exhibit N into evidence.
 7               MR. SMITH:  We have no objections to
 8          it, Your Honor.
 9               THE COURT:  Admitted.
10               MR. SMITH:  Well we do object to the
11          extent that it's highlighted.
12               MR. SHIRLEY:  Yes, sir, and I'll --
13               MR. SMITH:  And yours has got
14          highlights all over it.  We object to
15          those highlights because those aren't on
16          the original document.
17               MR. SHIRLEY:  Sure.  And I'll be glad
18          to just recopy and substitute them.
19               THE COURT:  All right.
20               MR. SHIRLEY:  Offer them into
21          evidence when I get the copies.
22               THE COURT:  Do it without the
23          highlighting.
24               MR. SHIRLEY:  I'll just leave it here
25          until we get it.
```

```
 1                          (Whereupon, Defendant Sunshine's
 2                           Exhibit N was admitted into
 3                           evidence.)
 4    BY MR. SHIRLEY:
 5    Q    I'll show you what has been identified to me,
 6         this is Sunshine Exhibit A.
 7                          (Whereupon, Defendant Sunshine's
 8                           Exhibit A was marked for
 9                           identification.)
10    BY MR. SHIRLEY:
11    Q    And it appears that it's on page 12.  It
12         appears that Sunshine on the 13th of May told
13         Union Planters that they were changing
14         Commercial Bank, sent a check, right?
15    A    That is what it looks like, yes.
16    Q    Okay.  Does this document come to your office?
17    A    No, it does not.
18    Q    Is it correct for me to believe that on the
19         13th day of May, 2003, you interpret this
20         document, Defendant's Exhibit A, to indicate
21         that Sunshine banking is changing banks?
22    A    Yes.
23    Q    And that from that point forward any money sent
24         to them through a bank wiring should be sent to
25         Commercial Bank?
```

```
 1    A    Yes, unless they changed that.
 2    Q    Okay.  Well, do you have any documents that
 3         would indicate it's been changed?
 4    A    I believe there is document that says that.
 5    Q    Okay.  Do you know that?  Is that under your
 6         head?  Are you the one that makes that
 7         decision?
 8    A    The question is?
 9    Q    Yeah, I'm sorry.  I don't work at Union
10         Planters, right?  You understand that?
11    A    Right, I understand.
12    Q    And I don't know the choice of words to use to
13         identify departments.  But that document was
14         something to do with changing banks and letting
15         Union Planters know that?
16    A    That is correct.
17    Q    And what I don't understand is did that go to
18         the accounting department or did it go to
19         indirect writing?
20    A    It went into our department, yes.
21    Q    Okay.  Well, then you don't have anything that
22         says after May 13th, 2003, that the bank has
23         changed, have you?
24    A    Not to my knowledge at the present time.
25    Q    Well, gosh, you haven't been looking at all
```

1          this junk before you showed up down here in
2          Ozark?
3     A    I did not have all the exhibits, no.
4     Q    Well, where were they?  I mean, that's a Union
5          Planters document.  I got that from your
6          lawyer.  How come you can't look at that and
7          tell us?
8                    MR. SMITH:  Your Honor, that's
9               argumentative.
10                   THE COURT:  I sustain.
11    BY MR. SHIRLEY:
12    Q    You do know that I got that from your attorney?
13    A    I believe it to be correct, yes.
14    Q    You know I don't have a computer that's
15         connected with Union Planters for it to be sent
16         down here to me, you know that?
17    A    That's correct.
18    Q    And at this moment somebody that's supposed to
19         know what they're doing, you can't produce me
20         any document that says that was not the one
21         that was supposed to be used, the bank?
22    A    I believe --
23                   MR. SMITH:  Your Honor, that's an
24              argumentative question again and we object
25              to it.

292

```
 1                    THE COURT:  I overrule that
 2              objection.
 3    A    I believe there's been evidence produced
 4         otherwise.
 5    Q    Well, I say a document.  I'm asking you to tell
 6         me where the document is.
 7    A    I believe it's among some of this.
 8    Q    Now, are you talking about the document that
 9         was signed when they first went into business?
10    A    No.
11    Q    Okay.
12    A    There's another document I believe that goes to
13         CB&T for them to receive wire transfers, if I
14         remember correctly.
15    Q    All right.  Well, let me see if I can find the
16         one that -- it doesn't appear -- and I don't
17         mean to -- yeah, here we go right here.  Are
18         you talking about this one, the CB&T?  CB&T,
19         and I'm looking at Exhibit 1, page 11.
20    A    This is a document, yes.
21    Q    That's what you're talking about?
22    A    Uh-huh.
23    Q    What's the date on there?
24    A    4/5/2003.
25    Q    Well, that was before the May 13th?
```

```
 1    A    Okay.
 2    Q    So the May 13th would control, wouldn't it?
 3    A    To my knowledge it should, yes.
 4    Q    It should?
 5    A    Yes.
 6    Q    So they shouldn't have sent that money to CB&T.
 7         They should have sent that money wire
 8         transferred to Commercial Bank.  Yes?
 9    A    Yes.
10    Q    Thank you.  Now, that means that look at you as
11         an indirect writer looking at that
12         documentation, there's no reason to believe
13         that the acting president would believe money
14         would still go into CB&T if he told y'all in
15         Paducah, Kentucky, go to Commercial Bank.
16              MR. SMITH:  Your Honor, we object as
17                 to speculation as to what somebody else
18                 believed.
19              THE COURT:  I sustain.
20    BY MR. SHIRLEY:
21    Q    Well, sir, do I understand correctly that the
22         May 13th, 2003, request to change over to
23         Commercial Bank in Ozark from CB&T in
24         Enterprise, that's what it was done for so the
25         new money would be transferred to Commercial
```

```
 1        Bank?
 2   A    If I was in charge of that I would say that
 3        would be correct, yes.
 4   Q    In charge of it?  That doesn't -- you said you
 5        got the document; that it came in --
 6   A    Unfortunately I'm not in charge of changing
 7        that.
 8   Q    Oh.  You mean yet again somebody else that was
 9        your supervisor that was wrong and now it's
10        some other department that did it wrong, huh?
11        Yes?
12   A    That could be true.
13                MR. SMITH:  Your Honor, I object to
14           Mr. Shirley continuing to argue with the
15           witness, Your Honor.
16                THE COURT:  I sustain that objection.
17           Try to get facts.
18   BY MR. SHIRLEY:
19   Q    Is it correct that you've never sent anything
20        to Sunshine Camping that says that Regions Bank
21        merged with Union Planters; is that right?
22   A    I'm not sure.
23   Q    Well, I'm just asking you.  You haven't ever
24        done it?
25   A    Me personally, no.
```

```
 1    Q    Yes, sir.  Well, you have been a -- you know,
 2         very informative telling us they merged.  And
 3         you know all this business about how they take
 4         over; isn't that what you said?
 5    A    I know something about it, yes.
 6    Q    Well, where's the documentation that proves
 7         that?
 8    A    The letter that -- saying that we're merging
 9         with Regions?
10    Q    That says they have a right to all this.  I
11         mean, you say you work for them now, and you
12         done told this jury that Regions Bank is a
13         successor.  How do you know that?
14    A    Well, unfortunately I've been through a prior
15         merger, so I know a little bit about that.
16    Q    Well, is that legal knowledge?
17    A    It's not legal knowledge.
18    Q    Okay.  You're not saying you know legal
19         knowledge?
20    A    That's correct.
21    Q    You're just saying if it's done like it --
22    A    You didn't ask me legal knowledge.
23    Q    If it's done like it used to be done or like
24         it's supposed to be done, that's the way it is?
25    A    When the banks merge, all rights are assigned
```

```
 1              to the new bank.
 2    Q    And when the bank merged, your books and
 3         records said this was a zero balance, didn't
 4         it?
 5    A    No.
 6    Q    Criminal loss balance?
 7    A    That's what it says on those documents.
 8    Q    Yes, sir, and that's the documents that Regions
 9         Bank got when the merger occurred.  There ain't
10         no other documents, is there?
11    A    That's not because of the merger.
12    Q    Anything else is just internal computer
13         business, isn't it?  Yes?
14              MR. SMITH:  Judge, again, I'm sorry.
15    A    The question is?
16              MR. SMITH:  I'm sorry.  Mr. Shirley
17           continues to argue with the witness, and
18           we object to the form of his argumentative
19           questions.
20              THE COURT:  I overrule the objection.
21   BY MR. SHIRLEY:
22    Q    Were you saying yes?
23    A    And the question, please, again?
24    Q    That Regions was a stranger to Union Planters,
25         correct?  They were not the same entity?
```

297

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay. |
| 3 | A | Not before the merger. |
| 4 | Q | So before the merger the only document that |
| 5 | | existed was this document that said it was a |
| 6 | | zero balance and a criminal loss? |
| 7 | A | Yes. |
| 8 | Q | And that criminal loss was to write it off and |
| 9 | | get it off the books, wasn't it? |
| 10 | A | No. |
| 11 | Q | Well, is that because you're in the accounting |
| 12 | | department? |
| 13 | A | No. |
| 14 | Q | Okay.  Then that's really just a guess, isn't |
| 15 | | it? |
| 16 | A | No. |
| 17 | Q | Okay.  I guess you know? |
| 18 | A | Yes. |
| 19 | Q | Okay.  Do you agree with me -- and forgive me |
| 20 | | if I asked you this, but I've got my notes and |
| 21 | | I try to follow my notes.  And I apologize, I'm |
| 22 | | not trying to waste your time or the Court's or |
| 23 | | the jury's.  You do agree with me that Union |
| 24 | | Planters drafted the dealer agreement and they |
| 25 | | decided how it would read, right? |

```
 1    A    That's correct.
 2    Q    And you'd also agree that the last person in
 3         so -- well, strike that.  The last entity, the
 4         last entity to have the authority over these
 5         loans was Union Planters; that was the entity?
 6    A    (No response.)
 7    Q    I mean, Regions Bank wasn't a part of Union
 8         Planters in June 2004, was it?
 9    A    It was not officially.  The merger had been
10         announced by that time.
11    Q    Okay.  Well, then, up until that day it was
12         Union Planters and its employees who decided
13         whether criminal prosecutions against Mr.
14         Williams would occur, right?
15    A    I believe that to be correct, yes.
16    Q    And then when Regions Bank took over they
17         decided whether there'd be criminal
18         prosecutions, right?
19    A    I can't answer that.
20    Q    Well, you're down here on behalf of Regions,
21         aren't you?
22    A    Well, unfortunately I'm not the security
23         officer.
24    Q    And you were asked to give a deposition on
25         behalf of Regions, weren't you?
```

```
 1    A    Yes.
 2    Q    Well, has it come to your attention that
 3         Regions has told Mr. Williams they're not gonna
 4         prosecute him criminally?
 5    A    That's never been told to me.
 6    Q    Have you ever investigated?
 7    A    No.
 8    Q    Why?
 9    A    I'm not a security officer of the bank.
10    Q    Somebody else has got to do that, right; is
11         that what you're saying?
12    A    That would be correct, yes.
13    Q    You would agree with me that the last entity to
14         keep any of this from happening was Union
15         Planters?
16    A    Please rephrase the question.  The entity?
17    Q    No, sir.  The last entity to have prevented
18         this from happening, any of this loss, was
19         Union Planters?
20    A    Well, I can't believe that because Union
21         Planters and Regions have merged, so they're
22         the same entity.
23    Q    Well, Regions didn't have anything to do with
24         this when you approved these things.
25    A    That's correct.
```

```
 1    Q    And Sunshine Camping company with a forgery,
 2         forged application didn't approve it, you
 3         approved it?
 4    A    Yes.
 5    Q    Don't you regret doing that?
 6    A    I do at this point in time, yes.
 7    Q    Sure.  Now, you mean -- how many years you been
 8         in this banking business?
 9    A    Twenty-five years.
10    Q    How many?
11    A    Twenty-five years.
12    Q    And you mean this guy fooled you?
13    A    Yes, he did.
14    Q    Oh, my gracious.  How much financing and
15         banking knowledge does this man over here have?
16    A    I have no idea.
17    Q    Okay.  Well, let's assume he has none.  Would
18         you think he would be able to detect something
19         that you couldn't detect?
20    A    I would think not, no.
21    Q    Huh?
22    A    I would think not, no.
23    Q    Okay.  Well, I wanted to -- you do agree with
24         me, don't you, that what Jon Williams did is
25         stealing, don't you?
```

301

1   A   Most definitely.

2   Q   And it's stealing in Alabama and it's stealing

3       in Kentucky, right?

4   A   Yes, sir.

5   Q   Okay.  And you're not accusing Sunshine of

6       stealing, are you?

7   A   I believe our lawsuit's against Sunshine

8       Camping Center and Jon Williams, so yes.

9   Q   Yes, what?

10  A   Yes, they stole.

11  Q   Well, there is no one but Jon Williams that has

12      ever come to your attention as knowing anything

13      about this, right?

14  A   I believe that to be correct yes, sir.

15  Q   Right.  And you remember me asking you if you

16      had any basis in your deposition to suggest

17      that you knew anything that would indicate that

18      Comber Borland knew anything.  You remember

19      that?

20  A   Yes.

21  Q   And your answer was no?

22  A   No.

23  Q   And it is today, isn't it?

24  A   Yes.

25  Q   Now, it's just not good business to let

```
 1        somebody run off and not bring the title in, is
 2        it?
 3    A   That is a common nature of our business.
 4        Unfortunately customer would not be able to
 5        receive his unit if he had to wait for the
 6        title.
 7    Q   Oh, so this Exhibit J to Jon Williams, Dale
 8        York, that says you contacted him March 3
 9        through December 3 -- you remember sending that
10        out?
11    A   I did not send that out.
12    Q   You didn't send it out?
13    A   No.
14    Q   You just made a record of all those contacts?
15    A   Leigh Turner from Union Planters in my
16        department sent this out.
17    Q   So she was able to tell from your computer that
18        all these contacts had been made to find out
19        where those titles were?
20    A   She's actually the one that makes the contacts.
21    Q   Okay.  That's her job?
22    A   That's correct.
23    Q   And she just let him get away with it?
24              MR. SMITH:  Objection, argumentative,
25          Your Honor.
```

```
 1                    THE COURT:  I sustain.  I sustain.
 2   BY MR. SHIRLEY:
 3   Q    Okay.  So same thing is true with McAllister
 4        and Peters, isn't it?  I'm sorry, I thought you
 5        looked at it.  Wouldn't want to be accused of
 6        not letting you look at it.
 7   A    There's also a James Pote on here as well.
 8   Q    So somebody at Union Planters the entity knew
 9        that the procedures were not followed long long
10        before Mr. Williams got in trouble with the law
11        and it all came to surface where Mr. Channell
12        was notified, right?
13   A    Rephrase the question again.
14   Q    Well, y'all knew that there was something
15        smelly, didn't you?  That these titles were not
16        in?
17   A    We knew we had four titles that were not in.
18   Q    And that ain't good business, is it?
19   A    Unfortunately you don't always get titles on
20        time.
21   Q    That's isn't what I asked you.  Is that good
22        business?
23   A    I would say no.
24   Q    No?
25   A    No.
```

```
1    Q    Thank you.  Well, how did he keep these loans
2         afloat all this time?
3    A    I can't speculate to this.
4    Q    But Mr. Channell said that you could look on
5         the computer because the payments were scanned
6         into the computer; is that right?
7    A    That's what Mr. Channell said.
8    Q    You don't believe that?
9    A    I have no reason to doubt what he says.
10   Q    I don't either and -- but you don't have
11        anything to do with collections?
12   A    That's right.
13   Q    Who does?
14   A    Collection department.
15   Q    But they, the payment department, the payment
16        department would have known if payments were
17        being made by money orders from somebody that
18        was different than the loan, wouldn't they?
19   A    I can't testify as to what they would know.
20   Q    Well, then you can't rule that out, can you?
21   A    That's true.
22   Q    So it all boils down to there was plenty of
23        opportunity with Union Planters to stop this
24        scheme.  And there's so many people juggling
25        the iron that y'all all couldn't get together
```

1          and decide what to do, right?

2                    MR. SMITH:  Object to argumentation,

3               Judge.

4                    THE COURT:  I overrule.

5     A    Rephrase the question or ask me the question

6          again.

7     Q    Okay.  Well, you would forgive me if I can't

8          say it just exactly like I said it, right?

9     A    Right.

10    Q    If I understand your testimony, what you're

11         saying is there are three or four different

12         departments that are involved in this?

13    A    That is correct.

14    Q    But they are all employees of Union?

15    A    That is correct.

16    Q    And the indirect lending department is to keep

17         fraudulent loans from coming through, right?

18    A    They try to do that, yes.

19    Q    But you didn't do that this instance?

20    A    On those instances, no.

21    Q    And then the collection department, they're

22         advised and trained and knowledgeable that if

23         somebody is not sending the title in, the

24         paperwork to give the bank the security, check

25         into it, there is a polecat that's smelly;

```
 1           that's what they're taught, isn't it?
 2    A      Polecat?  I'm not sure that's the wording I'd
 3           use.
 4    Q      Well, let me say that's what they ought to use.
 5           It means quite well, doesn't it?  You don't
 6           have any difficulty understanding what I say
 7           when I say it's a polecat, do you?
 8    A      I guess, yes, I do.
 9    Q      You do?  Okay.  Well, I imagine some of
10           these --
11    A      I mean, this is a court of law, I mean.
12    Q      Some of these other city slickers around here
13           probably don't know what that is.  Well, let me
14           apologize for using such a difficult term.
15           It's not an acceptable way of doing business at
16           Union Planters for somebody who's stolen money
17           from you to pay back a loan with a money order,
18           and the collection department is trained to be
19           checking on that, right?
20    A      I'm not sure the collection department is
21           trained to monitor every payment comes in.
22           When an account comes past due, then they may
23           have looked into it at that point in time.
24    Q      Okay.  So, and --
25    A      That would be --
```

```
 1    Q    And this is not something that makes you proud,
 2         is it?
 3    A    No.
 4    Q    And that's because you know it isn't suppose to
 5         happen, right?
 6    A    Right.  The dealer fulfills its obligation,
 7         that shouldn't happen.
 8    Q    Well, my gracious, sir, that's all Union
 9         Planters.  It ain't got nothing to do with the
10         dealer.  That's all your internal stuff.  Yes?
11    A    That document is internal.
12    Q    Yes, I noticed.  You're not gonna say one thing
13         bad about Union Planters, are you?
14              MR. SMITH:  Your Honor, I --
15              THE COURT:  I sustain the objection.
16           And, Mr. Shirley, let's try to confine our
17           questions and remarks to the facts of the
18           case.  Try to avoid being argumentative,
19           please.
20    BY MR. SHIRLEY:
21    Q    Do you know whether -- I can't remember, but I
22         believe that that note said that the State of
23         Alabama was involved with Agent Ward.  Does
24         that ring a bell with you?
25    A    It rings a bell to me that maybe Mel Channell
```

```
 1              mentioned the gentleman's name to me one point
 2              in time, the security officer.
 3       Q      Right.  You don't know him?
 4       A      I don't know him, no.
 5       Q      But you know that if Mr. Channell was inclined
 6              to he could have contacted Mr. Ward, the ABI
 7              agent, and asked him to start an active
 8              criminal prosecution?
 9       A      I would assume so, yes.
10       Q      Now, do you think that you could stay hired if
11              you stole money from Union Planters?
12       A      No.
13       Q      Do you think that that's part of your job, to
14              steal money from Union Planters?
15       A      No.
16       Q      Do you think it's part of your job and that
17              you're doing work in the scope of your
18              employment to steal money from a third person?
19                   MR. SMITH:  We object, that calls for
20                 a legal conclusion, Your Honor.
21                   THE COURT:  I overrule the objection.
22                 You may answer the question.
23       A      The question again, please?
24       Q      Yes, sir.  Do you think that you're working --
25              let me start over just a minute.  At one time
```

1        you were the vice president of Union Planters?

2   A   Yes.

3   Q   And now your title or position is identified by

4        a position as opposed as an officer?

5   A   That is correct.

6   Q   And whether you're an employee for Regions or

7        an officer from Union Planters, do you believe,

8        sir, that you are in the scope of your

9        employment and working at your job and doing

10       your duties for Union Planters or Regions if

11       you steal money from a third person?

12            MR. SMITH:  We object again, Your

13          Honor.  Calls for a legal conclusion.

14            THE COURT:  I overrule.

15   A   That is not in the scope of my job.

16   Q   What reasons do you have to think that that was

17       in the scope of Jon Williams's job?

18   A   He was the president of the company.

19   Q   Well, you heard testimony today that he wasn't.

20       You're trying to tell me that if you're a

21       president or a vice president, like the vice

22       president of Union Planters, and you steal

23       money that's part of your job?

24   A   That's not part of my job.

25   Q   Okay.  Well, why is it part of Mr. Williams's

1       job in your mind?

2   A   He signed an agreement with Union Planters.

3   Q   I didn't say that, I'm asking about jobs.

4               MR. SMITH:  Your Honor, may he be

5           allowed to answer the question?

6               THE COURT:  Yes.  Let's do that.

7   BY MR. SHIRLEY:

8   Q   Yes, sir, and don't tell me --

9               MR. SMITH:  Your Honor --

10  BY MR. SHIRLEY:

11  Q   -- what's in the agreement, that's not what I

12      asked.

13              MR. SMITH:  Your Honor, may he be

14          allowed to answer the question without Mr.

15          Shirley --

16              MR. SHIRLEY:  Well, yeah, if you will

17          just quit interrupting me, we'll press on.

18              MR. SMITH:  Your Honor, I'm not

19          trying to interrupt Mr. Shirley.  I'm just

20          trying to make sure this jury gets a full

21          and fair presentation of the facts, not

22          some harangue from some lawyer.

23              THE COURT:  All right.  If you'll

24          restate your question, please.

25              MR. SHIRLEY:  Yes.

BY MR. SHIRLEY:

Q    I didn't ask anything about the agreement, did
     I, sir?

A    No.

Q    So we don't have to include in your answer the
     agreement, do we?

A    I do not know that --

          MR. SMITH:  Your Honor --

          THE COURT:  I sustain the objection.

     Ask your question, please.

BY MR. SHIRLEY:

Q    Do you agree, sir, as a vice president of Union
     Planters that it was not in the scope of your
     employment or your duties to steal money from a
     third person?

A    No, but I am not a corporate officer.

Q    Pardon?

A    I am not a corporate officer.

Q    Not at Regions?

A    Not at Regions.

Q    But at Union Planters?

A    I was not a corporate officer.

Q    Okay.  Thank you.  And I appreciate you -- but
     it wouldn't matter, you were a vice
     president --

```
 1    A    That's correct.
 2    Q    -- in charge of the department.  And the answer
 3         would be the same, wouldn't it?
 4    A    Yes, sir.
 5    Q    And I'm asking you what you know about Jon
 6         Williams.  How can you say in your mind that
 7         that was within the scope of his employment,
 8         stealing money from Union Planters?
 9    A    I would say it's not in anybody's scope of
10         employment.
11    Q    I thought so, too, and I thank you for that
12         answer.  Would you agree with me that the real
13         success of an indirect writing credit approving
14         company is primarily contingent upon good
15         underwriting, good policy and procedure of
16         underwriting?
17    A    Yes.
18    Q    And that's the backbone of it, right?
19    A    That is the backbone.
20    Q    Do you have any reason to believe -- never
21         mind, I won't ask that.  Just one moment.  Need
22         just a moment to make certain I haven't omitted
23         introducing an exhibit through this witness.
24         That's all I have, thank you.
25              THE COURT:  All right.  Mr. Matthews?
```

1                    CROSS-EXAMINATION
2       BY MR. MATTHEWS:
3       Q    Mr. York, have you ever met Mr. Williams?
4       A    Just -- I met him yesterday or saw him
5            yesterday.
6       Q    So in the past few years you didn't know who he
7            was?
8       A    No.
9       Q    Did you know who Mr. Borland was?
10      A    I did know who Mr. Borland was.  We had a
11           deposition scheduled on the same day back in
12           May of last year.
13      Q    So you didn't know him before when all this was
14           going on?
15      A    Not personally.
16      Q    All right.
17                    THE COURT:  Redirect?
18                    MR. SMITH:  Yes.
19                    REDIRECT EXAMINATION
20      BY MR. SMITH:
21      Q    Mr. York, had you accepted contracts that Mr.
22           Williams had assigned before?
23      A    Yes, we did.
24      Q    When he was at prior company?
25      A    Yes.

314

1    Q    Any problems with any of those?

2    A    No.

3    Q    Is there anything that led you to believe

4         before, I think it was sometime in June of

5         2004, that there was any problem with any of

6         these contracts that Mr. Williams was sending

7         to be assigned?

8    A    No.

9    Q    Was there anything on the face of the

10        contracts, anything written on them --

11   A    No.

12   Q    -- that indicated there was any problem?

13   A    No.

14   Q    They were regular on their face, weren't they?

15   A    Yes.

16   Q    Do you know anything about how Mr. Williams may

17        have made payments on these contracts?

18   A    I do not know.

19   Q    Whether it was by money order or anything else?

20   A    No, I do not.

21   Q    In fact, there hasn't been any testimony in

22        this courtroom as to how he made any of those

23        payments, has there been?

24   A    Not that I've heard.

25   Q    Now, if you stole money from Regions or Union

```
 1            Planters, would they let you keep on working
 2            for them?
 3    A       Most definitely not.
 4    Q       And you've heard testimony in this case.  Let
 5            me ask you this.  If you paid out money without
 6            authorization, if you wrote checks to yourself
 7            without authorization like Mr. Williams did
 8            sometime in before August of 2002, would they
 9            let you keep working?
10    A       No, they would not.
11    Q       Would they let you continue to write contracts?
12    A       No, they would not.
13    Q       Now, was it part, as far as you know, of Mr.
14            Williams's job with Sunshine to assign
15            contracts?
16    A       Yes.
17    Q       That's what the authorization said, wasn't it?
18    A       Yes, it was.
19    Q       And you never received and the bank never
20            received anything that said otherwise; would
21            that be true?
22    A       That's correct.
23    Q       Did the bank pay $18,260.50 to Sunshine Camping
24            Center on the first Lawson contract?
25    A       Yes.
```

316

1   Q    And then $1,092.99 as a finders fee on the
2        first Lawson contract?
3   A    Yes.
4   Q    On the second Lawson contract did the bank pay
5        Sunshine $8,516.06?
6   A    Yes, it did.
7   Q    Did it pay a finders fee of $1,430.03?
8   A    I believe that says $1,340.03.
9   Q    Thank you, Mr. York, you're absolutely right.
10       Was that paid to Sunshine?
11  A    Yes, it was.
12  Q    Did it pay off this note from the first Lawson
13       loan 18,284.56 because of those documents?
14  A    Yes.
15  Q    On the Peters, did the bank pay Sunshine
16       $45,171.50?
17  A    Yes.
18  Q    Did the bank pay a finders fee of $2,710.29?
19  A    Yes.
20  Q    Exhibit 1, page 92, if you'll look at that.
21                       (Whereupon, Plaintiff's Exhibit
22                       Number 1, page 92, was marked
23                       for identification.)
24  A    I have that.
25  Q    You recognize that?

```
 1   A    Yes, data entry form.
 2   Q    Does that reflect the monies paid on the
 3        McAllister loan?
 4   A    Yes, it does.
 5              MR. SMITH:  Your Honor, we'd offer
 6          page 92 of Exhibit 1.
 7              THE COURT:  Admitted.
 8                  (Whereupon, Plaintiff's Exhibit
 9                   Number 1, page 92, was admitted
10                   into evidence.)
11   BY MR. SMITH:
12   Q    Did the bank pay Sunshine $19,000 on that
13        McAllister loan?
14   A    Yes, it did.
15   Q    Did the bank pay Sunshine $1,140 as a finders
16        fee on that loan?
17   A    Yes.
18   Q    Has the bank gotten other than a small amount
19        of that money back?
20   A    No.
21   Q    Has the bank asked Sunshine to pay it back?
22   A    Yes, we have.
23   Q    Under the terms of the dealer agreement, says
24        the dealer will at all times hereafter -- you
25        see that?
```

318

1   A   Yes.

2   Q   Meaning from the date of the agreement forward?

3   A   Yes.

4   Q   At all times hereafter indemnify and hold

5       harmless the bank against any and all. That's

6       what it says, any and all, doesn't it?

7   A   Yes.

8   Q   Liabilities, loans, damage, costs, and

9       expenses, correct?

10  A   Yes.

11  Q   Of whatever kind or nature, doesn't it?

12  A   Yes, it does.

13  Q   Including reasonable attorneys fees?

14  A   Yes.

15  Q   And it not only said that on the dealer

16      agreement, it said it on the back of the

17      contracts that were assigned, didn't it?

18  A   I believe that's correct, yes.

19  Q   I'm gonna show you that assignment by seller

20      once again. Under paragraph J: If any -- it

21      says any, doesn't it?

22  A   Yes, it does.

23  Q   Of these warranties is breached or untrue,

24      seller will upon assignee's demand purchase

25      this contract from assignee; is that correct?

```
 1    A    That is correct.
 2    Q    And you called on these folks at Sunshine to do
 3         it, didn't you?
 4    A    Yes, I did.
 5    Q    Did they do that?
 6    A    No, they did not.
 7    Q    And when these monies were paid to Sunshine,
 8         this Exhibit J, this Exhibit J, Union Planters
 9         was trying to find out why the titles hadn't
10         been submitted; is that correct?
11    A    That is correct.
12    Q    And you were getting the runaround from
13         Sunshine, weren't you?
14    A    Yes, we were.
15    Q    But that was going on after the monies had been
16         paid?
17    A    That is correct.
18              MR. SMITH:  I think that's all I
19         have, Your Honor.
20              THE COURT:  All right.
21              MR. SHIRLEY:  I don't have anything
22         else, thank you.
23              MR. MATTHEWS:  No, sir.
24              THE COURT:  All right.  Thank you,
25         sir, you may step down.
```

1                    MR. KNIGHT:  Call Agent J.R. Ward of

2            the Alabama Bureau of Investigation,

3            please.  He's outside.

4                    MR. SMITH:  I'll get him.

5                    JIMMY R. WARD

6    having been first duly sworn or affirmed, was

7    examined and testified as follows, to-wit:

8                    DIRECT EXAMINATION

9    BY MR. KNIGHT:

10   Q    You ready?

11   A    Yes, sir.

12   Q    Please state your name.

13   A    I am Jimmy R. Ward, II, also known as J.R.

14        Ward.

15   Q    I can refer to you as Agent Ward?

16   A    That's correct.

17   Q    And what do you do for a living?

18   A    I work with the Alabama Department of Public

19        Safety Alabama Bureau of Investigation as a

20        major crimes investigator.

21   Q    Okay.  And just explain what a major crimes

22        investigator does.

23   A    Major crimes investigations involve murders,

24        embezzlements, theft rings, theft of property

25        cases, and a lot -- we're an assisting agency

```
 1              to other police departments.  When they call us
 2              in, normally they don't have the assets
 3              available to work an appropriate type of case;
 4              and therefore we do the investigation.  Either
 5              they assist us or we assist them.
 6    Q    How long have you been with the ABI?
 7    A    I've been with ABI for approximately
 8              three-and-a-half years now.
 9    Q    You were there in 2003 or 2004; is that
10              correct?
11    A    Yes, sir, that's correct.
12    Q    Are you familiar with the business by the name
13              of Sunshine Camping Center?
14    A    Yes, sir, I am.
15    Q    Tell us how you know that business.
16    A    I first became familiar with Sunshine Camping
17              Center -- let me refer to a particular month,
18              sir.  January of 2004.  I was contacted by
19              Level Plains Chief of Police by the name of
20              Kenny Jackson.  Chief Jackson contacted me and
21              advised me that he had a case that had been
22              reported to him that was well over his head and
23              he was gonna need assistance on it.  And when I
24              responded to meet with Chief Jackson, he
25              produced documents that were given to him
```

```
 1              prior.  And at that time I became familiar with
 2              Sunshine Camping Center.
 3         Q    Now, as part of your investigation did you have
 4              occasion to meet Mr. Comber Borland?
 5         A    Yes, sir, I did.
 6         Q    Do you recognize Mr. Borland?
 7         A    Yes, sir, I do.
 8         Q    Is that him in the pink shirt?
 9         A    In the pink shirt, yes, sir.
10         Q    Okay.  When you met with him what did you
11              understand him to be -- who did you understand
12              him to be?
13         A    He was the owner and operator of Sunshine
14              Camping Center.
15         Q    Okay.  How many times would you say you met
16              with Mr. Borland?
17         A    I met with Mr. Borland numerous times.
18              Personally, I would have to say maybe a half a
19              dozen times; by phone conversation, a lots more
20              than that.  Maybe as many as a couple dozen
21              times.  That's just an estimate, but it was a
22              lot.
23         Q    Okay.  Tell me about your first meeting that
24              you remember having with Mr. Borland.
25         A    It was the same day that I met with Chief
```

1    Jackson.  Once I got this information he
2    basically went through just minor parts of what
3    was going on.  I really didn't have a real big
4    picture of what was going on from what he had
5    explained to me.  So at that point in time when
6    I left Chief Jackson from his police
7    department, which was probably less than a
8    mile, to go to Sunshine Camping Center, I went
9    ahead and responded to Sunshine Camping Center.
10   I walked in through the front door.
11   Someone there greeted me and I asked to speak
12   to Mr. Borland.  And Mr. Borland eventually
13   came in.  It wasn't very long that I was there
14   waiting.  He came in and introduced himself.  I
15   introduced myself.  And at that time I began
16   speaking with him.
17   Q   Tell me about what went on in this first
18       conversation.
19   A   The first conversation I advised Mr. Borland
20       who I worked for and I was here to start
21       investigating a case that involved Sunshine
22       Camping Center and some possible forgeries and
23       thefts that were happening.  Mr. Borland
24       seemed -- I don't understand what you're
25       talking about.  You know, he was a little bit

| | | |
|---|---|---|
| 1 | | standoffish on what I was coming to him with. |
| 2 | | It was like, I have no knowledge of what you're |
| 3 | | asking me and what -- |
| 4 | Q | Was it fair to say it was more than |
| 5 | | standoffish?  He denied knowing anything about |
| 6 | | it? |
| 7 | A | Yes, sir.  He says -- you know, I hadn't gotten |
| 8 | | direct to the points, but I was giving certain |
| 9 | | things that I was there for.  And it was like |
| 10 | | he did not want any contact with ABI, you know. |
| 11 | | And then I -- |
| 12 | Q | You told him the points that you were there -- |
| 13 | A | I told him, I said:  Mr. Borland, I said, Its |
| 14 | | time -- you need to talk to me.  At this point |
| 15 | | in time I don't know what's going on.  All I |
| 16 | | know is I've got a stack of documents that were |
| 17 | | given to me by Chief Kenny Jackson.  He's |
| 18 | | requested that I be here and, I said, And |
| 19 | | that's why I'm here. |
| 20 | Q | But he denied knowing anything about these |
| 21 | | documents they had given to Chief Jackson? |
| 22 | A | Now, that's when he opened up. |
| 23 | Q | Okay.  But prior to that -- |
| 24 | A | Once I produced these documents and showed him |
| 25 | | the documents and advised him that I was |

```
 1           requested by chief Kenny Jackson, then he
 2           opened up and able to sit down with me.
 3    Q      But he didn't want to talk to you until he saw
 4           you had the documents?
 5    A      That's correct.
 6    Q      Just generally tell us what Mr. Borland
 7           disclosed to you in your investigation.
 8    A      There was a lot of things that Mr. Borland
 9           disclosed to me.  Of course, I had questions
10           about particular type forms, how these forms
11           were used, what these forms were used for, the
12           banking account, the numbers, several things
13           like that, you know, just minor things.
14               But as I'm learning more about his
15           relationship with Jon Kelly Williams, Mr.
16           Borland explains to me that when he first began
17           his business he and Mr. Williams were 50/50
18           partners in the business in Sunshine Camping.
19           And as the relationship, the work relationship
20           grew, Mr. Borland discovered that Mr. Williams
21           was using the business funds to pay for
22           personal expenses.  And therefore he approached
23           Mr. Williams with the fact or with the threat
24           of criminal prosecution regarding embezzlements
25           from the business.  At that point in time Mr.
```

1          Borland explained to me that Mr. Williams
2          agreed to give a certain percentage of his
3          business, of his 50 percent, to Mr. Borland to
4          avoid criminal prosecution.  And this continued
5          on.  Their working relationship continued on.
6          Mr. --
7     Q    Let me stop you.
8               MR. SMITH:  Hold it.  I'm sorry.
9     BY MR. KNIGHT:
10    Q    Let me stop you there.  He told you, if I
11         understand you correctly, that he was gonna
12         give him a certain percentage of his business
13         to avoid criminal prosecution; is that what you
14         said?
15    A    Yes, sir.
16    Q    Is that the only reason he offered for becoming
17         the -- or for getting this percentage of the
18         business?
19    A    Yes, sir, that's the only thing that I can
20         recall.
21    Q    Okay.  He didn't tell you that he was getting
22         this percentage of the business because his
23         relatives were putting capital into the
24         company?
25    A    No, sir.

```
 1   Q   Did he mention a word of that?
 2   A   No, sir.
 3   Q   So the only reason that he offered was that he
 4       had caught Mr. Williams embezzling from the
 5       company?
 6   A   That is correct.
 7   Q   Did he mention anything about the promissory
 8       note --
 9   A   No, sir.
10   Q   -- being executed for Mr. Williams in favor of
11       Comber Borland at this time?
12   A   No, sir.
13   Q   Not a word about that?
14   A   No, sir.
15   Q   Now, I'm sorry to interrupt.  Continue on after
16       this --
17   A   As their business relationship continued, and I
18       don't know the timeframe from the time this
19       portion of the business was given until the
20       next time something arose, Mr. Borland says he
21       had another incident which involved a possible
22       criminal situation and therefore he ended up
23       obtaining 100 percent control of Sunshine
24       Camping Center.
25   Q   Let me interrupt again.  He didn't terminate
```

```
 1            his employment after this --
 2      A     No, sir, he did not.
 3      Q     -- after he first discovered these first -- he
 4            just got a certain percentage of the company,
 5            correct?
 6      A     Yes, sir.
 7      Q     So I understand he said Jon Williams continued
 8            on in his employment with Sunshine, correct?
 9      A     Yes, sir.
10      Q     And then there's a second incident where he
11            discovered acts of embezzlement; is that
12            correct?
13      A     Yes, sir.
14      Q     And what happened within the company as a
15            result of that?
16      A     One hundred percent ownership was transferred
17            to Wallace Comber Borland.
18      Q     Okay.  And he told you that that was because of
19            he had discovered additional acts of
20            embezzlement?
21      A     Yes, sir.
22      Q     And it was a hundred percent ownership?
23      A     Yes, sir.
24      Q     What happened after this?  I mean, obviously
25            didn't fire him?
```

1   A   No, sir.  He allowed Mr. Williams to stay on as
2       just a salesman for Sunshine Camping Center.
3   Q   He said just a salesman?
4   A   As a salesman on commission basis.
5   Q   Did he say that he had authority to do
6       financing contracts?
7   A   No, sir.  He -- of course, that was brought up
8       when I discovered some checks that were written
9       and -- by Jon Kelly Williams.  And he says that
10      he has absolutely no authorization or no
11      control over the banking accounts or the
12      financial aspect of Sunshine Camping Center.
13  Q   Okay.  Tell me what happened after that.
14  A   He allowed him to remain on as a salesman on
15      commission-type basis.  And again, I'm not sure
16      the timeframe that went on from that time until
17      the time he discovered that Mr. Williams had
18      written a $27,000 check on Sunshine Camping
19      Center from the Sunshine Camping Center
20      account.  He had given that check to Phillip
21      Jones.  Mr. Jones approached Mr. Borland
22      wanting reimbursement for that $27,000 because
23      the check bounced on nonsufficient funds.  And
24      Mr. Borland at that time said he became aware
25      that Mr. Williams had written a check and at

1    that point in time he fired him from the
2    business.
3  Q  Okay.  After this did you ever have anymore
4    contact with Mr. Borland?
5  A  Yes, sir.  You know, like I said, we spoke on,
6    you know, a couple dozen times, either by phone
7    or by person.  I maybe met with him a half
8    dozen times at his business and maybe a couple
9    of dozen times on the telephone by him
10    returning my call or me returning his call.
11  Q  What would -- he'd call you up, though --
12  A  There was a lot of --
13  Q  -- is that correct?
14  A  There was a lot of civil questions that Mr.
15    Borland was bringing forth to me.  He was
16    concerned about Union Planters Bank and them
17    fixing to shut him down from sending loans to
18    them.  And there was a lot of stuff, and I just
19    plain out told him, I said, Mr. Borland, you
20    need to go get you a lawyer.  There's no way I
21    can answer these questions for you.  Those are
22    civil questions.  I'm a criminal investigator.
23    I'm not trained or authorized by law to give
24    you civil advice.  And that was repeated.  That
25    was several times that I advised him of this,

```
 1        and eventually his calls ceased and never heard

 2        from him anymore.

 3    Q   Thank you, Agent Ward.  That's all I have.

 4    A   Yes, sir.

 5              MR. SHIRLEY:  It's okay?

 6              THE COURT:  Yes, sir.

 7                   CROSS-EXAMINATION

 8  BY MR. SHIRLEY:

 9    Q   Your criminal investigation was Jon Kelly

10        Williams?

11    A   Yes, sir.

12    Q   And that's all it's ever been?

13    A   Yes, sir.

14    Q   And the $27,000 check, did you ever see that?

15    A   Yes, sir, I did.

16    Q   And did you satisfy yourself it was a forgery?

17    A   Yes, sir, I was.

18    Q   Okay.  And do you know what this lawsuit is

19        about?

20    A   No, sir, not really.  I just know bits and

21        pieces.  I had several criminal investigations,

22        and I'm not exactly sure which one this is

23        about.

24    Q   Well, based upon your testimony so far, you

25        have not mentioned that you've done any kind of
```

```
 1        criminal investigation about Lawson -- Hubert

 2        Lawson, McAllister, or Peters; is that right?

 3    A   They -- portions of theirs was investigated,

 4        yes.  And I never had a case file that involved

 5        them directly.

 6    Q   And so you have not actively pursued a criminal

 7        investigation against those three?

 8    A   Against those, no, sir.

 9    Q   Right.  But even those three concerned Jon

10        Williams, didn't they?

11    A   Yes, sir, that's correct.

12    Q   Okay.  Thank you.

13               THE COURT:  Mr. Matthews?

14               MR. MATTHEWS:  No questions.

15               THE COURT:  Thank you, sir.

16               THE WITNESS:  Can I be excused?

17               THE COURT:  Yes, sir.  Thank you for

18          being with us today.

19               THE WITNESS:  Yes, sir.

20               MR. SMITH:  Your Honor, may we

21          approach?

22               THE COURT:  Yes, sir.

23                  (Whereupon, counsel conferred at

24                   the Bench out of the hearing of

25                   the jury.)
```

1          MR. SMITH:  I'm pleased to do
2     whatever the Court wishes for us to do,
3     but Comber Borland will be our next
4     witness.
5          THE COURT:  Okay.  I think we better
6     adjourn for the day and come back in the
7     morning.  We'll come back at 8:30 again.
8          MR. SHIRLEY:  That's fine.
9               (The following was heard in open
10              court.)
11         THE COURT:  Ladies and gentlemen,
12    we'll take the evening recess at this
13    time.  I'm going to excuse you to be back
14    in the jury room again in the morning at
15    8:30, and we'll try to get started
16    promptly at that time.  So we'll let the
17    jurors go out first.
18              (The jury left the courtroom.)
19         THE COURT:  Let me ask you about jury
20    charges.  It's usually helpful for me to
21    have those a little in advance for review.
22    So if you have them prepared I'll let you
23    file them at this time.  And of course we
24    can make any adjustments or additions or
25    deletions from them when we have our

1            charge conference.

2                MR. SHIRLEY:  This is off the record.

3                    (Discussion off the record.)

4                MR. SHIRLEY:  Judge, for the record

5            we offer Exhibit A.

6                MR. SMITH:  Which one is that?

7                THE COURT:  All right.

8                MR. SMITH:  Okay.  We're good.  We're

9            okay.

10             MR. SHIRLEY:  Now, can you wait till

11         I go copy that?

12                   (Whereupon, Defendant Sunshine's

13                    Exhibit A was admitted into

14                    evidence.)

15                   (Break in the proceedings.)

16                   (The following was heard on

17                   May 3, 2006.)

18              THE COURT:  Any matters we need to a

19         address before we bring the jury in this

20         morning?

21              MR. SMITH:  Not from Regions, Your

22         Honor.

23              MR. MATTHEWS:  No, sir.

24              THE COURT:  I will announce that the

25         Court has reached a decision regarding the

1    motion to exclude the evidence on the
2    attorneys fees.  And based upon Mr. York's
3    testimony on cross-examination that he
4    lacked the knowledge and experience to
5    determine the reasonableness of the fee
6    and the Court's inability to find any
7    authority to allow a lay opinion to
8    otherwise testify or support attorneys
9    fees, I'm gonna grant that motion to
10   exclude.
11                   (Whereupon, Plaintiff's Exhibit
12                   Number 15 was withdrawn from
13                   evidence.)
14        MR. SMITH:  Then, Your Honor, I would
15   say this.  I would offer myself as a
16   witness to testify as to the
17   reasonableness of the fees and the
18   necessity of the charges in and about the
19   prosecution of this case.
20        MR. SHIRLEY:  I will object.  I
21   prepared discovery requests about experts
22   and any reports or documentation that was
23   to be produced or introduced from any
24   expert.  And if he's offering himself as
25   an expert witness and going to introduce

1          the documentation and the exhibits there,

2          it's never been produced to me and I've

3          not had an opportunity to review it or

4          inspect it.

5              THE COURT:  I'm gonna overrule that

6          objection.

7              MR. SHIRLEY:  We respectfully except,

8          Your Honor.

9              THE COURT:  All right.  If there's

10         nothing else we'll bring the jury in and

11         continue.

12                  (The jury entered the

13                   courtroom.)

14             THE COURT:  Good morning, ladies and

15         gentlemen.

16             JURORS:  Good morning.

17             THE COURT:  I trust everyone got a

18         good night's rest and are ready to go this

19         morning.  We'll be continuing with the

20         plaintiff's case, and Mr. Borland has been

21         called as a witness.  If you'll raise your

22         right hand and be sworn.

23                  COMBER BORLAND

24    having been first duly sworn or affirmed, was

25    examined and testified as follows, to-wit:

1       <u>DIRECT EXAMINATION</u>

2       <u>BY MR. SMITH:</u>

3       Q    May it please the Court, ladies and gentlemen.

4            You are Wallace Comber Borland, III?

5       A    Yes.

6       Q    You're also known as Comber Borland?

7       A    Yes, sir.

8       Q    And you are president of Sunshine Camping

9            Center, Incorporated?

10      A    Yes.

11      Q    And you have been president since I believe

12           April of 2003; would that be correct?

13      A    I think that is correct.

14      Q    Okay.  If the documents that Mr. Pittman, your

15           lawyer who incorporated the business, gave to

16           us reflect that, you wouldn't argue with me,

17           would you?

18      A    No, sir.

19      Q    I didn't think so.  You were initially the vice

20           president of the corporation; is that right?

21      A    That's right.

22      Q    And you and Mr. Jon Williams founded this

23           company back in the fall, I think

24           November-December thereabouts of 2001; is that

25           correct?

```
 1    A    That's correct.
 2    Q    Now, you heard Agent Ward of the ABI testify
 3         yesterday, did you not?
 4    A    Yes, I did.
 5    Q    And do you recall his testimony about coming to
 6         see you in January or so of 2004?
 7    A    Yes, sir.
 8    Q    Do you remember your meeting with him at that
 9         time?
10    A    Yes, sir.
11    Q    And do you remember when Agent Ward first
12         approached you, you were hesitant to talk with
13         him?
14    A    Yes.
15    Q    You told him that you didn't know what he was
16         talking about, didn't you?
17    A    At that time he had not supplied information
18         enough for me to know what he was talking
19         about.
20    Q    Well, he told you he was there asking about
21         some fraud that had happened, didn't he?
22    A    Yes, but I didn't know what fraud.
23    Q    About some contracts that weren't valid, didn't
24         he?
25    A    But I didn't know what contracts.
```

1    Q    Well, wait, now, that was January 2004, wasn't

2         it?

3    A    Yes.

4    Q    You had already fired Jon Williams, hadn't you?

5    A    Yes.

6    Q    And he told you he was there asking about

7         contracts that were fraudulent, and you told

8         him you didn't know what he was talking about?

9    A    I didn't.

10   Q    Isn't it true you had already been to see Chief

11        Jackson of the Level Plains Police Department?

12   A    He came to see me, yes.

13   Q    And you gave him some documents, didn't you?

14   A    I gave him stuff that was in a briefcase, yes.

15        I did not know what it consisted of.

16   Q    And you knew that there was some problems with

17        some contracts with the bank, didn't you?

18   A    At what time, sir?

19   Q    Well, when the man from the ABI came to see

20        you.

21   A    No, sir.

22   Q    Well --

23   A    I don't think so.

24   Q    Okay.  And then he told you he was there about

25        some false contracts; is that right?

```
1    A    He told me a number of things, sir.  I don't
2         remember exactly everything he said.
3    Q    And then you talked with him, didn't you?
4    A    Yes, I did.
5    Q    Talked with him on a number of occasions,
6         didn't you?
7    A    Yes, sir.
8    Q    And you told him, didn't you, that you found
9         out that Mr. Williams had taken some money from
10        you?  You told him that, didn't you?
11   A    I think he heard that wrong -- depends on
12        what --
13   Q    No, sir --
14             MR. SHIRLEY:  Let him finish his
15        answer.
16   A    Depends on all what you're saying and
17        everything.  Did I know that Jon was taking
18        money?  I mean --
19   Q    My question, Mr. Borland, was very simple.  You
20        told him that you found out Mr. Williams was
21        taking some money?
22   A    Yes.
23   Q    And you told him that when you found out Mr.
24        Williams was taking some money, you took away
25        the presidency of the corporation from Mr.
```

341

```
1           Williams, didn't you?
2      A    No, sir.
3      Q    You didn't tell him that?
4      A    No, sir.
5      Q    You heard Mr. Ward say that, didn't you?
6      A    Yes.
7      Q    Are you telling us that Mr. Ward wasn't telling
8           this jury the truth?
9      A    No, I'm saying he heard me wrong.
10     Q    He heard you wrong.
11     A    I'm not calling the man -- saying he said
12          anything wrong.
13     Q    Now, Mr. Ward is a sworn law enforcement
14          officer in this state, isn't he?
15     A    That's correct.
16     Q    He doesn't have a dog in this fight between
17          Sunshine and my client the bank, does he?
18     A    Not that I know about.
19     Q    He doesn't have any reason or motive to come up
20          here and tell this jury something that didn't
21          happen, did he?
22     A    I just said he heard it wrong.
23     Q    No, sir.  He doesn't have any reason or motive
24          to tell this jury something that didn't happen,
25          does he, as far as you know?
```

1   A   I don't know.  I don't have that ability to

2       find out what he does or does not have.

3   Q   So you're saying that what he told this jury

4       yesterday when he said that you told him that

5       you found out Mr. Williams had been taking

6       money from you and you removed him from being

7       president, that just wasn't what happened?

8   A   That's not what happened.

9   Q   So he's wrong?  Mr. Williams --

10   A   He heard me wrong.

11   Q   He heard you wrong?

12   A   That's not what I meant.

13   Q   All right.  Now, didn't you tell him also that

14       you let Mr. Williams stay on writing, financing

15       contracts after you found out Mr. Williams had

16       been stealing from your business?

17   A   He wasn't -- depends on what you call stealing.

18       I mean, you know, I knew that he used the

19       credit card, check card to get gas for his car

20       every now and then.  That's what I was talking

21       about.

22   Q   Sir, I'm sorry.

23   A   Did I know he was stealing thousands of

24       dollars?  What are you asking me?

25   Q   Sir, I'm sorry.  You heard Mr. Williams testify

1      too, yesterday, didn't you?

2   A   Yes.

3   Q   And Mr. Williams said that he had been taking

4      money from your company, correct?

5   A   That's what he said.

6   Q   To pay his personal bills, correct?

7   A   That's what he said.  I don't remember exactly

8      what he said.

9   Q   And that's just what you told the trooper or --

10     excuse me, Mr. Ward, Agent Ward.  That's what

11     you told him, wasn't it?

12  A   I told you what I told Mr. Ward already.

13  Q   All right, sir.  Now, you had an account with

14     CB&T in Enterprise, didn't you, your company

15     did?

16  A   The company did.

17  Q   And you -- when that account was first opened,

18     both you and Mr. Williams were the people that

19     had signatory authority on that account.  You

20     could both write checks, correct?

21  A   That's correct.

22  Q   And Mr. Williams used that account to write

23     checks for his personal expenses, didn't he?

24  A   (No response.)

25  Q   Didn't he?

```
 1    A    When?  At what timeframe?

 2    Q    Well, before August 5th of 2002.

 3    A    While he was still president?

 4    Q    Yes, sir, that's right.

 5    A    Yes.

 6    Q    He did that, didn't he?

 7    A    Yes.

 8    Q    And you found out about it, didn't you?

 9    A    I knew it.

10    Q    You knew it and you didn't like it, did you?

11    A    I did the same thing.  I mean, it depends on

12         what amounts you're talking about.  Ten dollars

13         for gas, yes, I knew he had done stuff like

14         that.

15    Q    Well, he took $15,000 from the business, didn't

16         he?

17    A    No, sir, he did not.

18    Q    So when he got up here yesterday and said he

19         took $15,000 from the business --

20    A    I don't think that's what he said.

21    Q    I'm sorry.  When he got up here yesterday and

22         said he took $15,000 from the business, that

23         just wasn't true?

24    A    He didn't say that I don't think, sir.  Can you

25         show me that?
```

1    Q    Well, sir, you entered into an agreement with
2         him where he surrendered his presidency of the
3         business; is that right?
4    A    That is correct.
5    Q    He gave you five shares of stock of the
6         business, didn't he?
7    A    That is correct.
8    Q    Because originally you had 250 shares and he
9         had 250 shares, right?
10   A    That is correct.
11   Q    And it was a 50/50 split?
12   A    Yes.
13   Q    And then in August of 2002 you got control of
14        it, didn't you?
15   A    Yes.
16   Q    You took him off the CB&T account, didn't you?
17   A    Yes.
18   Q    And you did that because you found out he was
19        taking money from the business, didn't you?
20   A    No, sir.  I did that because my sister was
21        employed to take care of the books.
22   Q    Didn't --
23   A    And she's the one doing the deposits.
24   Q    You didn't take yourself off, did you?
25   A    Of course not.

346

1    Q    But you took Mr. Williams off?

2    A    He wasn't an officer.  Depending on what

3         timeframe you're talking about.

4    Q    Wait, now.  He was an officer on August 5th,

5         2002, wasn't he?

6    A    Yes, sir.

7    Q    And he wasn't removed as president till three

8         weeks later, right?

9    A    Okay.  Well.

10   Q    That's what the documents show.

11   A    That's what the documents show, yes.

12   Q    Okay.

13   A    It takes time to do things, I'm sorry.

14   Q    So you're telling this jury that what Mr.

15        Williams said about what happened and what

16        Mr. Ward said about what you told him isn't the

17        way things went down; is that right?

18   A    About what situation, sir?

19   Q    About the $15,000.

20   A    I don't believe Mr. Ward said anything about

21        the $15,000.

22   Q    Well, Mr. Ward said -- Mr. Ward did -- not to

23        argue with you, sir.  Mr. Ward did tell us

24        yesterday, though, that you removed Mr.

25        Williams as president when you found out he had

```
 1          been taking money from the company; isn't that
 2          right?  That's what he said?
 3    A     That's what he said.
 4    Q     And you say you never told him that?
 5    A     That's correct.  I said he heard me wrong.
 6          That's not what I said.
 7    Q     All right.  Now, after that these two Lawson
 8          deals that we've referred to throughout the
 9          course of this trial occurred; would that be
10          correct?
11    A     Yeah, there's two Lawson deals we've been
12          referring to.
13    Q     It was after those two Lawson deals that you
14          became hundred percent owner of the company;
15          isn't that right?
16    A     Yes, sir.
17    Q     And didn't you tell -- strike that.  Did you
18          hear Mr. Ward testify yesterday that you told
19          him that you became a hundred percent owner of
20          the company after you found out Mr. Williams
21          had continued to take money from the company?
22          Did you hear him testify to that yesterday?
23    A     He testified to something I would have to hear
24          or read his testimony to see exactly what he
25          said.
```

1    Q    That's what you told him, wasn't it?

2    A    No, sir, that's not what I told him.  I've

3         already repeated myself and told you that.

4    Q    So when he testified to that yesterday, this

5         man who didn't have a dog in this fight, this

6         ABI sworn investigator, when he testified that

7         you told him that, he wasn't telling the truth;

8         is that what you're telling us?

9    A    I said he heard me wrong, sir.

10   Q    He heard you wrong?

11   A    Yes.  That's not what I meant.

12   Q    No, wait, this man is an investigator for the

13        Alabama Bureau of Investigation.  You

14        understand that, don't you?

15   A    Yes, sir.

16   Q    You would assume he's got some pretty

17        substantial training about listening to people?

18   A    Yes, sir.

19   Q    And he came down to interview you about thefts

20        from the bank, didn't he?

21   A    He came down to talk to me about the paperwork

22        that the Level Plains Police Department gave

23        me.

24   Q    And that included these monies from the bank

25        didn't it, these loans supposedly with the

```
 1        bank?
 2    A   It was about those loans, but we didn't know
 3        what it was at that time.
 4    Q   He's talking about $90,000, wasn't he?
 5    A   I don't know.  He was -- I don't know what all
 6        he was talking about.
 7    Q   That's not a small --
 8    A   He was talking about a lot of things.
 9    Q   That's not a small sum of money, is it?
10    A   No, sir, $90,000 is not.
11    Q   And you're telling us that this trained
12        investigator, who's trained to ask questions
13        and listen to people, who was investigating
14        this theft of $90,000, didn't hear you right?
15        Is that what you're telling us?
16    A   He didn't hear me right or I didn't explain it
17        right.  I don't know the way that it was taken.
18    Q   So what you're saying is you could have told
19        him that --
20    A   No, sir.
21    Q   You never told him that?
22    A   I never did tell him that Jon was stealing
23        money from me.
24    Q   Jon was taking money from you.  You told him
25        that, didn't you?
```

```
1    A    (No response.)

2    Q    Let me ask you this.

3    A    Yes, but what amounts?

4    Q    Did you --

5    A    I mean, what kind of money are you talking

6         about?

7    Q    Did you tell Mr. Ward that after repeated

8         embezzlements by Mr. Williams you finally took

9         a hundred percent control of the business?  Did

10        you tell him that?

11   A    Did I tell him that was the reason why I did

12        it?

13   Q    No, sir.  Did you tell him that after repeated

14        embezzlements you took a hundred percent

15        control of the business?

16   A    No, sir.

17   Q    You never told him that?

18   A    No, sir.

19   Q    So if he testified to that yesterday, he wasn't

20        telling the truth?

21   A    He heard me wrong.

22   Q    He heard you wrong.  Well, what's the

23        difference between hearing you wrong and not

24        telling the truth, please?

25   A    I don't know.  I'm not educated enough to
```

```
 1        explain such things, sir.
 2    Q   Heard you wrong.  I've never heard that term
 3        before.  Is that a Comber Borland term?
 4    A   I guess it's a southern term.
 5    Q   Well, you know, I'm just as southern as you
 6        are, brother.  I grew up in Phenix City,
 7        Alabama.
 8    A   Well, I've heard it all the time.
 9    Q   Heard somebody wrong?
10    A   Yeah.
11    Q   Okay.  Whenever it was -- well, let me ask you
12        this.  You allowed Mr. Williams to stay with
13        this company after you found out he had been
14        taking money from the company, didn't you?
15    A   Taking money?
16    Q   Yes, sir, taking money.
17    A   He never did take money from the company.
18    Q   Well, wait, now.
19    A   He took --
20    Q   You got this man --
21    A   -- gasoline and stuff like that.
22    Q   He took gasoline and stuff like that that you
23        didn't authorize him to take, right?
24    A   Depends on what time.  I mean, you know, he
25        would tell me that he forgot -- we had a check
```

1        card that we put -- filled up the company car
2        or something like that or his personal car, if
3        he had to go do something for the company.  And
4        if he forgot to give me a receipt or something
5        like that, I would ask him about that and I
6        forgot about it.
7    Q   Well, wait, now.
8    A   Or going out to eat or something like that.
9    Q   Did he ever borrow any money from you?
10   A   Did Jon Williams ever borrow money from me?
11   Q   Yes, sir.
12   A   Yes.
13   Q   He borrowed money.  Borrowed $15,000 from you,
14       didn't he?
15   A   Yes, he did.
16   Q   You entered into a note with him for that,
17       didn't you?
18   A   Yes.  He bought a personal truck for his own
19       personal self.
20   Q   He bought a personal truck for his own personal
21       self?
22   A   Yes, sir.  He borrowed the money from me.
23   Q   Borrowed the money from you?
24   A   Not Sunshine Camping Center.
25   Q   Tell me what kind of truck it was?

353

1    A    It was a green and white Ford F150, about a '97

2         or '98 was the year.

3    Q    Who had the title of that truck?

4    A    I don't know who had the title to it.

5    Q    You didn't have the title to it, did you?

6    A    No.

7    Q    You've been in the car sales business or the RV

8         sales business for quite some time, hadn't you?

9    A    Quite some time?

10   Q    Yes, sir.

11   A    Five or six years.

12   Q    You know about selling things that had titles

13        to them, don't you?

14   A    Yes.

15   Q    You know on that title there's a place where

16        you can check security interest or lien, you

17        know that, don't you?

18   A    Yes.

19   Q    You know, also, on that title there's a place

20        where you could have the title in your name,

21        couldn't you?

22   A    Could have if I wanted to.

23   Q    And you know a truck can be pledged as

24        collateral for a loan, can't you?

25   A    (No response.)

354

1    Q    Can't you?

2    A    I don't know, I guess so.

3    Q    You don't know that?

4    A    Yes.

5    Q    Let me ask you to look at Exhibit 13 you've got

6         in front of you up there.  And I want to tell

7         you what page in just a minute.  Look at page

8         22 if you would, please, sir.

9    A    Okay.

10   Q    That's the note that you entered into with Mr.

11        Williams back on August 29, 2002, isn't it?

12   A    That is correct.

13   Q    You had lawyer Pittman draw that up for you,

14        didn't you?

15   A    Yes, sir.

16   Q    Doesn't say anything one where about a truck,

17        does it?

18   A    Doesn't say anything about anything.

19   Q    Says $15,000, doesn't it?

20   A    Yes, sir.

21   Q    Now, you know about pledging stuff as

22        collateral, don't you?  You know about what I

23        mean by collateral?

24   A    Yes, sir.

25   Q    Somebody says in this instance, look, if I

355

1     don't pay you for this loan that I'm using to
2     buy my personal truck, you get my truck.  You
3     know about how that works?
4  A   I don't want his truck.  Didn't need his truck.
5  Q   I didn't ask you that.  You know how that
6     works, don't you?
7  A   Yes.
8  Q   Let's read here paragraph one.  The collateral
9     covered by this security agreement -- that
10    meant this loan, didn't it, this document?
11  A  I assume that's what --
12  Q  Is of the description found above and all
13    products, natural increase, improvements,
14    accessions, and additions thereto and
15    replacements and proceeds thereof.  That's what
16    it says, right?
17  A  That's what it says.
18  Q  And it's talking about five shares of stock
19    that you transferred, isn't it?
20  A  Yes.
21  Q  And it goes on to talk about 245 shares of
22    stock, doesn't it.
23  A  Yes.
24  Q  That was the collateral, wasn't it?
25  A  Yes.

| | | |
|---|---|---|
| 1 | Q | Wasn't no truck, was it? |
| 2 | A | I didn't say it was a truck. |
| 3 | Q | Have you ever told anybody before that this |
| 4 | | loan was for a truck? |
| 5 | A | I think so.  I'm -- |
| 6 | Q | Okay.  Do you remember when I took your |
| 7 | | deposition up in my office in Montgomery back |
| 8 | | about a year ago now? |
| 9 | A | Yes, sir. |
| 10 | Q | May 10th? |
| 11 | A | Yes, sir. |
| 12 | Q | You remember that? |
| 13 | A | Yes. |
| 14 | Q | Have you seen that deposition lately? |
| 15 | A | This what you call lately, yes. |
| 16 | Q | All right.  Remember we had a court reporter |
| 17 | | there like Ms. German? |
| 18 | A | Right. |
| 19 | Q | You rose your hand and swore to tell the truth |
| 20 | | just like you've sworn to tell us here today |
| 21 | | the truth? |
| 22 | A | That's right. |
| 23 | Q | Okay.  I'm gonna give you that deposition and |
| 24 | | I'm gonna ask you a little bit.  Now, we didn't |
| 25 | | have -- I didn't have with me that day this |

```
 1            note, did I?
 2     A      I don't think so.
 3     Q      I wasn't able -- didn't have that from
 4            Mr. Pittman, did I?
 5     A      I don't think so.
 6     Q      Didn't you tell me then that the reason that
 7            the five shares of stock were given to you were
 8            so that you could be the majority stockholder
 9            in the company?
10     A      Yes, and it was a reason behind it.
11     Q      Did you tell me also that the reason that that
12            was done is because your father-in-law would
13            not loan you anymore money --
14     A      That is a true fact.
15     Q      -- to invest in the company?
16     A      That is a true statement.
17     Q      And didn't you tell me that there was no other
18            reason other than those two?
19     A      I'm -- I'll have to see it.
20     Q      Well, we'll go back and look at it if you'd
21            like to.
22     A      Okay.
23     Q      But didn't you tell me that there was no other
24            reason.
25     A      I don't remember that.
```

1    Q    Okay.  Sir, let's look on page 28 of your
2         deposition.  You need any help finding it?
3         I'll tell you what, let's start -- let's start
4         on April -- on page 26.
5              MR. SHIRLEY:  I object, Your Honor.
6         If he's using the deposition to impeach
7         him he's supposed to ask him what he said
8         and to answer it and then read it and ask
9         him if he said that, not just to read his
10        testimony while he's examining.
11             MR. SMITH:  I'm sure, as Mr. Shirley
12        well knows, under the rules the deposition
13        of a party or a representative of a party,
14        corporate representative, can be used for
15        any purpose, Your Honor.
16             MR. SHIRLEY:  But that isn't what
17        he's doing.  He's trying to cast an
18        impugned doubt on his testimony by
19        changing this technique right here.  He's
20        not offering the deposition testimony
21        under the rule that he's saying to you.
22             THE COURT:  I overrule your
23        objection.
24   BY MR. SMITH:
25   Q    Page 26, line 14.  Have you found it, Mr.

```
 1            Borland?
 2     A      Yes, sir.
 3     Q      All right.  Question:  If I've understood your
 4            testimony, and certainly correct me if I'm
 5            wrong, in April of '03 the company needed some
 6            more cash to buy travel trailers; is that
 7            correct?
 8     A      That's what it says, that's correct.
 9     Q      And Mr. Williams did not have the ability to do
10            that?
11     A      Correct.
12     Q      But you either had the ability and/or had the
13            willingness to do that?
14     A      Sometime, correct.
15     Q      But you either -- but in order to do that you
16            wanted to become the sole shareholder of the
17            corporation?
18     A      Yes, on 4/2/03.
19     Q      4/2/03.  That's ahead of what we're talking
20            about now, isn't it?
21     A      Yes.
22     Q      We'll get to it.  And so to get you to pay him
23            more money you were going to acquire all of Mr.
24            Williams's shares?
25     A      Correct.
```

```
1    Q    Now, turn to page 28, line 6.  Now, you also
2         told me on April 2, 2003, Mr. Williams resigned
3         as an officer?
4    A    Yes.
5    Q    Why did he resign as an officer?
6    A    That was one of the agreements of the money
7         being given to the company.
8    Q    Question:  Any other reason other than the fact
9         that money was given to the company by your
10        father-in-law and eventually you wherein he was
11        asked to resign?
12   A    No, sir.
13   Q    You didn't tell me anything about a truck
14        there, did you?
15             MR. SHIRLEY:  Object.  That's
16        argumentative.  He didn't ask him.  He
17        didn't ask in the deposition, he hadn't
18        asked him this morning.
19             THE COURT:  I overrule the objection.
20   BY MR. SMITH:
21   Q    I'll read the question again for you.  Any
22        other reason other than the fact that money was
23        given to the company by your father-in-law and
24        eventually wherein he was asked to resign.  And
25        your answer?
```

```
 1    A    No, sir.  But this --
 2    Q    Okay.
 3    A    -- is the company, that is personal.
 4    Q    Turn back to page 25, please.  We're gonna talk
 5         about August 29, 2002, now.  Line 3.  Now, do
 6         you know why Mr. Williams sold five shares to
 7         you on August 29, 2002?  And your answer?
 8    A    Yes, sir.
 9    Q    Question:  Tell us why.
10    A    The company needed money to buy travel
11         trailers, and I had all the money and he didn't
12         have any.
13    Q    You didn't tell us back in this deposition last
14         year anything about this $15,000 note that
15         talks about five shares being pledged as
16         collateral for some truck, did you,
17         Mr. Williams?
18              MR. SHIRLEY:  I object to that.  He's
19           asking if he disclosed anything in a
20           question in the deposition.  That's an
21           improper technique of impeachment.  He's
22           asked him about it today.  He's not shown
23           him any question where he was asked that
24           in his deposition.
25              THE COURT:  Overruled.
```

BY MR. SMITH:

Q    You didn't tell us, did you, nothing about a
     truck back a year ago?

A    I wasn't asked.

Q    I'm gonna read my question one more time, and
     I'm gonna let you tell these members of the
     jury again.

A    You're asking me something that was personal.
     On that truck was personal.  That personal
     money came from me not the company to give to
     Jon Williams.  This is talking about the
     company.  Am I correct on that, sir?

Q    Sir, sir.  You just got through telling us not
     within the last 10, 15 minutes that the 5
     shares -- you see it right here where it's
     written in this security agreement?

A    Yes, sir.

Q    You see that 5 shares of stock that belongs to
     Jon K. Williams?  You see that?

A    Yes, sir.

Q    And you said you told us that he was doing that
     because of this supposed green truck.  You told
     us that not 15 minutes ago.

A    No.  I said that's the reason why I loaned him
     the $15,000, sir.

```
1    Q    Question -- this is page 25, line 3, again.
2         Question:  Do you know why Mr. Williams sold 5
3         shares to you on August 29, 2002.  And what was
4         your answer?  Once again, what was your answer?
5         Line 5 is your answer.
6    A    Yes, sir.
7    Q    And my question, tell us why.  And your answer
8         back a year ago was what?
9    A    You want me to keep on repeating myself?
10   Q    Yes, sir, I do.  I do.  Because I want to find
11        out what the truth is.  You told us something
12        back a year ago and you didn't say nothing
13        about a green truck.  And now you come into
14        this courthouse today and say, Oh, this
15        security agreement really didn't have anything
16        to do with the company; it was the green truck.
17   A    You didn't ask me what the $15,000 was used for
18        a year ago.  You're asking me what it is used
19        for now, sir.  And I told you it was used for a
20        truck.
21   Q    Are you gonna answer my question?
22   A    I can't answer your question, sir.
23   Q    Is it you can't or you won't?
24   A    I tried.
25   Q    Okay.  Okay.
```

1   A   It is my belief that was what I --

2   Q   And, in fact, sir, Mr. Williams didn't pay you

3       this personal note, did he, for this supposed

4       truck?

5   A   Excuse me?

6   Q   He didn't pay you for that truck, did he?

7   A   The 15,000?

8   Q   That's right.

9   A   Yes, he paid me for it.

10   Q   Oh, he did?

11   A   Yes.

12   Q   Well, actually as of April 2, 2003, he hadn't

13       paid for it, had he?

14   A   I don't have the dates when he paid me for it

15       but he paid me for it.

16   Q   Well, let's look at this second note.  This is

17       page 24.

18   A   No, sir, he didn't at that time pay me.

19   Q   Uh-huh.  Because now -- he's given you now in

20       this one the 245 shares of stock; isn't that

21       right?

22   A   That is true.

23   Q   Transferred it to you, didn't he?

24   A   That's what the document states, yes.

25   Q   Because he hadn't paid this $15,000 back; isn't

365

1       that right?

2   A   That is true.

3   Q   Okay, sir.  And when you did that second

4       note -- put it back up here.  When you did this

5       one, doesn't say anything about a truck, does

6       it?

7   A   No, sir.  He was a friend of mine.  I didn't

8       think we had to list everything.

9   Q   He was a friend of yours?  He had been taking

10      money from you.

11  A   No, he was not taking money.  Taking 5 and 10

12      dollars.  Who doesn't do that?  I do it.  I did

13      it without him knowing it when he was

14      president.

15  Q   And so when he got up here on the stand

16      yesterday and said he took money from the

17      company, he just wasn't telling the truth?

18  A   I'd like to know how much money he took so he

19      could pay me back.

20  Q   Well, he told you -- he paid you this 15,000 --

21  A   No, I didn't know he took it.

22  Q   He paid you this $15,000 note, didn't he?

23  A   He paid me for that $15,000, yes, sir, but he

24      paid me on the truck.

25  Q   He paid you that note --

1   A   That's why I --
2   Q   He paid you with that note from money he got
3       from the bank, didn't he?
4   A   I don't know where he got the money from, sir.
5       I don't know where the money came from.  The
6       money was supposed to, as you said, was
7       supposed to be going into Commercial Bank.  The
8       money we got was out of CB&T checking account.
9   Q   Let me just ask you this.  You were the only
10      person, you and your -- I think was it your
11      wife?
12  A   What's the rest of the question, me and my wife
13      what?
14  Q   After August 5th, 2002, you were the only
15      ones on the CB&T account, weren't you?
16  A   No, sir.
17  Q   You weren't?
18  A   No, sir.
19  Q   Well, you were the president of the company
20      after April of 2003, weren't you?
21  A   Yes.
22  Q   You were the person got the bank statements,
23      weren't you?
24  A   They came to the business, yes.
25  Q   You looked at the bank statements, didn't you?

367

1    A    Sometimes.  I had my sister taking care of it.

2    Q    Had your sister taking care of it?

3    A    Yes.

4    Q    And she'd look at the numbers on the checks

5         that were going out, wouldn't she?  She'd

6         review the checks?

7    A    I would assume so, yes.

8    Q    She'd review the deposits, didn't she?

9    A    Yes.

10   Q    And this isn't -- y'all's business isn't a big

11        business.  You had less than 10 employees,

12        didn't you?

13   A    Yes.

14   Q    And, I mean, you knew -- everybody in the

15        company knew when a camper was sold or an RV or

16        whatever was sold, didn't you?

17   A    If I was there.  I -- my mother-in-law died and

18        there was a lot of times I wasn't there at the

19        company.  That's why I had other people

20        working.

21   Q    You telling this Court and this jury you

22        wouldn't review the bank statements of this

23        company that you were president of?

24   A    No, sir, I didn't say that.  I said depending

25        on when in certain, certain, you know, cases.

```
 1          I wouldn't review them every --
 2    Q     Are you telling us here today that the money
 3          for the Lawson transactions -- you know what
 4          I'm talking about when I talk about the two
 5          Lawson loans?
 6    A     Yes, sir.
 7    Q     Are you telling us that that money didn't come
 8          into a Sunshine account?  Are you telling us
 9          that?
10    A     I can really tell you that not all of it went
11          into it.
12    Q     Well, didn't you tell me in your deposition
13          that not one dollar of that Lawson money went
14          into the account?
15    A     That is true.
16    Q     Uh-huh.  And you told us -- you knew you were
17          coming to give that deposition on May 10th,
18          didn't you?  You knew you were doing that,
19          didn't you?
20    A     Yes.
21    Q     And you had gone back to look and see whether
22          any of that Lawson money had come into the CB&T
23          account, didn't you?  You'd looked, hadn't you?
24    A     I looked but not looked good enough.
25    Q     Well, I'm sorry.  You told us that you looked
```