```
 1            and it hadn't gone in there, didn't you?
 2      A     Yes.  I was looking for a certain name, like
 3            Lawson, and it was hidden the way that it was
 4            put in there.
 5      Q     Well, I'm talking about going into your bank
 6            account, just deposits into your account.  You
 7            looked, didn't you?
 8      A     Yeah, but deposits can be added together.  They
 9            can be put -- certain names put beside the
10            checks that's not correct.  There's a lot of
11            situations.
12      Q     Let's do it this way.  Turn to page 133 of your
13            deposition.  Page 134, line 9.
14      A     134, line 9.
15      Q     Yes, sir.  My question to you back a year ago:
16            Do you know if Sunshine received any money from
17            Union Planters on this Lawson contract that we
18            see here in Exhibit 2.  And wasn't your answer:
19            I know they did not?
20      A     At that time that's correct.
21      Q     So you're saying your testimony is a year ago
22            was different than what it is now?
23      A     Yes.  I researched it and found it out.
24      Q     Well, let's talk.  Let's ask you this next
25            question that I asked you back a year ago after
```

1        you said I know they did not.  Next question:

2        Have you gone back and looked.  And what was

3        your answer?

4    A   Yes, I looked, but I didn't look in detail.

5    Q   You didn't find it, did you?

6    A   Well, I wasn't looking for the right

7        information.

8    Q   So then you did -- Sunshine did get -- let me

9        find it so that we're all clear about this.  I

10       believe this is already in evidence.  In fact,

11       I know it is.  Page 113 of Exhibit 1.  I'm

12       sorry, doesn't quite fit.  Pay to the order of

13       Sunshine Camping Center.  $18,216.50.  Lawson

14       P-R-O-C, do you see that?

15   A   Yes, sir.

16   Q   Meaning Lawson proceeds?

17   A   Yes, that's what it means.

18   Q   That money went into Sunshine's account at

19       CB&T, didn't it?

20   A   Scoot the check over so I can see.

21   Q   Yes, sir, absolutely.

22   A   That's the account number.  But as Jon's

23       already testified, he took it out.

24   Q   I didn't ask you what he did or didn't do.  It

25       went into Sunshine's account at CB&T, didn't

```
 1        it?
 2   A    I don't know, I didn't deposit it.
 3   Q    So you can't say?
 4   A    I can't -- only thing I can say is that is the
 5        checking account number.
 6   Q    Okay.  Well, let's talk about the next one.
 7        Look on Exhibit 7, page 163.  It's in evidence,
 8        too.  Here we see Sunshine Camping Center,
 9        Lawson proceeds, abbreviate P-R-O-C again.
10        $8,516.06.  That's what it's for, right?
11   A    Yes.
12   Q    That went into Sunshine's account at CB&T,
13        didn't it?
14   A    That's the account number.  And as Jon has
15        already testified he put it in there, and he
16        took it out without me knowing about it.
17   Q    So it did go into your account, didn't it?
18   A    According to him it did.  Only thing I can
19        testify to that's the account number.
20   Q    So you don't know whether it went into there or
21        not, right?  Is that what you're telling us
22        now?
23   A    I'm telling you that's the account number.
24   Q    First you told us that it went in there.  Then
25        when we got to your deposition and you told us
```

```
 1              that it -- you told us a year ago it didn't,
 2              and now you're telling us you don't know?
 3      A      No, sir.  I'm telling you a year ago I did not
 4              know it.  And I would have to look and see
 5              exactly what amounts and everything that you're
 6              talking about.  And if he says it went in
 7              there, he took it out, I believe him.  I would
 8              have to do somemore research to find out.
 9      Q      Okay.  What about the Peters money, that
10              $47,881?  Did that go into the CB&T account?
11      A      The one that was supposed to go into
12              Commercial?  Yes, it went into CB&T.
13      Q      Okay.  So you're telling this Court and this
14              jury that there was a $47,881 deposit in CB&T
15              in your business and that didn't register with
16              you?
17      A      Yes, sir, it registered.  Jon was putting money
18              into the account for units to be done.  I was
19              told by him that his mother was basically going
20              to loan him the money for him to put money into
21              the business and to pay me off for the $15,000
22              loan.  And that's what that was used for, yes,
23              sir.
24      Q      Well, you got the bank statement, didn't you?
25      A      Yes, sir.
```

1   Q   And that bank statement showed that there was

2       an automatic deposit from Union Planters Bank,

3       didn't it, talking about the CB&T statement

4       when it showed this $47,881?  It showed that

5       there was an automatic deposit from Union

6       Planters Bank.  It showed that, didn't it?

7   A   That was at the time that we was changing

8       checking accounts, and I did not get that

9       statement.  Whether somebody hid it from me or

10      whatever, when I got back after that year ago,

11      I did do and pull the statement, got them to

12      send me a copy.  And, yes, it does have Union

13      Planters on it.

14   Q   If you looked at that statement back at that

15      time or at any time from July of '03 to January

16      of '04, based on the explanation Mr. Williams

17      gave you and based on what you knew from that

18      where it said Union Planters Bank, you would

19      have known something wasn't right, wouldn't

20      you?

21   A   If I would have looked at it.  But I had people

22      hired that was doing that stuff, and I didn't

23      always get in detail about what was for what.

24   Q   You telling us you just don't pay attention to

25      your business?

374

```
1    A    No, sir.
2    Q    That's why --
3    A    Do you know where every check for you write in
4         your business goes to?
5    Q    That's why you let a man who you knew had been
6         stealing from you continue to work for you,
7         right?
8    A    No, sir, that's not right.  He is a friend of
9         mine for I don't know how many years.  Our kids
10        played together and everything like that.  So,
11        no, I didn't know he was a thief or I didn't
12        know he was stealing from me.
13   Q    Well, the reason you let him stay on the
14        business is because he was a friend, right?
15   A    I let him stay in the business because he was
16        doing a job and providing money for the
17        business and wanted to buy back into the
18        company at a later time.
19   Q    That's what you were concerned about, wasn't
20        it, getting money in this business so you could
21        have some money to go in your pocket; isn't
22        that right?
23   A    Do what?  No.  I was getting money from my
24        family and everybody else to buy units.
25   Q    You wanted this business to do well, didn't
```

```
 1        you?
 2    A   Everybody wants their business to do well.
 3    Q   And I agree with you a hundred percent.
 4    A   But do I want to take stolen money to make it
 5        well, no, sir.
 6    Q   I agree with you a hundred percent.  And you
 7        knew this man as far as -- you knew this man
 8        was doing a good job, making sales and getting
 9        contracts written, right?
10    A   I knew he was getting good ones done, yes.
11    Q   And you wanted to keep him on so he would
12        continue to do that, didn't you?
13    A   Of course.
14    Q   Even though you found out back in August when
15        you had him sign this note that he had been
16        stealing from the company?
17    A   He wasn't stealing.  I don't call that
18        stealing.
19    Q   Okay.
20    A   Getting gas and stuff like this.
21    Q   Okay.
22    A   I never did catch him stealing money.  When I
23        did, I fired him, sir.
24    Q   Now, you told us that this $15,000 loan --
25        can't find the note right now -- was paid off
```

376

1            with money that came out of the company, right?

2            You told us that, didn't you?

3   A   It was money that came out of the company that

4            his family put into it, yes, sir.

5   Q   Wait, wait.  I want to make sure that I'm

6            understanding.  We've all got to picture this.

7            This is a personal loan on a personal issue

8            that you and he have on this supposed truck,

9            right?

10   A   Right.

11   Q   And instead of getting -- and you say that he

12           told you -- this is what you say -- that he

13           told you that this 47-odd thousand dollars came

14           from his mother-in-law, correct?

15   A   No, sir.  I said it came from his mother that

16           was loaning him money to pay me back for my --

17           the truck that he did and to invest into the

18           company.  And she was having it wired into CB&T

19           checking account, yes, sir.

20   Q   Wait a minute, now.  Let's see if we can do the

21           math.  47,881 went into that CB&T account,

22           wasn't it?

23   A   If that's what written down there.  I'd have to

24           look back at the records.

25   Q   Fifteen thousand-odd of it went off -- went to

377

```
 1            pay you off, right?
 2      A     Yes, sir.
 3      Q     So that left -- see, I went to Auburn, I can't
 4            do math.  Grew up in Phenix City you can't do
 5            math either.  $32,881 that was left after his
 6            personal loan was paid off, right?
 7      A     That's what your math comes out to.
 8      Q     And that money stayed in the company, didn't
 9            it?
10      A     No, sir.
11      Q     Did it pay to Jon Williams?
12      A     Excuse me?
13      Q     Did that $32,881 that was left that came from
14            that Peters loan, did that get paid to Jon
15            williams?
16      A     Yes, sir.
17      Q     So he stole that out of your account, too?
18      A     He didn't steal it out of the account.  His
19            mother said they wasn't gonna invest at that
20            time.  This was so --
21      Q     So you're saying the man's mama was in with him
22            in some sort of scheme to take money from your
23            company?
24      A     No, sir, I did not say that.
25      Q     Let me move on.
```

1    A    I said his mother was gonna use the money to
2         loan him so he could invest in the company so
3         he could build back and get his shares back.
4    Q    All right.  Let me do this, and we'll finish up
5         with this point.  When you found out -- well,
6         let me ask you this.  Do you believe Jon
7         Williams did wrong?
8    A    Now, yes.
9    Q    You believe that he has -- think your lawyer's
10        gonna ask you this, because he's already said
11        something about it.  Do you think he's ruined
12        your reputation?
13   A    Yes, he has.
14   Q    And that of your business?
15   A    Yes.
16   Q    And you understand the bank is suing your
17        business to get this ninety-something thousand
18        dollars that was paid back; is that right?
19   A    Yes.
20   Q    And that was done all because of Mr. Williams,
21        correct?
22   A    Yes.
23   Q    You filed not one lawsuit against Mr. Williams
24        for that, have you?
25   A    Correct.

1    Q    And you believe it's all Mr. Williams's fault,

2         don't you?

3    A    Yes.  Mr. Williams has agreed to pay it, too.

4    Q    Agreed to pay it to you?

5    A    No, pay you, Union Planters.  I think that's

6         what he said yesterday.

7    Q    I didn't hear that, sir.  And I can tell you my

8         folks don't have a dollar yet.

9    A    I'm sorry.  I thought --

10   Q    Of course, you've known for some time -- you've

11        known for some time, haven't you, that the bank

12        wanted this money, correct?

13   A    Depends on what some time is.

14   Q    Well, let's look at page 20 of Exhibit 1.  Do

15        you have it there, sir?

16   A    It's about 10, 15 exhibits up here.

17   Q    Can I help you, then, please?

18   A    No, I think I found it.  Just opened already.

19   Q    Right.  Page 20, please.  Did you receive that

20        from Dale York of the bank?

21   A    Yes.

22                  MR. SMITH:  Your Honor, we would

23             offer page 20 of Exhibit 1.

24                  THE COURT:  It's admitted.

25                      (Whereupon, Plaintiff's Exhibit

```
 1                    Number 1, page 20 was marked
 2                    for identification and was
 3                    admitted into evidence.)
 4      BY MR. SMITH:
 5      Q    April 15, 2004, Mr. York sent you this letter
 6           to advise you that Union Planters Bank has not
 7           received our lien perfection on the following
 8           customers financed through your dealership,
 9           correct?
10      A    That's what it states.
11      Q    And there's a number listed including
12           McAllister, Peters, and Lawson, correct?
13      A    Correct.
14      Q    Now, these other folks, Gladier, Porte, Coleman
15           and Owens, those were real contracts, weren't
16           they?
17      A    Yes.
18      Q    There was just some problem with the titling
19           information, correct?
20      A    I don't know what the problem was.
21      Q    Well, but as far as Gladyer, Port, Coleman and
22           Owens, that all worked itself out, right?
23      A    Yes.
24      Q    Mr. York goes on to say on April 15, 2004, two
25           years ago now:  We are aware of certain issues
```

```
 1              with regard to these contracts.  Correct?
 2       A      That's what it says.
 3       Q      And he further goes on to say:  Should these
 4              issues not be resolved, the dealership --
 5              that's Sunshine, right?
 6       A      Yes.
 7       Q      Will be responsible for making Union Planters
 8              Bank whole.  Correct?
 9       A      Yes.
10       Q      That's what it says.  You didn't respond to
11              that, did you?
12       A      No, sir.
13       Q      Now --
14       A      Because I'm not responsible for fraudulent
15              loans.
16       Q      We'll get to that.  Well, I know you're not
17              responsible for them.  Your company is, isn't
18              it?
19       A      No.  I'm not in the business of doing criminal
20              acts.
21       Q      Turn to page 7 of your Exhibit 1, please, and
22              this one is already in evidence.  About a month
23              after that date in April you got another letter
24              from Mr. York, didn't you?
25       A      Yes.
```

1    Q    As you're aware Union Planters Bank purchased

2         three fraudulent loans from your dealership.

3         You see that?

4    A    Yes, sir.

5    Q    That is a true statement, isn't it?

6    A    I know there's three faulty loans.

7    Q    Well, Union Planters Bank bought them from you,

8         didn't they?

9    A    Yes, sir.  Yes, sir.

10   Q    Okay.  As per our dealer agreement dated

11        January 26, 2002, we are demanding the payoffs

12        of total $90,763.54, correct?

13   A    That's what it says.

14   Q    Please send these payoffs to my attention no

15        later than Monday, June 21, 2004, correct?

16   A    That's what it says.

17   Q    Did you send the payoffs on these three

18        fraudulent loans Union Planters purchased from

19        your dealership on or before June 2004?

20   A    No, sir, because --

21   Q    I didn't ask you why, sir.  Your lawyer can ask

22        you that.  You haven't done it even till today,

23        have you?

24   A    I'm not responsible for faulty loans.

25   Q    All right.  I know you're not but your

```
 1            dealership is.
 2    A       No, sir, my dealership is not responsible for
 3            criminal acts.
 4    Q       Let's talk, please.  Your dealership is not
 5            responsible for criminal acts?
 6    A       That employee does.
 7    Q       Are you a lawyer?
 8    A       No, sir.
 9    Q       Have you ever been a lawyer?
10    A       No, sir.
11    Q       Do you know what the law is in that regard?
12    A       (No response.)
13    Q       Do you know what the law is in that regard?
14    A       What is it?
15    Q       That's based on what your lawyer's told you.
16                    MR. SHIRLEY:  Object to that.  That's
17              improper cross-examination and he knows
18              it.
19                    THE COURT:  I overrule.
20    BY MR. SMITH:
21    Q       That's what your lawyer has told you, isn't it?
22    A       I've heard it several times --
23    Q       Your lawyer --
24    A       -- from several different people.
25    Q       Your lawyer is one of them, isn't he?  The one
```

1    that's standing up here defending your company,

2    telling everybody --

3          MR. SHIRLEY:  We object, Your Honor.

4          MR. SMITH:  Wait a minute.

5  BY MR. SMITH:

6  Q    Telling everybody that this is all confusing.

7          MR. SHIRLEY:  He's invading the

8          attorney/client privilege with that

9          question and that response.

10          MR. SMITH:  I'll withdraw the

11          question, Your Honor.  I'll withdraw it.

12          THE COURT:  Thank you.

13  BY MR. SMITH:

14  Q    Okay.  Let's look at the dealer agreement that

15       Mr. York's referring to here.  And that's on

16       page 1, 2, and 3 of Exhibit 1.  Do you have it

17       there?

18  A    Yes, sir.

19  Q    I have page 1 on the screen.  Let me ask you to

20       look at page 3 of the exhibit.  And that's the

21       signature page where Sunshine accepted that --

22       the terms of that agreement, correct?

23  A    It says dealer, authorized signature and title.

24  Q    I know.  That's the third page of that

25       agreement, isn't it?

1   A   Yes, that's the third, yes.

2   Q   Mr. Williams at that time was president of

3       Sunshine, wasn't he?

4   A   Yes, he was.

5   Q   And he was authorized to enter into this dealer

6       agreement on behalf of the company, wasn't he?

7   A   Not for criminal intent.

8   Q   I'm sorry.  Was he authorized to enter in --

9   A   For good loans he was authorized to sign that

10      document, yes, sir.

11  Q   I'm sorry, sir.  I'm gonna have to get your

12      deposition out again.  Page 61 and 62 of your

13      deposition.  Actually on page 60.  Start on

14      page 59.  And I ask you beginning on page 59,

15      we looked at the first page of the dealer

16      agreement.  We looked at the first page of it.

17      I asked you:  You were aware that Union

18      Planters was one of the financial institutions

19      that would provide financing to Sunshine

20      customers, didn't you?  This is on page 60.

21  A   Yes, sir.

22  Q   And you knew that Mr. Williams had some contact

23      with Union Planters about providing financing,

24      didn't you?

25  A   Yes, sir.

1    Q    Question:  And on January 26, 2002, was Mr.

2         Williams president of the company?

3    A    Yes.

4    Q    Question:  Did he have the authority to enter

5         into this agreement on behalf of the company.

6    A    What do you mean by behalf?

7    Q    Question:  Well, I mean, a company can only act

8         through its officers and agents, wouldn't that

9         be true?

10   A    As far as I know.

11   Q    Question: I mean, a human being has got to sign

12        the thing, right?

13   A    Right.

14   Q    Question:  And Sunshine wanted to have some

15        sort of agreement with Union Planters so that

16        Union Planters would provide financing to

17        customers, didn't it?

18   A    Correct.

19   Q    That was true in January of 2002?

20   A    Correct.

21   Q    And it was true the rest of 2002?

22   A    Correct.

23   Q    And in 2003?

24   A    Correct.

25   Q    And in 2004?

1  A   I don't know.

2  Q   Line 23.  If it was necessary for this

3      recreational vehicle dealer agreement to be

4      signed by a representative of Sunshine, was it

5      all right for Mr. Williams to do that?

6  A   Where you reading that from?

7  Q   Help you here.  Page 60, right there.  All

8      right.  I'm gonna start over.  In any event if

9      it was necessary for this recreational vehicle

10     dealer agreement to be signed by a

11     representative of Sunshine --

12 A   Excuse me.

13 Q   -- was it all right for Mr. Williams to do

14     that.  And your answer?

15 A   Page 62 is missing.

16 Q   I'll be dog.  Hold on a minute, Mr. Borland.

17     Thank you for pointing that out.  You can

18     prepare and prepare and you're missing the page

19     that you want.  Let me see if this copy has got

20     it.  This one has.  Let's just swap.  Let me

21     read my question one more time.  In any event

22     if it was necessary for this recreational

23     vehicle dealer agreement to be signed by a

24     representative of Sunshine, was it all right

25     for Mr. Williams to do that?

388

1    A    Yes.  It was as long as he didn't use it for
2         criminal intent or faulty loans.  It wasn't in
3         business to steal.
4    Q    Well, but you did, though, didn't you?
5    A    No, sir, I didn't.
6    Q    Let's see.  Let's look at this, paragraph 1.
7         It is agreed from time to time Union Planters
8         Bank of Paducah, Kentucky, hereinafter known as
9         the Bank, will purchase contracts from Sunshine
10        Camping Center.  That's what it says, isn't it?
11   A    That's what it says.
12   Q    Two:  The dealer -- now, the dealer is Sunshine
13        Camping Center, isn't it?
14   A    That's what's written in there.
15   Q    The dealer will identify each applicant, right?
16        That's what it says, isn't it?
17   A    Yes, that's what it says.
18   Q    Goes on to say the dealer -- that's Sunshine,
19        isn't it?
20   A    Yes.
21   Q    -- shall assume all loss and damage sustained
22        by the bank which results from any false
23        representation contained in the application
24        which the dealer knows to be false when the
25        application is submitted to the bank.  Correct?

```
 1            That's what it says, isn't it?
 2    A      That's what it says.
 3    Q      Now, Mr. Williams, at the time this was signed,
 4           was an officer of the company, wasn't he?
 5    A      Yes.
 6    Q      And at the time the Lawson contracts were
 7           signed he was the president of the company,
 8           wasn't he?
 9    A      Yes.
10    Q      And this says the dealer shall assume all loss
11           and damage sustained by the bank which results
12           from any false representation contained in the
13           application which the dealer, Sunshine, knows
14           to be false when the application is submitted
15           to the bank.  That's what it says, isn't it?
16    A      Sunshine Camping Center didn't authorize Jon
17           Williams to sign that for faulty loans.
18    Q      I beg your pardon, sir.  I asked you -- it
19           says, doesn't it, the dealer shall assume all
20           loss and damage sustained by --
21    A      That's what the paperwork I get --
22    Q      Uh-huh, that's what it says.  And that's what
23           Mr. Williams on behalf of Sunshine entered into
24           so Sunshine could have a relationship with the
25           bank, right?
```

390

1   A   Not for faulty loans.  That's what the thing
2       says, but it doesn't --
3   Q   Where does it say anything different?
4   A   Doesn't say anything about criminal loans up
5       there.
6   Q   I know.  Does it say that, well, the dealer is
7       excused if they are criminal loans that are
8       done?
9   A   No, but he wasn't authorized to sign that to do
10      criminal loans.  He wasn't authorized to do it.
11  Q   It says any, doesn't it, sir?  It says any.
12  A   But I did not authorize him.  Sunshine Camping
13      Center did not authorize him to sign it under
14      those situations.
15  Q   Sir, he was the president of the dadgummed
16      company.
17  A   But he still wasn't authorized.
18  Q   It says any false representation, doesn't it?
19  A   That's what that piece of paper is saying.  I'm
20      saying you asked me what I authorized, Sunshine
21      Camping Center authorized.
22  Q   Wait.  You were only the vice president of the
23      company when the Lawson deals were done,
24      weren't you?
25  A   Oh, that's correct.  I didn't even sign that

```
 1           document.
 2     Q     Okay.  And then when -- you know, for some
 3           reason now, as of April 2, 2003, Mr. Borland is
 4           no longer an officer of the company, right?
 5     A     I didn't say that.
 6     Q     As of April 2, 2003, was Mr. Borland -- I mean,
 7           excuse me, Mr. Williams removed as an officer
 8           of the company?
 9     A     Are you asking me or them?
10     Q     No, sir, I'm asking you.
11     A     What are you asking?  I can't see the paper
12           or --
13     Q     Is this a little bit better?
14     A     Yes.
15     Q     Okay.  Good.  April 2, 2003, Mr. Williams was
16           no longer an officer of the company?
17     A     That's correct.
18     Q     But you kept -- and you kept him on, though,
19           didn't you?
20     A     Yes, I kept him on.
21     Q     And he was working for Sunshine, wasn't he,
22           when the McAllister and the Peters deals were
23           bought by the bank?
24     A     Yes.
25     Q     And there were false representations contained
```

1       in the Lawson, McAllister, and Peters

2       contracts, weren't there?

3   A   Yes.

4   Q   And this agreement says any false

5       representation contained in the application

6       which the dealer knows to be false when the

7       application is submitted to the bank, right?

8   A   That's what the agreement says, but he wasn't

9       authorized to sign it under those cases.

10  Q   Well, let's talk about who was authorized to

11      assign contracts.

12  A   Sign contracts?

13  Q   That's right.  Let's talk about who was

14      authorized to assign.

15              MR. SMITH:  Ms. German, is page 4 of

16          Exhibit 1 in evidence?

17              THE REPORTER:  Yes, sir.

18              MR. SMITH:  Thank you.

19  A   And this book is falling all apart.

20  Q   That's okay.

21  A   I'm just telling you.

22  Q   That's okay.  Yeah, that's okay.  Thank you,

23      though, for letting us know.  Now, this would

24      have been signed sometime in January of 2002,

25      wouldn't it?

393

1   A   That's correct.

2   Q   At the time the dealer agreement was signed,

3       right?

4   A   I wasn't there when the dealer agreement was

5       signed, so I don't know.  But I figured it

6       would be in January, yes.

7   Q   And it shows here that there are two people are

8       authorized to assign retail contracts to Union

9       Planters Bank.  Says -- that's what it says,

10      isn't it?

11  A   That's correct.

12  Q   Says one of them is Jon K. Williams.

13  A   Yes.

14  Q   Correct?  That's his signature there, right?

15  A   Yes.

16  Q   So's another one is Wallace C. Borland, III,

17      right?

18  A   Right.

19  Q   That's your signature there, right?

20  A   Right, to sign contracts.

21  Q   Now, here's my question to this jury.  At any

22      time after January 2002, did Sunshine tell

23      Union Planters that Jon K. Williams was no

24      longer authorized to assign retail installment

25      sales contract to the bank?

1    A    You're asking the jury or me?  You said you was

2         asking the jury.

3    Q    Sir?

4    A    Correct?  You asking me or the jury?

5    Q    My question is, at any time after January 2002

6         did Sunshine tell Union Planters that Jon K.

7         Williams was no longer authorized to assign

8         contracts?

9    A    Yes, sir.

10   Q    When?

11   A    I don't remember exactly.

12   Q    Wasn't it true that you didn't tell them until

13        January of 2004, when Mr. Williams was fired?

14   A    I asked for all contracts or anything to be

15        signed to be sent to me, but I did not receive

16        anything.

17   Q    Well, let's go back to your deposition.  I'm

18        sorry.  All right.  Here's my question on page

19        63, line 20.  Asked you back last year.  Are

20        63 -- pages 63 and 64 in that one?

21   A    (No response.)

22   Q    Are they there?

23   A    Yeah, I got 63 and 64.

24   Q    All right.  Question:  Well, my question is, at

25        any time before January of 2004, did Sunshine

395

1     tell Union Planters that Jon Williams no longer

2     has Sunshine's authority to assign contracts.

3     And tell us what your answer was.

4  A   No.

5  Q   So you didn't tell them until January 2004 that

6     this man, who had been removed as president,

7     who had been taken off the accounts, who didn't

8     have a share -- a single share of ownership in

9     this company --

10  A   Because I didn't know what contracts.  That's

11     why I asked for all paperwork to be sent to me.

12  Q   Sir, my question was -- and I'm gonna have

13     to --

14  A   I understand your question.

15  Q   -- read it again.  At any time --

16  A   No's the answer.

17  Q   Thank you.

18  A   You're welcome.

19  Q   Part of the dealer agreement again, the

20     dealer -- and that's Sunshine, isn't it?

21  A   That's what the document states, sir.

22  Q   Warrants that all contracts will be valid and

23     enforceable against the purchaser, correct?

24  A   That's what it states.

25  Q   The dealer will at all times hereafter

396

1       indemnify and hold harmless the bank. That's

2       what it states, isn't it?

3  A   That's what it reads.

4  Q   It goes on to say: Including reasonable

5       attorneys fees arising from or connected with

6       claims of misrepresentation or fraud, failure

7       or refusal in handling warranty obligations in

8       connection with the sale or financing of any

9       recreational vehicle under this or any other

10      agreement, correct?

11  A   That's what it reads.

12  Q   Now, these retail installment contracts that

13      were assigned by Sunshine to Union Planters

14      contain this assignment provision, correct?

15  A   I don't know.

16  Q   Okay.

17  A   I would have to see a contract to see that.

18  Q   Well, if Mr. Williams told us that it contained

19      this provision, would you disagree with him?

20  A   No, I don't have no ground to.

21  Q   All right. Now, you agree with me that these

22      four contracts at issue -- two from Lawson, and

23      two from McAllister -- excuse me, two from

24      Lawson, one from McAllister, and one from

25      Peters -- those are false contracts, aren't

397

```
 1          they?
 2     A    Yes.
 3     Q    There was no way for Union Planters to know
 4          that those were false contracts, were there?
 5     A    I really can't answer that question.  I'm not
 6          Union Planters.  The guidelines specify they
 7          should have caught something.
 8     Q    You just don't know, do you?
 9     A    No, I don't know that.
10     Q    Look at your deposition and make sure that's
11          what you told me last time.
12               MR. SMITH:  Your Honor, if I may just
13            have a minute.
14               THE COURT:  Yeah.
15   BY MR. SMITH:
16     Q    Whose job at Sunshine was it to make sure that
17          contracts were good and enforceable back in
18          2002 and 2003?
19     A    Jon Williams.
20     Q    As far as Union Planters knew, Jon Williams was
21          authorized by Sunshine to assign contracts up
22          until January 2004, correct?
23     A    Yes.
24     Q    And you agree that Mr. Williams through his job
25          had access to private information from
```

1        customers?

2    A   You have to tell me more.

3    Q   He had access to getting -- well, Mr.

4        McAllister particularly, through his job he was

5        able to get information about Mr. McAllister's

6        birth date, correct?

7    A   That was part of his job.

8    Q   For his social security number?

9    A   (No response.)

10   Q   Yes?

11   A   To get McAllister, no, he wasn't authorized to

12       get that.

13   Q   I'm sorry.  McAllister is a customer?

14   A   Yes.

15   Q   You remember Mr. McAllister came in back in --

16   A   So you asked me if a customer came in he was

17       authorized to get information, yes, sir.

18   Q   Yeah, so as to get financing so a sale could

19       happen, correct?

20   A   That's correct, yes.

21   Q   And he could use his job to get that

22       information, correct?

23   A   Yes.

24   Q   Because he was somebody up until January of '04

25       that was responsible for assigning contracts,

```
 1              correct?
 2      A       I didn't understand the question, sir.
 3      Q       Up until January of '04 Mr. McAllister was one
 4              of -- excuse me.  Up until January of '04 Mr.
 5              Williams was one of the people at the company,
 6              Sunshine, who could -- who could obtain
 7              financing and assign contracts?
 8      A       Yes, sir.  Yes, sir.
 9      Q       Now, who was Mr. Williams's supervisor at
10              Sunshine?
11      A       At what timeframe?
12      Q       Well, from the time the company was formed up
13              until April of 2003.
14      A       To begin with he had no supervisor.
15      Q       Somebody became the supervisor, didn't they?
16      A       I had more interest in the company, so, yes,
17              sir.
18      Q       After April of '03 you became the supervisor,
19              didn't you?
20      A       Yes, sir.
21      Q       Did Sunshine provide Mr. Williams with any
22              training regarding his job?
23      A       No.
24      Q       Did you provide him any training on what he
25              should do as far as obtaining credit for
```

```
 1          customers?
 2     A    I relied on him.  He's the one that had the
 3          knowledge.
 4     Q    Can we agree that Mr. Williams used his
 5          position with Sunshine Camping Center to obtain
 6          over $90,000 from Union Planters?
 7     A    For faulty loans, yeah.
 8               MR. SMITH:  I believe those are all
 9               the questions I have of this witness, Your
10               Honor.
11               THE COURT:  If I could see the
12               attorneys up here just a minute.  This is
13               off the record.
14                  (Discussion off the record.)
15               THE COURT:  Does anybody feel like
16               they need to take a break right now?
17               Okay.  We'll go ahead and take a short
18               recess at this time, and I'll excuse the
19               jury to go back to the jury room.
20                  (The jury left the courtroom.)
21                  (Break in the proceedings.)
22                  (The jury entered the
23                   courtroom.)
24                  CROSS-EXAMINATION
25     BY MR. MATTHEWS:
```

401

Q    Mr. Borland, I've just got a couple of questions.  Now, when the Peters deal went down and $47,000 went to your bank account, you testified 15,000 of that went to you; is that correct?

A    Testified that Jon gave me $15,000 that came out of that account, yes, sir.

Q    Well, the check had to be written by you, didn't it?

A    Yes, sir.

Q    You wrote yourself a check for $15,000; is that correct?

A    Honestly, I don't remember if it was a check or if it was just withdrawn out of the account or how it was.

Q    The money was in your bank account, right?

A    Yes, sir.  Yes, sir.  It was in Sunshine Camping Center bank account, yes, sir.

Q    And you're the only one that could get the money out, you or I guess your sister?

A    Yes, yes.

Q    Whoever was doing the books.

A    Yes.

Q    I believe y'all were on the signature cards?

A    Right.  Yes, sir.

402

Q     Yesterday do you recall when the ABI investigator, Mr. J.R. Ward, testified and he was asking about your business with Mr. Williams and y'all owned 50 percent of the stock and that type thing?  Do you recall him saying that when Mr. Williams turned over his stock to you, the reason he turned over your stock -- the stock to you is that you told him if he didn't do it you were gonna prosecute him?  Do you remember that?

A     No, sir.

Q     You don't remember him saying that?

A     I remember him saying that, but I don't remember telling him that.

Q     Okay.  You remember Officer Ward testifying to that, but you didn't tell him that?

A     No, sir.

Q     So he was wrong about that?

A     The stock was transferred because of family's money being put into the company and he could not.

Q     How much money did they put in the company?

A     Probably close to -- over a period of time close to a hundred thousand dollars.

Q     Okay.  Do you know --

403

1   A   Wasn't all at one time either so.

2   Q   Now, you know ninety-something thousand dollars

3       went into Sunshine's account.  You know that to

4       be a fact, don't you?

5   A   Now I do, yes.

6   Q   Now you do.  Can you account for any of the

7       monies other than what Mr. Williams says he

8       took and put in his pocket?

9   A   Let me back up because I just said something

10      that wasn't correct.  No, not all that money

11      went into Sunshine Camping Center's account.

12  Q   Okay.  Which of the ninety thousand went in and

13      which didn't go in?

14  A   I really -- I know McAllister didn't go in and

15      some of Lawson's didn't go in.

16  Q   Okay.  So he got that directly?

17  A   That's what he testified to.

18  Q   Okay.  He also testified that some of the

19      Lawson money -- you remember when I wrote this

20      zero to 6,000 on the board?

21  A   Uh-huh.

22  Q   Some of the Lawson money went in the bank, went

23      into your account, and he doesn't know how much

24      of the money that was leftover stayed in the

25      account.

404

1    A    That's --

2    Q    Do you have any judgment as to how much stayed

3         in the account?

4    A    I don't think none of it stayed in the account.

5    Q    You think that number would be zero?

6    A    Yes.

7    Q    But you admit 15,000 of it went to your

8         account, went to you?

9    A    15,000 did go to me, yes, sir.

10   Q    Okay.

11              MR. MATTHEWS:  I believe that's all,

12         Judge.

13                    CROSS-EXAMINATION

14   BY MR. SHIRLEY:

15   Q    Let me start back, if I may, with you.  You

16        remember the beginning of Sunshine Camping

17        company, Inc., that timeframe, correct?

18   A    Yes, sir.

19   Q    And it was you and Mr. Williams that got

20        started?

21   A    Yes, sir.

22   Q    And the money that was provided to get started

23        came from where?

24   A    Myself.

25   Q    Okay.  And then that -- yourself would include

405

1       whom, anybody else?

2   A   To get started it was just basically me.

3   Q   Okay.  And from that point forward you got

4       started, and we've heard the dates and the

5       chronology and that sort of thing, correct?

6   A   Correct.

7   Q   And then some period of time the even amount of

8       stock holdings was changed, correct?

9   A   Correct.

10  Q   Pardon me.  And when the amount was changed,

11      the first amount of stock holding was changed

12      with five shares?

13  A   Correct.

14  Q   And tell us approximately when that was.

15  A   End of 2002.

16  Q   Okay.  And so at that point the documents have

17      been introduced in August.  At that point there

18      was a change in who was writing the checks?

19  A   At that time both of us was.

20  Q   Right.  And then there was some transition

21      there between the months, the ending months of

22      '02 where everything was getting worked out,

23      right?

24  A   Correct.

25  Q   Then you come over into in August of '02, was

406

1        there a financial need for the company?

2    A   Yes.

3    Q   And what was the financial need?

4    A   We needed more money to buy more trailers.

5    Q   Okay.  And when you say trailers, you're making

6        reference to RV recreation vehicles?

7    A   Yes, sir, recreation vehicles.

8    Q   And in so doing that did you talk to Mr.

9        Williams about it?

10   A   Yes, sir.

11   Q   And what did he offer in the way of money?

12   A   He could not come up with any money.

13   Q   And what, if anything, did you say to him about

14       him having to lower the number of shares he had

15       because of you getting other money?

16   A   I told him that my relatives told me that if

17       they was gonna loan me anymore money, then I

18       would have to have the stock in Sunshine

19       Camping Center.

20   Q   And that's what happened?

21   A   That's what happened.

22   Q   And then there was a truck, correct?

23   A   That is correct.

24   Q   And the truck was what kind -- you've told us

25       about the truck, the color, the size, et

407

1       cetera?

2    A    Right.

3    Q    And the money for the truck came from where?

4    A    My personal self.

5    Q    Okay.  Then you come back over into April,

6         April 2003.  And a resignation is done, I

7         believe.  You remember the --

8    A    Yes.

9    Q    -- documents that were shown, the documents

10        that were introduced?  What was --

11   A    Yes.

12   Q    -- the reason for that?

13   A    Because he was no longer president of the

14        company.

15   Q    And what, if any, kind of financial need was in

16        existence at that time?

17   A    From him, none.

18   Q    Okay.  Well, what was it for the corporation?

19        Were y'all needing financing at that time?

20   A    Yes, yes.

21   Q    Okay.  And did you procure that financing from

22        someone?

23   A    Yes.

24   Q    And what, if anything, did the procurement of

25        that financing in April have to do with getting

408

1      the rest of the stock?

2  A   We needed more money for it.

3  Q   Okay.  And so at this timeframe you became the

4      sole owner of the shares of stock in Sunshine

5      Camping Center?

6  A   That is correct.

7  Q   And then the next event that you were involved

8      with Jon Williams about was when you went to

9      CB&T banking?

10 A   Yes.

11 Q   And this is -- before you went down there what

12     discussion had you had with Jon Williams about

13     someone other than Jon Williams -- what did Jon

14     Williams tell you the person's name was, who

15     that person was, if anyone, that helped provide

16     money for him to buy back into the business?

17 A   His mother.

18 Q   How did that come about?  Did he just stroll in

19     one day and say this has happened?  Explain the

20     circumstances surrounding that.

21 A   He lost the stock and had to give it up because

22     he didn't have the funds.  And more inventory,

23     more funds you have, the more big the business

24     and more sales and more prosper off of it and

25     everything.  So he wanted to get money from his

409

```
 1           mother, is what he told me, to buy back some of
 2           his stocks.  And that's what I was willing to
 3           do for him.
 4    Q      And when you went to the bank, what was your
 5           belief about there being any money that had
 6           been wired to the bank?  What was your
 7           understanding?
 8    A      What dates?
 9    Q      Before you went to the bank to get the $15,000.
10    A      Repeat the question.
11    Q      Yeah.
12    A      I'm sorry.
13    Q      Well, you testified that you got $15,000.
14    A      Yes, sir.
15    Q      You got it either by a withdrawal, cashier's
16           check, or a check.  You just told --
17    A      Yes.
18    Q      -- Mr. Matthews you didn't remember exactly how
19           that was done.
20    A      Right.
21    Q      That occasion was sometime in July, July 17,
22           18, something of that nature?
23    A      That's correct, yes, sir.
24    Q      All right.  Well, before you went down there
25           where did you understand the money was coming
```

410

1       from?

2    A    It was coming from Commercial Bank.

3    Q    Okay.  From Commercial Bank?

4    A    Well, I mean, you're losing me because I think

5         you're talking about the money -- you're gonna

6         have to rephrase the question.

7    Q    Let me start over.  Let me reference you to the

8         money that Mr. Matthews asked you about.

9    A    Okay.

10   Q    That money came from what bank?

11   A    CB&T.

12   Q    Now, before you went to CB&T did you know there

13        was money in the bank?

14   A    Yes, sir.

15   Q    That's what I'm trying to ask you.

16   A    Yes, sir.

17   Q    Where did you think that money came from?

18   A    Jon's mother.

19   Q    And how did you know that?

20   A    Jon told me.

21   Q    And how did he explain it?

22   A    That his mother was going to loan him the money

23        so he could revest back his shares and get his

24        shares back into the company.

25   Q    And the money was gonna go where?

411

1    A    Be wired into CB&T checking account.

2    Q    Well, when you went down there, did you know

3         that it wasn't going to be used in Sunshine

4         Camping company?  When you went to the bank did

5         you know that?

6    A    I knew that the 15,000 was going to come to me

7         because that's what was discussed.

8    Q    Okay.

9    A    And the other was gonna be used for recreation

10        vehicles.

11   Q    And then the other money went where, the other

12        than the $15,000?

13   A    It went back to Jon.

14   Q    And what was his reason or what did he tell you

15        that he was taking that money out?

16   A    The -- his mother, which was the person that

17        was loaning him the money, changed her mind and

18        not at this time that she was going to invest.

19        Something happened, I think, that night.

20   Q    And Defendant's Exhibit A has been introduced

21        into evidence.  And as of the date on this

22        document what belief did you have as to how

23        money was to be transferred from Union Planters

24        to the Commercial Bank?  What did you think it

25        would occur?

412

1   A   It was as of 5/13/03, it was supposed to be

2       wired into Commercial Bank.

3   Q   So if you went to CB&T on or about July 17 or

4       18, you would have thought Union Planters was

5       wire transferring money to Commercial Bank?

6   A   That's correct.

7   Q   What was the reason for the Commercial Bank

8       change?

9   A   I live in Ozark.  My wife was the one that was

10      doing most of the deposits and everything.  And

11      since she was here in Ozark it was just easier

12      for her to go there to make the deposits.  Plus

13      they would -- we was trying to get money

14      loaned, and Commercial Bank wanted to loan us

15      the money --

16  Q   Okay.

17  A   -- and CB&T wouldn't.

18  Q   Now, insofar as -- go back just a moment and

19      let me ask something and then I'll move on.

20      Back in the early part of January, 2002 -- we

21      seen this dealer agreement and the dates -- and

22      up until the time that Jon Williams left the

23      employment of Sunshine Camping, was there ever

24      an occasion for anyone to come from Union

25      Planters or from Regions or anyone to come and

413

1       have a training session about what to do about

2       completing these documents, how to complete

3       them, what was the impact of it, anything of

4       that nature?

5   A   No.

6   Q   And at the time that -- I think you've

7       testified to this, and I want to be sure that

8       it's clear.  When you started the business, you

9       were not in the financing end of Sunshine

10      Camping?

11  A   That's correct.

12  Q   Who was?

13  A   Jon.

14  Q   Okay.  And then in August of '02, did it change

15      any?  Did you become active?

16  A   I started doing some.

17  Q   Okay.  But you still were not as experienced as

18      you are today?

19  A   No, no, no.  I was just -- no.

20  Q   You were asked questions about several things

21      in your deposition.  And one of the things that

22      was asked about you testified something to the

23      effect that you didn't think the Lawson money

24      was received; do you remember that question?

25  A   Yes, sir.

414

Q     And what were you talking about when you say
      that?  You made a comment that you had checked
      your records.  What records are you talking
      about?

A     Well, the bank account information that I had,
      the books that I had did not have Lawson's name
      on it.  And that's basically what I was looking
      for was the name.

Q     So your internal records that would show up
      with some money didn't have the name of Lawson
      for you to match it against your bank
      statement?

A     That's true.

Q     That's what you're talking about?

A     Yes, sir.

Q     But as the matter progressed and saw some of
      this documents that we've seen in the trial of
      this case, were you able to go back and look?

A     Yes, sir.

Q     And, for example, when you gave your
      deposition -- I forget the date but they said
      it was about a year ago.  I remember it,
      somewhere around --

            MR. SMITH:  May 10.  May 10 of last
      year.

BY MR. SHIRLEY:

Q    At that time you were banking with what
     company?  May 10, 2005, what banking company?

A    Commercial Bank.

Q    Okay.  And so at that time giving your
     deposition all the transactions had come in,
     correct?

A    Correct.

Q    And at the time you gave your deposition did
     you know that a transfer, wire transfer, cash
     transfer had occurred to CB&T from Union
     Planters?

A    No.

Q    Because on the day of your deposition you
     believed what you believed the day you got the
     money?

A    Right.

Q    Now, let me ask, in January 2004 you discovered
     a check had been written on the account.  Do
     you recall which account it was?

A    CB&T.

Q    And it had nothing to do with Union Planters
     did it?

A    That's correct.

Q    But it was whose account?

```
 1    A    It was Sunshine Camping Center's account.
 2    Q    And it was a check of substantial money, 25
 3         $27,000, something of that nature?
 4    A    $27,000.
 5    Q    And that's the day that you called the police?
 6    A    That's correct.
 7    Q    And the day the police were called, he escorted
 8         Mr. Williams off the property?
 9    A    That is correct.
10    Q    And at that day had you known of anything that
11         concerns the claims that are made in this
12         lawsuit?
13    A    No.
14    Q    Now, the person that you spoke with at Level
15         Plains was whom, what type of officer was he,
16         if you know?
17    A    He was the police chief.
18    Q    And I believe -- do you remember his name?
19    A    I don't.
20    Q    Does the name Kenny Jackson refresh --
21    A    (Indicated in the affirmative by a nod of the
22         head.)
23    Q    And I got that name from listening to Agent
24         Ward yesterday.
25    A    Uh-huh.
```

417

1 Q And when Agent Ward came to you, had you talked

2   with or turned over anything yourself to Kenny

3   Jackson before Agent Ward came to you?

4 A Yes.

5 Q What?

6 A I don't know what.  It was a bunch of

7   paperwork, coupon books that you would make

8   payments to different loans about that was in a

9   briefcase, and items that was in the desk that

10   Jon was using.

11 Q Okay.  And when Agent Ward arrived, do you

12   recall when it was that he came to see you?

13 A I -- during the day, yes.

14 Q Do you remember the calendar date?

15 A No, sir.

16 Q Do you know the actual date?

17 A No, sir.

18 Q Do you know -- can you tell us if, in fact, you

19   had transpired with anyone or investigated with

20   anyone or learned anything about the nature or

21   the detail of those documents that were given?

22 A No, sir.  It was the next day.

23 Q So the things that he was asking you about, you

24   had not sat down and looked over and --

25 A I didn't know what he was talking about.

1    Q    -- and examined or anything of that nature?

2    A    Didn't know what he was talking about.

3    Q    Okay.  Now, the truck -- the truck was a truck

4         that was used by Mr. Williams where?

5    A    For his personal use.

6    Q    Okay.  And during the time that you -- you said

7         you had been friends and you considered Jon

8         Williams a friend; you had testified to that?

9    A    Yes, sir.

10   Q    And you testified to the number of years that

11        you had known him and been around him?

12   A    Yes.

13   Q    And did you know and understand whether or not

14        he gambled?

15   A    Depends on what you call gambling.  I mean, I

16        know that he went down and got lotto tickets.

17        Did I know that somebody come up there and

18        threatened him, no.

19   Q    Okay.  And until this lawsuit came about and

20        the events around this lawsuit, you had never

21        heard that someone was after him for not paying

22        his gambling debts?

23   A    No, sir, not to my knowledge nobody came up.

24   Q    Now, I was trying to understand.  I can't

25        remember.  I believe that Agent Ward used the

1          word "embezzlement." You knew -- words to the

2          effect that you knew Jon had embezzled. Do you

3          remember his testimony?

4   A    Some of it.

5   Q    Well, let me ask you to assume someone was to

6          ask you about embezzlement of Jon Williams

7          before he was fired. My first question is did

8          you know about any?

9   A    No.

10   Q    Okay. If, in fact, he had exploited some

11          money, some properties of Sunshine Camping

12          company, what was the approximate value of

13          that?

14   A    Very little. I mean, a couple hundred dollars.

15   Q    Okay. And what was the nature of it? Describe

16          the type and nature of what it was.

17   A    I mean, we sold propane. We would, you know,

18          get grills filled up with propane, you know.

19          And sometimes be in a rush, it would be after

20          working hours. So, you know, we forgot about

21          it. And a company truck or his personal truck

22          when he wanted to use it for personal use. I

23          did the same thing.

24   Q    And when you took the $15,000, however it was

25          given to you there at the CB&T Bank in July of

```
 1              2003, that was to pay you back for the money
 2              that you loaned him for the truck?
 3     A        Yes, sir.
 4     Q        And the money that you believed on that day was
 5              coming from a source unconnected and unrelated
 6              to Union Planters?
 7     A        Yes.
 8     Q        That's all I have.  Thank you.
 9                      THE COURT:  All right.
10                      MR. SMITH:  I have no redirect, Your
11                 Honor.
12                      MR. MATTHEWS:  I've got one question.
13                      THE COURT:  All right.
14                      RE-CROSS EXAMINATION
15     BY MR. MATTHEWS:
16     Q        Now, you say you loaned him $15,000 at some
17              previous time?
18     A        Yeah.
19     Q        Where'd it come from?
20     A        The monies basically that my kinfolks and my
21              father-in-law, my father, I don't know because
22              I kept all of it from units that we would sell
23              and put back in the business.
24     Q        Did you write him a check for it?
25     A        I think so.  I don't know if I did or if it
```

```
1         came from my father-in-law.  I would have to --
2         or not my father-in-law, my father.  I would
3         have to check and see.
4    Q    You're testifying under oath that you gave him
5         $15,000 at some time prior to signing these
6         notes?
7    A    Yes, sir.
8    Q    Cash or check?
9    A    No, sir.  I gave him a check.  Now, I don't
10        know if it was one check or it was two checks
11        or the situation, but yes, sir.
12   Q    Okay.  That's all.
13                MR. SMITH:  We have nothing else,
14           Your Honor.
15                THE COURT:  Thank you, sir, you may
16           step down.
17                MR. SMITH:  We call Rhoda Tomlinson
18           of Community Bank & Trust.
19                     RHODA TOMLINSON
20   having been first duly sworn or affirmed, was
21   examined and testified as follows, to-wit:
22                   DIRECT EXAMINATION
23   BY MR. SMITH:
24   Q    You are Rhoda Tomlinson?
25   A    Yes, sir, that's correct.
```

1    Q    And, Ms. Tomlinson, where are you employed?

2    A    At Community Bank & Trust of Southeast Alabama.

3    Q    That's also known as CB&T?

4    A    That's correct.

5    Q    And where is that located?  Where's the branch

6         that you work located?

7    A    In Enterprise.

8    Q    How long have you worked for CB&T?

9    A    Nineteen years.

10   Q    Tell us what you do for CB&T.

11   A    Okay.  I'm the operations assistant manager.

12   Q    Tell us what an operations assistant manager

13        does.

14   A    Okay.  I help keep the records of CB&T,

15        maintain stuff on microfilm and statements.

16   Q    Do you have -- are you the person at CB&T in

17        Enterprise responsible for keeping records

18        relating to signature cards on accounts?

19   A    Yes, sir.

20   Q    And also on deposits and checks that may be

21        written on accounts?

22   A    Yes, sir.

23   Q    And you've been in that capacity for how long?

24   A    Nineteen years.

25   Q    Nineteen years?  Okay.  You got a subpoena from

```
 1              me to appear here today, didn't you?
 2       A      Yes, sir.
 3       Q      And I asked you about an account in that
 4              subpoena maintained by Sunshine Camping Center,
 5              Incorporated; is that right?
 6       A      Yes, sir.
 7       Q      All right.  And do you know the account number?
 8       A      Can I look on here?  I don't know it by heart.
 9       Q      Let me ask you this question.  I'm sure that
10              there are a number of accounts that CB&T has?
11       A      Yes, sir.
12       Q      You can't commit all that stuff to your memory,
13              can you?
14       A      No, sir.
15       Q      But y'all have records?
16       A      Yes, sir.
17       Q      And you're the person in charge of those
18              records?
19       A      Yes, sir.
20       Q      And in the subpoena I sent you did I ask you to
21              go and look at certain records for the account
22              for Sunshine Camping Center, Inc.?
23       A      Yes, sir.
24       Q      And would that include signature card records?
25       A      Yes, sir.
```

1    Q    And would that also include records relating to

2         certain checks that may have been deposited

3         into Sunshine's account?

4    A    That's correct.

5    Q    All right.  Now, did you bring records that

6         reflect that with you today?

7    A    Yes, sir, I did.

8    Q    And are those records of CB&T?

9    A    Yes, sir.

10   Q    By looking at those records do you think you

11        can answer my questions about who had signature

12        authority on these accounts at certain times?

13   A    Yes, sir.

14   Q    And when certain checks were deposited into

15        those accounts?

16   A    Yes, sir.

17   Q    Okay.  If you could take a look at those

18        records and tell us what the account number for

19        Sunshine Camping Center was.

20   A    2524635.

21   Q    Okay.  Is what I've got up on the screen a

22        signature card for that CB&T accounts 2524635?

23   A    Yes, sir.

24   Q    And can you tell from looking at that when the

25        account was open?

```
 1    A    November 12, 2002.
 2    Q    Okay.  And who would have had the authority to
 3         write checks out of that account as of
 4         November 12, 2002?
 5    A    (No response.)
 6    Q    Can you --
 7    A    Yes, sir.
 8    Q    Who is that?
 9    A    Comber Borland and Barbara Franks.
10    Q    Now, this account that shows November 12, 2002,
11         and a signature by Comber Borland and Barbara
12         Franks, if the people who could write checks,
13         who could sign checks on that account was
14         changed, what would be done?
15    A    A new signature card would be issued.
16    Q    All right.  I'm gonna go back in time instead
17         of going forward.  Oh, and there's also this
18         stamp here, signature updated.  Tell us what
19         that means.
20    A    That means it was an updated card.  There was a
21         card before that.
22    Q    All right.  Let me show you this document here.
23         And that's the same account number, isn't it?
24    A    Yes, sir.
25    Q    And we see that signature updated logo.
```

1    A    Yes, sir.

2    Q    Is that yes?

3    A    Yes, sir.

4    Q    Okay.  And when would the signature on this

5         account number have been updated according to

6         this document?

7    A    August 5th, 2002.

8    Q    Okay.  And so according to this document as of

9         August 5th, 2002, who was the only person at

10        Sunshine that could sign checks?

11   A    Comber Borland.

12   Q    And he was the only person that could sign

13        checks up until this other one in November that

14        we've just looked at prior, correct?

15   A    Yes, sir.

16   Q    All right.  Go back one more.  Here's another

17        signature card for that account 2524635.  And

18        we don't see that signature updated logo on

19        there, do we?

20   A    No, sir, that's the original.

21   Q    This is the original when the account was

22        opened?

23   A    Yes, sir.

24   Q    What's the date the account was opened?

25   A    March the 11th, 2002.

1    Q    And who as of March the 11th, 2002, could sign
2         checks on this account?
3    A    Wallace Comber Borland and Jon K. Williams.
4    Q    And that would have been the case up until the
5         screen we looked at just before in August when
6         only Mr. Borland could sign, correct?
7    A    Yes, sir.
8    Q    All right.  Now, I want to ask you about three
9         checks that were deposited into or that I
10        believe were deposited into this account.
11        First is a check dated September 18, 2002,
12        that's -- on the reference line it says Lawson
13        proceeds I think the evidence has shown -- in
14        the amount of $18,216.50.  And my question to
15        you is, on or about September 18, 2002, was a
16        check in the amount of $18,216.50 put into
17        Sunshine's account at your bank?
18   A    Yes, sir.  We show that was deposited on
19        September 20th.
20   Q    Of what year?
21   A    2002.
22   Q    Does it show who the depositor was?  Does it
23        show who made the deposit?
24   A    Like which person?
25   Q    It doesn't show that?

1    A    No, sir.

2    Q    Fair enough.  And based on the documents we

3         just got through looking at the signature card,

4         as of September 18, 2002, the only person who

5         could write checks out of that CB&T account was

6         who?

7    A    Mr. Borland.

8    Q    Okay.  Mr. Borland?

9    A    Yes, sir.

10   Q    All right.  Got a check now that's dated

11        November 14, 2002, Sunshine Camping Center, and

12        again the logo Lawson proceeds.  And this one

13        is in the amount of $8,516.06.  According to

14        the records at your bank was a deposit in that

15        amount made on or about November 14, 2002?

16   A    Yes, sir.  We show November 18, 2002.

17   Q    All right.  And as of that date was Jon

18        Williams someone who was authorized to sign

19        checks out of that Sunshine Camping Center

20        account?

21   A    No, sir.

22   Q    Okay.  Show you a document marked as

23        Exhibit 10.  I will represent to you that this

24        document reflects an electronic transfer from

25        Union Planters Bank to Sunshine Camping Center

```
 1            dated July 16, 2003.  Can you see that or am I
 2            in your way?
 3    A       I can see it.
 4    Q       I'll represent to you it shows the amount of
 5            $45,171.50.  And my question is on or about
 6            July 16, 2003, was there an electronic transfer
 7            into Sunshine's account for the $45,000 amount?
 8    A       In our bank on July 17, 2003.
 9    Q       And would Mr. Williams have had authority to
10            sign any check to take any money of that amount
11            out of the CB&T account on that day?
12    A       No, sir.
13    Q       Thank you, Ms. Tomlinson.
14                   MR. SHIRLEY:  I don't have any
15               questions.
16                   MR. MATTHEWS:  No questions.
17                   THE COURT:  Thank you, ma'am,
18               appreciate you coming today.  You may step
19               down.  And may she be excused?
20                   MR. SMITH:  She may be excused, Your
21               Honor.  And may we approach just a minute?
22                        (Whereupon, counsel conferred at
23                         the Bench out of the hearing of
24                         the jury.)
25                   THE COURT:  Yes, sir.
```

1              MR. SHIRLEY:  We object to any

2       document relating to this attorney's fees

3       or records.  We object to it on the

4       grounds that it has not been disclosed to

5       us when we asked for such documentation in

6       interrogatory as well as a request for

7       production.  And I submit to the Court

8       that under interrogatory number 17 we

9       asked for any expert opinion or report of

10      any expert, and none was disclosed.  In my

11      request for production that was sent, the

12      plaintiff --

13                  (Reporter asked for

14                   clarification.)

15              MR. SHIRLEY:  The plaintiff responded

16      to request production the résumé or

17      curriculum --

18                  (Reporter asked for

19                   clarification.)

20              MR. SHIRLEY:  I'll say it any expert

21      that intends to testify.  And then under

22      documentation 25, I asked for --

23      documentation request 25 I asked for any

24      exhibit that would be introduced into

25      evidence.  And the reply was they'd be

```
 1              produced in accordance with Alabama Rules
 2              of Civil Procedure or scheduling order of
 3              this Court.
 4                   Now, the rules of procedure, Rule 26
 5              requires a different kind of disclosure
 6              and it's typical with a witness.  I would
 7              concede there is no scheduling order.  But
 8              rule -- the Alabama Rules of Discovery
 9              require when you ask for information and
10              documentation about an expert that that's
11              a different requirement.  There's also a
12              supplementary requirement under the rules
13              that require it to be supplemented.  And
14              at this juncture there has never been any
15              production.
16                   I'd like to further explain to the
17              Court that -- I take it that he's gonna
18              testify he's a licensed lawyer, licensed
19              lawyer, and that he has done this work,
20              and that he thinks this work is necessary.
21              But he's gonna have to testify that it's
22              reasonable.  And that requires expert
23              competence and requires an expert opinion.
24              Then he's gonna have a list that shows --
25              a very lengthy list of documentation that
```

1    identifies works that's been done that my
2    client has not ever seen or had the
3    opportunity to inspect, nor the
4    opportunity to impeach or to designate as
5    previously offered but now excluded from
6    evidence the nature of all the
7    transactions.
8        I submit to the Court and state for
9    the record that it seems very unfair for
10   this defendant to have to be placed upon
11   the burden of cross-examining counsel for
12   the plaintiff about his own bill when it's
13   never been produced but it has, in fact,
14   been seen -- has been asked for.  And I
15   don't think that the rules of procedure or
16   discovery have been followed.  And under
17   the present circumstances it patently and
18   unfairly prejudices my client.
19       For example, I would have the right
20   to depose him if I wanted to, and I didn't
21   have that right.  He didn't tell me it was
22   gonna be him.  He didn't tell me it was
23   gonna be anybody that was gonna come in
24   here and approve attorneys fees as
25   attorney.  Furthermore, he didn't tell me

1     that it was gonna be predicated upon a

2     document that he has prepared relating to

3     his work activities in this case for me to

4     have the opportunity to refute it if I so

5     want to refute it.  He takes unfair

6     advantage of this defendant, and we

7     respectfully and wholeheartedly submit

8     that he should not be able to do it.

9          MR. SMITH:  I have no response, Your

10    Honor.  We believe -- other than we

11    believe it's proper given the

12    circumstances to allow someone to testify

13    to these attorneys fees.

14         THE COURT:  Your objection is so

15    noted and overruled.

16         MR. SHIRLEY:  And let me ask this.

17           (Reporter asked for

18           clarification.)

19         MR. SHIRLEY:  I do not remember if

20    you file discovery in the clerk file in

21    Ozark.  I don't believe you do.

22         MR. SMITH:  I can't recall.

23         MR. SHIRLEY:  So my question is I

24    need to preserve the record of these

25    interrogatories and these responses unless

1            y'all stipulate that that's what was done

2            and that is --

3                MR. SMITH:  The document on the --

4                    (Reporter asked for

5                     clarification.)

6                MR. SMITH:  Exhibit 15 has not been

7            produced to Mr. Shirley until Monday.  I

8            believe it was produced Monday.  I was

9            not --

10                MR. SHIRLEY:  Negative.

11                MR. SMITH:  Which date did we use it,

12            Monday or Tuesday?

13                MR. SHIRLEY:  Tuesday.

14                MR. SMITH:  Okay, Tuesday.  Thank

15            you, Mr. Shirley.  That was first.

16            Second, no, I have not been disclosed, nor

17            have we disclosed any expert witness

18            regarding testimony.  We did not realize

19            that this would be an issue and, were, in

20            fact, surprised when there was an

21            objection raised by defense counsel to

22            Mr. York's testimony regarding the

23            attorneys fees issue.  And that's why we

24            believe that it's proper to call someone

25            who may otherwise be an expert but has not

1      previously -- but has not been previously

2      disclosed, is a surprise.

3           MR. SHIRLEY:  And I offer to make a

4      copy of the interrogatory 16 and request

5      for production 25 for the record because

6      this discovery is not in the clerk file,

7      and that was the point that I was making.

8           THE COURT:  Right.

9           MR. SHIRLEY:  That's what I intend to

10     do.

11          THE COURT:  Okay.  That will be

12     admitted.

13          MR. SHIRLEY:  And that will be

14     admitted?

15          THE COURT:  Yeah.

16          MR. SMITH:  Not to go back to the

17     jury?

18          THE COURT:  No, just as an exhibit to

19     the record.

20               (Whereupon, Defendant Sunshine's

21               Exhibits O and P were marked

22               for identification.)

23          MR. KNIGHT:  Regions calls John

24     Smith.

25               JOHN SMITH

```
 1   having been first duly sworn or affirmed, was
 2   examined and testified as follows, to-wit:
 3                      DIRECT EXAMINATION
 4   BY MR. KNIGHT:
 5   Q    You are John Smith, correct?
 6   A    That's correct.
 7   Q    Mr. Smith, do you know why you're testifying?
 8   A    Yes.  I'm here to testify regarding attorneys
 9        fees that my firm has billed Regions Bank
10        and/or its predecessor Union Planters in and
11        about the prosecution of this lawsuit against
12        Sunshine Camping Center and Jon Williams.
13   Q    You're obviously an attorney?
14   A    Yes, I have been since September of 1992,
15        admitted to the Alabama Bar.
16   Q    Your firm was hired to defend or to prosecute
17        this case on behalf of Regions Bank; is that
18        correct?
19   A    That's correct.  Its predecessor, Union
20        Planters, hired us.  And then Regions, its
21        successor, continued on with the lawsuit,
22        that's correct.
23   Q    Your firm charged certain fees and expenses to
24        Regions in the prosecution of this case; is
25        that correct?
```

```
 1    A    That's correct, for attorneys fees and related
 2         work.
 3    Q    Show you an exhibit, it's marked Exhibit 15.
 4         You know what that document is?
 5    A    Yes, sir.  This is a document that was produced
 6         at my request to demonstrate the fees and
 7         expenses that my firm had billed for the work
 8         that I and others had done in prosecuting this
 9         lawsuit.
10    Q    Okay.  And based on that document what were the
11         fees and expenses that your firm charged?
12    A    According to this --
13              MR. SHIRLEY:  Restate in full my
14           objection for the record.
15              THE COURT:  So noted.  Overruled.
16    A    According to the document, and it's a document
17         that I'm familiar with, it's $46,979.47.  There
18         was an additional $141 that was billed but had
19         not yet been recorded on the document that has
20         been added.  So $46,979.47.
21              MR. KNIGHT:  Okay.  Your Honor, we
22           offer Exhibit 15.
23              THE COURT:  It'll be admitted.
24                   (Whereupon, Plaintiff's Exhibit
25                    Number 15 was admitted into
```

1                       evidence.)

2                  CROSS-EXAMINATION

3    BY MR. SHIRLEY:

4    Q    You know that on behalf of Sunshine Camping

5         company, Inc., the defendant in this --

6    A    Wait, I'm sorry --

7                   MR. KNIGHT:  Your Honor.

8                   THE COURT:  Yeah.

9                   MR. KNIGHT:  I'm not sure -- we took

10             this up earlier.  I think it's on the

11             record previously.  I'm not sure what

12             Mr. Shirley is doing.

13                  MR. SHIRLEY:  He's up here for fair

14             game.

15                  THE COURT:  Well, I'm not sure

16             they're through with their examination.

17             You want to make an objection to the offer

18             of this document?

19                  MR. SHIRLEY:  Sure, sure.  I'm sorry.

20             I thought you said thank you.  I'm sorry.

21             My apologies.

22                  THE COURT:  Okay.

23                  MR. SHIRLEY:  But, yeah, I'll go

24             ahead if you want me to.  But I don't mind

25             establishing on the record that that

1     document -- may I voir dire to when that

2     document was produced?

3         MR. KNIGHT:  Your Honor, we were up

4     here ten minutes establishing -- putting

5     stuff on the record.  I don't know what --

6     anything additional that he wants to put

7     on there.

8         MR. SHIRLEY:  There's plenty of

9     things that's gonna be additional.

10        THE COURT:  I'm gonna deny your

11    request for voir dire.  You can just

12    address it on cross-examination.  Now, the

13    document has been offered into evidence,

14    is there any objection?

15        MR. SHIRLEY:  Yes, sir, and restate

16    all my same objection.

17        THE COURT:  All right.

18        MR. SHIRLEY:  Also, and we would add

19    that there's no predicate.  That he hasn't

20    predicated the accuracy of that.

21        THE COURT:  Okay.  I'm going to

22    overrule your objections.  It will be

23    admitted.

24        DIRECT EXAMINATION CONTINUED

25  BY MR. KNIGHT:

440

```
 1    Q    Now, to arrive at this figure you just told us,
 2         what did your firm do?
 3    A    Well, to arrive at that there was certain work
 4         that was performed, that I performed and that
 5         you performed, in prosecuting this lawsuit,
 6         including gathering documents, reviewing
 7         documents, taking the depositions of witnesses,
 8         traveling to take the depositions of witnesses,
 9         talking -- sending out subpoenas, talking to
10         witnesses, coming down and trying this case.
11         Everything that was necessary to prosecute this
12         case.  In my opinion, as someone with my
13         experience, everything that goes into this
14         $46,000 figure, all the work, in my opinion,
15         was necessary to bring the case to this point
16         to this trial before the jury.
17    Q    And you charge by the hour; is that correct?
18    A    Yes, that's correct.
19    Q    Okay.  And what's the hourly rate for your work
20         and my work?
21    A    For the work that I have done in this the
22         hourly rate was $270 an hour.  For your work it
23         was $160 an hour.  And given my 14 years of
24         experience practicing in the courts of Alabama,
25         I believe that is a reasonable hourly rate for
```

```
 1          the types of work performed.
 2    Q     And this is based on your knowledge and your
 3          experience.  How long have you been practicing?
 4    A     Fourteen years.  And I've tried cases all over
 5          the southern half of Alabama.
 6    Q     And where have you practiced?
 7    A     As I said, in southern -- anywhere from
 8          Birmingham south in the federal and state
 9          courts.
10    Q     Currently practicing in the city of Montgomery,
11          Alabama?
12    A     That's correct.  That's where my office is
13          located.
14    Q     Nothing further.
15                      CROSS-EXAMINATION
16    BY MR. SHIRLEY:
17    Q     You answered discovery requests that I filed on
18          behalf of Sunshine Camping company in this
19          case, did you not?
20    A     I prepared some responses that my client
21          executed, yes, sir.
22    Q     The request for production, it was requested
23          that any résumé or vitae of expert that was
24          going to testify in this trial be produced, and
25          you haven't done that, have you?
```

```
 1    A    I'm competent that that's --
 2              MR. KNIGHT:  Your Honor --
 3    A    -- what your request sought.
 4    Q    Right.  But you didn't produce that to me, did
 5         you?
 6              MR. KNIGHT:  I'm gonna object to
 7              this.  It's outside the scope of what
 8              Mr. Shirley can cross-examine him on.
 9              This is something related to discovery
10              which we took up for 15 minutes up here a
11              few minutes ago.  I don't see what this
12              has to do with the reasonableness and
13              necessity of attorneys fees.
14              THE COURT:  I'm going to overrule
15              your objection.
16              MR. SHIRLEY:  Thank you, Judge.
17    BY MR. SHIRLEY:
18    Q    And you did not produce your résumé to me, did
19         you?
20    A    No, sir, because I didn't realize until this
21         morning that it would be necessary for me to
22         testify.
23    Q    And the reason you realized this morning was
24         the previous attempt to introduce this document
25         through the testimony of Mr. York was
```

```
 1           reconsidered and sustained, wasn't it?
 2    A      That's correct, yes, sir.
 3    Q      Right.  Well, you've told us this isn't your
 4           first case?
 5    A      No, sir.
 6    Q      And you know there are competent ways of having
 7           an attorney expert present to go down this and
 8           do it without you having to do it, don't you?
 9    A      Yes, sir, I'm familiar with that.
10    Q      And you didn't rely on Mr. York as being a
11           lawyer, did you?
12    A      No, sir.  I believe Mr. York was a competent
13           witness to testify to that, but you were able
14           to elicit some testimony from him that
15           apparently changed the Court's mind.
16    Q      Yeah.  Your listing -- you didn't prepare this
17           document, document 15, did you?
18    A      No, sir, I did not.
19    Q      You're not the custodian, are you?
20    A      No, sir.  My secretary prepared that at my
21           request based on documents kept in my office.
22    Q      But you can't authenticate that she did it
23           correctly, can you?
24    A      Yes, sir, I believe she did.
25    Q      But the belief and knowing is two different
```

444

```
 1              things, isn't it?
 2   A    No, sir, I don't think so, not in this
 3        instance.
 4   Q    Your choice was to say believe, wasn't it?
 5   A    That's what I said, yes, sir.
 6   Q    Yeah.  You have not done any investigation that
 7        you can testify to under oath that you have
 8        identified each and every thing that's listed
 9        on these three pages as being done in this,
10        have you?
11   A    Yes, sir, I can.
12   Q    Okay.  And it was your choice to decide what
13        work would be done at $160 an hour or at $275
14        an hour, correct?
15   A    No, sir, not 275, 270.  But, yes, the answer to
16        your question is yes.  I made that decision.
17   Q    So if, in fact, you had wanted to, you could
18        billed out less.  You could have let your
19        associate do some of the things you were doing,
20        right?
21   A    Depending on how difficult or how involved the
22        work was, yes, sir, that's correct.  You
23        understand how that works.
24   Q    Yeah, I really do understand how that works.
25        As a matter of fact, you're not gonna try to
```

1      testify under oath that the same type of

2      competent, efficient legal work could not be

3      done by someone other than you for a

4      substantially less price, are you?

5  A   I don't know, sir. I know what I did and what

6      was necessary in my belief.

7  Q   You're testifying under oath you don't know

8      that a local lawyer would charge less and do

9      the same thing that you two have done? Is that

10     what you're testifying to?

11  A   No, sir, that's not what I'm saying.

12  Q   So there are reasonably competent attorneys

13     with more experience and more knowledge in this

14     county that could have done work for

15     substantially less than this bill, isn't it?

16  A   I don't know whether there are any other

17     attorneys that could or could not do this work

18     in this county. I can't answer that question.

19  Q   You ever associate attorneys in this county?

20  A   In Dale County? I -- yes, I've done that in

21     the past, not with my --

22  Q   And they don't charge you $270 an hour, do

23     they?

24  A   As I was going to say, not with my current

25     firm. In the past when I've engaged local

446

| | | |
|---|---|---|
| 1 | | attorneys in Dale County, we've had a different |
| 2 | | fee arrangement than an hourly rate. |
| 3 | Q | You decided what you would do, you decided what |
| 4 | | was gonna be charged. You don't consider |
| 5 | | yourself biased and prejudiced in this case? |
| 6 | A | Sir, all I'm testifying to -- |
| 7 | Q | I didn't ask that. Do you consider yourself to |
| 8 | | be a biased and prejudiced witness? |
| 9 | | MR. KNIGHT: Mr. Shirley, let him |
| 10 | | answer the question. |
| 11 | | THE COURT: Okay. I overrule your |
| 12 | | objection. Just answer the question. |
| 13 | A | What I'm saying, Mr. Shirley, is that I |
| 14 | | believe -- |
| 15 | Q | Excuse me, that is not what I asked you. This |
| 16 | | is cross-examination and you know it. |
| 17 | | MR. KNIGHT: Your Honor, he doesn't |
| 18 | | know what he's about to say. He's cutting |
| 19 | | him off three words into -- |
| 20 | | MR. SHIRLEY: That's right. |
| 21 | | THE COURT: Okay. I overrule |
| 22 | | your objection -- |
| 23 | | MR. SHIRLEY: Because it can be a |
| 24 | | negative -- |
| 25 | | (Both attorneys and witness were |

```
 1                        speaking at the same time.)
 2              THE COURT:  Hold it just a minute.
 3         Now, I'm overruling your objection.  Ask
 4         your question whether or not he believes
 5         he's biased or prejudiced, and you answer
 6         the question, please.
 7   BY MR. SHIRLEY:
 8   Q    Do you consider yourself a biased and
 9        prejudiced witness in this case, sir?
10   A    Under the facts that I'm testifying to about
11        this bill, no, sir, I do not.
12   Q    Well, it is an opinion, isn't it?
13   A    It is my opinion, correct.
14   Q    And I'm entitled to an opinion, am I not?
15   A    Absolutely.
16   Q    And the jury is entitled to an opinion, aren't
17        they?
18   A    Absolutely.
19   Q    And they can all -- all three of us can make a
20        different decision, can't we?
21   A    I would agree with that, yes, sir.
22   Q    Now, did you make any effort to contact someone
23        in Dale County that would charge less, to make
24        this bill less?
25   A    No, sir, I didn't do that.
```

```
 1    Q    Well, how can it be said to be reasonable?
 2    A    Because that's my opinion that it is.
 3    Q    And that's just an opinion, then, isn't it?
 4    A    Yes, sir, it is.
 5    Q    And I have an opinion it's not reasonable and
 6         my opinion is all right, isn't it?
 7    A    You can have your opinion.  We're all entitled
 8         to that, Mr. Shirley.
 9    Q    Thank you.  That's all I've got.
10              MR. MATTHEWS:  I don't have any
11         questions.
12              THE COURT:  Ladies and gentlemen,
13         before we leave this subject I want to
14         instruct you regarding the testimony of
15         the witness yesterday, Mr. York.  I
16         originally allowed his testimony regarding
17         the reasonableness of the attorneys fees
18         that had been charged.  After
19         cross-examination and hearing his
20         testimony at that time the Court has
21         decided to exclude that testimony, and I'm
22         going to direct that you not consider
23         Mr. York's testimony as to the
24         reasonableness of these attorneys fees.
25         Thank you.
```

1    MR. SMITH:  Thank you, Your Honor.

2    Your Honor, subject to confirming that all

3    of the exhibits that have been referred to

4    and have been admitted are, in fact, in

5    evidence, Regions rests.

6        THE COURT:  Okay.  Ladies and

7    gentlemen, there'll be some legal matters

8    that we'll need to take up at this time

9    outside of your presence and hearing, so

10    I'm going to excuse you to go back to the

11    jury room while we conduct this business.

12            (The jury left the courtroom.)

13        THE COURT:  Okay.  At this time I

14    will entertain any motions sought to be

15    heard.

16        MR. SHIRLEY:  Yes, sir, I do have

17    a -- thank you.

18            (Pause in the Proceedings.)

19        THE COURT:  All right, Mr. Shirley.

20        MR. SHIRLEY:  Your Honor, I think you

21    got the grasp of this case.  And what I

22    tried to do was to assert as a matter of

23    law the grounds by paragraph that under

24    the totality of the facts and application

25    with the law we have witnesses for Union

1    Planters/Regions, co-defendant Mr.
2    Williams acknowledging this was a theft;
3    that they would not -- they had no
4    evidence to say it was within the scope
5    arising out of the employment, and
6    admitted that -- Mr. York admitted that if
7    he was working and did this, it wouldn't
8    be in his job.  And he had no facts to
9    suggest that what Mr. Williams did was
10   anything but the same thing, theft,
11   stealing, a criminal act.  And that's, you
12   know, primarily the paragraphs that
13   address that issue as the ground for the
14   arising out of that would support any kind
15   of cause of action for the tort of
16   negligence or wantonness or any other
17   matter relating to a relationship that
18   would be a fraudulent, torturous,
19   fraudulent, negligent, wantonness,
20   negligent type of activity.  We would
21   respectfully state and submit that the
22   record is devoid of any evidence that
23   would suggest there's any kind of
24   negligent supervision, which is one of the
25   counts.

451

 1          And we would also submit to the Court

 2     that a cause of action as set forth in

 3     number 4 that relates to trover and

 4     conversion is insufficient to be

 5     maintained because primarily and generally

 6     money is not subject to trover and

 7     conversion as a matter of law.

 8          Secondly, the only time that it can

 9     be -- and I use this as an example because

10     this is not the only type of money that

11     could be trover or conversion applicable

12     or exist, but I think of it like this.

13     Somebody has $500 in gold coins, and they

14     are to be kept together.  And it is

15     collected and identified and set aside,

16     and you take that it would be trover.  But

17     the cases are replete that when the money

18     is to be commingled -- and there never was

19     any kind of misunderstanding or confusion

20     about it was going to be commingled and it

21     was going to be commingled in the deposits

22     of a bank Sunshine Camping company -- as a

23     matter of law there is no trover or

24     conversion.

25          And, you know, I think they speak for

452

themselves and they demonstrate to you --
the wording demonstrates to you matched
against the law and the evidence under the
negligence causes of action about
incompetence.

The evidence also demonstrated a
entrustment cause of action. And as a
matter of record for the record we
submit -- entrustment, we respectfully
submit to the Court it's not a recognized
cause of action on the end. You've gotta
have somebody that is entrusted with
something that is known to cause damage or
injury, like a shotgun, like a automobile,
like a automobile that's driven by someone
that's known to be an alcoholic having 10
or 12 DUI's. An entrustment cause of
action does not exist under the facts of
the law of this case.

We submit that there's no proof that
any activity that was authorized by the
plaintiff committed by Jon Williams that's
sued upon by the plaintiff under ground
number 15. I specifically address that
case to Your Honor because although it

1    doesn't concern a case involving a bank
2    and a recreational dealer, what it does
3    concern is where they tried to say that
4    something was in the scope of the
5    employment of an employee involving sexual
6    harassment, which matches up very
7    significantly to this. But they had no
8    proof before the acts were done that there
9    was any knowledge or notice -- any
10   knowledge or notice to the corporate
11   organization that this had occurred. And
12   in view of that, Mr. Williams said that he
13   acknowledged it was a scheme. He
14   acknowledged he sent all the documents up
15   there to them. He acknowledged that he
16   took the money, but that no one with
17   Sunshine Camping company knew anything
18   about it. An agent, a servant or employee
19   can't be giving notice to a corporation
20   when the foundation of their misconduct is
21   contrary to the interest of the
22   corporation or the principal that is
23   charged with the responsibility of the
24   employee. That is not notice by law to
25   the corporation.

454

1    I think Your Honor knows from

2    previous discussions the multiissues that

3    are alleged against the defendant Sunshine

4    Camping.  And as a matter of law I would

5    respectfully submit to the Court that

6    conspiracy can't occur.  Conspiracy can't

7    occur if you're alleging that the

8    conspirators are the people or person

9    that's the agent or employee and his

10   corporate principal because it's been said

11   time and again in here, you know, a

12   corporation can only act by its people

13   that are authorized.  And a conspiracy,

14   the only evidence of any conspiracy would

15   be with Jon Williams doing what he did

16   with a entity called Sunshine Camping

17   company.  And as a matter of law you can't

18   have conspiracy under those terms.

19        THE COURT:  Does that conclude your

20   argument?

21        MR. SHIRLEY:  Yes, sir, I think so.

22   And I could -- I think I may have skipped

23   over one, but I think you've read what I

24   said about the buy-sell agreement.

25        THE COURT:  Yeah.

1          MR. SHIRLEY: And I submit on that
2     written reply or position.
3          MR. KNIGHT: Your Honor, I think very
4     clearly this motion is due to be denied.
5     I guess the foundation of Mr. Shirley's
6     argument is that Jon Williams was outside
7     the line and scope of his employment. But
8     the evidence was very clear that Jon
9     Williams always had authority to assign
10    financing contracts. In fact, for a long
11    time Jon Williams was the sole person that
12    had the authority to assign financing
13    contracts to Regions. There were numerous
14    times that he did that. We saw some of
15    them were fraudulent, but he used that
16    position and that authority to submit
17    those contracts that were fraudulent to
18    get the money from Regions.
19         Mr. Shirley also speaks of its
20    criminal acts. There's two ways to defeat
21    the criminal acts, foreseeability
22    ratification. The evidence was clear from
23    Mr. Williams. He said, I was caught; I
24    was caught taking $15,000 from the
25    company. Agent Ward also said that's what

Comber Borland told him.  Comber Borland admitted he took money from the company. He says there's a dispute as to the amount of the money.  He says it was a little bit, but that's really irrelevant.  He was caught taking money from the company.  It was foreseeable that he would do it again. It was foreseeable that he would take money from other people.

There's also ratification.  All the money that Regions paid in this case went into the account -- or most of the money went into the account of Sunshine Camping Center.  Mr. Borland denies having knowledge, but this case is against Sunshine Camping Center.  That money coming to the account of the company ratifies Mr. Williams's acts of fraud.

As to Mr. Shirley's argument on the conversion claims, there's identifiable sums of money.  We showed, we put the checks up there.  We showed the checks. Each one of them going into the -- going to Sunshine Camping Center.  So they're very clearly identifiable sums.  That's

1    what you need for a conversion count.

2        As to the conspiracy, Mr. Shirley is

3    right to a certain extent if --

4        MR. SHIRLEY: Well, thank you.

5        MR. KNIGHT: You're welcome. You

6    can't have the conspiracy between the

7    corporation and the officer. However, if

8    the jury determines, as Mr. Shirley wants

9    them to, they're outside the line and

10    scope of the employment, then there can be

11    a conspiracy in this case between Mr.

12    Borland and -- excuse me, the company and

13    Mr. Williams, if he is acting outside the

14    line and scope of his employment. We

15    don't think he was, but the jury

16    determines that then our conspiracy count

17    is entitled to go to the jury.

18        I see the entrustment count, we'll

19    concede that. We've done some research,

20    and I think there we'll concede that the

21    conver -- I mean, the entrustment count

22    should -- the motion should be granted in

23    that regard. I believe that's all the --

24        THE COURT: Tell me again under what

25    circumstances the jury could find a

 1         conspiracy.

 2              MR. KNIGHT:  It's my understanding

 3         that if Mr. Williams is found to be acting

 4         outside the line and scope of his

 5         employment, then the role that Mr. Shirley

 6         cited about the company and the officer

 7         doesn't kick in.  In that case Mr.

 8         Williams will be opened up to conspire

 9         with whomever, Mr. Borland or the company.

10              THE COURT:  So a corporation could be

11         a partner in a conspiracy as long as it's

12         not with an officer of the corporation?

13              MR. KNIGHT:  That's my understanding.

14              THE COURT:  Okay.

15              MR. SHIRLEY:  I would just

16         respectfully -- I'm sorry, I didn't mean

17         to interrupt.

18              MR. KNIGHT:  No.

19              MR. SHIRLEY:  I thought you were.  If

20         I may start at the end of the complaint

21         and just make a few quick comments because

22         I do feel strongly about our position.

23         Wrongful entrustment is now out.  And then

24         the next issue is wrongful hiring,

25         training, and/or supervision.  And my

point here is -- that's count 8.  Count 9
is wrongful entrustment and I guess they
are withdrawing that.

MR. KNIGHT:  We certainly are not.
That's a very good count.  It's entitled
to go to the jury.  Evidence again, Mr.
Borland knew that Jon Williams had taken
money from the company.  Mr. Williams says
it's $15,000.  Agent Ward said Comber
Borland told him that he was embezzling
from the company.  Comber Borland told us
that he was taking money from the company;
says, Well, it wasn't that much.

MR. SMITH:  You mean Jon Williams?

MR. KNIGHT:  No.  Comber Borland told
us he was taking -- that Jon Williams was
taking money from the company; says, Well,
it wasn't that much.  Doesn't matter.  The
fact is he knew he was taking money,
unauthorized.  There's that testimony from
numerous people.  That count is clearly
entitled to go to the jury.

MR. SHIRLEY:  There is no testimony
it was being done at any time beforehand.
The earliest opportunity that anybody

1    could suggest what he is suggesting would
2    have to be sometime in February 2004.
3    That's the first time there's any conflict
4    in the evidence as to when someone would
5    have known.

6        There has been -- the term
7    "embezzlement" is not self-defining.  The
8    term "embezzlement" does not automatically
9    by substantial evidence bring in Union
10   Planters or Regions.  And the evidence is
11   that he said it was embezzlement.  He
12   never mentioned an amount.  He never
13   mentioned any circumstances.  He never
14   mentioned any affirmative acts or anything
15   of that nature.

16       And Mr. Borland took the stand.  And
17   on the proof that was offered in the
18   plaintiff's case, it is unrefuted that it
19   had nothing to do with these transactions
20   and that it was explained to where there
21   is no conflict in the evidence.  Ward's
22   testimony didn't make a conflict in what
23   the testimony of Mr. Borland was.  Ward
24   didn't make any conflict in the admission
25   clearly that I took all the money and I

never told Comber Borland about it.

MR. KNIGHT:  That's not the testimony.

MR. SHIRLEY:  It did not conflict with Mr. --

THE COURT:  York?

MR. SHIRLEY:  Yes.  His testimony that they on behalf of the plaintiffs didn't know anything.  So, you know, wrongful entrustment, entrustment, what did he entrust?  Where is the proof that i.e., for example, they gave him a shotgun?

THE COURT:  Well, now, that's out.

MR. KNIGHT:  That's out.

MR. SHIRLEY:  That's not what --

MR. KNIGHT:  And the reason why that is 'cause there has to be a chattel involved in that.  This is --

MR. SHIRLEY:  I'm sorry, I apologize.

MR. KNIGHT:  That's okay.

MR. SHIRLEY:  That's what I thought I said.  But let me go --

MR. KNIGHT:  Well --

MR. SHIRLEY:  Let me agree.

1               MR. KNIGHT:  Okay.

2               MR. SHIRLEY:  Now, we know that

3   number 9 is out.  We've agreed on that.

4               MR. KNIGHT:  Is that wrongful

5   entrustment?

6               MR. SHIRLEY:  That's right.

7               MR. KNIGHT:  Okay.  We agree.

8               MR. SHIRLEY:  Number 8 is what we're

9   now arguing, right?

10              MR. KNIGHT:  That's correct.

11              MR. SHIRLEY:  And that was my

12  confusion.  Okay?  And let me add this as

13  substantial evidence.  Where has anybody

14  took that stand and said that the way they

15  were doing business, that the way it was

16  done, whatever their securities were,

17  whatever their practices were, there has

18  not been any criticism, nor -- there's got

19  to be -- when we ride down the highway, we

20  are told that we can't go but so fast.

21  We're told by common law that we can't

22  misdrive because we have a duty.  You with

23  me?  Well, where's the duty that they had

24  an obligation to do business differently

25  about all the transactions?  I mean, the

1  breach, the negligence?  This is wrongful
2  supervision when a guy has a criminal
3  intent and a scheme outside the scope and
4  course of his employment?  And there's no
5  witness to say that you don't operate a
6  camping recreational facility like this
7  because it would be a breach of duty,
8  misconduct to do so.  How can the Court
9  declare that there's a question of fact?
10  How does the jury say, yeah, they drove
11  too fast?  Because there is no standard
12  that's been shown there has to be done in
13  a business like this.

The banking industry has the United
15  States Government, if it's a state bank
16  riding their coattails, and they tell them
17  what they gotta do, and that's pretty
18  easy.  But that's not the way it is with
19  Sunshine Camping in Level Plains, United
20  States of America.  That's the point I'm
21  trying to make.  That's what's missing in
22  this case.  In the wrongful hiring,
23  training, or supervision.

For example, the truth of the matter
25  is that Mr. York said the guides and

1    principles were that Union Planters is

2    supposed to train the dealer.  And there

3    ain't no evidence that anybody from Union

4    Planters ever did a thing to train

5    anybody.

6         MR. KNIGHT:  Your Honor, it was all

7    based on foreseeability.  We have

8    testimony from three different people that

9    Comber Borland knew that Mr. Williams had

10   taken some amounts of money from the

11   company prior to each one of those loans

12   being entered into or Regions paying out

13   on each one of those fraudulent loans.

14   It's foreseeable that it would happen

15   again.  It was foreseeable he would take

16   from the company, which there's testimony

17   that he did.  And it was foreseeable that

18   he would take from other people.  It's a

19   question of fact for the jury.

20        THE COURT:  The motion is going to be

21   denied as to all matters except for the

22   negligent entrustment.  That would be

23   granted as to that count.

24        MR. SHIRLEY:  I just wanted to say

25   one little small thing if I might.

1    THE COURT: All right, sir.

2    MR. SHIRLEY: You see, paragraph 4 of

3    the complaint says that Jon Williams at

4    all times was the president of the

5    corporation and at all times pertinent and

6    that's incorporated in the conspiracy

7    count. They don't allege, they don't

8    allege this conspiracy. I don't believe

9    that's a correct statement of the law what

10   he said that you can charge Jon Williams

11   and Union Planters with conspiracy, and if

12   the jury decides that he really was

13   outside the scope of his employment that

14   you have a valid conspiracy action. I

15   don't believe you can do that because of

16   what the law says about the peculiarity of

17   a corporation can't conspire with itself.

18   Secondly, that ain't what's alleged

19   against them. They're not alleging that.

20   They're saying that he was an officer,

21   agent. And that's the point that I'm

22   trying to make about the conspiracy. I

23   think that it's dead on arrival so to

24   speak for that reason.

25   THE COURT: I may change my decision

1    on that, but I'll take a look at it.

2    Okay.

3         MR. SHIRLEY:  I need two or three

4    minutes to see where we're going, to see

5    if we can get through.

6         THE COURT:  All right.

7              (Break in the proceedings.)

8              (The jury entered the

9              courtroom.)

10        THE COURT:  All right.  You may

11   proceed, Mr. Shirley.  The plaintiff has

12   rested and now the defendant is going to

13   present.

14        MR. SHIRLEY:  At this time the

15   defendant calls James Channell by

16   deposition.  Mr. Channell was deposed on

17   August 4, 2005, in Jackson, Mississippi,

18   which I think the Court would take

19   judicial knowledge is more than a

20   150 miles away from here.

21        MR. SMITH:  We'll stipulate to that,

22   Your Honor.

23        MR. SHIRLEY:  And Mr. Channell as the

24   testimony has developed, is called as an

25   adverse witness due to his

1      responsibilities with Regions.

2           THE COURT:  And I'll just instruct

3      the jury that you should give this

4      evidence the same weight that you would

5      give to testimony that was offered live

6      from the witness stand by a witness.

7           MR. SHIRLEY:  Ask you go to page 6

8      line 15.  And by way of explanation, I

9      didn't show you, but you see the pages

10     start and jump over here to the left.

11     Sometimes the depositions are set up --

12          MR. MATTHEWS:  I'm not Mr. Channell,

13     by the way.

14          MR. SHIRLEY:  Right.

15               (The following was being read

16                from the deposition testimony

17                of James M. Channell, Jr., by

18                Mr. Matthews and Mr. Shirley.)

19  BY MR. SHIRLEY:

20  Q    State your full name for the record, please.

21  A    James M. Channell, Jr.

22  Q    Mr. Channell, how are you currently employed?

23  A    I am a fraud investigator.

24  Q    Who is your employer?

25  A    Union Planters Bank, Regions Bank.

1   Q   How long have you held that position?

2   A   January of '02.

3   Q   And just a bit of basic background, where did

4      you grow up?

5   A   Hazelhurst, Mississippi.

6   Q   Did you graduate from high school there?

7   A   Yes.

8   Q   What year was that?

9   A   Eighty-seven.

10   Q   Did you go on to college after graduating from

11      high school?

12   A   Yes.

13   Q   Where was that at?

14   A   Southern Mississippi.

15   Q   Did you graduate from the University of

16      Southern Mississippi?

17   A   Yes.

18   Q   And what was your degree?

19   A   Criminal justice.

20   Q   And what year did you graduate?

21   A   Ninety-one.

22   Q   And after you graduated from college what did

23      you do full time for employment?

24   A   Went to work for the State tax commission,

25      special agent.

1   Q   And how long did you do that?

2   A   Until roughly 1998, I believe.

3   Q   And what caused the change at that time?

4   A   I went to work for the attorney general's

5       office.

6   Q   And how long did you work for the attorney

7       general's office?

8   A   Until I came here.

9   Q   So from 1998 through 2002?

10  A   Correct, 1988 (sic) or 1999, I can't remember

11      exactly.

12  Q   I'm going to assume with a background in law

13      enforcement you've never been arrested or

14      convicted of any crimes, have you?

15  A   Not that I'm aware of.

16  Q   Now in 2002 what were you hired by Union

17      Planters to do?

18  A   Fraud investigations.

19  Q   And if you would, tell me what that's comprised

20      of and what you do in relation to your

21      employment.

22  A   What I do is I'm responsible also security --

23      for the physical security of the branches, the

24      safe work environment, any -- basically any

25      criminal attempts or criminal acts made against

470

```
 1           the bank and also internal investigations.
 2     Q     Now, the aspect we would be talking about a lot
 3           today is about fraud issues.  Tell me what your
 4           responsibilities in relation to -- and I assume
 5           you're talking about fraud against the bank --
 6     A     Right.
 7     Q     -- either by employees or customers or
 8           outsiders.  Tell me about what your
 9           responsibilities are and what you do in
10           relation to that.
11     A     Well, you got to determine if there is fraud.
12           And if there is fraud when you work the
13           investigation, then give it to the authorities.
14     Q     Tell --
15                 MR. SHIRLEY:  Excuse me, page 10,
16              skipping to page 10, line 9.
17                      (Continued reading.)
18     BY MR. SHIRLEY:
19     Q     Tell me when you first became aware of concerns
20           relating to Mr. McAllister's loan with Union
21           Planters.
22     A     J.L. (sic) Ward of the Alabama Bureau of
23           Investigations contacted me in February and
24           stated there could be some problems with some
25           loans.
```

```
1    Q    And J.L. Ward was employed with whom?

2    A    Alabama Bureau of Investigations.

3    Q    And that would have been in February 2004?

4    A    Correct.

5    Q    What did Mr. Ward tell you at that time?

6    A    He said he was working -- if I'm not mistaken

7         he was possibly working the title fraud, and he

8         said he had run across a title involving loans

9         with Union Planters.

10   Q    And did he tell you at that time who this is

11        from?

12            MR. SHIRLEY:  I'm sorry.  What I was

13        trying to tell you to be careful of, I

14        didn't do.  So let me start over, line 25

15        of page 10.

16            (Continued reading.)

17   BY MR. SHIRLEY:

18   Q    Did he tell you at the time who this particular

19        fraud involved or who he suspected it involved

20        at the time?

21   A    On the titles, yes, Jon Williams.

22   Q    And who is Jon Williams?

23   A    Jon Williams is -- was, if I'm not mistaken,

24        president of Sunshine Camper.

25   Q    And to your knowledge what have you found out,
```

1           what is Sunshine Center, Inc.?

2     A     Sells campers.

3     Q     You understand that they're a retail

4           recreational vehicle sales outlet or dealer; is

5           that correct?

6     A     I understand they sell campers.  I don't know

7           exactly what they sell, but they sell campers.

8     Q     Now, in response to Mr. Ward's contact what, if

9           anything, did you do?

10    A     Upon his contact I contacted Dale York.

11    Q     And tell me for the record who is Dale York?

12    A     He is, from my understanding, he's over the

13          indirect loans in Paducah, Kentucky, I guess.

14          Paducah is in Kentucky.

15    Q     And what was the basis of your inquiry to

16          Mr. York?  What were you asking or trying to

17          find out from him?

18    A     I told him I needed the loan packages.

19    Q     And what loan packages did you order?

20    A     The ones that J.L. Ward, the names he gave me.

21              MR. SHIRLEY:  Okay.  Let's skip over.

22          And be sure that I am telling you right.

23          I highlighted your copy to help me.  Page

24          19, line 2, is that the next highlighted

25          segment?

1           MR. MATTHEWS:  Yeah.

2                  (Continued reading.)

3    BY MR. SHIRLEY:

4    Q    Now, as you worked specifically on Mr.

5         McAllister's loan package what, if any, of

6         those things did you do and what are the

7         results of those examinations?

8    A    Well, the address did not belong to him -- if I

9         remember correctly -- the phone numbers did not

10        belong to him, and the payments were in the

11        form of money order.  And if I remember

12        correctly, those payments were also made at the

13        same -- not every time, but I do remember

14        looking at one.  They were -- those payments

15        would come in at the same time.  As for example

16        McAllister, Peters, and Lawson would all come

17        in at the same time.

18              MR. SHIRLEY:  Okay.  And moving to

19           page 18, line 11.

20                  (Continued reading.)

21   Q    Let's talk about some things as a --

22              MR. SHIRLEY:  And that is a

23           highlighted, isn't it?

24                  (Continued reading.)

25   BY MR. SHIRLEY:

```
 1   Q    -- fraud investigator when you're looking at a
 2        loan, tell me what you're looking for when you
 3        suspect a fraudulent loan.  What are the things
 4        that are red flags or concerns for you as you
 5        look at a loan package and determine whether or
 6        not there may be fraud involved in that loan?
 7   A    You try to verify as much information as you
 8        can.  Of course I'm doing it 20/20.  I mean,
 9        hindsight's 20/20.  I'm doing it after the fact
10        to try to verify addresses, try to verify
11        signatures if you can.  We had no signatures in
12        that.  Look at the source of the payments,
13        where they're coming from, look at the phone
14        numbers, look at any information that we may
15        have in a loan package.  You try to verify all
16        that just by a step-by-step basis.
17             MR. SHIRLEY:  And have we already
18             read that part?
19             MR. MATTHEWS:  Yeah.
20             MR. SHIRLEY:  Okay.  Let me ask you
21             to look at page 36, line 7.  That is the
22             next one.
23                  (Continued reading.)
24   BY MR. SHIRLEY:
25   Q    When you determined that this was a fraud in
```

1    March of 2004, just to clarify, I may have

2    already asked you, but did you notify both the

3    collections and Mr. York that this was a

4    fraudulent loan as soon as you knew or

5    understood that in March of 2004?

6  A  I notified Mr. York and my supervisor.

7      MR. SHIRLEY:  And help me.  Is the

8     next highlighted page 49?

9      MR. SMITH:  Page 49, Mr. Shirley?

10     MR. SHIRLEY:  Yeah.

11     MR. MATTHEWS:  Yeah.

12     MR. SMITH:  Thank you.

13     MR. SHIRLEY:  Line 19.

14     MR. MATTHEWS:  Yeah.

15      (Continued reading.)

16 BY MR. SHIRLEY:

17  Q  Are you testifying that you knew when Robert

18    McAllister's payment cards or coupons were sent

19    out to the address that Union Planters had,

20    this notification came back?  You understand

21    what happened?

22  A  I didn't know that.

23  Q  Well, if you wanted to verify that how would

24    you go about doing that?

25  A  I would contact Dale York.  Now, whether he's

```
 1              the right person I don't know.
 2    Q    You said that you received information payments
 3         were made to Planters with a money order that
 4         covered payment for McAllister, Peters, and
 5         Lawson.  It was tied together, did I say that
 6         right?
 7    A    No, sir.
 8    Q    Well, clarify.
 9    A    It was multiple money orders.
10    Q    But how do you know it was paid by money
11         orders?
12    A    Because I looked at the image of it.
13    Q    Meaning what?  I know you understand what
14         you're talking about, but I don't work at Union
15         Planters.  You looked on a computer?
16    A    Just like anybody sends -- all payments are
17         imaged if they come in in paper form, check,
18         payment coupon, and you got the payment coupon,
19         and then following that you got the source of
20         the payment.
21    Q    And you have a printout that's in your file
22         concerning this matter or just saw that on the
23         computer is what I'm trying to ask you?
24    A    Yes.  You pull it up on a computer and then you
25         print it out.
```

```
 1    Q    And did you, in fact, print it out for your
 2         file?  That's what I'm asking about.
 3    A    Yes, sir.
 4                   MR. SHIRLEY:  Okay.  And go with me.
 5              I think the next page would be 62.
 6                   MR. MATTHEWS:  Okay.
 7                      (Continued reading.)
 8    BY MR. SHIRLEY:
 9    Q    Is there anyone in the security department that
10         knows more about the matters involved in Jon
11         Williams and Robert McAllister or Mr. Lawson or
12         Ms. Peters -- and that other name is under a
13         motion in limine.
14    A    Not to my knowledge.
15    Q    Have you interacted with Hubert Lawson?
16    A    We had a phone conversation.
17    Q    And what was it about?
18    A    About the loan.  I don't know if it was Hubert
19         Lawson, III, or not, but interacted with Bert
20         Lawson.
21    Q    You don't know if Bert Lawson is the same one
22         as Hubert Lawson, III?
23    A    Should be.  He said he was.
24    Q    And what did he explain to you --
25                   MR. SMITH:  Your Honor, we object,
```

```
 1                    that would be hearsay.  Mr. Lawson is a
 2                    resident of the state of Alabama.  We
 3                    believe we've previously subpoenaed him.
 4                    And what Mr. Lawson may have said to
 5                    Mr. Channell is very clearly hearsay.
 6                         THE COURT:  I sustain that objection.
 7                         MR. SHIRLEY:  Well, the reason that
 8                    it's offered is because it is relating to
 9                    the investigation, and it is knowledge
10                    that comes from their security officer.
11                    That was the purpose in offering it.
12                         THE COURT:  Just to show his
13                    knowledge?
14                         MR. SHIRLEY:  To show his knowledge,
15                    what he learned about it, and what, if
16                    anything, he did about it.
17                         THE COURT:  I'll overrule the
18                    objection.
19                         (Continued reading.)
20     A    That I believe Jon Williams was his former --
21          there's some kind of relation there,
22          brother-in-law, something to that effect.
23     Q    And Dorothy Peters, did you interact with her?
24     A    Never was able to reach her, no, sir.
25                         MR. SHIRLEY:  And look at -- check
```

```
1              and see if page 66 --
2                    MR. MATTHEWS:  No.
3                    MR. SHIRLEY:  I'm sorry?
4                    MR. MATTHEWS:  Sixty-seven?
5                    MR. SHIRLEY:  Yeah.  Page 67, line
6          18.
7                    (Continued reading.)
8      BY MR. SHIRLEY:
9      Q    And when you say the chargeoffs, that means
10          that you have written this e-mail relative to
11          Mr. Lawson, Dorothy Peters, Mr. McAllister.
12          And you've asked that the loans and the loan
13          numbers and the accounts to be charged off with
14          a zero balance.
15     A    Correct, to a criminal loss.
16     Q    And do you know if that was, in fact, done?
17     A    Yes, sir.
18     Q    And if I understand this form, when you start
19          your investigation it would be your
20          responsibility to apprise someone like Ms. Cane
21          whether or not to charge off the indebtedness
22          or not?
23     A    If it's criminally related, yes, sir.
24                    MR. SHIRLEY:  That's all I have.
25                    THE COURT:  All right.
```

1        MR. SMITH:  We have nothing to offer

2    from that deposition, Your Honor.

3        MR. SHIRLEY:  Thank you,

4    Mr. Matthews.

5        MR. MATTHEWS:  You're welcome.

6        MR. SHIRLEY:  No further evidence on

7    behalf of Sunshine.  And we rest, Your

8    Honor.

9        MR. MATTHEWS:  We rest, Judge.

10        MR. SMITH:  We have no rebuttal, Your

11    Honor.

12        THE COURT:  All right, sir.  What we

13    will have remaining when we return will be

14    the closing arguments by the attorneys and

15    then the Court's instructions to you.

16    There's some work that needs to be done

17    before we can get to that point.  And I'm

18    just estimating it will probably take

19    about two hours to get there.  So rather

20    than have you come in early and wait

21    around, I'm going to excuse you at this

22    time to be back at 1:45 in the jury room.

23    Now, the attorneys I would like to be back

24    at 1:15.  And we'll take care of the

25    business that we have, and then we'll try

```
 1              to begin with our closing arguments about
 2              1:45.  So with that I'll excuse the jury
 3              to leave and be back in the jury room at
 4              1:45.  Thank you.
 5                        (The jury left the courtroom.)
 6              THE COURT:  Okay.  This is a renewal
 7              of your motion?
 8              MR. SHIRLEY:  Yes.
 9              MR. MATTHEWS:  Judge, I may not be
10              back by 1:15 but by all means go ahead and
11              have the charge conference.
12              MR. SHIRLEY:  At this time, Your
13              Honor, we do resubmit our motion for
14              judgment as a matter of law at the close
15              of all the evidence, and restate all of
16              our grounds to the Court, all of our
17              previous arguments.  And again
18              respectfully submit that that conspiracy
19              case should go out, that as well as the
20              others, but most assuredly that one.
21              MR. SMITH:  We readopt all our
22              arguments previously made.
23              THE COURT:  Okay.  I'll give you a
24              ruling on your motion when we get back.
25              MR. SMITH:  Thank you.
```

```
1              (Break in the Proceedings.)
2         THE COURT:  Y'all want to review
3    these jury charges?  First of all, I'll
4    announce that on the motion of Sunshine
5    Camping as a judgment as a matter of law,
6    it will be denied with the exception that
7    the Court is going to grant it as to the
8    count for negligent entrustment and
9    conspiracy.  I'm gonna grant it as to
10   conspiracy as well.
11            CHARGE CONFERENCE
12        THE COURT:  So with that we'll look
13   at the plaintiff's proposed charges.  I've
14   glanced through those that have been
15   requested by both parties.  And there are
16   some duplications, and we'll get to those
17   in the defendant's requested charges.
18   First of all as to charge number 1 --
19        MR. SMITH:  Your Honor, these are of
20   the plaintiff's charges, plaintiff's
21   requested?
22        THE COURT:  Yes, sir.
23        MR. SMITH:  Okay.  Thank you.
24        MR. SHIRLEY:  And, Judge, I didn't
25   notice until I started reviewing, but mine
```

1          should just be numbered chronologically, I
2          left the number off, when you get to them.
3               THE COURT:  That's not a problem.  We
4          can --
5               MR. SHIRLEY:  If you'll just identify
6          them as number 1 through whatever they are
7          as we go along.
8               THE COURT:  I guess the best way to
9          address this is just, Mr. Shirley, if you
10         have an objection to the proposed charge,
11         you state your objection and I'll make a
12         decision unless --
13              MR. SHIRLEY:  All right.
14              THE COURT:  -- my inclination is not
15         to give it, and then I'll just announce
16         that.  And then, Mr. Smith, you and
17         Mr. Knight can address it.
18              MR. SHIRLEY:  Let me ask you -- not
19         ever trying a case, a jury case, with
20         you -- I know like number 1 it shows it's
21         the Alabama pattern jury instruction.  And
22         if, in fact, that jury instruction was
23         given, you know, in the general charges by
24         the Court, then, you know, I would object
25         to it being given the second time.

```
 1            THE COURT:  Yeah, I won't do that.
 2            MR. SHIRLEY:  Okay.
 3            THE COURT:  After having reviewed the
 4       requested charges, I believe that they
 5       adequately cover all the required charges
 6       unless y'all have a request for an
 7       additional charge.  Now, I do have some
 8       introductory charges, but they don't go to
 9       the specific causes of action.
10            MR. SHIRLEY:  We don't object to
11       number 1.
12            THE COURT:  Okay.  Number 1 will be
13       given.
14            MR. SHIRLEY:  And number 2 we object.
15            THE COURT:  You do object?
16            MR. SHIRLEY:  Yes, sir, because
17       although it might be -- notice it says
18       modified.  I would submit to the Court
19       that it's inadequate because it doesn't
20       have the qualifying language to associate,
21       you know, what is enumerated that's
22       supposed to be found under the facts which
23       have been presented in this case.
24            MR. SMITH:  Our response, Your Honor,
25       would be we'd be satisfied for the Court
```

1        to give pattern charge 3.06 as it exists

2        in the book.

3              THE COURT:  Okay.  Well, that charge

4        is different than the one you requested.

5        Well, let me see.  Let me check the

6        update, I guess, before I make that

7        statement.

8              MR. SMITH:  I'll tell you what.  Let

9        me -- I need to get the book.  I've got my

10       book here.

11             THE COURT:  Oh, I see.  Okay.  Yeah.

12             MR. SMITH:  Your Honor, the only

13       reason -- the material change is the

14       wrongful acts or omissions.  We have both

15       negligent and wanton counts in this

16       complaint and that was the purpose of the

17       modification.  But, Your Honor, we don't

18       have an objection to pattern charge 3.06

19       being given with negligent acts or

20       omissions of his agent done within the

21       scope of his employment.  That's what the

22       pattern says.

23             THE COURT:  All right.  Any objection

24       to that?

25             MR. SHIRLEY:  No, sir.

1          THE COURT:  All right.  I'm just
2     gonna modify, then.  Where it says
3     wrongful, I'm gonna insert negligent.
4     Okay.  Number 3.
5          MR. SHIRLEY:  I don't believe that
6     it's a proper charge.  Ostensible
7     authority or apparent authority as
8     interpreted there applies to the
9     substantial evidence in this case.
10         MR. SMITH:  Your Honor, our reason
11    for requesting that charge has to do with
12    the fact that from November/December of
13    '02 up until January of '04, Sunshine
14    never notified the bank that there was
15    any -- that Mr. Williams was no longer
16    authorized to assign contracts.
17         THE COURT:  Court will give that
18    charge.
19         MR. SHIRLEY:  Judge, the point I'm
20    trying to make is he just said that was an
21    omission.  And this says by acts.  Doesn't
22    say anything about omissions or failing to
23    do something.  It says definitive
24    evidence.  Ostensible authority, apparent
25    authority is a peculiar animal of agency

1  law.  And he says that what the -- what
2  they're trying to say by their facts is
3  that when you didn't tell them what went
4  on, that that's supposed to be evidence
5  of apparent authority.  Well, negative
6  conduct or no conduct or omission is not
7  something that can be apparent authority.
8      MR. SMITH:  Then, Your Honor, to
9  clear up any confusion Mr. Shirley may
10  have, they, Sunshine, provided the
11  document -- I can't recall the number,
12  it's out of Plaintiff's Exhibit 1 -- that
13  says these individuals are authorized to
14  assign contracts on behalf of Sunshine.
15  The Court will recall both Mr. Williams
16  and Mr. Borland were on that document.
17      THE COURT:  You know, I would be
18  willing to modify it by saying his acts,
19  omissions, words, or conduct reasonably
20  interpreted if that --
21      MR. SMITH:  That's acceptable to us.
22      THE COURT:  I'm gonna give the
23  charge.  I just think it's applicable in
24  this case.  All right.  Number 4, I think
25  it's just the standard --

1    MR. SHIRLEY: Yes.

2    THE COURT: -- pattern charge breach

3    of contract. Any objection?

4    MR. SHIRLEY: No, sir.

5    THE COURT: Pattern 5 is the -- or

6    charge 5 is, I believe, the standard

7    charge for negligence, definition of

8    negligence. Any objection?

9    MR. SHIRLEY: No, sir.

10    THE COURT: Number 6, joint

11    liability, joint several liability.

12    MR. SHIRLEY: Well, that's an

13    apparent clear statement of the law, but

14    it's vague and insufficient as to this

15    case.

16    THE COURT: I would like to hear how

17    this applies in this case, Mr. Smith.

18    MR. SMITH: Your Honor, there is an

19    argument from the defendant Sunshine that

20    Mr. Williams acted outside the scope of

21    his authority. I think the evidence is

22    clear whether Mr. Williams acted outside

23    or within the scope of his authority with

24    Sunshine, he committed negligent acts. If

25    he was, in fact, outside the scope of his

1     authority, then the claims on which we're

2     trying to predicate respondeat superior

3     liability on Sunshine would apply;

4     however, on the negligent hiring,

5     training, and supervision you've got their

6     negligent hiring, training, and

7     supervision -- that is Sunshine -- going

8     along with Mr. Williams's wrongful

9     negligent acts in creating these

10    fraudulent contracts.  They're jointly and

11    severally liable for those acts because

12    their -- because the proximate result of

13    that negligence are the damages to our

14    client.  Now, obviously we believe that

15    under the evidence the jury could find

16    that these acts were committed within the

17    line and scope of employment.  But I think

18    also under the evidence the jury could

19    find they weren't committed within the

20    line and scope of the employment.  But

21    because of the wrongful hiring, training,

22    and supervision count they can -- both

23    Sunshine and Mr. Williams can be jointly

24    and severally liable for the damages

25    caused to the bank.

1    THE COURT:  I believe -- because of

2    the facts of this case and the issue that

3    we have about the corporation's liability

4    for the actions of Mr. Williams and the

5    fact that the jury could find that it

6    either is liable or is not liable, I

7    believe this charge could be confusing and

8    I'm going to refuse to give it.

9    MR. SHIRLEY:  And, Your Honor, I'm

10   sorry but the --

11   THE COURT:  I'm gonna refuse number

12   6.

13   MR. SHIRLEY:  Thank you.  Insofar as

14   number 7 is concerned, we would just

15   submit that there's insufficient evidence

16   to substantiate wantonness.  Appears to be

17   the pattern jury instruction.

18   THE COURT:  I'm going to give that

19   charge.

20   MR. SHIRLEY:  And same objection to

21   number 8.

22   THE COURT:  That charge will be

23   given, also.

24   MR. SHIRLEY:  Charge number 9, we

25   object to it on the grounds that it's

confusing.  We object to it on the grounds
that it is being read from the judge.
There is no alternative provision in this.
There is no basis saying if, in fact, you
find by the substantial evidence thus and
so, et cetera, et cetera, then -- the form
is confusing.  It's lengthy.  It's wordy.
And I think it's overly suggestive as
being a charge of hypothesis.  Meaning,
when you read this it's going to suggest
that the jury is supposed to find that
fraud has occurred when we submit that is
not been established as a matter of law
and fact.

    MR. SMITH:  And, Your Honor, our
response would be this is pattern charge
18.00.  And it says at the end of the
first paragraph pattern charge, the fraud
charge in the plaintiff's complaint, is --
and it puts in brackets here referred to
the charges in the complaint and closes
the bracket.  And all we have done in
preparing is as the pattern jury charge
suggests, include the misrepresentations
and suppressions we assert in our

1   complaint.

2       THE COURT:  And then I note that that

3   charge is followed up with the various

4   definitions of willful, and I believe

5   mistaken -- or reckless and then mistaken

6   fraud.

7       MR. SMITH:  Yes, sir, that's correct.

8       THE COURT:  Okay.  Court will give

9   charge number 9.  Objection to 10?

10      MR. SHIRLEY:  I'm sorry, I thought

11  you said that you would give that and the

12  ones that followed.

13      THE COURT:  It is my intention to do

14  that, I just would give you an

15  opportunity --

16      MR. SHIRLEY:  We would -- just for

17  the record we would object.  That would go

18  through --

19      THE COURT:  Yeah.

20      MR. SHIRLEY:  -- 13?

21      THE COURT:  Yeah.  I'll be giving 10,

22  11, 12, and 13, yeah.

23      MR. SHIRLEY:  Number 14 we object on

24  the grounds that there is no evidence to

25  support the charging of that, because as a

1    matter of law there is not conversion, as

2    we addressed earlier.

3         THE COURT:  Court's going to give

4    that charge.  Number 15 will be given.

5    Court will give number 16.

6         MR. SHIRLEY:  We would object to 17

7    as being vague and incomplete.  And it

8    also being overly suggestive that there is

9    something when the question is has the

10   plaintiff proven by the substantial

11   evidence and is the jury able to find from

12   consideration of all the substantial

13   evidence whether or not thus and so.  It's

14   not a pattern jury instruction.  It's an

15   abstracted statement of the law.

16        MR. SMITH:  Your Honor, we would say

17   that there is no pattern jury instruction

18   that applies to our wrongful hiring and

19   training supervision count we've been able

20   to find.  This was taken from the Voyager

21   case where the Court stated the law with

22   regard to wrongful hiring, training, and

23   supervision.  Your Honor, if the Court

24   wants to insert, as Mr. Shirley has

25   suggested, something that it's the

494

1    plaintiff's obligation to produce or to

2    satisfy these elements by substantial

3    evidence, we understand that.  But we

4    believe this is a correct statement of the

5    law and given the wrongful hiring,

6    training, and supervision count that it's

7    appropriate to be given.

8        THE COURT:  Where it says liability

9    depends upon its being established by

10   substantial evidence, that such

11   incompetence was actually known, et

12   cetera, I will modify it to read in that

13   fashion, substantial evidence by the

14   plaintiff.  And number 18 will be refused.

15   Nineteen will be given.  Twenty will be

16   given.  Twenty-one will be given.

17   Twenty-two will be given.

18       MR. SHIRLEY:  We would object to

19   that, Your Honor.  We respectfully submit

20   that the previous charges that were given

21   adequately qualify what the damages are.

22   And to give this language and read this

23   language to the jury would be suggestive

24   that the Court has directed that they must

25   find under the allegations and argument of

1     the plaintiff and plaintiff counsel that

2     this is to be done, this is another one of

3     those hypothesis.

4          THE COURT:  You talking about 22?

5          MR. SHIRLEY:  Well, 23.

6          THE COURT:  You're referring to 23?

7          MR. SHIRLEY:  Yes, sir, I thought you

8     said you were giving 22.

9          THE COURT:  I did.

10         MR. SHIRLEY:  And remember I've got

11    this vent over my ears --

12         THE COURT:  Yeah.

13         MR. SHIRLEY:  -- and I apologize.

14         THE COURT:  Court will give 23.

15         MR. SHIRLEY:  I'm sorry?

16         THE COURT:  I will give 23.  We'll

17    review the verdict form that was attached

18    in just a minute.  Let's look at the

19    defendant's requested charges.

20         MR. SHIRLEY:  Are you gonna state

21    that these are charges from the parties or

22    these the charges --

23         THE COURT:  I normally don't say

24    anything about that.

25         MR. SHIRLEY:  That's what I wondered.

496

1    THE COURT:  Okay.  What will be

2    number 1, wantonness definition --

3    MR. SMITH:  I think that's already

4    covered, Your Honor.

5    THE COURT:  That's what I was

6    thinking.  We agree that that's already

7    been given by pattern charge, so I'm going

8    to deny that.

9    MR. SMITH:  As to number 2, duty owed

10   negligence and ordinary care, Your Honor,

11   that is a charge from the pattern.  And I

12   know the pattern has a very similar

13   charge.  We have no objection to that one

14   being given as long as it's a pattern

15   charge.

16   THE COURT:  All right.  Number 2 will

17   be given.  I think we have adequately

18   covered punitive damages.

19   MR. SHIRLEY:  That's Number 4?

20   THE COURT:  Number 3.

21   MR. SMITH:  Three.

22   MR. SHIRLEY:  Oh, okay.

23   THE COURT:  So I'm going to deny

24   defendant's requested charge number 3.

25   Number 4 on speculation, I would propose

1   to grant that charge.

2          MR. SMITH:  Again, we have no

3   objection as long as that's a pattern

4   charge, Your Honor.

5          MR. SHIRLEY:  And forgive me but you

6   are giving that?

7          THE COURT:  Yes.

8          MR. SHIRLEY:  Okay.  I'm sorry.

9          THE COURT:  I understand.  I don't

10  know if it's a pattern charge or not.

11         MR. SHIRLEY:  I believe it is.  We'll

12  look it up.

13         THE COURT:  I think it may be, too.

14         MR. SMITH:  We'd say that there's a

15  pattern charge on speculation very similar

16  to that, Your Honor, and as long as it's a

17  pattern charge we understand.  But if it's

18  not a pattern charge we do object.

19         MR. SHIRLEY:  Eleven twenty-two is a

20  pattern jury instruction.  I believe

21  that's where it came from.  I asked

22  somebody that helped me prepare this just

23  to go by that number and it appears to be

24  the same thing.  Eleven twenty-two.

25         THE COURT:  Okay.  Yeah.

1        MR. SMITH:  Okay.

2        THE COURT:  Number 5, jury is the

3 judge of the facts.

4        MR. SHIRLEY:  I believe that's a

5 pattern jury instruction as well.

6        THE COURT:  And I've already given

7 that in my opening charge as well so I'm

8 going to grant that.  I'll grant number 6.

9 Propose to grant number 7.

10       MR. SMITH:  Your Honor, I believe

11 that's a pattern charge.  And so long as

12 it is a pattern charge I don't have any

13 objection to it.

14       THE COURT:  All right, sir.  Number 8

15 is a standard charge that the Court gives.

16 I will give it.  I believe it may be

17 included in my general charge.  So I will

18 give it.

19       MR. SHIRLEY:  Number 9 was -- is a

20 jury charge associated with jury verdict,

21 I guess.

22       THE COURT:  Is there any objection to

23 9?

24       MR. SMITH:  Without knowing, Your

25 Honor, what the plaintiff's verdict form

1   might look like, it's difficult for me to
2   frame an objection one way or the other.
3   And I would request the Court just pass on
4   ruling on this one until we discuss later
5   on what the verdict form might look like.
6       THE COURT:  All right.  Okay.  Number
7   10?
8       MR. SMITH:  We do object to that,
9   Your Honor.  That is not a pattern charge.
10  I do not believe that is a correct
11  statement of the law.  I think what the
12  law says, that any ambiguous provisions in
13  the dealer agreement or contract might be
14  resolved against Regions, but that's not
15  what it says.  Says the language used in
16  the dealer agreement is claimed by the
17  plaintiff Regions and is to be construed
18  favorably to the nonmaker defendant
19  Sunshine.  I don't believe that's a
20  correct statement of the law, nor do I
21  believe that the second paragraph this
22  dealer agreement will be construed
23  strictly against the plaintiff and
24  liberally in favor of defendant Sunshine,
25  I don't believe that's a correct statement

1    of law.

2        Third paragraph talking about

3    ambiguous provisions, that may be a

4    correct statement of the law.  But again,

5    this is not a pattern charge.  And to the

6    extent that there is a pattern charge

7    dealing with ambiguous contracts, then we

8    believe that's the appropriate one to

9    give.  Going further, we don't believe any

10    of these contracts are in anyway

11    ambiguous.  I mean, I think they're very

12    clear and very fine.  Because of that I

13    don't believe it's proper for this charge

14    to be given.

15        MR. SHIRLEY:  And we respectfully

16    submit that that is a correct and proper

17    application of contract law under the law

18    of Alabama.  Any document drafted is to be

19    construed against the maker and liberally

20    in favor of the other party to the

21    agreement, the nonmaker of the document.

22    UCC law, that's insurance contract law,

23    that's contract law.  This was taken from

24    a pattern jury instruction that involved

25    how you're supposed to interpret an

1  insurance contract.  And it's the same
2  application, but that's also the general
3  application of law.  And it also, the
4  pattern jury instruction says that it's to
5  be construed strictly against the
6  plaintiff, which is undisputedly the maker
7  of this document, and liberally in favor
8  of defendant Sunshine, which is not the
9  maker, drafter, creator, writer, author of
10  this document.  And that the principles
11  should be -- these principles should be
12  employed in doing so.  And the contract
13  law -- it will be for the jury to decide
14  if it is ambiguous.  But to decide if it's
15  ambiguous they are permitted the
16  flexibility to rely upon it against the
17  maker.  And then they are required by
18  law -- if this was a nonjury case it would
19  be the way you would be required to do it,
20  to review -- if you found ambiguous
21  provisions, it's supposed to be construed
22  most strongly against the maker and in
23  favor of the nonmaker, defendant Sunshine.
24  It's a proper, accurate, true statement of
25  the law, and it's appropriate under these

facts.

THE COURT:  I'm gonna give it so that it reads the language used in the dealer agreement is framed by the plaintiff Regions.  And then I'm going to go down to the third paragraph, ambiguous provisions of a document will be construed most strongly against the maker, drafter and in favor of the defendant Sunshine.

MR. SHIRLEY:  And we respectfully except.  And so the second paragraph is omitted --

THE COURT:  Yes, sir.

MR. SHIRLEY:  -- from your charge?

THE COURT:  All right.  Eleven?

MR. SMITH:  Your Honor, we do object to that.  That is not a pattern charge. That is a charge that's personalized to the facts of this case.  It is confusing as it is written.  It is in effect an affirmative charge from the Court.  I think line and scope is well covered in other charges that the Court has agreed to give, and we believe that it will be improper for the Court to give this charge

1    as it is written.

2        MR. SHIRLEY:  That's a simple

3    application of the law of principal and

4    agency, and it has also been established

5    there's a conflict in the evidence to

6    decide whether it is.  And this charge is

7    saying to them if you find this.  It's not

8    saying they have to find that.  But if you

9    do find this, your verdict must be for

10   Sunshine and against the plaintiff.

11       THE COURT:  I have a problem making

12   that read correctly.  I'm going to deny

13   that charge.  Twelve?

14       MR. SMITH:  Your Honor, we would

15   object to that one on the same grounds as

16   we did on paragraph 11.  We believe it's

17   adequately covered by other charges.  We

18   believe it's confusing as written.  And

19   the other grounds -- it's covered by other

20   charges and the other grounds we assign

21   this to defendant's Sunshine request for

22   charge number 11.

23       THE COURT:  Court's going to deny 12.

24   I'm going to deny 13.  I think that's

25   adequately covered by the charge regarding

1    burden of proof.  I believe 14 (inaudible)

2         (Reporter asked for

3         clarification.)

4    THE COURT:  I believe 14 is

5    adequately covered in other charges.  I'm

6    going to deny it as well.  Okay.  I have

7    drafted a verdict form here that was just

8    taken from your proposal with the

9    inconclusion of punitive damages.  So if

10   y'all will just take a look at that and

11   see.

12   MR. SMITH:  Thank you, Your Honor.

13   Regions is satisfied with that verdict

14   form, Your Honor.

15   MR. SHIRLEY:  Your Honor, we believe

16   first of all that under the way the case

17   has been tried that it is a possibility

18   that the Court could -- the jury could, in

19   fact, find for Jon Williams, against Jon

20   Williams on behalf of the plaintiff, and

21   then find Sunshine Camping to be not

22   responsible or a verdict for defendant

23   Sunshine.  And the second part of this

24   uses the plural term defendants, and it

25   does not distinguish.  And I guess to make

505

1   it accurate it would need to be that

2   broken down.  And I'm not in the habit of

3   giving suggestive verdict forms to the

4   Court when I give my jury charges --

5       THE COURT:  Yeah.

6       MR. SHIRLEY:  -- and that's out of

7   the pattern jury instruction.

8       MR. SMITH:  Maybe, Your Honor, the

9   thing to do is have two verdict forms, one

10  as to the claims against Sunshine and one

11  as to the claims against Williams.

12      THE COURT:  Okay.

13      MR. SMITH:  And Regions would be

14  satisfied if there are two verdict forms

15  like that.

16      THE COURT:  And then when I give the

17  jury its instruction about filling out

18  this form, I will instruct the jury that

19  they may find -- let's see.  Well, let me

20  just ask y'all.  Do you think any other

21  directive instructions need to be given --

22      MR. SMITH:  If --

23      THE COURT:  -- with the two separate

24  verdict forms?

25      MR. SMITH:  I know that I will talk

1    about it in my part of closing, Your

2    Honor, if there are two separate forms,

3    and we're gonna ask them to return a

4    verdict for both of them. So I mean, to

5    the extent that that argument may be

6    explanatory. Now, to answer your question

7    directly, we would request that the Court

8    to say if you find in favor of Regions

9    against Sunshine write it here, write

10   whichever you found. If you find in favor

11   of Regions and against Williams here, but

12   you have to fill out both forms.

13            THE COURT: Right. Okay. I will

14   have these identified as to each

15   defendant. In other words, one will say

16   for defendant Sunshine Camping Center and

17   the other for the defendant Jon K.

18   Williams. The name will be mentioned in

19   each verdict form. So it will say: We,

20   the jury, find for the defendant Jon K.

21   Williams and against the plaintiff on one

22   form. On the other form it'll say: We,

23   the jury, find for the defendant Sunshine

24   Camping.

25            MR. SHIRLEY: Against the plaintiff.

1       THE COURT:  Yeah.  And at the top
2    it'll say for the plaintiff against the
3    defendant and --
4       MR. SHIRLEY:  You'll give us a copy
5    to look at that before we make our
6    summation?
7       THE COURT:  I will.  All right.  With
8    the exception of making that correction in
9    the verdict form, then, are we ready to
10    proceed with closing arguments?
11       MR. SMITH:  Regions is, Your Honor.
12       MR. SHIRLEY:  Yes, Your Honor, I do.
13       THE COURT:  It'll be about five
14    minutes probably before.
15            (Break in the proceedings.)
16       MR. SMITH:  We're satisfied.  I think
17    all of us are, Your Honor.
18       MR. SHIRLEY:  We don't have any extra
19    copies of those, do we?
20       THE COURT:  No, but we can sure get
21    them.
22       MR. SHIRLEY:  I'm not -- I don't
23    think -- I'm just trying to -- I'm not
24    objecting to the form, I'm just not as
25    comfortable using that as I am in some

1　　　　　　cases.  You follow what I'm saying?

2　　　　　　　THE COURT:  Uh-huh.

3　　　　　　　MR. SHIRLEY:  And that's the only

4　　　reason I would like to have ... have a

5　　　copy.

6　　　　　　　THE COURT:  If you'll take that in

7　　　there to Ms. Millard and ask her to

8　　　make --

9　　　　　　　MR. SHIRLEY:  I only need the one ...

10　　　　　　　　(The jury entered the

11　　　　　　　　 courtroom.)

12　　　　　　　THE COURT:  Ladies and gentlemen, at

13　　　this time we're prepared to move forward

14　　　with our closing arguments, first for the

15　　　plaintiff.

16　　　　　　　　(Closing arguments by Mr.

17　　　　　　　　 Knight.)

18　　　　　　　　(Closing arguments by Mr.

19　　　　　　　　 Shirley.)

20　　　　　　　　(Closing arguments by Mr.

21　　　　　　　　 Matthews.)

22　　　　　　　THE COURT:  Before we go further just

23　　　let me ask, is there anybody has an urgent

24　　　need to take a break before we go into the

25　　　final closing arguments?  Okay.

1       Mr. Smith.

2               (Closing arguments by Mr.

3           Smith.)

4           THE COURT:  Now, that you've heard

5       all the evidence and the arguments of

6       counsel, it becomes my duty to explain to

7       you the rules of law that you must follow

8       and apply in deciding this case.  When I

9       am finished you will go to the jury room

10      and begin your deliberations.  In deciding

11      the case you must follow and apply all the

12      law as I explain it to you whether you

13      agree with the law or not.  Regardless as

14      to any opinion you may have as to what the

15      law is or ought to be, it would be a

16      violation of your sworn duty to base your

17      verdict upon anything other than the

18      evidence in the case.  Also, you are not

19      to single out one instruction alone as

20      stating the law, but must consider the

21      instructions as a whole.  You must not let

22      your decision be influenced in anyway by

23      either sympathy for or prejudice against

24      anyone.  Both the public and the parties

25      expect that you will carefully and

impartially consider all the evidence
without prejudice or bias or sympathy and
follow the law as stated by the Court to
render a just verdict regardless of the
consequences.  Our system of law does not
permit jurors to be governed by bias,
prejudice, or sympathy, or by public
opinion.

In your deliberation you should
consider only the evidence, that is the
testimony of the witnesses and exhibits
that I have admitted in the record;
however, as you consider the evidence both
direct and circumstantial, you make
deductions and reach conclusions which
reason and common sense lead you to make.
Direct evidence is the testimony of one
who asserts actual knowledge of a fact,
such as an eyewitness.  Circumstantial
evidence is proof of a chain of facts and
circumstances tending to prove or disprove
an ultimate conclusion.

Remember that anything the lawyers
say is not evidence in the case.  The
function of the lawyers is to point to

1  those things most significant or most
2  helpful to their side of the case.  It is
3  your own recollection and interpretation
4  of the evidence that controls.  What the
5  lawyers say is not binding upon you.
6  Also, you should not assume from anything
7  that I may have said or any questions I
8  may have asked that I have any opinion
9  concerning any of the issues before you in
10  this case.  Except for my instructions to
11  you on the law you should disregard
12  anything I may have said during the trial
13  in arriving at your decision concerning
14  the facts.
15      Now, in saying that you must consider
16  all of the evidence, I do not mean that
17  you must accept all the evidence as true
18  or accurate.  You should decide whether
19  you believe what each witness had to say
20  and how important the testimony was.  In
21  making that decision you may believe or
22  disbelieve any witness in whole or in
23  part.  Also, the number of witnesses
24  testifying concerning any particular
25  dispute is not necessarily controlling.

You may decide that the testimony of a
smaller number of witnesses concerning any
fact in dispute is more believable than
the testimony of a larger number of
witnesses to the contrary.

In deciding whether you believe or do
not believe any witness, I suggest that
you ask yourself a few questions.  Did the
person impress you as one who was telling
the truth; did the witness have any
particular reason not to tell the truth;
did the witness have a personal interest
in the outcome of the case; did the
witness seem to have a good memory; did
the witness have the opportunity and
ability to observe accurately the things
he or she testified about; did the witness
appear to understand the questions clearly
and answer them directly; did the
witnesses' testimony differ from other
testimony or other evidence.

You should also ask yourself whether
there was evidence tending to prove that
the witness testified falsely concerning
some important fact or whether there was

1          evidence that at some other time the
2          witness said or did something or failed to
3          say or do something which was different
4          from the testimony he or she gave before
5          you during the trial.  You should keep in
6          mind of course that a simple mistake by a
7          witness does not necessarily mean that the
8          witness was not telling the truth as he or
9          she remembers it because people naturally
10         tend to forget some things or remember
11         other things inaccurately.  So if a
12         witness has made a misstatement, you need
13         to consider whether that misstatement was
14         simply an innocent lapse of memory or an
15         intentional falsehood.  And the
16         significance of that may depend on whether
17         it has to do with an important fact or
18         with only an unimportant detail.
19              Now, this is a civil case.  It's not
20         a criminal case.  Some of you may know
21         that in a criminal case the burden of
22         proof is beyond a reasonable doubt.  This
23         is not the burden of proof in this case
24         because as I said, this is a civil case.
25         The burden is upon the plaintiff, in this

1    case Regions, to reasonably satisfy you by

2    the evidence of the truthfulness of the

3    matters and things claimed before the

4    plaintiff would be entitled to recover.

5        In deciding whether any fact has been

6    proved to your reasonable satisfaction,

7    you may consider the testimony of all of

8    the witnesses regardless of who may have

9    called them and all the exhibits received

10   in evidence regardless of who may have

11   produced them.  If the proof fails to

12   establish any essential part of that which

13   is sought to be proved to your reasonable

14   satisfaction, then you should find against

15   the party having the burden of proof.

16       At this time I'm going to give you

17   specific instructions regarding to the

18   legal matters involved in the case.  When

19   an agent is engaged to perform a certain

20   service, whatever he does to that end or

21   in furtherance of the employment is deemed

22   to be an act done within the scope of the

23   employment.  An employer is liable to

24   others for the negligent acts or omissions

25   of his agent done within the scope of his

1    employment and within the line of his
2    duties.  Apparent authority for which a
3    principal is responsible to a third party
4    for the act of his agent is that authority
5    which arises when the principal by his
6    acts, omissions, words or conduct
7    reasonably interpreted causes such third
8    party to believe that authority has been
9    given to an agent to act in his behalf and
10   such authority cannot be established
11   solely by the acts of the agent.
12        The plaintiff in this action sues the
13   defendant for breach of contract.  The
14   elements of an action for breach of
15   contract are, one, existence of a contract
16   between plaintiff and defendant; two,
17   performance by the plaintiff; three,
18   defendant's failure to perform; and four,
19   resulting damage to the plaintiff.
20   Negligence means the failure to exercise
21   reasonable care.  That is such care as a
22   reasonably prudent person would have
23   exercised under the same or similar
24   circumstances; therefore, negligence is
25   the failure to do what a reasonably

```
1        prudent person would have done under the
2        same or similar circumstances, or the
3        doing of something which a reasonably
4        prudent person would not have done under
5        the same or similar circumstances.
6            Wantonness is the conscious doing of
7        some act or omission of some duty under
8        knowledge of existing conditions and
9        conscious that from doing -- from the
10       doing of such act or omission of such duty
11       an injury will likely or probably result.
12       Before a party can be said to be guilty of
13       wanton conduct it must be shown that with
14       reckless indifference to the consequences
15       he either consciously and intentionally
16       did some wrongful act or consciously
17       omitted some known duty which produced the
18       injury.
19           When an agent commits wantonness
20       within the line and scope of his
21       employment, his employer is also liable
22       for such wantonness regardless of the
23       employer's lack of actual participation in
24       such wantonness with his agent.
25           Ladies and gentlemen of the jury, the
```

1      plaintiff in this case is claiming damages

2      from the defendants for an alleged legal

3      fraud practiced upon it by the defendants.

4      The fraud charged in the plaintiff's

5      complaint is that the defendants

6      misrepresented, one, that the Hubert

7      Lawson, Robert McAllister, and Dorothy

8      Peters contracts were genuine and

9      enforceable; two, that the defendants had

10      with regard to the Lawson, McAllister, and

11      Peters contracts fulfilled all obligations

12      and taken all actions required of them

13      under the terms of the dealer agreement;

14      three, that the defendants had sold the

15      items described to the buyers described in

16      the Lawson, McAllister, and Peters

17      contracts, and had provided plaintiff with

18      a valid, enforceable security interest in

19      the items allegedly sold; four, that at

20      the time the defendants entered into the

21      terms of the recreational vehicle dealer

22      agreement the defendants would fulfill the

23      obligations required of them under the

24      recreational vehicle dealer agreement.

25         In addition the fraud charged in the

1  complaint is that the defendant
2  suppressed, one, that the Lawson,
3  McAllister and Peters contracts separately
4  and severally were forged and were
5  otherwise fraudulent; two, that the
6  defendants had not with regard to the
7  Lawson, McAllister and Peters contracts
8  fulfilled the duties and obligations
9  required of them under the terms of the
10  recreational vehicle dealer agreement.
11  The defendants for answer to the complaint
12  say they are not guilty of the charge
13  contained therein.
14      If you are reasonably satisfied from
15  the evidence that the defendants willfully
16  misrepresented a material fact to the
17  plaintiff with the intent to induce
18  plaintiff to act thereon and plaintiff did
19  without knowledge of its falsity act upon
20  said willfulness representation to his
21  injury, then the defendants are guilty of
22  legal fraud.  If you are reasonably
23  satisfied from the evidence that the
24  defendants misrepresented a material fact
25  recklessly without knowledge of the truth

1    or falsity thereof and with the intent to
2    induce plaintiff to act and that plaintiff
3    acted upon said reckless misrepresentation
4    to his injury, then the defendants are
5    guilty of legal fraud.  If you are
6    reasonably satisfied from the evidence
7    that the defendants innocently or by
8    mistake misrepresented a material fact to
9    the plaintiff thereby inducing action by
10   the plaintiff to his injury, then the
11   defendant would be guilt of legal fraud.
12   If you are reasonably satisfied from the
13   evidence that the defendants concealed
14   material facts from the plaintiff and
15   without his knowledge of such material
16   facts he acted to his injury, then the
17   defendant would be guilty of legal fraud.
18       A conversion is the appropriation --
19   one, the appropriation of the personal
20   property of one person by another to its
21   own use and benefit; or, two, by
22   destruction of one's personal property by
23   another; or, three, the exercise of
24   dominion by another over personal property
25   to the exclusion or in defiance of the

1          owner's right; or, four, withholding the

2          possession of personal property from the

3          owner by another under a claim of title

4          inconsistent with the owner's title.

5              The measure of damages for the

6          conversion of personal property is the

7          value of the property as of the date of

8          the conversion or the value of the

9          property at any time between the date of

10         the conversion of the trial, whichever is

11         greater, with interest at the rate of

12         6 percent per anum from the date of

13         conversion.

14             If you are reasonably satisfied from

15         the evidence that the defendants committed

16         conduct which would amount to a felony,

17         the defendant would be guilty of a civil

18         felony.  Alabama Code Section 13-8-3,

19         theft of property in the first degree,

20         provides:  A, the theft of property which

21         exceeds $2,500 in value or property of any

22         value taken from the person of another

23         constitutes theft of property in the first

24         degree.  Theft of property in the first

25         degree is a Class B felony.  Alabama Code

1        Section 13A-8-192, identity theft,

2        provides:  A, a person commits the crime

3        of identity theft if without the

4        authorization, consent, or permission of

5        the victim, and with the intent to defraud

6        for his or her own benefit or the benefit

7        of a third person, he or she does any of

8        the following.  One, obtains records or

9        accesses identifying information that

10       would assist in accessing financial

11       resources, obtaining identification

12       documents, or obtaining benefits of the

13       victim; two, obtains goods or services

14       through the use of identifying information

15       of the victim; three, attains

16       identification documents in the victim's

17       name.

18            Identity theft in which there is a

19       financial loss of greater than $500 or the

20       defendant has previously been convicted of

21       identity theft constitutes theft in the

22       first degree.  Identity theft in the first

23       degree is a Class C felony.

24            Alabama Code Section 13A-9-3, forgery

25       in the second degree, provides:  A, a

 1    person commits the crime of forgery in the
 2    second degree if with intent to defraud he
 3    falsely makes, completes or alters a
 4    written instrument which is or purports to
 5    be or which is calculated to become or to
 6    represent if completed:  One, a deed,
 7    will, codicil, contract, assignment, or a
 8    check, draft, note, or other commercial
 9    instrument which does or may evidence,
10    create, transfer, terminate, or otherwise
11    affect a legal right, interest,
12    obligation, or status; or, two, a public
13    record or an instrument filed or required
14    or authorized by law to be filed in a
15    public office or with a public employee;
16    or, three, a written instrument officially
17    issued or created by public office, public
18    employees, or government agency.
19        B, forgery in the second degree is a
20    Class C felony.  Alabama Code 13A-9-6,
21    criminal possession of forged instrument
22    in the second degree provides:  A, a
23    person commits the crime of criminal
24    possession of a forged instrument in the
25    second degree if he possesses or utters

1    any forged instrument of a kind specified

2    in Section 13A-9-3 with knowledge that it

3    is forged and with intent to defraud; B,

4    criminal possession of a forged instrument

5    in the second degree is a Class C felony.

6        In the employer and employee

7    relationship the employer is held

8    responsible for his employee's

9    incompetence when notice or knowledge,

10   either actual or presumed, of such

11   unfitness has been brought to him.

12   Liability depends upon its being

13   established by substantial evidence by the

14   plaintiff with affirmative proof that such

15   incompetence was actually known by the

16   employer or that had he exercised due and

17   proper diligence he would have learned

18   that which would charge him in the law

19   with such knowledge.

20       Ladies and gentlemen of the jury, the

21   Court will now instruct you on the law of

22   damages.  The burden is on the plaintiff,

23   Regions Bank, to reasonably satisfy you

24   from the evidence of the truthfulness of

25   its claims.  If after consideration of all

1       the evidence in this case you are not
2       reasonably satisfied of the truthfulness
3       of the plaintiff's claims, your verdict
4       should be for the defendants.  In this
5       event you would go no further.  This would
6       end your deliberations.
7           On the other hand, if after a
8       consideration of all the evidence in this
9       case you are reasonably satisfied of the
10      truthfulness of the plaintiff's claims,
11      your verdict should be for the plaintiff,
12      Regions Bank.  In this event it will be
13      necessary for you to arrive at an amount
14      to be awarded in the verdict form which I
15      will read to you and describe later in my
16      charge.
17          I now give you the following rules of
18      law to assist you in your deliberations in
19      arriving at an amount in the event you
20      find for the plaintiff.  Compensatory or
21      actual damages are allowed and should be
22      awarded where the plaintiff reasonably
23      satisfies the jury from the evidence that
24      plaintiff has been injured or damaged as a
25      proximate result of a legally wrongful act

1    on the part of the defendants.  Punitive
2    or exemplary damages are allowed to the
3    plaintiff and may be awarded in the sound
4    discretion of the jury in cases where the
5    plaintiff proves by clear and convincing
6    evidence that the defendant consciously or
7    deliberately engaged in oppression, fraud,
8    wantonness, or malice with regard to the
9    plaintiff.
10       The purpose of awarding compensatory
11    damages is to fairly and reasonably
12    compensate the injured party for the loss
13    or injuries sustained.  Compensatory
14    damages are intended as money compensation
15    to the party wronged to compensate him for
16    his injury and other damages which have
17    been inflicted upon him as a proximate
18    result of the wrong complained of.
19       The purpose of awarding punitive or
20    exemplary damages is to allow money
21    recovery to the plaintiff by way of
22    punishment to the defendants and for the
23    added purpose of protecting the public by
24    deterring the defendants and others from
25    doing such wrong in the future.  The

1    imposition of punitive damages is entirely
2    discretionary with the jury.  Should you
3    award punitive damages, in fixing the
4    amount you must take into consideration
5    the character and degree of the wrong as
6    shown by the evidence in the case and the
7    necessity of preventing similar wrongs.
8    For a plaintiff to be entitled to recover
9    punitive damages the plaintiff must prove
10   by clear and convincing evidence that the
11   defendant consciously or deliberately
12   engaged in oppression, fraud, wantonness,
13   or malice with regard to the plaintiff.
14   Clear and convincing evidence means that
15   when weighed against evidence in
16   opposition will produce in the mind of the
17   trier of fact a firm conviction as to each
18   essential element of the claim and a high
19   probabilty of the correctness of the
20   conclusion.  Oppression means subjecting a
21   person to cruel and unjust hardship in
22   conscious disregard of that person's
23   rights.  Fraud means an intentional
24   misrepresentation, deceit, or concealment,
25   or a material fact or of a material fact

the concealing party had a duty to disclose which was gross, oppressive, or malicious, and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury. Wantonness means conduct which is carried on with a reckless or conscious disregard for the rights or safety of others. Malice means the intentional doing of a wrongful act without just cause or excuse either, A, with intent to injure the person or property of another person or entity, or under such circumstances that the law will apply an evil intent.

Regions Bank claims that it is entitled to its attorney fees, cost and other litigation expenses it incurred in pursuing this action against the defendants. Attorneys fees, costs, and other expenses of litigation may only be recovered when authorized by statute, when provided in a contract, or in an equitable proceeding where the efforts of an

1    attorney creates a fund out of which fees

2    may be paid.

3         Regions Bank alleges that the

4    recreational vehicle dealer agreement and

5    retail installment contract and security

6    agreements, which it claims to be

7    contracts between the parties, authorizes

8    it to recover its attorneys fees, cost,

9    and other litigation expenses in the event

10   that your verdict is against the

11   defendants.  If you find that the

12   recreational vehicle dealer agreement

13   and/or retail installment contract and

14   security agreement is a contract between

15   the parties, and that the defendants

16   breached the contract, you may award

17   Regions Bank the amounts of its attorneys

18   fees and other litigation cost and

19   expenses if you find that attorneys fees,

20   costs, and other litigation expenses are

21   authorized by both or either of the

22   contracts.

23        The duty owed by defendant Sunshine

24   to Regions assignor Union Planters was to

25   exercise reasonable care not to injure or

1    damage it; that is, to exercise such care

2    as a reasonably prudent person would have

3    exercised under the same or similar

4    circumstances.  In awarding damages in any

5    case your verdict must not be based on

6    mere speculation or conjecture but must be

7    based upon the evidence and the just and

8    reasonable inferences shown thereby.

9         You will be the sole and exclusive

10    judges of the facts.  It will be your duty

11    to attempt to reconcile the testimony of

12    all the witnesses so as to make them all

13    speak the truth if this can be done

14    reasonably.  If you cannot reasonably

15    reconcile all of the testimony, it is then

16    your duty to consider the testimony with

17    the view of determining what the true

18    facts are.  In so doing you may accept or

19    reject any part of the testimony of any

20    witness and accept only the testimony you

21    consider worthy of belief.

22         In determining what the true facts

23    are from the evidence you may take into

24    consideration any natural interest or bias

25    a witness may have as a result of any

1    connection with the case.  You may take
2    into consideration the interest or bias a
3    witness may have -- may have shown while
4    testifying.  You may take into
5    consideration the demeanor of any witness
6    as to whether the witness has apparently
7    testified frankly or evasively.  You may
8    take into consideration any matter which
9    you would in your everyday affairs in
10   passing upon the truthfulness and accuracy
11   of the testimony.  Weigh the testimony in
12   the light of your common observation and
13   experience and reach a verdict that will
14   be based upon the truth as you determine
15   it from all of the evidence.
16       The burden is upon the plaintiff,
17   Regions, to reasonably satisfy you by the
18   evidence of the truthfulness of the
19   matters and things claimed by them before
20   they would be entitled to recover.  You
21   are the sole judges of the evidence and of
22   the credibility of the witnesses.  You may
23   accept or reject any part of the testimony
24   of any witness, and you should accept only
25   the testimony you consider worthy of

 1      belief.  In determining the weight to be
 2      accorded the testimony of any witness you
 3      may consider the demeanor of the witness
 4      while on the witness stand, his apparent
 5      candor or evasion or the existence or
 6      nonexistence of any bias or interest.
 7          The language used in the dealer
 8      agreement is framed by the plaintiff,
 9      Regions.  Ambiguous provisions of a
10      document will be construed most strongly
11      against the maker/drafter and in favor of
12      the defendant Sunshine.
13          It is your duty as jurors to discuss
14      the case with one another in an effort to
15      reach an agreement if you can do so.  Each
16      of you must decide the case for yourself
17      but only after full consideration of the
18      evidence with the other members of the
19      jury.  While you are discussing the case
20      do not hesitate to reexamine your own
21      opinion and change your mind if you become
22      convinced that you were wrong, but do not
23      give up your honest beliefs solely because
24      the others think differently or merely to
25      get the case over with.  Remember that in

1    a very real way you are the judges, judges

2    of the facts.  Your only interest is to

3    seek the truth from the evidence in the

4    case.

5    When you go to the jury room you

6    should first select one of your members to

7    act as your foreperson.  The foreperson

8    will preside over your deliberations and

9    will speak for you here in court.

10    For your convenience the Court has

11    prepared for your use in this case forms

12    of verdict which will be explained to you.

13    No inferences are to be drawn by you from

14    the fact the Court has supplied you with

15    these forms or from the order in which the

16    Court reads them to you.  When you have

17    reached a verdict you will select and

18    complete the form which corresponds to

19    your verdict and which is to be signed by

20    your foreperson.  All 12 of you must agree

21    on any verdict which you return to court.

22    Now, there are two verdict forms and

23    you must fill out each of the two forms.

24    The first form -- and they're not

25    numbered, I'm just going to read these to

1      you in this random order -- is verdict
2      form, and it says defendant Sunshine
3      Camping Center, Inc.  So this will be your
4      verdict with regard to the defendant
5      Sunshine Camping Center, Inc.  The top
6      part of this form reads:  If after a full
7      and fair consideration of all the evidence
8      you find for the plaintiff, then you
9      should use the following verdict form:
10     We, the jury, find for the plaintiff and
11     against the defendant Sunshine Camping
12     Center, Inc., and assess the plaintiff's
13     damages as follows.  Then there's a place
14     for you to write in the amount of
15     compensatory damages and a place for you
16     to write in the amount of punitive damages
17     if you find punitive damages.  You'll need
18     to write out the amount in handwritten
19     form and then numerical form so there will
20     be no misunderstanding about what that
21     amount is.  If you do not find that the
22     plaintiff is entitled to punitive damages,
23     then of course you would not award
24     punitive damages.  But if you do find that
25     the plaintiff is entitled to punitive

1    damages, you must have also found that the
2    plaintiff was entitled to compensatory
3    damages.  In other words, you can't award
4    punitive damages without awarding
5    compensatory damages.
6         The bottom part of that form reads in
7    this way:  If after a full and fair
8    consideration of all the evidence you find
9    for the defendant Sunshine Camping Center,
10   Incorporated, then you should use the
11   following verdict form:  We, the jury,
12   find for the defendant Sunshine Camping
13   Center, Incorporated and against the
14   plaintiff, and then the foreperson would
15   sign below that section.
16        On the other verdict form it is
17   exactly the same with the exception that
18   it is for the defendant Jon K. Williams.
19   It reads:  If after a full and fair
20   consideration of all the evidence you find
21   for the plaintiff, then you should use the
22   following verdict form:  We, the jury,
23   find for the plaintiff and against the
24   defendant Jon K. Williams and assess the
25   plaintiff's damages as follows.  Again

1  there's a place for you to enter

2  compensatory and punitive damages if you

3  find that the plaintiff is entitled.  On

4  the bottom of the form, If after a full

5  and fair consideration of all the evidence

6  you find for the defendant Jon K.

7  Williams, then you should use the

8  following verdict form:  We, the jury,

9  find for the defendant Jon K. Williams and

10  against the plaintiff and the foreperson

11  would sign that verdict.

12      At this time I'm going to allow you

13  to go back to the jury room that you've

14  been using.  You are not officially

15  retired and you should not begin your

16  deliberations until the bailiff brings

17  back to you the exhibits that have been

18  entered in the case and the verdict forms.

19  That will be your signal that you can

20  begin your deliberations.  In the meantime

21  perhaps you can go back and take a little

22  break and relax for just a few minutes

23  until we can get that to you.  With that

24  I'll excuse the jurors to go back to the

25  jury room.

536

1          (The jury left the courtroom.)

2          THE COURT:  Okay.  The Court will

3     hear any matters that need to be brought

4     before it at this time.

5          MR. SMITH:  Your Honor, we are

6     satisfied with the Court's charge with one

7     exception.  We had requested pattern jury

8     charge 28.08, which was our charge number

9     six, regarding joint and several

10    liability.  And in the charge conference

11    the Court indicated that it would not give

12    that charge.  We respectfully except to

13    that ruling as we believe given the facts

14    of this case that it is a proper charge;

15    otherwise, we're satisfied.

16         THE COURT:  All right.  Thank you.

17    Mr. Shirley?

18         MR. SHIRLEY:  Yes, sir.  We have no

19    further objection.  We reincorporate in

20    the jury charge conference our grounds for

21    objection as the basis for the lack of

22    instruction and charges that we went

23    through in the charge conference.

24         THE COURT:  All right.

25         MR. SHIRLEY:  Adopt that, incorporate

537

1         it, refile it with this motion.
2             THE COURT:  At this time let's
3         address this juror issue.  You'll see it's
4         four o'clock.  And I would suggest to you
5         that there would be a substantial risk
6         that a verdict might not be reached this
7         evening.  And this juror, Deborah Griffin,
8         has provided the Court with a doctor's
9         excuse saying -- let's see:  The above
10        lady is the wife of my patient Barney
11        Griffin who is scheduled for neck disc
12        fusion surgery on May the 4, 2006.  She
13        should be excused from jury duty to help
14        care for her husband.
15            MR. SMITH:  Your Honor, Regions would
16        say that we have no objection to juror
17        Griffin being dismissed and being replaced
18        with juror Skeen, number 163, who was the
19        alternate and who was Regions' last strike
20        in this case.
21            THE COURT:  Is there any objection to
22        the Court taking of that action?
23            MR. SHIRLEY:  No, sir.  Sunshine
24        Camping has no objection.
25            MR. MATTHEWS:  No objection.

1          THE COURT:  I will do that, then.

2    And I would like all the parties to see

3    the court reporter and review your

4    exhibits and just make a statement on the

5    record that all your exhibits are there

6    and accounted for before we send them back

7    to the jury room.

8          MR. SHIRLEY:  I'm satisfied, too.  I

9    always feel uneasy when I take them up

10   there to argue that that's an opportunity

11   for something to get lost.

12         MR. SMITH:  I'm satisfied that both

13   of the ones offered by plaintiff and

14   offered by defendant Sunshine are present.

15         THE COURT:  Ms. Griffin, right here.

16   How are you doing this afternoon?

17         MS. GRIFFIN:  I'm fine.

18         THE COURT:  You're Barney's wife?

19         MS. GRIFFIN:  Yes.

20         THE COURT:  Okay.  I got your excuse

21   here from the doctor --

22         MS. GRIFFIN:  Right.

23         THE COURT:  -- saying that you need

24   to be available for his surgery tomorrow.

25         MS. GRIFFIN:  In the morning at

1    6 o'clock.

2        THE COURT:  Okay.  Well, since it's

3    four o'clock and y'all haven't started

4    deliberating yet and we do have an

5    alternate juror which we use just for this

6    very purpose, I'm going to excuse you at

7    this time.

8            (Juror Griffin was excused.)

9            (Jury received the evidence at

10            4:05.)

11           (The following was heard May 4,

12            2006.)

13       THE COURT:  Mr. Shirley, if you want

14   to make reference to this document, you

15   can do so.

16       MR. SMITH:  If you want to offer

17   it -- both of us can offer it.

18       THE COURT:  I'm going to file it.

19   I'm going to --

20       MR. SMITH:  You'll make it -- okay.

21       THE COURT:  -- file it in the file.

22       MR. SMITH:  As long as it makes it in

23   the Court's record, Your Honor.

24       MR. SHIRLEY:  It can be a Court

25   exhibit.

1    MR. SMITH:  Yeah, Court's exhibit, I

2    think that'd be appropriate.

3    MR. SHIRLEY:  On behalf of Sunshine

4    we have been presented a question.  We

5    object to the Court answering the

6    question.  The question asks for matters

7    that have already been charged to the

8    jury.  Any response from the Court to the

9    jury, we find objectionable.  We find it

10    objectionable because it would be an

11    invasion of the Court and an apparent

12    suggestion to the jury that the Court is

13    directing them what to do.  The verdict

14    form to be entered, the Court spent time

15    telling them what they were supposed to

16    do.  They have a document in there that

17    allows for a resolution of the verdict

18    that is consistent with this question, if

19    that's what they want to do.  If you were

20    to answer affirmatively or negatively this

21    question that has been asked without a

22    full-blown presentation explanation of the

23    law and how they are to apply the facts to

24    the law, like you spent better than an

25    hour doing yesterday, it would unduly

1    suggest to them that the Court is

2    directing them to enter a verdict of this

3    nature.

4        In all due respect to the Court I

5    know that would not be the Court's intent

6    to make any kind of suggestion, but their

7    deliberations and their question here,

8    they have some commentaries at the bottom

9    that aren't supposed to be answered

10   either.  They're just making commentaries.

11   The asterisk at the bottom, the purpose or

12   intent of what they're trying to

13   accomplish.

14       And the point that I'm further making

15   to the Court is you charged them on that.

16   And although the suggestion might be that

17   this is what the jury wants to know, the

18   truth of the matter is nobody can rule out

19   that it isn't something that just one or

20   two of the jurors want to know.  And if,

21   in fact, that's what happens, we

22   respectfully submit that it would be

23   giving undue emphasis to the position as

24   the questions are indicated adverse to

25   Sunshine when they've already been told

1    all this.  And Sunshine believes that the
2    best thing to do would be for the Court to
3    advise them that -- the best thing in my
4    judgment would be for the Court to advise
5    the jury that the Court believes that the
6    instructions into that question are in the
7    record and that at this juncture there
8    will be no response affirmative or
9    negatively.
10        THE COURT:  Let me say something here
11    before you make your argument, Mr. Smith.
12    I think Mr. Shirley has a point in
13    reconsidering this about the verdict
14    forms.  I believe that if the Court simply
15    states to the jury that a review of the
16    verdict forms themselves should answer
17    this question for them, because the
18    verdict forms say if you're reasonably
19    satisfied from the evidence that the
20    plaintiff is entitled to a verdict against
21    Sunshine, then you would render the
22    following verdict.
23        Before I give them any other
24    instructions other than that, I think it
25    might be the best thing for the Court just

1      to ask them to review the verdict forms,

2      which would actually speak for themselves.

3          MR. SMITH:  Your Honor --

4          THE COURT:  What do you think about

5      that?

6          MR. SMITH:  Your Honor, we would say

7      first that we think given the context of

8      the question -- and the Court has

9      indicated that it will make this note page

10     with this question or questions --

11     actually they're two are written -- on a

12     Court's exhibit to the record.  We think

13     under the context of the question as

14     expressed with our intent at the bottom

15     and it goes on that the Court can answer

16     that question without unduly prejudicing

17     the defendant or without giving a charge

18     that says you must find.  I think the

19     Court can instruct that under the verdict

20     forms you can find for either or both or

21     neither.  It's up to you to make that

22     determination and the verdict forms

23     explain that.

24          So we believe, Your Honor, that it

25     would be appropriate for the Court to

544

1    answer that question.  The Court can

2    answer it in a neutral manner that does

3    not suggest an answer one way or -- excuse

4    me.  The Court can charge or answer the

5    question in a neutral manner that does not

6    indicate any direction by the Court as to

7    how the jury should find, but that should

8    the jury find in a certain way, they may

9    do the things that they have asked about

10   in the question.

11        THE COURT:  Okay.

12        MR. MATTHEWS:  Judge, this may be

13   simplistic but I think the proper thing to

14   tell the jury is that they're the jury and

15   they can do whatever they want to in the

16   parameters of what you instructed them.

17   And that would -- that's a simplistic way

18   to deal with it.  But basically you're

19   telling them, yes, they can do that or

20   they can do something else.

21        MR. SHIRLEY:  And that's our point on

22   behalf of Sunshine, Your Honor.

23        MR. MATTHEWS:  I think that's the

24   fair way to do it, Judge, is say you're

25   the jury, you can do whatever you want to

1    do either way and your -- and you've got
2    forms back there to take care of it.  I've
3    had this come up before in another case,
4    same exact.
5          THE COURT:  Okay.  If you will, let's
6    just bring the -- well, I'll tell you
7    what.
8          MR. SMITH:  Can we --
9          MR. MATTHEWS:  You can go back there,
10   Judge.
11         MR. SMITH:  You can go back there,
12   Judge.  I think you can.
13         MR. SHIRLEY:  If you --
14         THE COURT:  With the court reporter?
15         MR. SMITH:  Sure, sure.
16         MR. SHIRLEY:  That'd be fine.
17         MR. SMITH:  I think that'd be fine.
18         MR. SHIRLEY:  We don't have any
19   objection, with this reservation.  I
20   guess -- do we know what you're gonna say?
21         THE COURT:  Well, I'll let y'all
22   stand right there in the hall and listen
23   to it.
24              (The following was heard in the
25                  jury room with the attorneys

1                    present.)

2           THE COURT:  Okay.  Y'all may be

3      seated if you want to.  You might want to

4      stand up.  You might be tired of sitting

5      down, I don't know.  Okay.  I have

6      received your questions and I have

7      reviewed them.  The first question:  Can

8      we award compensatory damages against

9      Sunshine Camping, Inc., in addition to can

10     we award compensatory and punitive damages

11     versus Sunshine Camping Center defendants

12     Jon K. Williams.

13          You have the verdict forms here that

14     I have reviewed with you.  And the verdict

15     form states that if after a full and fair

16     consideration of all the evidence you find

17     for the plaintiff, which is Regions Bank,

18     then you should use the following verdict

19     form.  Then the verdict form provides:

20     We, the jury, find for the plaintiff and

21     against the defendant Sunshine Camping

22     Center, Inc. and assess plaintiff's

23     damages as follows.  And then there's a

24     place for you to fill in compensatory

25     damage and punitive damages.

1        Now, my instruction to you regarding

2   that was that you cannot award punitive

3   damages without awarding compensatory

4   damages.  You can based upon your findings

5   as to whether or not punitive damages

6   should be awarded, award compensatory

7   damages and not punitive damages, but you

8   can't do the reverse.

9        And then the same is true with regard

10  to Jon Williams.  The verdict form reads

11  the same.  If after a full and fair

12  consideration of all the evidence you find

13  for the plaintiff against Jon K. Williams,

14  then you should use the following verdict

15  form:  We, the jury, find for the

16  plaintiff against the defendant Jon K.

17  Williams and assess the plaintiff's

18  damages as follows.  And then you would

19  determine what damages you're going to

20  assess against defendant Jon K. Williams.

21  And the same explanation, a place there.

22  You can't award punitive without awarding

23  compensatory.  You can award compensatory

24  without awarding punitive if that is your

25  decision and your finding.

1        And of course you can also if you
2    find that that the defendant -- if you
3    find after consideration -- full and fair
4    consideration of all the evidence you find
5    for the defendant Jon K. Williams, then
6    you should use the following verdict form:
7    We, the jury, find for the defendant Jon
8    K. Williams.  The same would be true with
9    regard to Sunshine Camping Center.  If
10   after a full and fair consideration of all
11   the evidence you find for the defendant
12   Sunshine Camping Center, Inc., then you
13   should use the following verdict form:
14   We, the jury, find for the defendant
15   Sunshine Camping Center, Inc., against the
16   plaintiff.
17       I hope that adequately answers your
18   question.  I believe that's, you know, the
19   fairest answer that I can give you in
20   fairness to all the parties' concerns.  So
21   I'm gonna ask you to continue your
22   deliberation, reviewing the verdict forms
23   if you need to.  And I believe they're
24   really self-explanatory as far as the
25   questions that you've asked the Court

1       about.

2          MS. COLLIER:  One more question?

3          THE COURT:  Well --

4          MS. COLLIER:  So either --

5          THE COURT:  Go ahead and ask your

6       question.

7          MS. COLLIER:  -- or, not both?

8          THE COURT:  Yes, you can award the

9       damages against both defendants if that's

10      your finding.

11         MS. COLLIER:  Okay.  Thank you.

12            (The following was heard in open

13             court.)

14            (The jury entered the

15             courtroom.)

16         THE COURT:  Madam foreperson, has the

17      jury reached a verdict?

18         MS. COLLIER:  We have, Your Honor.

19         THE COURT:  I'm gonna ask you, if you

20      will, just to fold it in half and give it

21      to the bailiff there and let him bring it

22      to me, please.  Okay.  Now, we only have

23      one verdict form here.  We're gonna need

24      the other verdict form as well.  Have you

25      reached a verdict with regard to the

1       defendant Jon Williams?

2           MS. COLLIER:  We did.  All of our

3       judgment will be on that piece of paper.

4       Do I need to sign the second one?

5           THE COURT:  Yes, ma'am.  I'm going to

6       excuse y'all to go back into the jury

7       room.  There has to be a verdict for each

8       defendant.

9           MS. COLLIER:  There does?  Okay.

10          THE COURT:  And so I'm going to

11      excuse y'all at this time to go back to

12      the jury room, and I'm going to give you

13      this verdict form as well.

14              (The jury left the courtroom.)

15              (Break in the proceedings.)

16              (The jury entered the

17              courtroom.)

18          THE COURT:  Okay.  Madam foreperson,

19      if you would give the bailiff there your

20      verdicts.  Okay.  I'll now read the

21      verdicts that have been handed to me.

22      First the verdict form Defendant Sunshine

23      Camping Center, Incorporated.  We, the

24      jury, find for the plaintiff and against

25      the defendant Sunshine Camping Center,

1     Incorporated and assess the plaintiff's

2     damages as follows:  Compensatory

3     $143,000.79; punitive damages, nothing is

4     entered there.  Signed by the foreperson

5     Tammy Parker Collier.

6          On the verdict form for defendant Jon

7     K. Williams:  We, the jury, find for the

8     plaintiff and against the defendant Jon K.

9     Williams and assess the plaintiff's

10    damages as follows:  $96,894.32; punitive,

11    no entry made there.  Signed by Tammy

12    Parker Collier.  Ms. Collier, is this --

13    are these verdicts the verdicts of the

14    jury?

15         MS. COLLIER:  Yes, Your Honor.

16         THE COURT:  Okay.  At this time I

17    would like to express the Court's thanks

18    and appreciation for your service this

19    week.  I know it's been a long week.  For

20    jurors to have to serve, you know,

21    three-and-a-half days, that's a pretty

22    long term of service here in Dale County.

23    Most cases don't last quite that long, so

24    I know it's been perhaps an inconvenience

25    and a sacrifice for all of you to be away

```
 1              from your homes, your families, and your
 2              work for this period of time.  But it is a
 3              tremendous service that you have given
 4              Dale County and the citizens of this
 5              community in rendering this service as
 6              jurors in this case.
 7                   Ms. Bludsworth will have a check, a
 8              small token of the State's appreciation
 9              for your service.  She'll be getting that
10              out in the mail to you probably tomorrow.
11              So with that I will excuse you at this
12              time to go about your business.  Thank you
13              so much.
14                        (Jury dismissed.)
15                   THE COURT:  With that I will have the
16              file in my office here.  The verdict forms
17              will be available for y'all to make a copy
18              of and to get anything else out of the
19              file that you might want at this time.
20              And are there any other matters need to be
21              brought before the Court at this time?
22                   MR. SMITH:  Regions has nothing
23              further, Your Honor.
24                   THE COURT:  Thank y'all.
25                        (End of Proceedings.)
```

<u>REPORTER'S CERTIFICATE</u>

STATE OF ALABAMA

DALE COUNTY

I, Stephanie H. German, Court Reporter and Notary Public, State at Large, do hereby certify that the foregoing transcript is a true and correct reproduction of my machine shorthand notes taken on said occasion.

WITNESS my hand this the 24th day of July, 2006.

_____

STEPHANIE H. GERMAN - COURT REPORTER